UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

v. 20 Cr. 677 (AT)

CHOLO ABDI ABDULLAH,

Trial

Defendant.
------------------------------x

New York, N.Y.
October 29, 2024
12:40 p.m.

Before:

HON. ANALISA TORRES,

District Judge

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
NICHOLAS S. BRADLEY
JONATHAN L. BODANSKY
Assistant United States Attorneys

CHOLO ABDI ABDULLAH, Pro Se

ADAMS & COMMISSIONG LLP
KARLOFF C. COMMISSIONG, Standby Counsel

LAW OFFICES OF ONAODOWAN & DELINCE
CHRISTINE DELINCE, Standby Counsel

SAHLI LAW PLLC
EMILEE A. SAHLI, Standby Counsel

ALSO PRESENT: SABRINA JIM MUNOZ
SEAN ZERGER, Special Agent, FBI

(In open court; jury present)

THE COURT: Please be seated.

Members of the jury, this case is officially on trial, and you are the jurors in this case.

As you can see, the jury is composed of 12 members. In addition, there are four alternates. If you are an alternate, you need to pay as close attention to the evidence as the jury. If, for any reason, any one of the members of the jury is unable to serve, an alternate will be required to step into the place of that juror.

As I mentioned yesterday, this trial is expected to last about three weeks, that is, until November 15th. During trial, you will be required to be in this courtroom from 9:00 a.m. sharp until 5:00 p.m.

Breakfast will be available in the jury room starting at 8:30 a.m. Food is not allowed in the courtroom, so if you intend to have breakfast, it is best to arrive by 8:30.

You will have a lunch break each day.

Court will not be in session on Tuesday, November 5th, Election Day, and Monday, November 11th, Veterans Day.

I now will give you some preliminary instructions to guide you in your participation in the trial. The second part of the trial is about to start. This part is the opening statement by the prosecution.

In his opening statement, the Assistant United States

Attorney is required to indicate to you what the government intends to prove by way of evidence to support the charges against the defendant.

Now, the defense also has the option to make an opening statement, but will not be making an opening statement.

Now, what the government says in its opening statement is not evidence. An opening statement is, in a sense, a preview of what the government expects that the evidence will show.

Next, the government will present a witness and will ask the witness questions. This is called direct examination. Once the prosecution completes those questions, the defendant will then be given an opportunity to question the witness. This is called cross-examination. This process will continue for each witness the prosecution presents to give testimony. When the government finishes calling all of its witnesses, the defendant will be given the opportunity to present witnesses in his defense. However, you must remember that the defendant need not prove anything. Therefore, he does not have to cross-examine the government's witnesses or offer his own witnesses.

Once both sides have finished presenting witnesses, the prosecution and the defense will be given the opportunity to make closing remarks. These closing arguments are not evidence; they are just arguments made by the government and

the defendant, if the defendant chooses to do so, to discuss the facts and circumstances in the case, and they should be confined to the evidence and to reasonable inferences to be drawn from the evidence.

So, again, neither opening statements, nor closing arguments, are evidence, and you should disregard any statement or argument made by the government or the defendant that is not based on the evidence.

After the closing arguments, I'll give you detailed instructions on the law that relates to this case. When I finish my instructions, you will then retire to deliberate to reach a verdict.

Now I'm going to instruct you on evidence. First, let me tell you what evidence is.

Basically, evidence consists of oral testimony under oath, any stipulations of the parties, and physical exhibits that are introduced by either the prosecution or the defendant and allowed into evidence.

If an exhibit is given to you to examine, you should examine it carefully, individually, and without comment.

There are two types of evidence, direct and circumstantial.

Direct evidence is direct proof of a fact, such as testimony of an eyewitness.

Circumstantial evidence is proof of facts from which

you may infer, or conclude, that other facts exist. There is a simple example of circumstantial evidence that is often used in this courthouse. Assume that when you came into the courthouse this morning, the sun was shining, and it was a nice day. Assume that the courtroom blinds were drawn, and you could not look outside. As you were sitting here, someone walked in with an umbrella that was dripping wet. Then, a few minutes later, another person also entered with a wet umbrella. Now, you cannot look outside of the courtroom, and you cannot see whether or not it is raining, so you have no direct evidence of that fact, but, on the combination of facts that I have asked you to assume, it would be reasonable and logical for you to conclude that it had been raining.

That is all there is to circumstantial evidence — you infer, on the basis of reason and experience and common sense, from one established fact, the existence or nonexistence of some other fact.

Not all circumstantial evidence presents a clear and compelling inference. The strength of the inferences arising from circumstantial evidence is for you to determine.

I will give you further instructions on these, as well as other matters, at the end of the case, but keep in mind that you may consider both kinds of evidence.

If you are instructed that some evidence is received for a limited purpose only, you must follow that instruction.

Questions asked by the attorneys, the defendant, or even myself are not, in and of themselves, evidence; only questions coupled with answers are evidence. Therefore, you may not infer any fact from the mere asking of a question.

The reason I point this out to you is simple. During the course of questioning, the prosecution and the defendant may exercise their right to object to the other's question, to an answer given to a question, or to the introduction of an exhibit on the ground that the government or the defendant believes it is somehow legally improper or inadmissible. At that point, I will either sustain or overrule the objection. If I sustain an objection to a question, you must disregard the question and any answer, if one has been given. You must also draw no inference from the question or from any answer. Nor are you to speculate as to what the witness would have said if permitted to answer.

Evidence stricken from the record must, likewise, be disregarded.

Conversely, if I overrule the objection, the question will be allowed or the answer will stand, and it will remain as evidence.

When I overrule an objection to any evidence, you must not give such evidence any more weight than if the objection had not been made. Please bear in mind that my rulings on the law are simply that, and under no circumstance are such rulings

to be considered by you as indicating that the Court has an opinion as to the guilt or innocence of the defendant. Under our law, the Court may not, and will not, entertain any opinion as to the guilt or innocence of the accused.

Members of the jury, you and you alone, are the sole and exclusive judges of the facts.

Now, I want you to understand that objections may come rather quickly, and, at times, either party may seem rude. Please do not resent this or penalize either party for this. Understand that they are just doing their job, and this is part of it.

As I stated at the beginning, you are the triers of fact. Therefore, it will be up to you to decide which witness to believe and which witness not to believe.

Furthermore, you will decide how much of every witness' testimony to accept and how much to reject.

How do you decide what to believe and what not to believe? Listen to the witnesses, watch them, and observe them. Then decide whether you believe or disbelieve them in the same way you decide such questions in your ordinary life. Did they know what they were talking about? Were they candid, honest, open, and truthful? Did they have a reason to falsify, exaggerate, or distort their testimony?

Please use your common sense in evaluating all testimony. All that is asked of you is that you apply the same

common sense you would apply in your everyday lives to determine who is telling you the truth, who is not, and who is telling you something less than the full truth. Please remember that it is the quality of the evidence that controls, not the quantity of evidence or the number of witnesses called by either side.

You must decide the case solely on the evidence and the law before you, and must not be influenced by any personal likes or dislikes, opinions, prejudices, sympathy, or biases, including unconscious biases.

Unconscious or implicit biases are stereotypes, attitudes, or preferences that people may consciously reject, but which may be expressed without conscious awareness, control, or intention. Like conscious bias, unconscious bias, too, can affect how we evaluate information and make decisions. All of us, no matter how hard we try, tend to look at others and tend to weigh what they have to say through the lens of our own experience and background. We each have a tendency to stereotype others and make assumptions about them. Often we see life and evaluate evidence through a clouded filter that tends to favor those like ourselves.

You must do the best you can to put aside such stereotypes, for all litigants and witnesses are entitled to a level playing field in which we do the best we can to put aside our stereotypes and prejudices. You are to be guided solely by

the evidence in this case and my instructions on the law.

Although you are the sole judges of the facts, my job is to be the sole judge of the law. You must accept the law as I give it to you without hesitation or reservation. You must accept the law as I give it, even if you privately disagree with me or the law.

There are three basic principles of law that apply to this and all criminal cases. They are: The presumption of evidence, the prosecution's burden, and the standard of proof.

First, the presumption of innocence: A defendant is presumed innocent, and that presumption remains with the defendant throughout the trial, and is not removed unless and until the defendant's guilt is proven beyond a reasonable doubt.

The indictment containing the charges against the defendant is only an accusation, nothing more. It is not proof of guilt or anything else. Therefore, because no evidence has been presented to you as of yet, if you were to deliberate right now, you would have to find the defendant not guilty.

Second is the prosecution's burden. The burden of proof is on the government. The defendant has no burden, and is not required to do anything to prove his innocence. The defendant has the option of just sitting back and not doing anything. Why? Because the defendant has no burden of proof, and the defendant is presumed innocent.

The defendant is not required to put on a defense or call any witness because of the presumption of innocence. If the defendant chooses not to take the stand or testify on his own behalf, you may not draw any negative inference from that. In other words, you cannot hold that against him.

Third is the standard of proof. The prosecution is required to prove the defendant's guilt beyond a reasonable doubt. This standard does not require the prosecution to prove the defendant's guilt beyond all possible doubt or to a mathematical certainty. The prosecution does, however, have to prove the defendant's guilt beyond a reasonable doubt. A doubt is not reasonable if, instead of being based on the nature and quality of the evidence or the insufficiency of the evidence, it is based on some guess or whim or speculation unrelated to the evidence.

In my final instructions to you at the end of the trial, I will give you detailed instructions on the law as to the specific charges against the defendant. Those instructions are intended to guide you through your deliberations and to enable you to reach your decision.

Finally, I'm now going to instruct you on how you must conduct yourselves during this trial.

You must keep an open mind during the trial. You must keep your eyes open throughout the trial. You may not ask the witnesses questions. Do not converse, either amongst

yourselves or with anyone else, about anything related to the case. You may tell the people with whom you live and your employer that you are a juror and give them information about when you'll be required to be in court, but you may not talk with them or anyone else about anything related to the case. Do not at any time during the trial request, accept, agree to accept or discuss with any person the receipt or acceptance of any payment or benefit in return for supplying any information about the trial.

You must promptly report directly to me any incident within your knowledge involving an attempt by any person to improperly influence you or any member of the jury.

Do not visit or view the premises or place where the charged crime was allegedly committed or any other premises or place involved in this case.

And you must not use internet maps or Google Earth or any other program or device to search for and view any location discussed in the testimony.

Do not read, view, or listen to any accounts or discussions of the case reported by newspapers, television, radio, the internet, or any other news media. I'm going to repeat that: Do not read, view, or listen to any accounts or discussions of the case reported by newspapers, television, radio, the internet, or any other news media.

Do not attempt to research any fact, issue, or law

related to the case, whether by discussion with others, by research in a library, or on the internet, or by any other means or source.

In this age of instant electronic communication and research, I want to emphasize that, in addition to not conversing face to face with anyone about the case, you must not communicate with anyone about the case by any other means, including by telephone, text message, email, internet chat or chatrooms, blogs, or social websites, such as Facebook and X. You must not provide any information about the case to anyone by any means whatsoever, and that includes the posting of information about the case, or what you are doing in the case, on any device or internet site, including blogs, chatrooms, social websites, or any other means.

You must also not Google or otherwise search for any information about the case or the law that applies to the case or the people involved in the case, including the defendant, the witnesses, the lawyers, and myself.

Now, ladies and gentlemen, I want you to understand why these rules are so important. Our law does not permit jurors to converse with anyone else about the case or permit anyone to talk to them about the case because only jurors are authorized to render a verdict. Only you have been found to be fair, and only you have promised to be fair. No one else has been so qualified.

Our law also does not permit jurors to converse amongst themselves about the case until the Court tells them to begin deliberations, because premature discussions can lead to a premature final decision.

Our law also does not permit you to visit a place discussed in the testimony, and I mean either in person or virtually.

First, you cannot always be sure that the place is in the same condition as it was on the day in question.

Second, even if it were in the same condition, once you go to see a place discussed in the testimony to evaluate the evidence in light of what you see, you become a witness, not a juror. As a witness, you may now have an erroneous view of the scene that may not be subject to correction by either party. That is not fair.

Finally, our law requires that you not read or listen to any news accounts of the case, and that you not attempt to research any fact, issue, or law related to the case. Your decision must be based solely on the testimony and other evidence presented in this courtroom. It would not be fair to the parties for you to base your decision on some reporter's view or opinion or upon information you acquire outside of the courtroom.

These rules are designed to help guarantee a fair trial, and our law, accordingly, sets forth serious

consequences if the rules are not followed.

I trust you understand and appreciate the importance of following these rules, and, in accord with your oath and promise, I know you will do so.

During the trial, it may be necessary for me to confer with the parties out of your hearing regarding questions of law or procedure. On some occasions, you may be excused from the courtroom for that reason. I will try to limit these interruptions as much as possible, but you must remember that this matter is very important, and you are here to determine the defendant's guilt or innocence, and you must be patient, even though the case may seem to go slowly.

Finally, I permit jurors to take notes, but you don't have to take notes. Notes are just an aid to your own recollection.

The court reporters in this case report everything that is said in the courtroom, and any portion of the testimony can be read back to you in open court during your deliberations. If you do take notes, be aware that note-taking may distract you from something important that is happening on the witness stand. Whether or not you take notes, rely on your own recollections. Don't be influenced by the fact that another juror has taken notes.

I've just told you that you're to report to me any attempt by anyone to improperly influence you. Lawyers and the

defendant are not permitted to have any contact with you other than what takes place on the record during the course of this trial. So, if you see any of them, for example, in the hallway or outside, and they don't say hello or acknowledge your presence, please don't think that they're being rude. They simply are not permitted to have any contact with you.

Now, Assistant United States Attorney Jonathan Bodansky will make his opening statement.

MR. BODANSKY: For more than a year, Cholo Abdi Abdullah, the defendant, lived and studied at a flight school in the Philippines. He was training to become a pilot, but he was training to become a pilot for a very specific and deadly reason — to highjack a plane and crash it into a building here in this country. He was training to recreate the September 11 terrorist attacks. He was training to murder innocent people. And he was training to do it on behalf of a violent terrorist organization called al-Shabaab, an Al Qaeda affiliate in Somalia that has sworn to attack and kill Americans.

And the defendant methodically planned and prepared for this attack. He spent months receiving military training from al-Shabaab in Somalia. He logged hundreds of hours of training at that flight school in the Philippines, hundreds of hours in the classroom, in-flight simulators, in flying actual planes, training to get a commercial pilot's license and a job with an airline.

He tested airport security, and he researched how best to carry out this attack. He researched things like explosives, past highjackings, and targets here in the United States.

And he kept his al-Shabaab handler, his contact, updated on the progress that he was making, updated on everything he was doing to prepare for this attack.

That is what the defendant did. He prepared for years to highjack a plane and attack this country for a deadly terrorist organization. And now, Cholo Abdi Abdullah sits right here, the defendant in this case.

Over the next few minutes, I'm going to do two things. First, I'm going to talk about what we're going to prove in this case; and, second, I'm going to talk about how we're going to prove it.

So, first, what will the evidence show? Well, at trial, you'll hear a lot about al-Shabaab. You'll learn that al-Shabaab is a terrorist group based in Somalia. You'll learn it has close ties with Al Qaeda, another terrorist group, and that it even swore allegiance to Al Qaeda in 2012. And that for years, al-Shabaab has targeted United States and its citizens repeatedly engaging in mass casualty attacks and killing Americans.

And against this backdrop, you'll learn that in 2015, the defendant joined this vicious terrorist organization.

You'll hear that the defendant traveled from Kenya, where he was born, to Somalia, where he met with local al-Shabaab members. And that he then traveled with a group of other recruits to a series of al-Shabaab safe houses, where they lived and trained together for months.

He trained with AK-47 assault rifles. He learned to build explosives, including improvised explosive devices, or IEDs. And he learned what's called operational security, how to operate in secret, to avoid detection.

You'll learn that eventually, after many months, he was told by his al-Shabaab commanders that they'd been watching him, that they'd chosen him for a special, important mission — to become a pilot, highjack a plane, and carry out an attack on the United States. You'll learn that the defendant agreed and accepted that mission.

And you will learn all about what the defendant did next. You'll learn that in 2017, he traveled thousands of miles to the Philippines to enroll in flight school and begin intensive training for a commercial pilot's license, the very type of license that he would need to get a job with an airline and to pilot the types of large passenger aircraft that are used on commercial flights every day. He lived and studied at that flight school for more than a year, training full time, under the guise of becoming a genuine commercial pilot, but, in fact, training to carry out a terrorist attack.

And all the while, the defendant built his attack plan. He researched, for example, how to get a job with a U.S. airline, how to travel to the U.S., were there air marshals on every flight, how to open a cockpit door from the outside, whether military aircraft will shoot down a highjacked plane, and he researched prior terrorist highjacking attempts.

You'll also learn that during this same time, al-Shabaab terrorists attacked a hotel complex in Nairobi, Kenya. During that attack, an al-Shabaab suicide bomber detonated a suicide vest and killed a U.S. citizen, and gunmen attacked the hotel grounds with assault rifles and grenades, killing another 20 people. You'll learn that after this deadly attack, the defendant searched for video footage of the suicide bomber detonating that suicide vest.

And what did the defendant do next? Just days after researching that horrific attack, the defendant searched online for "Tallest building in Atlanta." Two months later, he researched "Suicide plane crashes," and looked for flight schools in Florida.

You'll also learn that the defendant's pilot training was expensive. The defendant needed money to carry out this terrorist plot. And so the defendant repeatedly met with al-Shabaab operatives to get installments of cash, roughly $100,000 in total, all to finance this terrorist attack.

And meanwhile, through it all, he maintained contact

with his al-Shabaab handler, a senior member of al-Shabaab, who served as the defendant's primary point of contact, and who had also played a key role in planning the Nairobi hotel attack.

(Continued on next page)

MR. BODANSKY: (Continued) The two of them communicated regularly through anonymous online communications and encrypted communications, maintaining that operational security that the defendant had been trained on. You will see some of these communications for yourselves.

And, finally, you will learn that in June of 2019, the defendant passed his commercial pilot's license skills test and reached the final stages of his pilot training.

Before he could bring his deathly plot to fruition, he was arrested in the Philippines. That is what the evidence at this trial will show: That the defendant was a terrorist devoted to al-Shabaab, planning and preparing four years to carry out a 9/11-style attack on the United States.

So how are we going to prove all of this to you? Well, first, you will hear that after the defendant was arrested, FBI agents interviewed him. And during that interview, the defendant admitted that he joined al-Shabaab, and that he was trained on things like firearms, explosives and operational security. He admitted that he traveled to the Philippines to enroll in flight school. And he admitted why he did all of this: To become a pilot and hijack a plane for al-Shabaab.

You will hear from one of the agents who participated in that interview, and you will even see a recording of it. That's right, the defendant is on tape admitting that he joined

al-Shabaab, knowing full well about its terrorist activities.

And that's not all. You will learn that the defendant's admissions line up with a host of other evidence in this case, including a mountain of electronic evidence from the defendant's online accounts, his email and his Facebook accounts, as well as the defendant's phones and other electronic devices. You will see for yourselves the defendant's Google search history, including searches for things like potential targets, terrorist propaganda, airline security protocols and past al-Shabaab terrorist attacks.

You will also see the defendant's progress reports to his al-Shabaab handler, reports describing all the things he was doing to prepare for this terrorist attack and his ideas for how best to carry it out. You will see him describe in describing this plot the brothers during 9/11. And you'll see him conclude in his words that the only successful hijacking since 9/11 was because it was hijacked by the pilot himself.

You will see how the defendant filmed himself flying the planes he was training on; videos showing the defendant trying to perfect his craft so he could commit this terrorist attack. And you'll hear from witnesses who will walk you through all of this digital evidence.

So you will have the defendant's admissions backed up by reams of evidence from the defendant's own online accounts and devices, but you will see and hear even more evidence. You

will hear from an inspector with Kenya's antiterrorism police unit who was involved in investigating that Nairobi hotel attack. He will show you surveillance footage of that attack in which you will see for yourselves the al Shabaab suicide bomber detonating his suicide vest outside a cafe and the chaos and horror that followed; footage that the defendant searched for, before then pressing forward in the Philippines continuing to train to commit a terrorist attack himself.

You will also hear from an instructor at the flight school in the Philippines, the very school where defendant trained for that commercial pilot's license for more than a year. He will tell you all about the defendant's intensive training there, and he will explain just how close the defendant got to completing his training and getting that commercial pilot's license.

And as you hear his testimony, you will know why the defendant was at that flight school month after month studying and training for that license to carry out a terrorist attack against this country.

And, finally, you will hear from a witness who specializes in researching al-Shabaab and other terrorist groups like it. She will provide context to the other evidence in the case and explain al-Shabaab's background and tactics. She will explain how al-Shabaab targets Americans and the West. She'll explain other terrorist attacks that they have

committed, including the Nairobi hotel attack, and she will explain how the defendant's plot fit into al Shabaab's larger campaign of terrorism.

So that is some of what I expect you will see and hear during this trial. And by the end of it, you will know exactly what happened here: That the defendant worked for years to carry out this deadly 9/11-style attack on the United States as part of a foreign terrorist organization that has dedicated itself to killing Americans.

And as a result of his conduct, the defendant is charged with multiple crimes relating to terrorism. Judge Torres will explain these charges in detail at the end of the trial, but they all involve the defendant's participation in a plot that I've just described to you: His plot to hijack a plane and crash it into a building here in this country.

At the end of this trial, we will have a chance to talk to you again, to explain how all of this evidence fits together to prove that the defendant is guilty as charged. Between now and then, I ask you to do three things:

First, pay careful attention to the evidence as it comes in.

Second, follow Judge Torres' instructions on the law.

And, third, use your common sense, the same common sense you use in your everyday lives.

If you do those three things, you will reach the only

conclusion that is consistent with the evidence in this case and the law: The defendant Cholo Abdi Abdullah is guilty.

THE COURT: Members of the jury, the government has finished its openings statement. The next stage of the trial is witness testimony. We will start that after lunch, and so I will need you to be here at 2:15 outside of the courtroom, ready to walk in. Actually, you can go right into the jury room. You can go into the jury room ready to come through that door you see on the far right.

But, of course, again, you are not allowed to discuss the case amongst yourselves. Don't permit anyone to discuss the case in your presence.

Starting tomorrow at 8:30, we will have your breakfast, and at the lunch hour there is a light snack. But today we will not have that snack for you, so you may go out for lunch and, of course, you can also go out for lunch during the remainder of the trial, but keep in mind that you must arrive promptly back in the courtroom at the time that I designate.

Have a good lunch.

(Continued on next page)

(Jury not present)

THE COURT: Please be seated.

I want to remind the government that although Mr. Abdullah has stated that he does not plan to make objections, you must follow the rules of evidence.

See you at 2:15.

(Luncheon recess)

(Continued on next page)

AFTERNOON SESSION

2:15 p.m.

(Trial continued)

THE COURT: Do the parties agree that all jurors are present and properly seated?

MR. BODANSKY: Yes, your Honor.

MR. ABDULLAH: Yes, your Honor.

THE COURT: Would the government call its first witness, please.

MR. BODANSKY: Your Honor, the government calls Special Agent Kevin Song.

KEVIN SONG,

called as a witness by the Government,

having been duly sworn, testified as follows:

THE COURT: You may be seated, and you may inquire.

MR. BODANSKY: Thank you, your Honor.

THE COURT: First, if you will, please state your name and spell it for me.

THE WITNESS: Yes, Kevin Song. K-E-V-I-N. S-O-N-G.

THE COURT: Go on.

DIRECT EXAMINATION

BY MR. BODANSKY:

Q. Good afternoon.

A. Good afternoon.

Q. Are you currently employed?

A. Yes.
Q. Where do you work?
A. I work for the U.S. Attorney's Office for the Southern District of New York.
Q. What's your title there?
A. Special agent.
Q. Are you currently assigned to any particular group?
A. Yes.
Q. What group?
A. The New York Joint Terrorism Task Force.
Q. What is the New York Joint Terrorism Task Force?
A. It is a federal task force led by the FBI, comprised of many different federal agencies as well as state and local; namely, the NYPD, and its purpose is to investigate terrorism.
Q. Do you know the defendant, Cholo Abdi Abdullah?
A. Yes.
Q. How do you know him?
A. I know him because I interviewed him. I also participated in transporting the defendant back from the Philippines to the United States.
Q. Approximately when was that?
A. December of 2020.
Q. Do you see the defendant, Cholo Abdi Abdullah, in the courtroom today?
A. Yes, I do.

Q. Can you please identify him by where he is sitting and an article of clothing that he is wearing?
A. Yes. He is sitting in the second table first seat in a tan top.
MR. BODANSKY: Please let the record reflect that the witness identified the defendant.
THE COURT: Correct.
Q. You said a moment ago that you transported the defendant from the Philippines to the United States. During your interview of the defendant, did the defendant describe how he first came to be in the Philippines?
A. Yes.
Q. What did he say?
A. He said he was there to study to become an airline pilot.
Q. Did the defendant say why he had moved to the Philippines to study to become an airline pilot?
A. Yes. He was there to study to become an airline pilot on behalf of al-Shabaab.
Q. Just in brief, what is al-Shabaab?
A. Al-Shabaab is a foreign terrorist organization that is headquartered in Somalia. It's taken responsibility for several deadly attacks in Africa.
Q. Did the defendant describe his relationship with al-Shabaab?
A. Yes.

Q. What did he say?
A. He said he's a member.
Q. What, if anything, did the defendant say as to why he was training to become a pilot on behalf of al-Shabaab?
A. He said he was training to become a pilot on behalf of al-Shabaab so that he can hijack a plane.
Q. Taking a step back, you testified a moment ago that you work at the U.S. Attorney's Office, and you're assigned to the joint terrorism task force. For approximately how long have you been with the U.S. Attorney's Office?
A. Approximately eleven years.
Q. And for approximately long have you been assigned to the joint terrorism task force?
A. About nine years.
Q. What sorts of investigations have you worked on during that time?
A. I worked a wide variety of terrorism investigations, including terrorism financing, either domestically or internationally.
Q. What is your role on those investigations?
A. I am a case investigator.
Q. What does that entail?
A. That entails leading an investigation, participate in arrest interviews and conducting a criminal investigation.
Q. Prior to joining the U.S. Attorney's Office, did you work

anywhere else?
A. Yes.
Q. Where else did you work?
A. I worked for the United States Secret Service.
Q. For how long?
A. About 12 years.
Q. What was your title there?
A. Special agent.
Q. What training, if any, did you receive during your time with the Secret Service?
A. We received a number of different trainings, which includes training for protective assignments. It includes training with investigations as far as interviewing, conducting arrest, serving search warrants and surveillance.
Q. And what training, if any, have you received while at the Southern District of New York?
A. We continue our training and education in various topics like interviews and firearms and defensive tactics.
Q. Now, turning your attention to this case specifically, how did you first become involved in the defendant's case?
A. I was asked by my supervisor if I could assist with the extradition process of the defendant who was overseas and in custody in the Philippines and to assist in transporting the defendant back to the United States and interview him in the process.

Q. Did you ultimately participate in transporting and interviewing the defendant?
A. Yes.
Q. Where in the Philippines specifically did you first take custody of the defendant?
A. In Manila, at the airport in Manila in the Philippines.
Q. How did you get to Manila?
A. We flew on an Air Force aircraft. The aircraft is called a C-17. It's a large cargo aircraft windowless and very noisy.
Q. When did you land in the Philippines?
A. December 14, 2020.
Q. And what happened after you landed there?
A. We landed. We met with Special Agent Ben Virtue on the ground in the Philippines, and we were led to a room right off the tarmac. In that room, the defendant was there, along with a number of items and his property.
Q. You mentioned Special Agent Ben Virtue. Who is that?
A. He's the special agent assigned to the U.S. Embassy in Manila. He's the FBI representative on the ground.
Q. Now, you said you went to a room in which there was the defendant and other items. Did there come a time that you took custody of the defendant?
A. Yes.
Q. And did there come a time that you also took custody of those other items?

A. Yes.
Q. Generally speaking, what did those other items consist of?
A. They consisted of several cellphones, two laptops, a USB drive, an iPad, a bag and a suitcase.
Q. After taking custody of the defendant and those items, what happened next?
A. We took everything and went back onto the same airplane we arrived in, and we left the Philippines en route back to the United States.
Q. Now, you testified a moment ago that in addition to transporting the defendant, you also interviewed the defendant. When did that interview first begin?
A. It began shortly after we got off the ground in Manila on the aircraft.
Q. And you said that aircraft was destined for the United States, correct?
A. Yes.
Q. Did the aircraft make any stops on its way back?
A. It did.
Q. Where did it stop?
A. It stopped in Yokota, Japan at Yokota Air Base.
Q. Why?
A. To refuel.
Q. And where did the plane next land after Japan?
A. It landed at Stewart International Airport in New Windsor,

New York.
Q. Is that located within the Southern District of New York?
A. Yes.
Q. Approximately when did the aircraft land there?
A. December 15, 2020.
Q. What happened after you landed at Stewart International Airport?
A. We brought the defendant off of the plane and escorted him to the Hudson Valley Resident Agency, which is an FBI field office nearby at the airport.
Q. And what happened once you got to the FBI field office?
A. We processed the defendant. We took fingerprints, photos, and we continued our interview.
Q. After the continuation of the interview concluded at the field office, what, if anything, happened next with respect to the defendant?
A. The defendant was then transported from Hudson Valley FBI office down to the Metropolitan Correction Center.
Q. What is that?
A. That's a federal jail here in Manhattan.
Q. After the defendant was transported to that location, did you have any further involvement in the defendant's case?
A. No.
Q. Now, you testified a moment ago that your interview of the defendant began during the flight back from the Philippines. I

would like to focus on that portion of the interview. Who participated in that interview?
A. It was myself and Special Agent Kenneth Klose from the FBI.
Q. Approximately how long did that portion of the interview last?
A. It lasted hours, the better part of a day.
Q. And who conducted the questioning during that interview?
A. We both did, myself and Special Agent Klose.
Q. Did there come a time during the interview that you asked the defendant what language he preferred?
A. Yes.
Q. What did he say?
A. English.
Q. And in what language was the interview conducted?
A. English.
Q. Now, what steps, if any, did you take before you began questioning the defendant?
A. We reviewed a couple of documents, the advice of rights forms.
Q. What is an advice of rights form?
A. It's a form that advises the defendant that he does not need to speak to us; that he can have his lawyer present.
Q. Ms. Jim, can you please display for the parties and the Court what's been marked as Government Exhibit 902?
Special Agent, do you recognize this?

A. Yes, I do.
Q. What do you recognize it to be?
A. This is the advice of rights form that we use for the defendant.

MR. BODANSKY: The government offers Government Exhibit 902.

THE COURT: Any objection? I hear no objection. Go ahead.

MR. BODANSKY: Can we please publish this for the jury?

Q. Special Agent, did you and your partner read this document to the defendant?
A. Yes.
Q. I'd like to read this into the record. Can you please read the first four paragraphs into the record?
A. Yes.

We are special agents with a law enforcement agency of the United States Government called the Federal Bureau of Investigation. Even though we are not presently in the United States, United States laws provide you with certain rights in your dealings with us.

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Even if you previously made statements while in

custody, those statements may not be usable against you in a U.S. court.

Q. Can you now please read the next four paragraphs.

A. Even if you previously made statements while in custody, that does not mean you have to make statements now.

We are not interested in any of the statements you have made to anyone before. We do not care what you said to anyone in the past. This is a new start relating to the pending criminal charges in the United States. We are interested in learning the truth, no matter what you may have said before. You do not need to speak to us today just because you have spoken with others in the past.

Anything you say can be used against you in court, including the pending prosecution in the United States.

You have the right to talk to a lawyer for advice before we ask you any questions.

Q. Can you please read the remainder of this page.

A. You have the right to talk to a lawyer for advice before we ask you any questions.

You have the right to have a lawyer with you during questioning today.

If you cannot afford a lawyer, one will be appointed for you before we proceed with any questioning if you wish.

If there is anything about where we are or who is here that would prevent you from making a truthful and voluntary

statement to us, there is no reason for you to speak.
Q. Special Agent, did you read each of those rights to the defendant?
A. Yes.
Q. And how, if at all, did he respond?
A. He responded acknowledging it verbally and initialing the line next to each paragraph.
Q. Are those initials reflected on this document?
A. Yes, they are.
Q. Where?
A. They are next to the paragraph. The first paragraph, it's next to it on the left.
Q. To be clear, whose handwriting is that?
A. The defendant's.
Q. Could we please turn to page 2 of this document.
Special Agent, can you please read the top portion of this page into the record.
A. Acknowledgement of rights and waiver of rights to an attorney and to remain silent.
Q. Can you please continue reading.
A. I am willing to make a statement and answer questions.
I do not want a lawyer at this time.
I understand my rights and my decision is a knowing and voluntary one.
No promises or threats have been made to me. And no

pressure or coercion of any kind has been used against me.
Q. Did you read this page to the defendant as well?
A. Yes.
Q. And how, if at all, did he respond?
A. He acknowledged that he understood.
Q. And did he similarly initial these paragraphs?
A. Yes.
Q. Is that reflected on this document?
A. Yes.
Q. Is this document signed?
A. Yes, it is.
Q. Who signed it?
A. The defendant and myself.
Q. After completing your review of this document with the defendant, did you then begin the rest of the interview?
A. Yes.
Q. At any point during that interview, did you re-review the defendant's rights with him?
A. Yes, we did.
Q. How many times did you do that?
A. Three other times.
Q. Why?
A. We took long breaks at times. We took breaks to pray, to eat, use the restroom. And after each extended break, we came back and reviewed this form.

Q. And when you re-reviewed the defendant's rights with him, how did he respond?
A. He acknowledged, and he understood, and he initialed.
Q. And is that reflected on this document as well?
A. Yes.
MR. BODANSKY: We can take down document Exhibit 902.
Q. Turning to the substance of the interview, did the defendant say where he was born?
A. Yes.
Q. What did he say?
A. He said he was born Isola, Kenya.
Q. Did he describe his educational background?
A. Yes.
Q. What did he say?
A. He said he completed two out of four years of a journalism program.
Q. What, if anything, did he say about where he was living at the beginning of 2015?
A. He said he was living in Nairobi, Kenya.
Q. What, if anything, did he say about whether there came a time in 2015 that he left Kenya?
A. Yes. He said that he left Kenya at a point in 2015 to get on the bus to go to Somalia.
Q. Did he say why he was going to Somalia?
A. He said he was going to join al-Shabaab.

Q. Where is al-Shahaab primarily based?
A. Somalia.
Q. I believe you testified a moment ago that he went there by bus. Did he say whether or not he traveled alone or with others?
A. Yes.
Q. What did he say?
A. He said he traveled with his friend.
Q. Did he identify that friend?
A. Yes.
Q. What did he say about that friend?
A. His friend's name is Ali Salim.
Q. What, if anything, did he say about his understanding about Ali Salim was traveling to Somalia?
A. Ali Salim was traveling to Somalia to also join al-Shabaab.
Q. Did the defendant say specifically where in Somalia he was traveling to?
A. Yes.
Q. Where?
A. Bardhere, Somalia.
Q. Can you describe what the defendant said he did once he arrived in Bardhere?
A. The defendant arrived in Bardhere, Somalia to a police station, and at that police station he met with two intelligence officers from al-Shabaab. The intelligence

officers put the defendant on the telephone with another intelligence officer that he would later know as Azzam, and then from there they left the police station and went to a safe house in Jilib, Somalia.
Q. What is a safe house?
A. A safe house is a location that organizers would make to either hide from the government or a place to safely congregate for its group.
Q. Did he say how long he was then at that safe house in Jilib?
A. Yes.
Q. How long?
A. About three months.
Q. What, if anything, did he say about who else he was with at that safe house for those three months?
A. He said he was with 19 other al-Shabaab recruits.
Q. Did he describe those individuals?
A. Yes, he did.
Q. What did he say?
A. He said they were between the ages of 18 and 30. They were males from different tribes.
Q. Did he identify anyone as being in charge of that safe house?
A. Yes.
Q. What did he say?

A. He said Abdul Salim -- I'm sorry -- Abdul Salam is in charge of the safe house.
Q. Is that the same Abdul Salim he traveled on the bus with or somebody different?
A. I'm sorry? Was your question who is the leader of that safe house?
Q. I apologize. What was the name of the individual he identified as being in charge of the first safe house?
A. Yes, Abdul Salam.
Q. Did he identify the names of any other individuals at that safe house?
A. He did.
Q. How did he do that?
A. **He listed the names on a sheet of note paper for us.**
Q. Ms. Jim, can you please display for the witness, the parties and the Court what's been marked as Government Exhibit 905.
Special Agent, do you recognize this?
A. Yes.
Q. What do you recognize it to be?
A. These are our notes from the interview with the defendant.
Q. And the names on the left-hand side, who wrote those names?
A. The defendant.
MR. BODANSKY: The government offers Government Exhibit 905.

THE COURT: Any objection?

MR. ABDULLAH: Yes, your Honor.

THE COURT: Approach, please.

(Continued on next page)

(At the sidebar)

THE COURT: What is the ground for your objection?

MR. ABDULLAH: I don't remember writing the names. I don't remember writing any of them.

THE COURT: The objection is overruled.

(Continued on next page)

(In open court)

THE COURT: You may continue. Overruled.

Q. Can we please publish this document for the jury?

Special Agent, who is the first person on the defendant's list?

A. Azzam.

Q. Had he referenced Azzam earlier in the interview?

A. Yes.

Q. What did he say about Azzam?

A. Azzam is the al-Shabaab intelligence officer he spoke to on the phone at the police station. He also said that he is one of the Dusit attackers.

Q. You said one of the Dusit attackers?

A. Yes.

THE COURT: What do you mean by that, Dusit?

THE WITNESS: Dusit is a hotel and office complex in Kenya that was attacked by al-Shabaab.

THE COURT: Go ahead.

THE WITNESS: It was a terrorist attack.

Q. To be a little more specific, are you aware of an attack that took place at that location the DusitD2 Hotel in Nairobi, Kenya in 2019?

A. Yes.

Q. Who was the second person on the defendant's list?

A. Ali Salam -- Salim.

Q. Did the defendant referenced Ali Salim previously?
A. Yes.
Q. What did he say about Ali Salim?
A. Ali Salim is his friend that rode the bus with him from Kenya to Somalia to join al-Shabaab. He is also a Dusit attacker.
Q. Did the defendant reference the Dusit attack at any other time during the interview?
A. Yes.
Q. Approximately how many times did the defendant reference the Dusit attack during the course of your interview?
A. A number of times.
Q. What, if anything, did the defendant say generally about the other names on this list?
A. He said they were in their twenties and thirties from different tribes.
Q. You can take down Government Exhibit 905.
Now, did there come a time during your interview that you reviewed any photographs of individuals with the defendant?
A. Yes.
Q. Can you describe what you did?
A. We had a photo book that contained a number of photographs, and we showed the defendant one photo at a time, and we asked if he recognized the person in the photo.
Q. Ms. Jim, can you please display for the witness, the

parties and the Court what's been marked as Government Exhibit 911.

Special Agent, do you recognize this document?

A. Yes.

Q. What do you recognize it to be?

A. This is amongst the photo book that we have showed the defendant at that interview.

MR. BODANSKY: The government offers Government Exhibit 911.

THE COURT: Any objection?

MR. ABDULLAH: No, your Honor.

THE COURT: Overruled. Rather -- you're not objecting?

MR. ABDULLAH: I am not objecting.

THE COURT: Go ahead.

Q. Can you please publish this for the jury.

Did this document contain multiple photographs?

A. Yes, it does.

Q. Did you show each of those photographs to the defendant?

A. Yes.

Q. What, if anything, did you ask him with respect to each photograph?

A. I asked him if he recognized the person in the photo, and if he did, to identify them by name.

Q. Turning to page 2, did the defendant identify this

individual?
A. Yes.
Q. Who did he identify him as?
A. Azzam.
Q. The same Azzam we just discussed?
A. Yes.
Q. Can we now turn to page 4?
Did the defendant identify this individual?
A. Yes.
Q. Who did he identify him as?
A. Ali Salim.
Q. The same Ali Salim we were just discussing?
A. Yes.
Q. We can take down Government Exhibit 911.
Now, turning back to the safe house, did the defendant say why he and the other recruits were at that safe house?
A. Yes.
Q. What did he say?
A. They were at the safe house to first be vetted by al-Shabaab. They had to turn over their passports, their cellphones, along with passwords for the cellphone. They all --
THE COURT: What do you mean by the word "vetted"?
THE WITNESS: Vetted, I mean al-Shabaab was testing their intentions to see if they were truly coming to join

al-Shabaab or they could be a government agent or a spy.
Q. Now, did the defendant describe what, if anything, they did at the safe house during that time?
A. Yes.
Q. What did he say they did?
A. They conducted training. They had firearms training in AK-47 rifles. They had religious training. They prayed. Read the Koran.
Q. What, if anything, did the defendant say about who provided this training?
A. Al-Shabaab did.
Q. You said a moment ago that the defendant said they received firearms training, including training on AK-47s. What is an AK-47?
A. AK-47 is a rifle Soviet-made rifle that can fire both semi-automatically and fully automatically.
Q. What does it mean for a firearm to be able to fire semi-automatically?
A. When you squeeze the trigger one time, a semi-automatic weapon would fire one round, and the rifle would automatically cycle the next round into the chamber.
Q. And what does it mean for a firearm to be automatic?
A. Automatic fire is with one squeeze of the trigger, multiple rounds would come out of the firearm.
Q. Ms. Jim, can you please display for the witness, the

parties and the Court what's been marked as Government Exhibit 1301.

Special Agent, do you recognize this?

A. Yes.

Q. What do you recognize it to be?

A. This is an AK-47.

MR. BODANSKY: The government offers Government Exhibit 1301.

THE COURT: Any objection?

MR. ABDULLAH: No.

THE COURT: So far all of the introduced exhibits are admitted. Go ahead.

(Government's Exhibits 902, 905, 911 and 1301 received in evidence)

Q. Please publish this exhibit.

Again, Special Agent, what is this a photograph of?

A. An AK-47 rifle.

Q. Ms. Jim, we can take down Government Exhibit 1301.

Special Agent, are you familiar with the term operational security?

A. Yes.

Q. What does that refer to?

A. That refers to keeping things secret. It refers to not telling people what a potential plan can be so that the plans don't stop or are not stopped by an adversary.

Q. What, if anything, did the defendant say about whether or not he received any training on operational security?
A. He said he did.
Q. When was that?
A. That was at -- also at the first safe house.
Q. And who provided that training?
A. Al-Shabaab.
Q. What are some examples of how one can employ operational security?
A. It could be changing your cellphone, changing email accounts, having multiple accounts, multiple cellphones.
Q. Now, what, if anything, did the defendant say as to where he went next after that safe house?
A. After that safe house, the defendant said they went to the Boni Forest.
Q. Did he say where that is?
A. Yes.
Q. What did he say?
A. He said the Boni Forest is on the border of Kenya and Somalia.
Q. How long did they stay in the Boni Forest?
A. About six months.
Q. What, if anything, did he say about who else he was with in the Boni Forest for that time?
A. He was there with the 19 other recruits.

Q. Can you describe what the defendant said as to what they did in the Boni Forest during that time?
A. Yes. They did military-style type training. They hiked for long distances with heavy -- heavy things in their packs. They hid different caches or supplies of food in the ground in the Boni Forest for other members of al-Shabaab to find.
Q. Did the defendant say where he went next after the Boni Forest?
A. Yes.
Q. Where did he go next?
A. They went to a safe house in Jilib.
Q. What, if anything, else did he say about who he was with in this second safe house in Jilib?
A. He was there with the other 19 recruits.
Q. Did he say how long he was at that second safe house?
A. About three months.
Q. And what did he say about what they did in that second safe house?
A. At this second safe house, they learned about explosives. They learned how to make a bomb using ammonium nitrate. They learned how to build large bombs that he described that were two feet by two feet. And they learned to build smaller bombs that were the size of two fists.
Q. Did he say anything about what the purpose of those bombs would be?

A. Yes.
Q. What did he say?
A. He said the larger bombs were for attacking vehicles and -- vehicles on the road.
Q. Did there come a time during the interview that improvised explosive devices or IEDs were discussed?
A. Yes.
Q. What is an IED?
A. An IED is an improvised device, meaning its components can be found commercially by regular people.
Q. In what context were IEDs discussed?
A. We discussed it when we were talking about the bombs that were fashioned and how they were made.
Q. Now, focusing on that period at the second safe house, did the defendant describe being introduced to any other al-Shabaab members while at that safe house?
A. Yes.
Q. Who did he describe being introduced to?
A. He described being introduced to another al-Shabaab member named Brother.
Q. Who did he say introduced him to Brother?
A. Abdul Salam.
Q. And how, if at all, did he say Abdul Salam described Brother?
A. Abdul Salam described Brother as his superior.

Q. Did the defendant say whether there came a time that he met Brother?
A. Yes.
Q. What did he say?
A. He said he met Brother at the second safe house, outside of the second safe house in a vehicle.
Q. And what, if anything, did the defendant say about what he and Brother discussed in that vehicle?
A. The defendant said that Brother told him that he should not worry about explosives and fighting; that he has a bigger plan for him.
Q. What, if anything, did the defendant say as to how that made him feel?
A. The defendant said it made him feel important.
Q. Did the defendant say where he went next?
A. Yes.
Q. Where did he go next?
A. He went back to the Boni Forest.
Q. And what, if anything, did he say he did there in the Boni Forest that second time?
A. While him and the rest of the recruits were back in the Boni Forest, the rest of the recruits were out conducting military attacks on military targets, and he was back at the camp cooking.
Q. Did he say why he was back at the camp?

A. Yes.
Q. What did he say?
A. He said he was back at the camp because of this greater plan that he was going to be part of, and he was going to be safe at the camp.
Q. Did he say how long he stayed in the Boni Forest that second time?
A. Yes, about a month.
Q. Did he say where he went next after the Boni Forest that second time?
A. Yes.
Q. Where did he go next?
A. He went to a third safe house in Jilib.
Q. Did he say who else he was with at that third safe house?
A. He said he was alone.
Q. Did he describe whether or not he was free to leave that third safe house that he was alone in?
A. He did. He said the safe house was not guarded.
Q. Did he ever in fact try to leave the safe house according to him?
A. No.
Q. And did he say how long he was at that third safe house alone?
A. About three months.
Q. Did he say whether he had any visitors at that third safe

house?
A. He did.
Q. What did he describe?
A. He described getting visits from Azzam, Abdul Salam and also Brother.
Q. How frequent approximately were those visits?
A. Azzam would visit every day. Abdul Salam would visit once or twice a week. And Brother would visit two to three times in the span that he was there.
Q. Did the defendant say why he was at that third safe house?
A. Yes.
Q. What did he say?
A. He said he was there because he had a greater plan.
Q. Can you describe what, if anything, the defendant said about his understanding of what these greater plans were for him?
A. His understanding was that he was meant for something bigger than the fighting and the explosives, and that he was going to be held aside for a plan that Brother had approached him on.
Q. What had Brother said to him?
A. Brother had asked him if he would like to be an airline pilot.
Q. What, if anything, did the defendant say in response?
A. At first the defendant was reluctant. And then he

eventually agreed.

Q. Did Brother describe why the defendant had been selected for this?

A. Yes. The defendant said that Brother said that they had been watching him for a long time, and they believe that he's very intelligent; and that he was hand selected for -- for this mission.

Q. Did the defendant say whether or not he continued to communicate with Brother after Brother said all of that to him?

A. Yes.

Q. Did he describe how they would communicate?

A. Yes. They would --

Q. What did he say?

A. He said they would communicate on Facebook and SendSpace.

Q. What is SendSpace?

A. SendSpace is an online messaging application.

Q. Did defendant say whether there came a time that Brother put the defendant in contact with any other al-Shabaab members?

A. Yes.

Q. What did he say?

A. He put him in touch with a person named Stella Grace, a Facebook profile with the name Stella Grace.

Q. We'll come back to Stella Grace.

Now, returning back to that third safe house, did the defendant say whether there came a time that he returned to

Kenya?
A. Yes.
Q. What did he say?
A. He said he returned to Kenya to retrieve his passport and to start researching airline schools.
Q. Did the defendant say whether he eventually settled on a particular school?
A. Yes.
Q. Which one did he eventually settle on?
A. He settled on the All Asia Academic Aviation Academy in the Philippines.
Q. Did he say why he selected that one?
A. He said because of costs and ease of travel.
Q. Did he say anything about the documents he submitted as part of applying to that flight school?
A. Yes.
Q. What did he say?
A. He said that he had to submit a fake college diploma and also send in a criminal history record.
Q. Did he say whether or not he ultimately traveled to the Philippines to enroll in that school?
A. Yes.
Q. What did he say?
A. He said he did.
Q. What, if anything, did he say as to how long he was in the

Philippines at that flight school?
A. He said he was there for months.
Q. Did he describe what sorts of planes he might ultimately pilot?
A. Yes.
Q. What sorts of planes did he describe?
A. Cargo planes or 747.
Q. Did the defendant describe any plans to leave the Philippines after he completed his flight training?
A. He did.
Q. Based on your involvement in this investigation, are you aware of whether or not the defendant in fact left the Philippines after completing his training?
A. He did not.
Q. Why not?
A. He was arrested in the Philippines.
Q. I'd like to turn back to the Stella Grace that you referenced earlier. Did the defendant say after leaving Somalia he remained in contact with Stella Grace?
A. Yes.
Q. What did he say?
A. He said he kept in daily contact with Stella Grace. He would frequently update Stella Grace on his status.
Q. What did he mean by that, "update him on his status"?
A. Whether he was -- any issues that arised or any problems

that he was facing.
Q. How, if at all, did the defendant describe the nature of his relationship with Stella Grace?
A. Stella Grace was in charge of him. He described it as a handler relationship.
Q. What is a handler?
A. A handler is a person that is your main point of contact when you're acting as an operative.
Q. You testified earlier about something called operational security. Did the defendant and Stella Grace utilize any examples of operational security?
A. Yes.
Q. What did they do?
A. They frequently changed their profile names, and they also spoke in coded language.
Q. Did the defendant describe through which platforms he and Stella Grace communicated?
A. Yes.
Q. What did he describe?
A. He described Facebook and SendSpace.
Q. Did he describe any steps they took to encrypt their communications?
A. Yes.
Q. What did he say about that?
A. They used an application called TrueCrypt.

Q. What is TrueCrypt?
A. TrueCrypt is a publicly available encryption application.
Q. Now, you said earlier that Stella Grace was a Facebook account that the defendant had been put in touch with. Did the defendant say whether Stella Grace used any other Facebook screen names over time?
A. Yes.
Q. What did he say?
A. The defendant said Stella Grace also used Lara Smith and Kimani Mthame.
Q. Did the defendant say whether he received any instructions from Stella Grace in those communications?
A. He did.
Q. What instructions did he say he received?
A. He received instructions on things to research online.
Q. What sorts of things did he research?
A. He was researching all of the plots after 9/11.
Q. Did the defendant say whether he came to any conclusions after conducting his research?
A. Yes. He also did research on visas on traveling to the Bahamas. The defendant talked about researching visas available from Kenya to the Bahamas and while in the Bahamas able to obtain a transit visa from the Bahamas to Atlanta.
Q. Did he describe any conclusions he came to as to how to go about hijacking a plane?

A. He did. He said because of this transit visa, it made it feasible to hijack a U.S. airline.
Q. And did he say -- did he reference any conclusions he reached as to how to physically hijack an aircraft?
A. He did. He said that in order to do that, he needed to be a pilot. So that if he was a pilot, he can already be in the cockpit. He could drug the other pilots and take control of the plane.
Q. Now, you've referenced certain online research the defendant did. Did the defendant describe also undertaking any in-person research?
A. He did.
Q. What did he describe?
A. He described researching the feasibility of taking a knife on board an airplane by using nail clippers to test security.
Q. Did the defendant describe any conversations with Stella Grace about the United States specifically?
A. Yes.
Q. What did he describe?
A. He described the visa, transit visa, between the Bahamas and Atlanta.
Q. And did he say what the purpose would be of getting a visa to enter the United States?
A. To be able to hijack a plane in the United States.
Q. You referenced Atlanta a moment ago. Did he describe any

particular research he undertook with respect to Atlanta?
A. Yes.
Q. What did he describe?
A. He described researching the tallest building in Atlanta.
Q. Did he say why he was researching Atlanta in particular?
A. Yes. Because Atlanta is known to be a busy airplane hub, and there are many flights between Atlanta and the Bahamas.
Q. Are you aware of Atlanta being a hub for any major U.S. airlines?
A. Yes.
Q. What airlines?
A. Delta Airlines.
Q. Now, did the defendant say whether he was ever told by his superiors of a specific attack plan?
A. No.
Q. Did he say why he was not ever told of a specific attack plan?
A. He said it was because of operational security, to keep secrets that leadership in al-Shabaab never told anyone the specific date and time of an attack.
Q. Ms. Jim, can you please display for the witness, the parties and the Court what's been marked as Government Exhibit 408.
Special Agent, do you recognize this?
A. Yes, I do.

Q. What do you recognize it to be?
A. This is a document that I had at that interview, and I read portions of it to the defendant.
MR. BODANSKY: The government offers Government Exhibit 408.
THE COURT: Any objection? It is admitted.
(Government's Exhibit 408 received in evidence)
BY MR. BODANSKY:
Q. Can we please publish that?
Special Agent, you said you read portions of this document to the defendant. What portion of this document did you read to the defendant first?
A. The fourth paragraph that starts with "Brother."
Q. Can you please read into the record, the fourth paragraph and the fifth paragraph?
A. "Brother, all is well. I would like to brief you on some things Inshallah. Firstly, have a gliems of some of the attempt that happened after 9/11. Below which I copy pasted from Wikipedia."
Q. Did you read that language to the defendant?
A. Yes.
Q. Did you ask him any questions about that language?
A. I asked him if he recognized that and did he write it.
Q. How did he respond?
A. He denied it.

Q. He denied having written it?
A. Yes.
Q. Special Agent, generally speaking, how would you describe the defendant's demeanor during the course of the interview?
A. Generally he was soft-spoken, low energy and defeated attitude.
Q. Did there ever come a time during the interview that his demeanor changed?
A. Yes.

(Continued on next page)

BY MR. BODANSKY:
Q. When was the first time that that had occurred?
A. It was right before I read this excerpt.
Q. What was the context in which it first occurred?
A. We were talking about Brother -- I don't recall.
Q. Is there anything that would refresh your recollection?
A. My notes.

MR. BODANSKY: Can we please show, for the witness, the parties, and the Court, what's been marked 3502-15, page 7.

Please enlarge just the middle portion of the page, the fourth and fifth paragraphs.

Q. Special agent, take a moment to review that, and let me know when you're done.

(Pause)

A. I'm done.

MR. BODANSKY: We can take that down.

BY MR. BODANSKY:
Q. Special Agent, does that refresh your recollection as to when the first time it was that the defendant's demeanor changed?
A. Yes.
Q. And when was that first time that his demeanor changed?
A. It's when we were discussing Brother and Brother's larger plans for the defendant.
Q. Can you describe what happened?

A. When we got to this point in the conversation, the defendant became uneasy, appeared uncomfortable, and did not want to answer.

Q. Now, were there any other times, after that, that the defendant's demeanor changed again?

THE COURT: So, when you say that he did not want to answer, how do you know he didn't want to answer?

THE WITNESS: Oh, he was just quiet.

THE COURT: Okay.

So, you can testify as to what he did, but you can't testify as to what was in his head.

Go ahead.

BY MR. BODANSKY:

Q. When was the next time that you observed his demeanor changing?

A. The next time was after we read this excerpt.

Q. And what did you observe at that time?

A. I observed he appeared surprised.

MR. BODANSKY: Ms. Jim, can we please publish Government Exhibit 408 again, if it's not already.

And can we please turn to page 2.

Q. Special Agent, did there come a time that you read another portion of this document to the defendant?

A. Yes.

Q. What portion did you next read to the defendant?

A. Four paragraphs down, starting with "Comments."
Q. Can you please read that paragraph into the record?
A. "Comments: Brother, firstly, I did a research about the -- the interception procedure, and I have it somewhere with me, but I didn't share it with you today because this is not in our priorities; it's just for the precaution and to know about their reaction. So I will share it with you, inshallah, very soon, and it's something I will learn it in depth when I do the type rating, inshallah."
Q. Did you ask the defendant who authored this language?
A. Yes.
Q. And what did he say?
A. He said he did.
Q. After that, did there come a time that you revisited that first portion of the letter that you had read to him?
A. Yes.
Q. And how, if at all -- what did he say about that first portion at that time?
A. He said he wrote that, too.
Q. Did he say who he sent this letter to?
A. He said he sent it to Brother.
MR. BODANSKY: Ms. Jim, can you please now display, for the witness, the parties, and the Court, what's been marked as Government Exhibit 409.
Q. Special Agent, do you recognize this document?

A. Yes.
Q. What do you recognize it to be?
A. This is a document that I read an excerpt to the defendant.
MR. BODANSKY: The government offers Government Exhibit 409.
THE COURT: Any objection?
I hear no objection. It's admitted.
MR. ABDULLAH: No, your Honor.
(Government's Exhibit 409 received in evidence)
MR. BODANSKY: Can we please publish that document.
BY MR. BODANSKY:
Q. Special Agent, which portion of this document did you read to the defendant?
A. I read the paragraph startling, "the other thing."
Q. Can you please read that paragraph into the record?
A. "The other thing is that; yesterday a lady texted me on the Facebook Messenger 'asalaam aleikum brother" so I replied 'wa aleikum salaam' and she asked me where I came from and I replied 'you first.' When I looked at her profile she shared a book known as 'SUICIDE BOMBERS ALLAH'S NEW MARTYRS' by Farhad Khosrokhavar and translated by David Macey. I knew all this details on the cover of the book she shared."
Q. Did you ask the defendant who wrote this language?
A. Yes.
Q. What did he say?

A. He said he did.
Q. Did he say who he sent this letter to?
A. He sent it to Stella Grace.
Q. Did he say why he wrote this portion of the letter to Stella Grace?
A. He said he was sensing something unusual happening in the Philippines.
Q. Did he describe anything that took place shortly after this?
A. Yes.
Q. What did he describe?
A. He said he was arrested in the Philippines.

MR. BODANSKY: We can take down Government Exhibit 409.

Q. Now, during the interview, did the defendant say anything about what he did for money while at the flight school?
A. He did.
Q. What did he say about that?
A. He said that he was supplied a hundred thousand dollars from Stella Grace.
Q. Did he describe how he received that money?
A. Yes.
Q. What did he say?
A. The defendant described receiving the money in four installments from Stella Grace.

Q. Did he describe how he received each of those installments?
A. Yes.
Q. What did he describe, in terms of how he received those installments of funds?
A. He described receiving two installments early on in Kenya. He described another time when he was given instruction by Stella Grace to travel to Nairobi and go to a specific coffee shop at a specific time, and at that coffee shop, someone would meet him and give him money.
Q. And did he say whether or not he, in fact, went to that coffee shop to receive money?
A. He did.
Q. Did he say approximately when that took place?
A. May of -- I don't recall exactly.
Q. Is there anything that would refresh your recollection?
A. Yes.
Q. What would refresh your recollection?
A. My notes.

MR. BODANSKY: Can we please show, for the witness, the parties, and the Court, what's been marked as 3502-15, page 9.

Q. Please take a moment to read the first paragraph, and let me know when you're done.

(Pause)

A. Yes.

MR. BODANSKY: Take that down.
BY MR. BODANSKY:
Q. Does that refresh your recollection as to when he said this meeting in the coffee shop took place?
A. Yes, it does.
Q. When did he say it took place?
A. May of 2019.
Q. And these four installments of cash, who did he say arranged these deliveries of funds?
A. Stella Grace.
Q. What, if anything, did he say about what he used the money for?
A. He said he used it to pay for the flight school and for his day-to-day expenses.
Q. Approximately how much of that money did he use toward the flight school?
A. Approximately $50,000.
Q. What, if anything, did the defendant say regarding his understanding of the source of these funds?
A. Yes, he said the source of the funds came from al-Shabaab's taxation of the people that lived within al-Shabaab-controlled territories in Somalia.
Q. Now, we've been discussing the interview that took place during the flight from the Philippines back to the United States. But you said earlier that there was a second

portion of the interview as well; is that right?
A. Yes.
Q. Can you remind the jury when that second portion of the interview took place?
A. It took place when we landed in New York, at Stewart International Airport, and we went to the Hudson Valley FBI office.
Q. And who participated in that portion of the interview at the Hudson Valley FBI office?
A. Myself and Special Agent Klose.
Q. And, in general, what was the purpose of that second portion of the interview?
A. It was to continue the first portion of the interview, to cover any gaps, and ask any questions to clarify things.
Q. Was that second portion of the interview recorded?
A. Yes, it was.
Q. Why was it recorded?
A. We were at the Hudson Valley RA, and it was a requirement to do so.
Q. What about the earlier portion of the interview on the flight, was that portion recorded?
A. It was not recorded.
Q. Why not?
A. It's my understanding that it was not required, and also because of the loud noise on the aircraft, there was a concern

that any recording would be of poor quality.

MR. BODANSKY: May I approach the witness?

THE COURT: You may.

BY MR. BODANSKY:

Q. Special Agent, I've handed you a disk marked Government Exhibit 920, which contains Government Exhibits 913A, 913B, 913D, 913E, 913F, 913G, 913H, and 913I.

Do you recognize this disk?

A. Yes, I do.

Q. Have you reviewed the contents of this disk previously?

A. Yes.

Q. How do you know this is the same disk that you reviewed previously?

A. This disk has my initials and date on there.

Q. Generally speaking, what's contained on this disk?

A. They contain excerpts of the recorded interview at the Hudson Valley FBI office.

Q. Do the video excerpts on this disk accurately depict portions of the interview you conducted at the Hudson Valley office in December of 2020?

A. Yes, they do.

Q. Does the video also contain captions?

A. Yes.

Q. Do those captions accurately reflect the discussion during those portions of the interviews?

A. Yes.

MR. BODANSKY: Your Honor, the government offers Government Exhibit 920, as well as Government Exhibits 913A, 913B, 913D, 913E, 913F, 913G, 913H, and 913I.

THE COURT: Any objection?

MR. ABDULLAH: No.

THE COURT: Hearing no objection --

MR. ABDULLAH: No.

THE COURT: -- it is admitted.

(Government's Exhibits 920, 913A, 913B, 913D, 913E received in evidence)

(Government's Exhibits 913F, 913G, 913H, and 913I received in evidence)

THE COURT: And we're going to stop now — members of the jury, it's 3:30 — to take our ten-minute break. We'll resume at 3:40. Remember that you are not allowed to discuss the case amongst yourselves. Don't permit anyone to discuss the case in your presence.

(Jury not present)

THE COURT: Sir, you may step out.

(Witness temporarily excused)

(Continued on next page)

THE COURT: Please be seated.

Mr. Bodansky, there are certain exhibits that you are going to seek to admit subject to connection; is that correct?

MR. BODANSKY: That's correct, your Honor.

THE COURT: And you are going to indicate which exhibits you're seeking to admit subject to connection, right?

MR. BODANSKY: That's correct, your Honor, yes.

THE COURT: All righty.

We'll be back at 3:40.

(Recess)

THE COURT: The defendant and the jury should be entering momentarily.

(Continued on next page)

(Jury present)

THE COURT: You may be seated.

AUSA Bodansky, you may continue.

MR. BODANSKY: Thank you, your Honor.

THE COURT: And remember, sir, that you are still under oath.

THE WITNESS: Yes, your Honor.

BY MR. BODANSKY:

Q. Special Agent, we were discussing the second portion of your interview of the defendant at the Hudson Valley field office.

During that portion of the interview, did there come a time that you again discussed Stella Grace?

A. Yes, we did.

Q. And what, if anything, did you discuss about Stella Grace?

A. We spoke about the communication between the defendant and Stella Grace.

MR. BODANSKY: Ms. Jim, can you please publish and pause Government Exhibit 913A.

Q. Now, Special Agent, what is this in front of you?

A. This is the interview room at the Hudson Valley FBI field office.

Q. Can you remind the jury who participated in this portion of the interview?

A. Yes. It's myself — I'm seated in the lower portion of the

photo — Special Agent Klose is on the right side, and the defendant is on the left upper-hand portion of the video screen.

MR. BODANSKY: Ms. Jim, can you please play this video.

(Video played)

BY MR. BODANSKY:

Q. Special Agent, did there come a time during that portion of the interview that the defendant described Facebook accounts used by Stella Grace?

A. Yes.

Q. What, if any, other Facebook accounts did he identify?

A. Lara Smith and Kimani Mthame.

Q. And did there come a time during that portion of the interview that the defendant described any accounts that he had used?

A. Yes.

Q. What accounts did he identify that he had used?

A. Marshal Stewart.

Q. During the interview, did there come a time that you discussed with the defendant his use of codewords with Stella Grace?

A. Yes.

MR. BODANSKY: Ms. Jim, can you please publish and play Government Exhibit 913B.

(Video played)

BY MR. BODANSKY:

Q. Special Agent, during this portion of the interview at the Hudson Valley field office, did there come a time that you asked the defendant about the explosives training he had described earlier receiving at the second al-Shabaab safe house?

A. Yes, we did.

MR. BODANSKY: Ms. Jim, can you please publish and play Government Exhibit 913D.

(Video played)

Q. During this portion of the interview at the Hudson Valley field office, did there come a time that you asked the defendant about the firearms training he had described earlier, including the use of AK-47s?

A. Yes, we did.

MR. BODANSKY: Ms. Jim, can you please publish and play Government Exhibit 913E.

(Video played)

Q. You mentioned earlier the Dusit attack.

During this portion of the interview at the Hudson Valley field office, did there come a time that you asked the defendant how he first came to learn of the Dusit attack?

A. Yes, we did.

Q. What did he say?

A. He said he learned it from the media and from briefings from Stella Grace.

MR. BODANSKY: Ms. Jim, can you please publish and play Government Exhibit 913F.

(Video played)

Q. Special Agent, during the interview, did there come a time that you asked the defendant whether or not he had told anyone that he joined al-Shabaab?

A. Yes, we did.

MR. BODANSKY: Ms. Jim, can you please publish and play Government Exhibit 913G.

(Video played)

Q. Special Agent, during the interview, did there come a time that you asked the defendant about any prior al-Shabaab attacks?

A. Yes, we did.

MR. BODANSKY: Ms. Jim, can you please publish and play Government Exhibit 913H.

(Video played)

Q. Finally, Special Agent, during the interview, did there come a time that you asked the defendant about the circumstances surrounding how he first joined al-Shabaab?

A. Yes, we did.

MR. BODANSKY: Ms. Jim, can you please publish and play Government Exhibit 913I.

(Video played)

BY MR. BODANSKY:

Q. Special Agent, who is Anwar al-Awlaki?

A. Anwar al-Awlaki is an American online lecturer, English-speaking, who espoused a lot of extreme jihadist philosophies.

Q. Is he associated with any particular terrorist group?

A. Yes. With al Qaeda.

MR. BODANSKY: Ms. Jim, you can take down Government Exhibit 913I, please.

Q. Changing gears slightly, Special Agent, you testified earlier that when you were in the Philippines, you not only took custody of the defendant, but also other items; is that right?

A. Yes.

Q. What, if any, instructions had you been given with respect to those devices?

A. I was instructed to verify all the devices, inventory them, and speak to the defendant, and ask him if he owns those devices.

Q. What was your understanding as to where those devices had come from?

A. They came from the Philippine authorities after the arrest of the defendant.

Q. With respect to electronic devices, how many electronic

devices did you take custody of?
A. Seven electronic devices.
Q. Can you briefly describe them?
A. There were three cell phones, two laptops, an iPad, and a USB drive.
MR. BODANSKY: May I approach the witness?
THE COURT: Go ahead.
BY MR. BODANSKY:
Q. Special Agent, I've handed you what's been marked for identification as Government Exhibits 101, 102, and 103.
Please take a moment to look at each item, and let me know when you're done.
(Pause)
A. Yes.
Q. Do you recognize these items?
A. Yes.
Q. What do you recognize them to be?
A. These are the exact three items that I received in the Philippines upon meeting the defendant, and transported these items, these three items, back to the United States.
Q. In preparing to testify today, did you review these three items?
A. Yes.
Q. And did you mark them in any way during your review?
A. I did.

Q. How so?
A. I initialed and dated each item.
Q. And do these items contain those initials and dates?
A. Yes, they do.
Q. Can you just very briefly describe each item one at a time?
A. The first item is a USB drive. It's a flashcard.
The next item is a gold-colored cell phone.
The third item is a blue-colored cell phone.
Q. For the sake of the record, when you said "the first item," were you referring to Government Exhibit 101?
A. Yes.
Q. And was the second item Government Exhibit 102?
A. Yes.
Q. And the third was Government Exhibit 103?
A. Yes.
Q. What's an FBI evidence number?
A. An FBI evidence number is a unique number for each specific piece of evidence. It's tied to a unique case file.
Q. After you took custody of the electronic devices in the Philippines, was an FBI evidence number assigned to each item?
A. Yes, they were.
Q. Do the items in front of you today have evidence numbers written on them?
A. Yes.
Q. Have you had an opportunity to compare the evidence numbers

on the items in front of you to the USB, the gold cell phone, and the blue Samsung that you took custody of in the Philippines?
A. Yes.
Q. Do those evidence numbers match?
A. Yes, they do.
Q. What, if anything, can you conclude from that?
A. That these were the same three items that I received in the Philippines and brought back to the United States.
MR. BODANSKY: May I approach again?
THE COURT: You may.
BY MR. BODANSKY:
Q. Special Agent, I've just handed you Government Exhibits 101P, 102P, and 103P.
Again, take a moment to review each one, and let me know when you're done.
(Pause)
A. Yes.
Q. Do you recognize these items?
A. Yes, I do.
Q. What do you recognize them to be?
A. These are photographs of Government Exhibits 101, 102, and 103.
Q. Just for sake of the record, is 101P a photograph of Government Exhibit 101?

A. Yes.

Q. Is Government Exhibit 102P a photograph of Government Exhibit 102?

A. Yes.

Q. And is Government Exhibit 103P a photograph of Government Exhibit 103?

A. Yes.

MR. BODANSKY: The government offers Government Exhibits 101P, 102P, and 103P.

THE COURT: Any objection?

I hear no objection. They are admitted.

(Government's Exhibits 101P, 102P, and 103P received in evidence)

MR. BODANSKY: Ms. Jim, can you briefly publish each exhibit, one at a time.

And 102P.

And 103P.

Thank you. We can take that down.

BY MR. BODANSKY:

Q. Special Agent, during the course of your interview of the defendant, did there come a time that you asked him about these devices?

A. Yes.

Q. What, if anything, did you ask him?

A. I asked him if he recognized these devices and if he owned

them.

MR. BODANSKY: Ms. Jim, can you please display, for the witness, the parties, and the Court, what's been marked as Government Exhibit 904.

BY MR. BODANSKY:

Q. Special Agent, do you recognize this?

A. Yes.

Q. What do you recognize it to be?

A. These are handwritten notes from the interview.

Q. And directing your attention to the middle portion of the page, what information is listed here?

A. The devices.

Q. And are the three devices we just discussed listed here?

A. Yes.

Q. And what, if anything, did you ask the defendant about this information?

A. We asked him to confirm this information, and if the defendant owns this device, if the device belongs to him.

Q. Did you ask him to do anything with respect to this document, if a device belonged to him?

A. Yes.

Q. What did you ask him to do?

A. We asked him to initial the side, on the left side of the page.

Q. And are those initials reflected on this page here?

A. Yes, they are.

Q. And, to be clear, whose handwriting are those initials?

A. The defendant.

THE COURT: What about the handwriting on the rest of the page?

THE WITNESS: That is myself or my partner's.

MR. BODANSKY: Your Honor, the government offers Government Exhibit 904.

THE COURT: Any objection?

MR. COMMISSIONG: Just a moment, your Honor?

(Counsel conferred with defendant)

MR. ABDULLAH: Your Honor, I have one objection.

THE COURT: All right. If you'll step up, please.

(Continued on next page)

(At sidebar)

MR. ABDULLAH: Your Honor, I apologize for not objecting before because if you see, like all the devices, that it is initiated except the USB, that I object to USB to be admitted, because it was not initiated by anyone.

THE COURT: So, my understanding is that is not part of the exhibit? Or no?

MR. BODANSKY: It's part of the exhibit. I believe the defendant is noting that he initialed certain devices but he did not initial one of the devices. I intend to elicit that fact, that he did not initial that other device, and make that clear.

THE COURT: Okay.

So, he is going to point that out to the jury.

MR. ABDULLAH: Oh.

THE COURT: Okay.

(Continued on next page)

(In open court)

THE COURT: Overruled.

(Government's Exhibits 904 received in evidence)

MR. BODANSKY: If we could please publish Government Exhibit 904.

BY MR. BODANSKY:

Q. You mentioned in front of you were a gold phone and a blue phone.

Are those two items listed in the middle portion of this page?

A. Yes, they are.

Q. And what, if anything, did you ask the defendant with respect to those two devices?

A. If those phones belonged to him, and if they do, initial.

Q. And how did he respond?

A. He responded that they did belong to him.

Q. Did he initial next to those two devices?

A. Yes.

Q. Now, did you also ask him about the USB drive that we were discussing earlier?

A. Yes.

Q. What, if anything, did he say in response to your questions as to that device?

A. He said that device was not his. He said he usually uses a different brand of USB, an HP, or Toshiba.

Q. Now, staying with Government Exhibit 904, and directing your attention to the top portion of the page, what information is included here?
A. This is a list of biographical information. We have full name for the defendant, a date of birth, a citizenship, and tribe.
Q. And what, if anything, did you ask him with respect to this information?
A. We asked the defendant to confirm this information — his name, his date of birth, citizenship, his tribe.
Q. Did you ask him to do anything if the information was accurate?
A. Yes. We asked him to initial on the left-hand side of each line.
Q. And how did he respond with respect to this information?
A. He agreed that the information was accurate.
Q. Now, turning to the bottom half of this document, generally speaking, what's reflected on the bottom half of this document?
A. We have a list of Facebook accounts and email addresses.
Q. Can you please read each of those Facebook accounts and email addresses into the record?
A. Abdul Abdi, John Moses, Salah Far, Ali Blow, Marshal Stewart.
Emails are kokotabdull@gmail.com, snrabdul@gmail.com, abdulsnr@gmail.com, abdulsnr@mail.com, abdul.snr@yondex.com.

Q. Did you ask the defendant anything about those accounts and emails?
A. We asked if these accounts and emails belonged to him.
Q. And how did he respond?
A. He responded that they do.
Q. And did you, similarly, ask him to initial any account that belonged to him?
A. Yes, we did.
Q. And did he initial each of these accounts?
A. He initialed each one.
Q. Are those initials reflected on the page here?
A. Yes, they are; on the left.
Q. And, just to be clear, whose handwriting is it that these initials were written in?
A. That's the defendant's.
MR. BODANSKY: Ms. Jim, we can take down Government Exhibit 904, please.
Q. Now, special agent, in addition to the electronic devices, did you also recover any other items?
A. We recovered a suitcase and a bag, and there were various documents.
Q. To be clear, you recovered these in Manila, when you recovered the defendant as well?
A. Yes.
MR. BODANSKY: Your Honor, may I approach again?

THE COURT: You may.

Q. Special agent, I've handed you items marked for identification as Government Exhibits 104, 105, 106, and 107. Again, take a moment to review each one, and please let me know when you're done.

(Pause)

A. Yes.

Q. Do you recognize these items?

A. Yes.

Q. What do you recognize them to be?

A. These are the same four items that I retrieved in the Philippines when I met the defendant and brought them back to the United States.

Q. Again, in preparing to testify today, did you have an opportunity to review these items?

A. Yes.

Q. Did you mark them in any way during your review?

A. Yes.

Q. How so?

A. I initialed and dated each item.

Q. And do these items reflect your initials and that date?

A. Yes, they do.

Q. Can you please briefly describe each item, one at a time?

A. Government Exhibit 104 is a Kenyan passport. Government Exhibit 105 is a business card from All Asia Aviation Academy.

Government Exhibit 106 is a notebook. And Government Exhibit 107 contains various in-flight documents.

Q. Now, as with the electronic devices we discussed a moment ago, after you took custody of the various other items in the Philippines, was an FBI evidence number assigned to each item?

A. Yes.

Q. Do the items in front of you have evidence numbers written on them?

A. Yes, they do.

Q. And have you had an opportunity to compare the evidence numbers on the items in front of you today with the evidence numbers assigned to the items you collected in the Philippines?

A. Yes.

Q. And do evidence numbers match?

A. Yes, they do.

Q. What, if anything, does that allow you to conclude?

A. That these are the same exact items that I received in the Philippines and brought back to the United States.

MR. BODANSKY: The government offers Government Exhibits 104, 105, 106, and 107.

THE COURT: Any objection?

Hearing no objection, they are admitted.

MR. BODANSKY: Thank you, your Honor.

(Government's Exhibits 104, 105, 106, and 107 received in evidence)

MR. BODANSKY: And may I approach one more time?

THE COURT: You may.

Q. Special agent, I have now handed you items that have been marked for identification as Government Exhibits 104P through 110P. Again, please take a moment to review each one, and please let me know when you're done.

(Pause)

A. Yes.

Q. Do you recognize these items?

A. Yes, I do.

Q. What do you recognize them to be?

A. These are photographs of Government Exhibits 104, 105, 106, 107, 108, and 109, and 110.

Q. The items photographed in Government Exhibits 108, 109, and 110, were those items found within Government Exhibit 107?

A. Yes, they were.

Q. That was the manila envelope?

A. Yes.

Q. Are these photographs accurate representations of Government Exhibits 104, 105, 106, 107, and items found within Government Exhibit 107?

A. Yes, they are.

MR. BODANSKY: The government offers Government Exhibits 104P through 110P.

THE COURT: Any objection?

Hearing no objection, they are admitted.

(Government's Exhibits 104P through 110P received in evidence)

(Continued on next page)

BY MR. BODANSKY:
Q. Can we please publish Government Exhibit 104P?
Special Agent, what is this?
A. This is a Kenyan passport.
Q. And directing your attention to page 10, who does this passport belong to?
A. The defendant.
Q. Now, directing your attention to page 4, what's reflected on this page?
A. These are multiple entrance and exit stamps from Kenyan immigration.
Q. What do these stamps signify?
A. That the defendant had entered and exited Kenya.
Q. And now directing your attention to page 7, what is reflected on this page?
A. Several visas to the Philippines.
Q. If we could just zoom in on the middle top portion of this page. Are these examples of the Philippine visas?
A. Yes.
Q. Are there other Philippine visas on other pages of this passport?
A. Yes, there are.
Q. Ms. Jim, can you now please publish Government Exhibit 105P. Can we please turn to the second page.
Special Agent, what is this item?

A. This is a business card from the All Asia Aviation Academy.
Q. To be clear, what did the defendant say was the name of the flight school in the Philippines that he had enrolled in?
A. He said it was the All Asia Aviation Academy.
Q. Ms. Jim, can you please now publish Government Exhibit 106P.
What is this?
A. This is a photo of a notebook that I brought back from the Philippines to the United States.
Q. And can we please turn to the last page of this notebook. Can we please zoom in on the top portion of this page?
Is there any writing reflected on the top page of the notebook?
A. Yes.
Q. What writing is reflected?
A. Marshall Stewart.
Q. Did there come a time during your interviews of the defendant that he referenced the name Marshall Stewart?
A. Yes, the defendant said that this was his Facebook account.
Q. Ms. Jim, can you now please publish Government Exhibit 107P.
What is this?
A. This is a manila envelope containing several documents.
Q. Ms. Jim, can we now publish Government Exhibit 108P.
Do you recognize this?

A. Yes.
Q. What is this?
A. This is an aircraft weight and balance data sheet.
Q. Where was this item found?
A. This was found in the manila envelope. This was brought back from the Philippines to the United States by me.
Q. This was one of the items in the manila envelope at Government Exhibit 107, correct?
A. Yes.
Q. Ms. Jim, can you now publish Government Exhibit 109P.
What is this?
A. This is a document that contains a checklist for starting your engine before taxi and taxiing for an aircraft.
Q. And directing your attention to the top left of this page, what writing is reflected there?
A. All Asia Aviation Academy.
Q. Finally, Ms. Jim, can you please publish Government Exhibit 110P.
What is this?
A. This is also a flight checklist. It's a normal operations checklist for preflight inspection.
Q. Was this, like 108P and 109P, found within that manila envelope?
A. Yes.
Q. And directing your attention to the top left portion of

this page, what writing is reflected there?
A. All Asia Aviation Academy.
Q. Ms. Jim, we can take that down.
Special Agent, with respect to the defendant's plan to hijack an aircraft, did he describe at one point exploring different possible ways to do that?
A. Yes.
Q. What were the different ways he was exploring to do that?
A. He explored the thought of being a flight attendant on an aircraft versus a pilot.
Q. And did he conclude whether one option was better than the other?
A. Yes, he did. He concluded being a pilot would be better to hijack a plane because he would have access to the cockpit, he would be able to drug the other pilots, whereas if he was a flight attendant, he may not be able to get into the cockpit.
Q. You also testified earlier about doing certain research as to the United States for Stella Grace, the defendant doing research for Stella Grace concerning the United States, correct?
A. Yes.
Q. Did the defendant say anything as to why al-Shabaab was interested in attacking the United States?
A. Yes.
Q. What did he say?

A. He talked about al-Shabaab, the enemy of the -- the enemy of al-Shabaab is the United States.
Q. Two final questions, Special Agent.
Did the defendant say anything about what he expected would happen to others during the course of hijacking an aircraft?
A. Yes.
Q. What did he say?
A. He expected others to be killed and/or injured.
Q. Did the defendant say anything about what he expected to happen to himself in the course of hijacking an aircraft?
A. Yes. He expected to die.
MR. BODANSKY: One moment, your Honor.
No further questions, your Honor.
THE COURT: Cross-examination.
(Shakes head no)
All right. Then you may call your next witness because there will be no cross-examination. You may step out.
(Witness excused)
MR. BRADLEY: Thank you, your Honor.
The government calls Dr. Tricia Bacon.
LAW CLERK: Would the witness please state their name for the record.
THE WITNESS: Tricia Bacon.

TRICIA BACON,

called as a witness by the Government,

having been duly sworn, testified as follows:

THE COURT: Would you spell your name, please.

THE WITNESS: Sure. First name Tricia, T-R-I-C-I-A. Last name Bacon, B-A-C-O-N.

THE COURT: You may inquire.

MR. BRADLEY: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. BRADLEY:

Q. Where do you work?

A. American University.

Q. Where is American University?

A. Washington, D.C.

Q. What is your title there?

A. I'm an associate professor.

Q. What does it mean to be an associate professor?

A. It means I've been promoted with tenure.

Q. How long doing does it take to be promoted with tenure, Dr. Bacon?

A. After you get your Ph.D., it's about six years.

Q. What are your current duties and responsibilities?

A. My main duties and responsibilities are research and teaching.

Q. What courses do you teach at American University?

A. I teach a terrorism and counterterrorism class. I teach a class on intelligence analysis, national security policy, and practicum on counterterrorism.
Q. What is a practicum, Dr. Bacon?
A. It's a management of students to do a project for a client that has counterterrorism relevance.
Q. What other classes have you previously taught at American University?
A. I taught a class on the evolution of global jihad and introduction to political violence insurgency and terrorism, and a Ph.D.-level course on political violence and terrorism.
Q. What have you focused on, Dr. Bacon, in your classes about terrorism?
A. I teach my students about the main organizations that pose a threat to the United States.
Q. What are some of those main terrorist organizations, Dr. Bacon?
A. They have mainly been al Qaeda and the Islamic state.
Q. At a very high level, Dr. Bacon, what is al Qaeda?
A. So al Qaeda is an organization, and it is also a network of organizations that have alliances with the core organization. And it has an ideology that it wants to overthrow the current international order, specifically the U.S.-led international order in order to recreate a caliphate state, essentially.
Q. Is there a name for that ideology, Dr. Bacon?

A. It's often referred to as global jihadism.

THE COURT: What does caliphate mean?

THE WITNESS: It's essentially a mega state that would include countries that are Muslim majority dominated countries in a current sort of international system, and it would be a religious and political system.

Q. What would be the effect, Dr. Bacon, generally, of the caliphate on the United States?

A. Well, the view of al Qaeda is that you have to overthrow the United States in order to achieve this political objective. So it would involve essentially the collapse of the United States.

Q. You mentioned a network of al Qaeda, Dr. Bacon. What did you mean by that?

A. So al Qaeda has created relationships with other organizations that are known as affiliate relationships and they are a specific kind of alliance.

Q. What are some of these affiliate organizations that you have taught courses about?

A. So I've taught courses about al Shabaab, which is one of al Qaeda's affiliates, as well as its affiliates in the Arabian Peninsula and North Africa.

Q. We'll talk more about al-Shabaab, Dr. Bacon, but where is al-Shabaab based?

A. It's primarily based in Somalia, but it has a presence

throughout East Africa.

Q. Beginning with your undergraduate studies, Dr. Bacon, could you please describe your educational background?

A. Sure. I have a B.A. in sociology from Stetson University, a master's degree in public policy and public affairs from the University of Florida, and a Ph.D. in international relations from Georgetown University.

Q. When did you receive your Ph.D. from Georgetown University?

A. 2013.

Q. What was the focus -- what was your focus during your Ph.D. studies at Georgetown?

A. I focused on understanding terrorist organizations alliance behaviors specifically when they formed alliances with one another.

Q. Did you write a dissertation as part of your Ph.D. studies?

A. Yes. That was the topic of my dissertation.

THE COURT: What is a dissertation?

THE WITNESS: I think it's probably most charitably referred -- like a book, but it's when you have to defend in front of a committee of your advisors and other faculty members.

Q. What was the title of that dissertation, Dr. Bacon?

A. "Why Terrorist Groups Form International Alliances."

Q. Now, were you employed while you were pursuing your Ph.D. while at Georgetown?

A. Yes, I was.
Q. Where were you working?
A. I was working at the U.S. Department of State.
Q. Approximately when did you work at the U.S. State Department?
A. From about January 2003 to August 2013.
Q. What was your most recent title that you held at the state department?
A. Senior foreign affairs officer.
Q. When you were a senior foreign affairs officer, Dr. Bacon, in which bureau or office within the state department did you work?
A. I worked in the Bureau of Diplomatic Security, the Bureau of Counterterrorism, and the Bureau of Intelligence and Research.
Q. I'd like to focus on your work at the Bureau of Counter -- excuse me -- the Bureau of Intelligence and Research. Did you work for any component or office within that group at the State Department?
A. Yes, I worked in the Office for Analysis of Terrorism, Narcotics and Crime.
Q. What were your responsibilities there?
A. So the responsibilities there are to analyze terrorist organizations that pose a threat to U.S. interest overseas primarily and to analyze the counterterrorism efforts of

countries in specific regions.
Q. What regions did you work on when you were at the Office of Analysis for Terrorism, Narcotics and Crime?
A. I worked on Africa, and then I worked on South Asia.
Q. Over what period of time were you working on Africa, Dr. Bacon?
A. Around 2004 to 2007.
Q. What happened after 2007?
A. I was assigned to work on south Asia as the region.
Q. Now, during your work at the state department, what were some of the most significant terrorist organizations that you focused on?
A. Well, during the period I was working on Africa, the group I focused on the most was the formation and emergence of al-Shabaab.
Q. What were some of the issues that you handled at the State Department relating to al-Shabaab?
A. There were two main issues. One was that there was a cell of East African al Qaeda operatives who were hiding in Somalia under the protection of individuals who became al-Shabaab, and the other was how al-Shabaab essentially sort of coalesced into an organization.
Q. Did you receive any recognition for your work on al-Shabaab while you were at the State Department?
A. Yes, I did.

Q. What recognition did you receive?
A. I received two Superior Honor Awards.
Q. Now, Dr. Bacon, what did you do after leaving the State Department?
A. I joined the faculty at American University.
Q. Did you continue to research terrorist organizations after becoming a professor?
A. Yes, I did.
Q. Did that research include organizations such as al-Shabaab?
A. Yes, it did.
Q. Did it include other al Qaeda affiliates as well?
A. Yes, it did.
Q. Now, as part of your academic work, what methods have you used to learn and research about al-Shabaab?
A. I have reviewed other scholars' work on the organization. I've reviewed international organizations or think-tank reports. I have followed the group's propaganda. And I've traveled to the region.
Q. What did you do during traveling to the region or during your travels to the region?
A. As an academic?
Q. Yes.
A. I primarily conducted interviews, semi-structured interviews with people who had knowledge of al-Shabaab.
THE COURT: All righty. We are going to stop here.

Dr. Bacon is going to return tomorrow morning at 9:00 to continue her testimony.

So what I have to remind you of is that 8:30 breakfast will be here, but you must be ready to come into the courtroom at 9:00 a.m. sharp. If you are late, it throws everything off. Many people are involved in putting on a trial, and their schedules entitle get disrupted. My schedule will get disrupted. So you must be on time.

Remember, do not discuss this case amongst yourselves or with anyone else. Don't permit anyone to discuss the case in your presence. See you tomorrow. Have a good evening.

(Jury not present)

(Witness not present)

THE COURT: Who do you expect to be calling tomorrow?

MR. BRADLEY: Your Honor, we will continue with our testimony of Dr. Bacon. We will next -- the names of the witnesses specifically we would call Joseph Kolum, and then we would call Shunsuke Otani.

THE COURT: Is there anything before we close for the day?

MR. BRADLEY: Not from the government's perspective, your Honor.

MR. COMMISSIONG: Just one moment, your Honor.

(Pause)

MR. COMMISSIONG: Nothing, your Honor.

THE COURT: All right then 8:45.

MR. BRADLEY: Just for planning purposes, your Honor, I would just note that we do seem to be moving at a pretty brisk clip just from the government's perspective, just so the Court is aware.

THE COURT: See you tomorrow morning. Good evening.

(Trial continued October 30, 2024 at 8:45 a.m.)

INDEX OF EXAMINATION


Examination of: Page

KEVIN SONG

Direct By Mr. Bodansky . . . . . . . . . . . . . .37

TRICIA BACON

Direct By Mr. Bradley . . . . . . . . . . . . . 112


GOVERNMENT EXHIBITS


Exhibit No. Received

902, 905, 911 and 1301 . . . . . . . . . . . .61

408 . . . . . . . . . . . . . . . . . . . . .75

409 . . . . . . . . . . . . . . . . . . . . .80

920, 913A, 913B, 913D, 913E . . . . . . . . .86

913F, 913G, 913H, and 913I . . . . . . . . .86

101P, 102P, and 103P . . . . . . . . . . . .96

904 . . . . . . . . . . . . . . . . . . . . 100

104, 105, 106, and 107 . . . . . . . . . . . 104

104P through 110P . . . . . . . . . . . . . . 106