UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

v. 20 Cr. 677 (AT)

CHOLO ABDI ABDULLAH,

Trial

Defendant.
------------------------------x

New York, N.Y.
October 30, 2024
8:45 a.m.

Before:

HON. ANALISA TORRES,

District Judge

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
NICHOLAS S. BRADLEY
JONATHAN L. BODANSKY
Assistant United States Attorneys

CHOLO ABDI ABDULLAH, Pro Se

ADAMS & COMMISSIONG LLP
KARLOFF C. COMMISSIONG, Standby Counsel

SAHLI LAW PLLC
EMILEE A. SAHLI, Standby Counsel

ALSO PRESENT: SABRINA JIM MUNOZ
SEAN ZERGER, Special Agent, FBI

(Trial resumed; in open court; jury not present)

THE COURT: Good morning.

MR. BRADLEY: Good morning.

THE COURT: Please make your appearances.

MR. BRADLEY: Good morning, your Honor. For the government, Nicholas Bradley, Jonathan Bodansky, along with Paralegal Specialist Sabrina Jim Munoz and Special Agent Sean Zerger, with the FBI.

MR. COMMISSIONG: Good morning, your Honor. Karloff Commissiong and Emilee Sahli, standby counsel. And Mr. Abdullah is present in the courtroom.

THE COURT: Please be seated.

Mr. Bradley, I assume that there is going to come a point when you ask me to qualify Dr. Bacon as an expert; is that correct?

MR. BRADLEY: That is correct, your Honor.

THE COURT: That should come sooner than later.

MR. BRADLEY: Yes, your Honor.

THE COURT: This morning, I received a letter from the government, docketed at ECF 139.

Mr. Abdullah, did you receive a copy of the letter, dated October 30th?

MR. ABDULLAH: Not yet.

MR. BRADLEY: We have a copy, your Honor. I believe we either handed it to him or are going to hand it to him now.

And as we noted in our email to chambers this morning, we don't believe this needs to be taken up before the proceedings this morning.

And I just note for the record that we have handed the letter to him now.

THE COURT: All righty.

So, Mr. Abdullah, if you would like to comment on the letter, I'd like you to do so in writing.

When is it that you wanted to raise the issues in the letter, Mr. Bradley?

MR. BRADLEY: Your Honor, we've been trying to bake in some lead time for the defendant's review. I expect that the witnesses, specifically the custodians of record from Meta and Google, would be witnesses offered tomorrow, at which point we would expect to offer those particular exhibits that were referenced in the letter.

THE COURT: All right, then.

So, Mr. Abdullah, I'm expecting a written response by tomorrow morning.

MR. ABDULLAH: Okay.

THE COURT: Is there anything that either party would like to raise at this time?

MR. BRADLEY: Not from the government, your Honor.

MR. COMMISSIONG: Not from standby counsel, your Honor.

THE COURT: We have a problem with Juror No. 2. She has expressed to a member of my staff that she does not understand everything that is being said because of a language barrier.

I can bring her in and question her at this time, if you would like.

MR. BRADLEY: I think that makes sense, your Honor.

MR. ABDULLAH: It makes sense, your Honor.

THE COURT: All right. If you'll have No. 2 come in, please.

(Pause)

(Juror present)

THE COURT: Good morning.

JUROR: Yes, good morning.

THE COURT: Are you Juror No. 2?

JUROR: Yes.

THE COURT: Is there a problem?

JUROR: My problem is that my English is not very well. I understand some parts, but I don't understand.

THE COURT: So, you're saying that some of what you have heard, you did not understand?

JUROR: Yes.

THE COURT: Okay.

So, it's very important that every juror understands --

JUROR: I understand.

THE COURT: -- a hundred percent.

JUROR: Yes. This case very difficult for me.

THE COURT: Okay.

And so what I encourage you to do is to continue to study English so that your English will improve --

JUROR: Yes.

THE COURT: -- to the point where you will understand 100 percent and be able to participate as a juror.

I'm happy that you have tried, but, unfortunately, I'm going to have to excuse you.

JUROR: Okay.

THE COURT: Thank you.

JUROR: Thank you.

(Juror not present)

THE COURT: Mr. Ballesteros, if you would have Alternate No. 1 enter the courtroom, please.

(Juror present)

THE COURT: Sir, you're Alternate No. 1?

JUROR: That's correct.

THE COURT: You are now Juror No. 2.

JUROR: Okay.

THE COURT: So when you come in at 9:00 a.m., you will be seated in the second seat from the left.

JUROR: Okay. Gotcha. Thank you.

THE COURT: We'll see you at 9:00 o'clock.

JUROR: Okay. Thank you.

(Juror not present)

THE COURT: Anything further?

MR. BRADLEY: One house matter, your Honor, in terms of offering or qualifying Dr. Bacon. I know some courts in the district have different preferences. I was intending to say, just in the presence of the jury, that the government, at the appropriate time, offers Dr. Bacon pursuant to Rule 702.

Would that be amenable to the Court's preference?

THE COURT: No, no. I think that you should say that you offer her as an expert in X subject.

MR. BRADLEY: Yes, your Honor, of course.

THE COURT: So that they understand that she is indeed an expert.

MR. BRADLEY: Yes, your Honor, of course.

THE COURT: All righty. So we will start at 9:00 a.m.

MR. BRADLEY: Thank you.

(Recess)

THE COURT: Please have the jurors brought in.

MR. BRADLEY: Your Honor, may we have the witness take the stand as well?

THE COURT: Yes.

MR. BRADLEY: Thank you.

(Jury present)

THE COURT: Good morning, jurors.

JURY MEMBERS: Good morning.

THE COURT: Please be seated.

We're going to continue with the testimony of Dr. Bacon.

Remember that you are still under oath.

THE WITNESS: Okay.

TRICIA BACON, resumed.

DIRECT EXAMINATION CONTINUED

BY MR. BRADLEY:

Q. Good morning.

A. Good morning.

Q. Dr. Bacon, you testified yesterday that you worked at the State Department; is that correct?

A. That's correct.

Q. How long did you work at the State Department?

A. Ten years.

Q. Approximately over what period of time were you responsible for counterterrorism issues related to Africa while at the State Department?

A. About 2004 to the end of 2007.

Q. What was your title at that time?

A. Foreign affairs officer.

Q. To what extent, during that 2004 to 2007 period, were you focused on matters related to al-Shabaab at the State

Department?
A. I would say that was my primary area of focus, because there were so many developments during that time.
Q. What kind of developments do you mean, at a general level?
A. Generally, it was the evolution and formation of al-Shabaab and the activities of some al Qaeda operatives that were cooperating with them.
Q. Now, Dr. Bacon, you also mentioned that you left -- that you then joined American University as a professor in 2013, correct?
A. Correct.
Q. And have you continued to research organizations such as al-Shabaab since becoming a professor?
A. Yes, I have.
Q. Dr. Bacon, are you familiar with the term "Sunni jihadist organization"?
A. Yes.
Q. What is that?
A. A label often applied to violent organizations that came to adhere to the Sunni interpretation of Islam and usually have a fairly extreme interpretation of that sect of Islam.
Q. Now, as part of your academic work, Dr. Bacon, what methods have you used to continue learning and researching about al-Shabaab?
A. I've consulted the work of other academics who have worked

on Somalia and al-Shabaab specifically. I followed, of course, media outlets and journalists who report on Somalia. I have consulted the reports of international organizations, like the United Nations, as well as aid organizations that operate in Somalia. I've consulted databases that have been constructed by other scholars, and I have conducted field research in the region.

Q. Will you be relying on a synthesis of those different sources and methods as part of your testimony today?

A. Yes, I will.

Q. Now, you mentioned, while you were at the State Department, you worked on matters related to Africa.

Did you travel to Africa during your time at the State Department?

A. Yes, I did.

Q. What parts of Africa?

A. I traveled to Uganda, Ethiopia, Kenya, and Djibouti.

Q. What did you do during those trips while at the State Department?

A. Well, two of those trips were what we call consultation trips, where I was meeting with security officials in those countries, police, civil society organizations, journalists, other diplomats, to get information from them about the state of the terrorist threat in the region.

For one of the trips, I went to serve at the

U.S. Embassy in Nairobi, which, at the time, was where the Somalia reporting was being conducted because we didn't have an embassy in Somalia at the time.
Q. What was the term for that position?
A. It was called a "Somalia watcher."
Q. What were your responsibilities as the Somalia watcher?
A. My responsibilities were to gather information about developments in Somalia, specifically with al-Shabaab, and report them back to Washington.
Q. What was the purpose of your studies, at the State Department or research at the State Department, related to al-Shabaab?
A. It was to understand the group's organization, its ideology, its objectives, its leadership, and particularly its relationship to al Qaeda.
Q. What did you ultimately do with that research while at the State Department?
A. I would produce written products or briefings for senior U.S. Government officials.
Q. Can you describe some of the ways you worked to learn about al-Shabaab during these trips while at the State Department?
A. I would have meetings with local government officials, security forces, security services, police, civil society organizations, as well as multilateral organizations, like the African Union, or international organizations, like the United

Nations.
Q. What is the African Union, Dr. Bacon?
A. The African Union is a regional multilateral organization in Africa that includes 55 African states.
Q. Dr. Bacon, have you traveled to Africa as part of your academic research after leaving the State Department?
A. Yes, I have.
Q. When did you travel to Africa?
A. I went twice in 2017, once in 2018, once in 2021, and once last year, in 2023.
Q. To what countries did you travel?
A. I went to Kenya and Somalia.
Q. What did you do while you were there?
A. So, for those trips, I was specifically conducting interviews for research projects that I was working on.
Q. What kind of research projects were you working on at this point?
A. So, I did a project on leadership in succession that included a case on al-Shabaab. I was doing a project on the state of al-Shabaab's relationship with al Qaeda. I did a project on how foreign fighters operated within al-Shabaab, and I did a project on al-Shabaab's decision-making.
Q. What are you referring to by the term "foreign fighters," Dr. Bacon?
A. So, foreign firefighters would be nonethnic Somalis who

have joined Al-Shabaab.
Q. Did you work on any commissioned projects at the time?
A. I did. I worked on two projects that were commissioned by the United Nations' special envoy for Somalia.
Q. What were those projects, Dr. Bacon?
A. One of those was the project looking at the trajectory and strength of the al Qaeda-al-Shabaab relationship, and the other was looking at prospects for foreign fighters to exert more influence in al-Shabaab.
Q. What do you mean by the term "trajectory"?
A. What we might expect in the future, in the next three to five years.
Q. Did you continue to conduct interviews during your travels to Africa as part of your academic studies?
A. Yes, I did.
Q. Who did you interview, Dr. Bacon?
A. It was a number of individuals. I would interview, again, people who were in the securities services, the militaries that were operating in Somalia, police, Somali government officials, international organizations, AU — African Union — and U.N. officials, as well as businessmen, aid organizations, and individuals formerly associated with the group.
Q. Approximately how many people did you interview?
A. I would say about a hundred.
Q. You mentioned different categories of people, for lack of a

better word.

Approximately how many people in each category did you interview?

A. I would say about ten or so in each category.

Q. Would that number be difficult to quantify?

A. Yes.

Q. Why is that?

A. Because the conflict in Somalia is blurry in a lot of ways, which is to say that people will have multiple affiliations. For example, there are people in the government who used to be in al-Shabaab. There are people working as businessmen, for example, who double as informants for al-Shabaab. Al-Shabaab has really penetrated Somali government institutions and society in a way that's hard to understand necessarily the allegiances of people you're talking to.

Q. Why did you select these different groups of people for your interviews?

A. Well, what I'm trying to do is get information from different sources, different types of sources, people with different perspectives, so I can try to corroborate information across these different categories.

Q. Why would you seek to corroborate this information?

A. It gives me more confidence that the information that I've collected is accurate.

Q. Where did you primarily conduct these interviews during

your academic research trips to Africa?
A. So, in Nairobi, in Mogadishu, in Hargeisa, and in Berbera.
Q. Why did you choose these locations?
A. Because those are all places where al-Shabaab operates and has a presence and where people who are involved in countering the organization are located.
Q. What kinds of topics did you cover during these interviews?
A. I was always seeking to understand the current state of the organization, but also its leadership, how much influence its leadership had, the state of its ties both with al Qaeda and some of the affiliated organizations, as well as the group's receptivity to different kinds of political settlements and solutions.
Q. Why were you doing all this?
A. So, a big part of my job is producing research that advances our knowledge and understanding of terrorist organizations, in my case, specifically al-Shabaab.
Q. In your field, Dr. Bacon, what is this kind of study called?
A. It's called qualitative research.
Q. What is qualitative research?
A. Qualitative research really focuses on in-depth understandings of specific cases. It is in contrast, usually, to quantitative research, which is the reliance on large datasets and doing statistical analysis of those datasets.

Q. How does qualitative research provide you with insight into a particular area of study?
A. It helps provide that kind of understanding because you really focus on one specific case in depth versus maybe a hundred different cases or 200 different cases at a more superficial level.
Q. Would qualitative studies, such as your interviews, be considered a generally accepted methodology in your field?
A. Yes, it is.
Q. Why is that?
A. It's one of the two main types of methodology that we train Ph.D. students at and that is accepted in the peer-review process that leads to publications.
Q. You mentioned publications.
During your work as an academic, what books have you published related to your studies on al-Shabaab?
A. I've published two books.
Q. What are the titles of those books?
A. The first book is called "Terror in Transition: Leadership in Succession in Religious Terrorist Organizations," and the second is "Why Terrorist Groups Form International Alliances."
Q. How do those books relate to al-Shabaab, Dr. Bacon?
A. So, the book on why terrorist groups form international alliances focused a lot on al Qaeda's development of an alliance network, and al-Shabaab was one of the groups that

formed an alliances with al Qaeda. So I looked at it from that perspective.

The "Terror in Transition" was a book that looked at four cases of leadership in succession in religious terrorist organizations, and al-Shabaab was one of the cases that I looked at.

Q. Do you have any forthcoming publications?

A. I do -- well, I have a manuscript I have just completed.

Q. What's the title of that manuscript?

A. I'm not necessarily committed to a title yet, if I'm honest with you, but it is on foreign fighter influence and insurgencies.

Q. How does that book on foreign fighters and insurgencies relate to al-Shabaab?

A. About half the book is on al-Shabaab. It looks at the evolution of foreign fighters' roles and influence within the group over the course of the insurgency.

THE COURT: Would you explain what you mean by "foreign fighters"?

THE WITNESS: So foreign fighters, in this context, would be nonethnically Somalis who join al-Shabaab and become part of the organization.

THE COURT: What do you mean by "nonethnically Somalis"?

THE WITNESS: So ethnic Somalia's would be an ethnic

category that is both in Somalia and some of the surrounding regions, as well as, of course, people who live overseas. So they speak Somali, and they are ethnically Somalia, and they have a clan identification associated with that ethnicity.

BY MR. BRADLEY:

Q. Dr. Bacon, in addition to the books you discussed, have you also published academic articles related to al-Shabaab?

A. Yes, I have.

Q. Can you describe some of those articles?

A. So, I did an article that examined the decision-making, the ideology, and the objectives of al-Shabaab. I published an article that looked at how foreign fighters influenced the early phases of al-Shabaab's insurgency. I published an article that looked at the al-Shabaab's decision to stay with al Qaeda when the Islamic state sought to kind of woo al-Shabaab away and become part of its alliance network.

Q. Were any of these articles published in a peer-reviewed journal?

A. Yes.

Q. Which ones?

A. Studies in Conflict & Terrorism, the Journal of Middle East and Africa, the George Washington project on extremism, and I think Terrorism and Political Violence.

Q. What is a peer-reviewed journal, Dr. Bacon?

A. A peer-reviewed journal is when you submit the article, it

is made anonymous, and then it's sent to two scholars who work on the same issues, and they provide anonymous feedback to assess the quality of the article and whether it's worth publishing.

Q. Were your books peer reviewed as well?

A. Yes, they were.

Q. Now, we talked about how you studied al-Shabaab in a number of ways.

Have you also studied any primary sources of information about al-Shabaab?

A. Yes. Al-Shabaab produces an extensive amount of propaganda, so I also have studied what the group puts out in the media.

Q. How does al-Shabaab issue propaganda, based on your studies?

A. It's long been fairly active in terms of putting out this kind of information. It's run websites, it had social media accounts on Facebook, in Twitter, in Telegram, and then it developed its own media wing that it uses to disseminate its propaganda.

Q. What is that media wing known as?

A. Al-Kataib.

Q. What kinds of propaganda does al-Shabaab issue?

A. Sometimes it's videos, sometimes it's really simply statements, sometimes it's showing people who are engaging in

training or videoing the actual operations, and providing footage of the operations it conducts.
Q. In what language does al-Shabaab issue this propaganda?
A. Initially, in the very early phases of the group, it was just in Somali, but very shortly after forming, it expanded its languages to English and Arabic, and then, later on, to Swahili as well. So most of its videos are in one language and have subtitles in multiple other languages.
Q. Why would al-Shabaab release propaganda in English, Dr. Bacon?
A. I think it does so for a couple of reasons. I mean, English is widely spoken in parts of the Horn of Africa. It also wants to reach potential supporters in the West. And some of its messages are directly delivered to, or intended to be delivered to, governments in the West.
Q. What's the general nature of the propaganda that al-Shabaab issues?
A. The general nature of it is to explain why it undertakes the actions that it does, what its motives are, what its purpose is.
Q. Approximately how many al-Shabaab-issued statements or propaganda pieces have you reviewed during the course of your academic career?
A. Oh, probably thousands at this point.
Q. Is reviewing such materials as part of your research

considered a generally accepted methodology in your field?
A. Yes, it is.
Q. Have you studied the work of other scholars about al-Shabaab?
A. I have.
Q. Why do you do that?
A. Because they sometimes have looked at different topics than I have, or they have different access to information or different sources of expertise.
Q. Who are some of those different scholars whose work you've surveyed related to al-Shabaab?
A. So, I've examined the work of Stig Hansen — he's a Norwegian scholar who wrote the first major book on al-Shabaab; the work of Roland Marchal, who is a French scholar who has pretty extensive contacts in Somalia and in al-Shabaab; Ken Menkhaus is an American scholar who worked at the U.N. in the 1990s in Somali and has really worked on these topics for a number of years. So those would be three examples.
Q. Are there any other examples, Dr. Bacon?
A. There's a very prominent Voice of America journalist named Harun Maruf who wrote a really insightful book on al-Shabaab as well.
Q. To your understanding, Dr. Bacon, are these works generally peer reviewed by other scholars?
A. The ones that are conducted by scholars are, yes.

Q. Have you studied any other publications related to al-Shabaab activities?
A. So, the countering terrorism center at West Point developed a database of al-Shabaab suicide attacks that I have also looked at fairly closely.
Q. Have you created databases as part of your academic research?
A. Yes, I have.
Q. What kind of databases?
A. So, I created a database that focused on the nationality of the suicide operatives that al-Shabaab has used, and I created a database of al-Shabaab's attacks on what are called forward operating bases, which are, in Somalia, sort of these small static bases that are manned by Somali government forces or African Union forces or U.S. forces.
Q. Have you studied other publications or reports issued by other organizations related to al-Shabaab?
A. Yes. So, the United Nations has a monitoring group that specifically reports on developments in the conflict in Somalia, and the U.N. also has a monitoring group that reports on activities related to al Qaeda and the Islamic State, and both of those monitoring groups have extensive information on al-Shabaab.
Q. Have you also studied the work of other journalists in this area?

A. Yes, I have studied, and I get regular, sort of, translations from different languages of journalism coming out of Somalia.
Q. Have you studied the publications or work of the U.S. Government or other country governments related to al-Shabaab?
A. Yes, I have.
Q. And how so?
A. So, the U.S. Government puts out something annually called the Country Reports on Terrorism, which provides an annual snapshot for the entire world, but will include a section on Somalia and al-Shabaab. The U.S. intelligence community puts out an annual threat report, for example. So those kinds of reports.
Q. Have you testified before, Dr. Bacon, regarding your knowledge of Sunni jihadist organizations?
A. In court?
Q. Yes.
A. Yes.
Q. Have you ever provided testimony before Congress related to those organizations?
A. Yes.
Q. Well, how many times?
A. Twice.
Q. After your time at the State Department, have you been

asked to use your knowledge of al-Shabaab to provide briefings?
A. Yes, I have.
Q. What kinds of briefings?
A. So, I've provided briefings for the U.N. special envoy on Somalia, to the U.K. cabinet office, the United Kingdom's cabinet office, to the U.S. Secretary of Defense, the U.S. ambassador to Somalia, other U.S. officials.
Q. Dr. Bacon, during your work at the State Department, and also as an academic, to what extent have you focused on al-Shabaab?
A. Al-Shabaab -- I do study a number of organizations, but al-Shabaab is one of the main ones that I study.
Q. As a result, Dr. Bacon, are you familiar with the history of al-Shabaab?
A. Yes, I am.
Q. Are you familiar with the structure of the group?
A. Yes, I am.
Q. And as well as its operations?
A. Yes.
Q. Are you being paid for your time in this case, Dr. Bacon?
A. Yes, I am.
Q. What is your rate?
A. $300 an hour.
Q. To your understanding, is that consistent with rates charged by your colleagues?

A. It's a little bit less, but, yeah, it's largely consistent.

MR. BRADLEY: Your Honor, one moment with standby counsel and the defendant.

(Pause)

MR. BRADLEY: Your Honor, at this time, the government offers Dr. Bacon as an expert in the history, structure, operations, and objectives of the group al-Shabaab.

THE COURT: Any objection?

MR. ABDULLAH: Your Honor, defense asks for a sidebar.

THE COURT: Okay.

(Continued on next page)

(At sidebar)

MR. BRADLEY: If it's his objection, he needs to --

MR. COMMISSIONG: No, I understand. I just want to offer some context.

(Pause)

MR. COMMISSIONG: Let me just explain how this happened.

So, in one of the transcripts the government provided with respect to Dr. Bacon, she testified at trial with, I believe, Judge Rakoff. Judge Rakoff flagged the issue with respect to how experts are qualified. He mentioned that the Second Circuit outlawed use of qualifying or offering an expert as an expert in a particular subject as opposed to proffering them pursuant to Rule 702. It's just something that I noted for the government and something that I relayed to the defendant as something that he should raise.

MR. BRADLEY: Your Honor, we're not aware of a binding circuit precedent on this. As I raised earlier, we understood it was a matter of judicial preference as to the phraseology of how a witness would be qualified in front of the jury. And, obviously, the jury would be instructed at the charge how they would take into account and consider the opinions of an expert in their deliberations — they can believe it or not believe it.

THE COURT: You're saying that the Second Circuit has said that an individual cannot be qualified as an expert in a

specific subject?

MR. COMMISSIONG: I'm not saying that. I'm just saying that when I read the transcript, that Judge Rakoff flagged it in that case. The government can't seem to find whatever the case may be. I can't find the case --

MR. BRADLEY: For context — and I appreciate Mr. Commissiong's trying to flag the issue — Judge Rakoff, at a previous trial, articulated that he believed the practice was no longer permitted in the Second Circuit. I am not aware of a case, and neither is our appeals unit familiar with any case, about that. I believe it's a matter of judicial preference.

THE COURT: So, Judge Rakoff is a learned judge, but I don't agree with him, if that is his position. And so you may seek to qualify Dr. Bacon as an expert in the subject that you described.

MR. BRADLEY: Thank you.

I believe you already said that, so I think we'll just hear any objection from the defendant.

MR. ABDULLAH: There's confusion, so we brought this matter to you to decide.

THE COURT: Yes. And I have decided that she can be qualified in the subject that he described.

MR. ABDULLAH: Okay, your Honor.

THE COURT: All righty.

(Continued on next page)

(In open court)

THE COURT: The witness is qualified as an expert in the subject matters that AUSA Bradley just described.

Go ahead.

BY MR. BRADLEY:

Q. Dr. Bacon, in preparing for your testimony today, did you review any of the discovery materials produced in this case?

A. No.

Q. Have you ever met the defendant?

A. No.

Q. Have you ever participated in the investigation in this case?

A. No.

Q. Now, Dr. Bacon, you've described -- first, just to recap, where is al-Shabaab primarily located?

A. It's primarily located in Somalia and operates in sort of the surrounding countries.

Q. Is there a term or description for that region of the world?

A. It's usually referred to as East Africa.

Q. Are you familiar with that geography, based on your research?

A. Yes.

MR. BRADLEY: Ms. Jim, could you please show the witness, the Court, and the parties what's been marked for

identification as Government Exhibit 1201.
BY MR. BRADLEY:
Q. Dr. Bacon, do you recognize Government Exhibit 1201?
A. Yes, I do.
Q. What is this?
A. It is a map of East Africa.
Q. Is it a fair and accurate depiction of East Africa?
A. Yes, it is.
MR. BRADLEY: Ms. Jim, could you also please show Dr. Bacon, the Court, and the parties what's been marked as Government Exhibit 1207 for identification.
Q. Dr. Bacon, what is shown here on the screen in Government Exhibit 1207?
A. It's a slightly smaller map of East Africa.
Q. Are there various locations on this map?
A. Yes.
Q. Are the locations in the map fair and accurate, to your knowledge?
A. Yes.
MR. BRADLEY: Your Honor, at this time, the government offers Government Exhibits 1201 and 1207.
THE COURT: Any objection?
MR. ABDULLAH: No objection.
THE COURT: They are admitted.
(Government's Exhibits 1201 and 1207 received in

evidence)

MR. BRADLEY: Ms. Jim, could you please publish Government Exhibit 1201.

BY MR. BRADLEY:

Q. Dr. Bacon, what do we see here in Government Exhibit 1201?

A. So, there is a map with three countries highlighted. In yellow is Somalia, and in white is Kenya and Uganda, and then there's an array of other countries in gray.

Q. Dr. Bacon, there are three stars on this map and some text next to them.

What are those locations?

A. So that is the capital of Uganda, which is Kampala; the capital of Kenya, which is Nairobi; and the capital of Somalia, which is Mogadishu.

MR. BRADLEY: Ms. Jim, could you please publish Government Exhibit 1207.

Q. Dr. Bacon, what are we looking at here?

A. So, this is a map which also has some of the capitals listed, as well as some additional locations.

Q. So, we'll continue to refer to these maps as we talk today.

MR. BRADLEY: And, Ms. Jim, you can pull that down, please.

Q. So, Dr. Bacon, at a basic level, what is al-Shabaab?

A. So, al-Shabaab is a predominantly Somali Sunni jihadist organization.

Q. What are its objectives?
A. It has basically three objectives. One is to overthrow the current Somali government and expel the foreign forces that are operating in Somalia, so that it can take power and forge its interpretation of an Islamic State.

The second is the unification of what is the idea known as Greater Somalia, which is to bring parts of neighboring countries that are mostly Somali into this Somali state, this Islamic State.

And the third is for this project to be part of al Qaeda's broader objective to overthrow the United States and create an Islamic caliphate that spans multiple countries.

THE COURT: When you say that neighboring states are mostly Somali, are you saying that the residents are mostly ethnic Somalians?

THE WITNESS: Yes, in certain regions in the surrounding countries.

BY MR. BRADLEY:
Q. Now, Dr. Bacon, you briefly mentioned this yesterday, but just as a very quick recap, what do you mean by caliphate or caliphate?
A. So, it's a reference to the idea of an overarching Islamic, like, essentially, a state, but an extensive state that has religious authority and that operates based on the religion of Islam. And it would include the most of the Muslim majority

countries in the Middle East, Africa, Southeast Asia, et cetera.

Q. At least under al-Shabaab's interpretation, how would the establishment of that caliphate affect the United States?

A. So the idea that al Qaeda propagates, that its allies and affiliations agree with, is that you can't achieve this objective without overthrowing the United States, that the United States is the main impediment to this long-term objective.

MR. BRADLEY: Ms. Jim, would you please publish Government Exhibit 1207 again.

Q. Now, Dr. Bacon, do you see Government Exhibit 1207 on the screen?

A. Yes, I do.

Q. And assuming the touchscreen works, could you please illustrate, Dr. Bacon, where al-Shabaab is primarily based in Somalia?

A. So, it operates in various parts of Somalia, but its sort of major control and operations are largely south of the line that I just sort of amateurly provided on that map.

MR. BRADLEY: And if I can just ask if the jury can just indicate with a thumbs up if they saw the telestrator?

Thank you, members of the jury.

Q. Dr. Bacon, on this map as well, there are a number of solid lines, but there is a dotted line just beginning at the very

top of the red line that you drew.

Could you describe that dotted line and why it's dotted?

A. So that is the border between Ethiopia and Somalia. It is largely internationally recognized, and Ethiopia recognizes it as well, but it is not recognized by Somalia because the area to the west of that line is one of those areas that I mentioned that's primarily ethnically Somali that would fit into this idea of a Greater Somalia.

Q. Are there any locations in Somalia today where al-Shabaab exerts particular control and influence?

A. Yes. So, south of the line that I provided, it controls almost all of the rural areas of Southern Somalia. So it doesn't control any major cities, like Mogadishu or Baidoa, but it does control most of the rural areas and a number of the roads that connect cities in Southern Somalia.

Q. There is one city near the bottom of the map of Somalia named Jilib.

Are you familiar with that city?

A. Yes.

Q. What is the significance of that city for al-Shabaab?

A. So Jilib is basically al-Shabaab's de facto capital.

Q. Taking a step back, Dr. Bacon, when was al-Shabaab formed?

A. So, al-Shabaab was formed as an independent organization in 2007, but it's -- their origins go back further than that.

Q. What were those origins, Dr. Bacon?

A. So, the main origin for al-Shabaab was an organization that operated in the 1990s known as Al-Itihaad al-Islamiya, AIAI, and when the government of Somalia collapsed in early 1990s, most of -- a civil war broke out, and most of the factions that were fighting were clan-based factions, but AIAI was an Islamist ideology faction, and it fought in the civil war and eventually collapsed as an organization later in the 1990s, and a number of al-Shabaab figures were in AIAI during that time.

Q. You mentioned that the Somalia government had collapsed around this time period.

What was happening in Somalia around the 1990s?

A. So, there was the overthrow of the government in this really brutal civil war, and then there was a U.N. intervention into the conflict to try to stem the famine and create some kind of negotiated settlement between the warring parties.

Q. So against all of that backdrop, under what circumstances did al-Shabaab emerge?

A. So, one of the things that AIAI did in trying to carve out a place in the civil war was it invited a number of al-Qaeda operatives to come to Somalia to help train them, and so they gained this experience and this training from al Qaeda during the 1990s.

A number of them, when the organization collapsed, continued to hold those same objectives; they just didn't have

an organization, a coherent organization, to operate within for several years during the late 1990s.

Q. When you use the term "operatives," what are you referring to?

A. So, within an organization like AIAI, there were individuals who were involved in trying to administer territory or judges, but then operatives are the people who were engaging in violence. AIAI lost several major battles to clan factions, and then was basically routed by Ethiopian forces. So when I say operatives, I'm referring to the people who are engaged in the violence.

Q. What ultimately became of those members of AIAI after the group collapsed?

A. So, there was a division between factions of the organization. There were some that saw that jihad or violence was not viable as a way to achieve their objectives, and so they really undertook a mission of proselytization to try to convert Somali society to their interpretation. And then there was another sort of subset of the organization that sought ways to continue to engage in violence, but were looking at a longer time horizon for achieving their objectives.

Q. Did any succession -- did any groups later form out of this division?

A. So, the more hardline faction of AIAI became the nucleus of al-Shabaab.

Q. Dr. Bacon, are you familiar with the term "Islamic Courts Union"?
A. Yes, I am.
Q. What is that?
A. So, in the absence of a government throughout the 1990s and 2000s, there were these various grassroot initiatives to create Islamic courts in order to provide a mechanism for justice, mediation, order. And a lot of times these courts just operated individually, but around approximately 2003, they came together in an umbrella organization that combined the courts and the militias associated with them, and that's the Islamic Court Union.
Q. About what time period are we talking about here?
A. Approximately 2002-2003.
Q. How did that group, the Islamic Courts Union, influence al-Shabaab's ultimate formation?
A. So, the Islamic Court Union was a very broad umbrella, so it had people of an array of ideological interpretations and views about what the objective was. Al-Shabaab embedded itself as one of the factions within the Islamic Court Union that was its most extreme ideologically. It was committed to violence to achieve its aims and sort to gain power within the Islamic Court Union and essentially take it over.
Q. What was the relationship between the Islamic Courts Union and al Qaeda around this time period?

A. So, the Islamic Court Union writ large didn't necessarily have a relationship with al Qaeda, but al-Shabaab, which was in the Islamic Court Union, did have a relationship with al Qaeda from the outset because there was a cell of East African al Qaeda operatives who had fled to Mogadishu to hide from counterterrorism efforts.
Q. Was that al Qaeda cell you mentioned involved in any terrorist attacks?
A. Yes, they were. A number of them participated in the 1990 bombings of the U.S. embassies in Nairobi and Dar es Salaam, in Kenya and Tanzania. And then in 2002, there was a bombing of a hotel in Mombasa, Kenya, in an effort to shoot down an airliner, a passenger airliner, flying out of the airport in Mombasa. The hotel bombing was successful, but they were not able to shoot down the passenger plane.
So those operatives were involved in those two attacks and fled, after the 2002 Mombasa attacks, to Mogadishu.
Q. Now, Dr. Bacon, just looking at Government Exhibit 1207, just to orient us, could you indicate on the map where Mombasa is?
A. Sure.
MR. BRADLEY: And the record should reflect that the witness has circled Mombasa.
Q. Now, Dr. Bacon, what did these al-Shabaab members in the Islamic Court Union ultimately do with these al Qaeda

operatives when they fled from Mombasa?
A. So, initially, they hid them. They were protecting them, and they hid them. But as the Islamic Court Union gained strength and control of Mogadishu, they essentially brought them out to a greater degree, and had them participate in fighting, and assigned them positions in the burgeoning al-Shabaab organization.
Q. What ultimately happened to the Islamic Court Union?
A. So the Islamic Court Union successfully took over Mogadishu and was the first entity to do so since the government collapse. But the al-Shabaab operatives within the group essentially provoked Ethiopian forces in nearby Baidoa, and the Ethiopian military response militarily defeated the Islamic Court Union in a matter of weeks.
Q. Why were Ethiopian forces involved in the conflict in Mogadishu at this time?
A. So, since 1991, there had been multiple international efforts to create a Somali government. The 14th effort was underway at this time, the Transitional Federal Government, and it had been formed in Nairobi with Ethiopian backing. And they had moved from Nairobi into Baidoa as kind of the notional capital because they were not strong enough to actually enter into Mogadishu because of the security situation there. So, the Transitional Federal Government was based in Baidoa and protected by Ethiopian forces there.

Q. Dr. Bacon, could you just indicate on Government Exhibit 1207 where Baidoa is?
A. Sure.
MR. BRADLEY: The record should reflect that the witness has circled Baidoa.
BY MR. BRADLEY:
Q. Dr. Bacon, after the Ethiopian forces came into Mogadishu, what happened to the Islamic Court Union?
A. So the Islamic Court Union effectively collapsed, but al-Shabaab remained a coherent unit after this Ethiopian intervention.
Q. How did al-Shabaab compare philosophically and ideologically to the Islamic Court Union?
A. Al-Shabaab was the most extreme ideological faction within the Islamic Court Union in its interpretation of Islam, its commitment to violence, and its political objectives.
Q. What were its political objectives at the time of al-Shabaab's formation?
A. The objectives I talked about earlier really were in place at the time of al-Shabaab's formation, which was the desire to create an Islamic State and a Greater Somali and to align itself with al Qaeda.
Q. At this point, how -- well, around this time period of al-Shabaab's emergence as an independent group, how did al-Shabaab view the United States?

A. Al-Shabaab was kind of born with the idea that the United States was one of its primary enemies.

Q. Why is that, Dr. Bacon?

A. It's multiple fold. I think it was in part because the Ethiopian intervention was seen as supported by the United States because the United States was targeting the al Qaeda operatives that were hiding with al-Shabaab, and because al-Shabaab really signed onto al Qaeda's mission from the beginning, it had existing connections with al Qaeda ideologically, as well as these personal connections with operatives dating back to the 1990s.

Q. Around the time of its formation as an independent group, how much of Somalia did al-Shabaab ultimately control?

A. So, initially, it just emerged as an insurgent force against Ethiopian forces in 2007, roughly 2008, but it succeeded in really inflicting a lot of casualties on the Ethiopians, and so the Ethiopians wanted to withdraw and essentially be backfilled by African Union forces. And so during this transition of withdrawal of Ethiopian forces and the rise of -- or influx of African Union forces, al-Shabaab really exploited that opportunity, and it took most of Southern Somalia, really the only exception being Mogadishu.

THE COURT: What do you mean by "exploited"?

THE WITNESS: Well, there was sort of a security vacuum as there was this transition between Ethiopian forces

and African Union forces. And the African Union forces had a defensive mandate, so they were protecting the Somali government, but they weren't undertaking any operations against al-Shabaab. So it was able to really expand and capture a lot of territory as the Ethiopians withdrew.

BY MR. BRADLEY:

Q. You mentioned the Somali government.

What was the Somali government doing around this time?

A. So, the Transitional Federal Government had become the Somali federal government at this time, and became a government that actually incorporated a number of the Islamic Court Union officials and leadership. So it was sort of developing as a federal government during this time.

Q. How has al-Shabaab's control of areas in Southern Somali changed over time?

A. So it was able to control territory for several years, and then the African Union forces, as well as Kenyan and Ethiopian forces, conducted a series of military operations that really rolled back its territory. Specifically, it took back the major cities. So al-Shabaab has basically remained entrenched in rural areas, but it doesn't control any major cities anymore.

Q. Is Jilib one of the cities that al-Shabaab does control?

A. Yes.

Q. Now, Dr. Bacon, how does al-Shabaab maintain influence in

Somalia today?
A. So, it maintains influence, in part, through controlling territory. It also runs a court system that gives it influence. It engages in violent attacks, which are a source of influence. And it has an elaborate extortion network that it refers to as taxation, which also gives it influence beyond its territory.
THE COURT: What do you mean by "extortion"?
THE WITNESS: It demands that people pay a certain amount of their business proceeds, their animal herds, anything they import, and if they don't pay, they use violence against them.
BY MR. BRADLEY:
Q. You mentioned tax, Dr. Bacon.
What kind of a tax are you talking about?
A. Al-Shabaab basically taxes everything in terms of the economy in Southern Somalia, even in areas it does not control. It has taxed the port in Mogadishu, for example. So it is able to reach in beyond areas that it doesn't control into all parts of the Somali economy.
Q. And my apologies, I might have misspoken. With regard to attacks --
A. Did you say attacks?
Q. Attacks.
A. Oh, I beg your pardon.

Q. My apologies.
A. Sorry.
Q. What kinds of attacks are you referring to?
A. So, al-Shabaab engages in battles with Somali military and African Union military forces, but it also engages in attacks, like assassinations, suicide bombings, armed assaults on hotels, restaurants, beaches, and an array of civilian targets.
Q. What is the purpose of al-Shabaab attacking civilian targets?
A. It's trying to intimidate the population so that it will not comply with the Somali government, and it's also trying to punish those who it sees as supporting the Somali government.
Q. Are these some of the ways in which al-Shabaab has pursued these political goals that you mentioned earlier?
A. Yes.
Q. Now, Dr. Bacon, are you familiar with the term "Sharia law"?
A. Yes.
Q. What is Sharia law?
A. So Sharia law is one of those terms that's used in a variety of different ways. There's no one meaning for Sharia law. It is essentially meaning Islamic law, law that is consistent with Islam and the Quran. But in the context of al-Shabaab, it has a very extreme interpretation of Sharia law in terms of harsh punishments and how it exerts social control.

Q. What kind of interpretation of Sharia law are we talking about?
A. I mean, it conducts things like amputations, it imposes how women must dress and where they're allowed to be located, it bans music and certain kinds of businesses, that kind of thing.
Q. Could you describe al-Shabaab's relationship with al Qaeda around the time it became an independent group, in 2007?
A. So, as soon as al-Shabaab became an independent group, it had the al Qaeda operatives that were already present take positions in al-Shabaab, and it put out a number of statements that were sympathetic to and praising al Qaeda.
Q. What ultimately became of the al Qaeda operatives that you mentioned earlier who were protected by al-Shabaab in Somalia?
A. By around 2011, they had all been killed.
Q. Prior to that, Dr. Bacon, what kind of positions did they hold within al-Shabaab?
A. They had senior positions in Shabaab's military, or what it would call its army, senior positions involved with training, head of training, and one that was involved in security, which is more sort of intelligence and covert operations.
Q. Could you describe some examples of these al Qaeda operatives who were promoted within al-Shabaab?
A. Yeah. One example would be an individual named Abu Talha al Sudani, who was a Sunni operative. In the early 1990s, al Qaeda was based in Sudan, and then it moved to Afghanistan

in 1996, and Abu Talha al Sudani was designated as the lead for al Qaeda in the region after its departure, and then he took on a senior military role in al-Shabaab later on.
Q. Could you provide another example, Dr. Bacon?
A. Yes. There was an individual named Harun Fazul. He had been deployed to Somalia in the early 1990s to provide the training that I mentioned, and then was involved in the 1998 embassy bombings and the 2002 Mombasa attacks. And then he fled to Mogadishu a little bit later than the other operatives, and he was Osama bin Laden's secretary when he was in Afghanistan, and he took on this role that I mentioned of sort of a security portfolio for covert operations.
Q. Are you familiar with an individual named Saleh Ali Nabhan?
A. Yes.
Q. Who is he, Dr. Bacon?
A. He was a Kenyan operative that was part of the East African al Qaeda cell. He was involved in the 2002 Mombasa attacks, and he, in particular, gained a high level of status and respect within al-Shabaab and was really widely admired within the group.
Q. Why is that, Dr. Bacon?
A. Sometimes non-Somalis have a difficult time gaining that kind of stature, but he really saw his role as connecting al-Shabaab to al Qaeda and imparting the skills and knowledge that he had gained as part of al Qaeda to al-Shabaab.

Q. Finally, are you familiar with an individual named Issa Osman Issa?
A. Uh-huh.
Q. Who is he?
A. So Issa Osman Issa was a Somali Kenyan who also was part of the East African cell involved in the 2002 Mombasa attacks, and he, like Abu Talha al Sudani, became more involved in the group's army operations and was involved in a number of battles.
Q. What was the significance of all of these promotions of al Qaeda operatives by al-Shabaab?
A. I think there were several things that were significant. One, it was an indication of the esteem with which they were held, that al-Shabaab viewed them as very capable. The second was it was a way of al-Shabaab signaling its respect for and desire to be associated with al Qaeda from the outset.
Q. How influential, ultimately, were these al Qaeda operatives within al-Shabaab?
A. Their level of influence varied, but someone like Saleh Nabhan was very influential within al-Shabaab.
Q. You mentioned that all of these operatives have since died.
How are they regarded within al-Shabaab today?
A. So, particularly Saleh Nabhan is invoked regularly by the organization. It will often declare operations in his memory, and really sort of celebrate him and his contributions to

al-Shabaab.

Q. When you say "operations," what are you referring to?

A. I'm referring to attacks.

Q. How did al Qaeda react to the emergence of al-Shabaab?

A. Al Qaeda reacted positively to the emergence of al-Shabaab. In particular, some of its more senior ideologues who made public statements embraced the al-Shabaab's objectives and embraced the organization.

Q. What are some examples of al Qaeda operatives who have supported al-Shabaab publicly?

A. So, there was an individual named Abu Yahya al-Libi, who was a Libyan al Qaeda ideologue who was a very public figure for the organization in explaining its ideology, its objectives. Very early on, he put out a series of statements supportive of al-Shabaab's mission in Somali to expel the Ethiopian forces to create an Islamic State in Somalia. So he was a very high profile, very senior figure in al-Qaeda, often referred to as the number two or number three within the group, who really publicly embraced al-Shabaab early on.

Q. Are you familiar with an individual named Anwar al-Awlaki?

A. Yes.

Q. Who he is?

A. Anwar al-Awlaki was an American cleric who left the United States and went to Yemen and joined the al Qaeda affiliate in Yemen, which is known as al Qaeda in the Arabian

Peninsula. But he became a really senior ideologue for the movement overall. He was a very high profile, very gifted speaker and very well trained as a cleric. And so he was a senior figure within the al Qaeda in the Arabian Peninsula specifically, but really al Qaeda as a whole.

Q. What, if anything, has Anwar al-Awlaki said regarding al-Shabaab?

A. He was really the first senior al Qaeda ideologue to directly name al-Shabaab and point out the organization specifically, not just its cause writ large, but the organization specifically, as pursuing an objective consistent with al Qaeda and an objective that he viewed as religiously valid.

Q. Now we'll return to Government Exhibit 1207 later.

MR. BRADLEY: But, Ms. Jim, could you please take that exhibit down. Thank you.

Q. Dr. Bacon, how did al-Shabaab respond to these statements of support by al Qaeda operatives?

A. It really reciprocated those statements and would put out statements either in direct response or put out statements with admiration for Anwar al-Awlaki or Osama bin Laden in its subsequent statements.

Q. What about Abu Yahya al-Libi?

A. It frequently still invokes Abu Yahya al-Libi, in particular, in its statements and refers to him as someone it

really admires and adheres to his guidance. He died in 2012, but he is still often invoked by al-Shabaab.
Q. How did al-Shabaab ultimately come to be recognized by al Qaeda?
A. It was a little bit of a convoluted process for al-Shabaab. It established direct contact with al Qaeda leadership in Afghanistan and Pakistan and asked to become an affiliate. And, initially, Osama bin Laden, who was alive at the time and al Qaeda's leader, said you can become an affiliate, but we don't want to make it public, we don't think it's a good idea for it to be public. So, al-Shabaab accepted this kind of private affiliate status within al Qaeda, and then later, after bin Laden was killed in 2012, it was publicly acknowledged as an al Qaeda affiliate by bin Laden's successor, Ayman al-Zawahiri.
Q. And how was it publicly acknowledged in 2012, Dr. Bacon?
A. So, after bin Laden was killed, al-Shabaab's leader made a public declaration to Ayman al-Zawahiri of a pledge of allegiance, and then the following year, in February 2012, al Qaeda put out a video that featured both al-Shabaab's leader and al Qaeda's leader, and announced that the two organizations were merging and that the two leaders were in this affiliate relationship.
Q. Who was al-Shabaab's leader at the time?
A. His name was Ahmed Abdi Godane.

Q. Did he appear in that propaganda piece?
A. Yes, he did.
Q. And who did he appear with?
A. Ayman al-Zawahiri, which was bin Laden's successor as the leader of al Qaeda.
Q. Historically, Dr. Bacon, has the United States taken any steps against al-Shabaab after its emergence?
A. Yes, it has.
Q. What are those?
A. One of the main ones was to designate the organization as a foreign terrorist organization, and as a specially designated global terrorist.
Q. When did that occur?
A. In February 2008.
Q. Do those designations continue to this day?
A. Yes.
Q. Why were those designations put into place?
A. They were put into place because of al-Shabaab's use of violence, its objectives, and its relationship with al Qaeda.

MR. BRADLEY: Ms. Jim, could you please show the witness, the Court, and the parties what's been marked for identification as Government Exhibit 1303.

Q. Dr. Bacon, do you recognize what's been marked as Government Exhibit 1303?
A. Yes.

Q. What is it?
A. So this is the logo that al-Shabaab puts on a lot of its media statements.
Q. Does this picture fairly and accurately depict al-Shabaab's logo?
A. Yes.
MR. BRADLEY: Your Honor, the government offers Government Exhibit 1303.
THE COURT: Any objection?
MR. ABDULLAH: No.
THE COURT: It is admitted.
(Government's Exhibit 1303 received in evidence)
MR. BRADLEY: Ms. Jim, could you please publish Government Exhibit 1303.
BY MR. BRADLEY:
Q. Dr. Bacon, what are we looking at here?
A. What's pictured here are two AK-47s that are on top of a depiction of the Quran, and, in the background, you can see the outlines of the State of Somalia.
Q. Dr. Bacon, do you see that there is text in yellow at the top and the bottom of this logo?
A. Yes.
Q. Do you know what that text at the top of the logo means?
A. Yes.
Q. What does it mean?

A. So, al-Shabaab means youth. So this says, "Youth Mujahideen Movement."
Q. What about the text across the bottom of the logo in yellow?
A. That says, "Youth Army of Somalia."
THE COURT: In what language is that?
THE WITNESS: Arabic.
BY MR. BRADLEY:
Q. Now, Dr. Bacon, there's also some text just above what you described as the open Quran.
What is that text?
A. So, that text is the declaration of faith for Muslims, which is one of the pillars of Islam that all Muslims adhere to their declaration of faith.
Q. What's the name of that declaration of faith?
A. Shahada.
Q. Just generally speaking, what is that?
A. It's a saying that there is no god but God and the prophet Muhammad was God's messenger.
Q. Does al-Shabaab have any other banners or logos that it uses?
A. Yes.
MR. BRADLEY: Ms. Jim, could you please show Dr. Bacon, the Court, and the parties what's been marked for identification as Government Exhibit 1302.

BY MR. BRADLEY:
Q. Dr. Bacon, do you see Government Exhibit 1302?
A. Yes.
Q. Do you recognize it?
A. Yes.
Q. What is it?
A. It's -- usually al-Shabaab uses it in videos. It will be a cloth flag that it will prop up in various parts of its videos.
Q. Does this picture fairly and accurately depict an al-Shabaab flag?
A. Yes.

MR. BRADLEY: Your Honor, the government offers Government Exhibit 1302.

THE COURT: Any objection?

Hearing no objection, it is admitted.

(Government's Exhibit 1302 received in evidence)

MR. BRADLEY: Ms. Jim, could you please publish Government Exhibit 1302.

THE COURT: So, is Arabic spoken by the membership?

THE WITNESS: Not most -- some of the members. It's not the primary language of most or even the second language of most, but it is a language some of them speak.

BY MR. BRADLEY:
Q. Dr. Bacon, I guess following on that, is there a reason why al-Shabaab would use Arabic text in logos or flags such as

this?

A. It's, in part, an honoring of the Quran being in Arabic and using the language of the Quran.

Q. Now, Dr. Bacon, do you see Government Exhibit 1302 on the screen, just to confirm?

A. Yes.

Q. Could you please tell us what we're looking at here?

A. So, this is another depiction of the Shahada, the declaration of faith that I mentioned before.

Q. And where is the Shahada on this flag?

A. So this is the text at the top of the flag.

MR. ABDULLAH: Objection, your Honor.

THE COURT: You'll step up, please.

(Continued on next page)

(At sidebar)

MR. ABDULLAH: The issue is that I don't know whether she speaks Arabic, but the translation that she gave for the emblem is not correct. So, I want to know whether she speaks Arabic.

THE COURT: So, you can do that on cross-examination. The objection is overruled.

Let's go.

(Continued on next page)

(In open court)

THE COURT: Overruled.

BY MR. BRADLEY:

Q. Just one more question about this exhibit, Government Exhibit 1302, Dr. Bacon.

Do you see the white circle in the middle of the flag?

A. Yes.

Q. What does that say?

A. It's essentially another way of communicating that declaration of faith referring to God, messenger, and Muhammad.

Q. Thank you.

MR. BRADLEY: Ms. Jim, can you please, if you would, pull down Government Exhibit 1302.

Q. Dr. Bacon, how is the leadership of al-Shabaab organized?

A. So, the most senior level, there's three layers to it. One is the top leader, who's known as the Amir, and then there is an executive council, which is around a dozen men, and then there is a broader consultative sura that has several dozen people who provides sort of symbolic leadership for the organization.

Q. Do you know the members of this executive council, Dr. Bacon, that you mentioned?

A. So, all of the members of the executive council are not necessarily clear, there are some secretiveness around it, but a few of the executive council members currently and in the

past are known.
Q. What do these three bodies or groups do in managing al-Shabaab?
A. They set the strategy for al-Shabaab, its direction, manage its attacks, its governance, its territory, those kinds of functions.
Q. What do you mean by "governance," Dr. Bacon?
A. So, in the areas that al-Shabaab controls, it has erected basically a full shadow government with governors, which it refers to as provinces, different ministries, a police force, and also a court system that I mentioned earlier.
Q. Does al-Shabaab have a name for its police or other similar organizations within itself?
A. So, its police are known as the Hisba, and it has an intelligence unit known as the Amniyat.
Q. What does the Amniyat do?
A. The Amniyat is the intelligence wing of al-Shabaab, so it is charged with identifying spies, with executing threats that the government makes to people who are supporting the government or not paying their taxes, it indoctrinates suicide bombers, and it manages Shabaab's more complex attacks, especially against higher profile targets.
Q. You mentioned suicide bombers.
What role to suicide bombers play in al-Shabaab attacks?

A. Al-Shabaab frequently uses suicide bombings either using vehicles or as suicide vests on people as part of its attacks either on their own or as a way to gain entrance into a hardened target, and then armed assailants can get in.

(Continued on next page)

Q. What did you mean by more complex targets, Dr. Bacon?
A. Targets that are more difficult to access because of security or because of where they're located.
Q. Would any of these targets be located outside of Somalia?
A. Yes.
Q. How does al-Shabaab refer to those kinds of attacks or operations?
A. They're generally referred to as external operations.
Q. How long has al-Shabaab conducted external operations, Dr. Bacon?
A. It conducted the first one in 2010.
Q. What is the top position in al-Shabaab called?
A. The emir.
Q. How is the emir selected?
A. So there's only been two leaders of al-Shabaab, but when there was succession, it was selected by the executive council.
Q. What power does the emir hold?
A. So the emir has basically absolute power. Some leaders have used that more than others though.
Q. Who was al-Shabaab's first leader?
A. Ahmed Abdi Godane. G-O-D-A-N-E.
Q. Is he known by any other names?
A. Yes, he was also known as Abu Zubair, especially in communications with al Qaeda.
Q. How long did Godane lead al-Shabaab?

A. So he was appointed as the group's leader in 2007, when it emerged as an independent organization, until his death in 2014.

Q. How is he regarded within al-Shabaab today?

A. He is viewed with a lot of admiration and respect. He really created al-Shabaab in his image and was a very influential leader.

Q. What was Godane's role in the relationship between al Qaeda and al-Shabaab?

A. So Godane was the leader who appealed to al Qaeda to become an affiliate to al Qaeda and eventually was successful in achieving that.

Q. Who is al-Shabaab's current emir?

A. His name is Ahmed Diriye.

Q. Is he known by any other names?

A. He also goes by Abu Ubaidah and Ahmed Umar.

Q. How does al-Shabaab's emir control others within the group?

A. The omniyat is a particularly powerful way that the leader can use to exert his will over the group, but, of course, the executive counsel and sharia council follow his orders.

Q. Why do they follow his orders?

A. Because when you join al-Shabaab, members of the group have to swear allegiance to the leader as sort of a religiously binding oath that they will be faithful to the leader.

Q. What is that religiously binding oath called?

A. A bayat.
Q. What's the significance of that?
A. It's basically emulating the pledge of allegiance that was given to the prophet Muhammad by early Muslims.
Q. What happens to the bayat when there is a leadership change within the group?
A. It has to be renewed to the new leader.
Q. How does al-Shabaab raise money for itself and its operations?
A. Al-Shabaab is pretty self-sufficient in its revenue generation through the extortion system that I mentioned earlier.
Q. I'm going to ask you this time actually about taxes. How does al-Shabaab -- you talked earlier about taxes. How does al-Shabaab tax the population?
A. So its taxes are essentially extortion, but they are based on, for example, the amount of money a business makes over the course of a year or how many animals are in a herd. So it will tax at different rates. It has checkpoints on the road that it will charge for moving through a specific road. And if you go through a road, and al-Shabaab discovers you haven't paid other taxes, it will then impose those taxes on the driver at that time. So it requires pretty in depth knowledge of various parts of the Somali economy.
Q. How does al-Shabaab exert this influence for taxation in

areas not under its direct control?

A. This is where the threat from the omniyat really is pronounced because the omniyat is able to threaten people who do not pay. It has been known to kidnap family members of people who don't pay or the people who don't pay, and then they're required to pay even more than they would have if they had just paid the tax.

Q. What, if any, services does al-Shabaab provide to the population in Somalia?

A. The main service that it provides is its court system.

Q. Could you describe its court system, Dr. Bacon?

A. So it has a series of courts that are used to mediate disputes in particular and a variety of sort of dispute-resolution cases. And it will call people from, you know, either its territory or places it doesn't control to its courts in order to hear them and rule on them.

Q. How does al-Shabaab hold out its court system within Somalia?

A. So al-Shabaab depicts its court system as not corrupt, unlike the government's court system, and adhering to sharia law versus clan-based considerations, which is another criticism of the Somali courts. And al-Shabaab uses sharia law as the basis or holds out that it uses sharia law as the basis for its decision, which has respect within Somali society.

Q. How does al-Shabaab enforce its court rulings?

A. There is the threat of violence if individuals do not comply with its rulings.

Q. Any other services that al-Shabaab provides to the Somali population?

A. It offers what it calls some education, but that's received a lot of scrutiny as really being more indoctrination centers than places that offer a viable education.

Q. Dr. Bacon, how has al-Shabaab historically regarded American interests?

A. Since the outset, al-Shabaab has viewed the United States as one of its primary enemies that it should conduct violence against.

Q. Why is that?

A. It's a couple rationales to it. One, of course, was initially the United States was seeking those al Qaeda operatives that al-Shabaab was hiding. It viewed the United States as backing Ethiopian intervention and then the African Union forces in Somalia, and it's also because al-Shabaab signed onto al Qaeda's agenda from a very early point.

Q. How did al-Shabaab respond to its designation by the United States as a foreign terrorist organization in 2008?

A. It affirmed its view that the United States was its enemy, but shortly after the designation, there was an airstrike that killed the senior al-Shabaab operative, and it really pointed to that event as a justification to "hunt the United States."

Q. How has al-Shabaab disseminated statements such as that regarding the United States?
A. So it has used social media. It has websites that it's operated as well, various ones when they're taken down, and then it has the media wing that we spoke about earlier Al-Kataib.
Q. What sort of involvement did the United States have in Somalia and East Africa around this time?
A. So the United States didn't have an official presence in Somalia until I think 2019 when it reopened an embassy, but it has provided training for a specific Somali special operations units known as the Danab and has been active overall in supporting the Somali federal government.
Q. Dr. Bacon, has al-Shabaab also targeted western interests more generally?
A. Yes.
Q. Why is that?
A. It views those other western interests as part of the U.S.-backed order, essentially it says those are synonymous with the United States and often refers to them as crusaders.
Q. Based on your research, Dr. Bacon, what is the significance of that term?
A. It's a way of depicting the conflict in terms of Christianity versus Islam.
Q. Has al-Shabaab historically conducted attacks in

furtherance of these views?
A. Yes.
Q. How do you know, Dr. Bacon, if these were al-Shabaab attacks?
A. Al-Shabaab has claimed these operations.
Q. How did they claim those operations?
A. Sometimes they issued statements during them. Sometimes they videoed parts of the operations and included that in subsequent videos that they issued.
Q. Now, Dr. Bacon, I'd like to focus on approximately the 2010 time period. Between 2010 and 2015, approximately how many major attacks had occurred outside of Somalia for which al-Shabaab has claimed responsibility?
A. There were, I think, three major attacks during that time.
Q. You testified earlier that what you describe as external operations began around 2010?
A. Mmm-hmm.
Q. What was that?
A. So in July 2010, al-Shabaab conducted suicide bombings of a restaurant in like a rugby club in Kampala where civilians were gathered to watch the World Cup, and there was an American killed in that operation.
Q. Were there other casualties in that attack?
A. Yes. I think there were around 70 casualties in that attack and more wounded.

Q. And what was the next major al-Shabaab attack that you're familiar with, Dr. Bacon?
A. So a couple years later, in September, I think, of 2013, al-Shabaab conducted an attack using armed assailants of a shopping mall in Nairobi.
Q. Ms. Jim, could you please publish again Government Exhibit 1207.
Now, Dr. Bacon, could you just indicate on the map please where Nairobi is located.
A. (Indicating)
Q. What is Nairobi, Dr. Bacon?
A. It's the capital of Kenya.
Q. Where did this attack take place in September 2013?
A. So it was in Nairobi in a mall known as the Westgate Mall.
Q. What happened during that attack?
A. There were four or five attackers who laid siege to the mall for about four days and killed 70 people and injured a couple hundred more.
Q. Were any U.S. citizens injured during the attack?
A. Several Americans were injured, yes.
Q. And directing your attention to May of 2014, was there another al-Shabaab external operation around this time?
A. Yes. In May 2014, there was an attack, a suicide attack by a couple in a restaurant in Djibouti.
Q. Focusing on Government Exhibit 1207, could you please

indicate on the map where Djibouti is.
A. (Indicating)
Q. What happened during this attack, Dr. Bacon?
A. So it was two suicide operatives who detonated their device and killed three people, I think, and wounded a dozen more in the capital of Djibouti, which is Djibouti City.
Q. Dr. Bacon, focusing first on the July 2010 attack in Uganda, what was al-Shabaab's justification for that attack?
A. Part of its justification for that was to punish Uganda for contributing forces to the African Union.
Q. Focusing on the Westgate attack in September 2013, what was al-Shabaab's justification for that attack?
A. So that attack probably had a dual justification. That mall was very popular with westerners who live in Nairobi, and it was also a way to retaliate against Kenya for contributing forces to the African Union.
Q. What about the attack in Djibouti in May of 2014?
A. So the Djibouti attack also had sort of two rationales. One was that Djibouti contributes forces to the African Union, and the second is that it's the host of the U.S. military base in the region, which is known as Camp Lemonnier, and it's the only U.S. military base in the region.
Q. Why were these regions targeted, Dr. Bacon?
A. I think it's twofold. It's a way of al-Shabaab exacting revenge on countries that contribute forces to the African

Union and trying to weaken their resolve to do so. And these were also countries that receive U.S. backing for their role in the African Union mission.

Q. Does the United States historically back the African Union mission?

A. Yes.

Q. Dr. Bacon, directing your attention to February of 2015, did al-Shabaab release any statements regarding additional external attacks?

A. Yes. That year it issued a statement encouraging supporters to conduct attacks in shopping malls in the United States.

Q. What other justifications has al-Shabaab given for attacks on civilians outside of Somalia?

A. It will justify them in terms of avenging the U.S. campaign in East Africa. It will also do them for sectarian reasons. In particular, to try to drive a wedge between Christian and Muslim communities in the region.

Q. When you say sectarian, what do you mean by that?

A. I mean trying to stoke tensions and unrest between Christian and Muslim communities.

Q. Can you provide an example of that, Dr. Bacon?

A. Yes. In 2015, al-Shabaab sent four or five gunmen to a university in Garissa, Kenya. And over the course of about a day, it killed a number of people. And in deciding who it was

going to kill, it tried to separate out Christians from Muslims and explicitly kill the Christian students and faculty at the university.

Q. Looking at Government Exhibit 1207 in front of you, Dr. Bacon, could you please indicate on the map where Garissa is?

A. (Indicating)

Q. Thank you.

Now, Dr. Bacon, just looking at a couple other locations on this map, do you see the location for the Boni National Reserve?

A. Yes.

Q. What is that location?

A. It's a national forest reserve between Somalia and Kenya that has a number of animals like elephants and those kinds of -- in a forested area that bridges sorts of Somalia and Kenya on the border.

Q. What, if any, influence does al-Shabaab have or maintain in the Boni National Forest?

A. Al-Shabaab has carved out sort of a safe haven in the Boni Forest where it plans operations, sometimes it brings kidnapping victims. It's really exploited that terrain to carve out a footprint there to conduct operations.

Q. Could you please indicate on the map where the Boni National Reserve is located?

A. (Indicating)
Q. Dr. Bacon, there is also a label on the map for a place called Bardhere. What is that location?
A. It's a city in Somalia.
Q. Dr. Bacon, directing your attention to May of 2018, what, if anything, did al-Shabaab announce around this time?
A. It had two major announcements during this time. One is it announced the reintroduction of something it called the Jerusalem Brigade.
Q. And what was the second announcement?
A. So the second announcement was that it was going to participate in a broader campaign that al Qaeda announced, and this was in response to the U.S. moving its embassy in Israel from Tel Aviv to Jerusalem. Al Qaeda announced a Jerusalem Will Not Be Judaized campaign, and its affiliates, including al-Shabaab, essentially announced that they would be participating in this al Qaeda-driven campaign.
Q. What was the Jerusalem Brigade, Dr. Bacon, focusing on the first announcement.
A. Al-Shabaab has this sort of rhetorical tendency to label certain units in symbolic ways. So it's not necessarily indicative of a really specific unit or brigade. Like it's called multiple brigades the Saleh Nabhan brigade. So it's a way of naming brigades to sort of project a certain cause for the organization.

Q. And you mentioned this operation Jerusalem Will Never Be Judaized. Was that also an al-Shabaab operation?
A. Yes, it was.
Q. How did al-Shabaab's messaging about this operation compare to that of al Qaeda around this time?
A. It basically repeated verbatim what al Qaeda indicated about its opposition to the U.S. Government, specifically President Trump's decision to move the embassy in Israel.
Q. Did any external operations or major attacks take place under this operation by al-Shabaab?
A. Yes, there were three main operations that it claimed under this banner.
Q. How do you know that these were al-Shabaab operations?
A. Because it claimed them, and it used that Jerusalem Will Not Be Judaized sort of declaration as part of it.
Q. At a high level, what were those three major attacks?
A. So in January 2019, there was an attack on a hotel office and restaurant compound in Nairobi. Later that year in September, there was an attack on a U.S. base in Somalia in Baledogle. Then in January of 2020, there was an attack on a U.S. base within a Kenyan base in Manda Bay, Kenya.
Q. I'd like to take these in turn, Dr. Bacon. So what happened -- what was targeted in the January 2019 attack?
A. So it's known as the DusitD2 complex, and it's a luxury hotel, restaurant, and businesses that are all sort of

co-located in one complex in Nairobi.
Q. What happened during that attack on the DusitD2 complex?
A. So there was a cell of operatives. One was a suicide operative, and he detonated his device to start the operation, and then the other four proceeded to conduct an armed assault of the compound for a little less than a day.
Q. Were there any casualties during this attack?
A. Yes, there were 20 casualties.
Q. Were any U.S. citizens killed in the attack?
A. Yes, there was an American killed.
Q. What was the significance of the use of a suicide bomber in this attack, Dr. Bacon?
A. Well, this was the first time that al-Shabaab had used a suicide attack in Kenya. The other attacks I mentioned were just armed assailants. So this was significant in the use of a suicide operative within Kenya. It was also significant because the operative was a Kenyan, a non-ethnic Somali Kenyan.
Q. Who was that individual, Dr. Bacon?
A. His name was Mahir Riziki.
THE COURT: Why do you say that's significant?
THE WITNESS: So in my tracking of terrorist suicide operations that al-Shabaab has conducted, it's very rare for them to use foreign operatives at all. They've used Kenyans on just a few occasions, and they've never used a Kenyan operative in Kenya, let alone one that was Kenyan. Most of their

operatives are Somali.

THE COURT: So what is the significance of that to you?

THE WITNESS: So combined with other parts of the attack, it suggested that al-Shabaab was developing a more sophisticated Kenyan core of operatives to conduct attacks.

Q. How did al-Shabaab claim responsibility for that attack on the DusitD2 complex?

A. It put out a claim during the attack and then a statement afterwards. And a few months later, it put together a video that it released through Al-Kataib.

Q. How did al-Shabaab justify the attack on the DusitD2 complex in its statements?

A. It really emphasized its perception that the Dusit compound was a home to American and western businesses. And it portrayed this as avenging the deaths of Muslims caused by the United States.

MR. BRADLEY: Your Honor, may I approach?

THE COURT: You may.

Q. Dr. Bacon, I just handed you a disk. It's been marked for identification as Government Exhibit 800, and it contains Government Exhibits 801A and 801B. Do you see that disk?

A. Yes.

Q. Do you recognize it?

A. Yes.

Q. What does that disk contain?
A. It contains footage from the al-Shabaab video on the Dusit attack.
Q. What footage was that issued from who issued that footage?
A. The Al-Kataib media wing for al-Shabaab.
Q. Have you reviewed the footage on that disk in preparation for your testimony today?
A. Yes, I have.
Q. And how do you know that that's on that disk?
A. Because I signed it.
Q. And how are you familiar with this footage as part of your research?
A. So I track al-Shabaab's claims of attacks, so I had watched the whole video previously when it issued it in 2020.
Q. Now, does Government Exhibits 801A and 801B contain fair and accurate depictions of the Al-Kataib footage regarding the DusitD2 statement or operation that you've reviewed as part of your research?
A. Yes.
MR. BRADLEY: Your Honor, the government offers Government Exhibits 801A and 801B.
THE COURT: Any objection?
Hearing no objection, it is admitted.
(Government's Exhibits 801A and 801B received in evidence)

Q. Ms. Jim, could you please pull up Government Exhibit 801A. Let's not play it yet.

Dr. Bacon, what are we about to see in Government Exhibit 801A?

A. The initial clip is people who were fleeing from the attack and being rescued, as well as footage of the assailants shooting and some of the consequences of that.

THE COURT: Could you just repeat the location?

THE WITNESS: So the compound is known as the Dusit compound. It was in Nairobi. D-U-S-I-T.

Q. Ms. Jim, could you please publish Government Exhibit 801A.

Dr. Bacon, what does the term Mujahideen mean?

A. It means holy fighters or holy Muslim fighters.

Q. How is that used by groups about like al-Shabaab?

A. It's used to convey that the violence they undertake is religiously legitimate, and it's used to refer to their fighters.

Q. Ms. Jim, could you please pull up Government Exhibit 801B.

Dr. Bacon, who was speaking at the end of that video?

A. It was a Kenyan cleric named Aboud Rogo.

Q. Who was he?

A. He was a Kenyan cleric who was very prolific in terms of making more extreme arguments in support of violence, in support of al Qaeda and who had close connections with the al Qaeda operatives who later fled to Mogadishu.

Q. How familiar with the term kufar?
A. Yes.
Q. What does that mean?
A. A non-believer, disbeliever.
Q. During that clip that we saw in Government Exhibit 801B, did you see an individual named Ali Salim Gichunge?
A. Yes.
Q. Who was he?
A. So he was the leader of the cell that conducted the Dusit attack in Nairobi.
Q. Now, Ms. Jim, could you please publish Government Exhibit 1702.

Dr. Bacon, I'd like to focus now on the second attack under this operation from al-Shabaab. Where did that take place?
A. That took place at the Baledogle Airfield.
Q. When was that attack?
A. September 2019.
Q. What happened during that attack?
A. There is a U.S. airfield located here in Baledogle, and al-Shabaab sent two vehicle-borne devices to try to breach the compound and then sent in about a couple dozen fighters in an effort to overrun the base.
Q. Could you please indicate on the map Government Exhibit 1207 where the Baledogle Airfield is.

A. (Indicating)
Q. What did al-Shabaab claim in taking responsibility for the attack on the Baledogle airfield?
A. It really highlighted this as an attack that was intended to strike the U.S. presence in the region. It talked about how it reflected that the number one priority should be to strike the United States and urged others to attack the United States wherever possible.
Q. Finally, Dr. Bacon, in January of 2020, what happened during the Manda Bay attack?
A. The Manda Bay attack was on a base that was a Kenyan base that had a U.S. base within it. Al-Shabaab sent, it's not clear exactly how many operatives, but probably several dozen with small arms, mortars, and rocket-propelled grenades and used it to attack the base.
Q. Were there any casualties during that attack?
A. Yes. There were several Kenyan casualties. Three Americans were killed as well.
Q. How did al-Shabaab claim responsibility for the Manda Bay attack?
A. It pointed to this base as the place that the United States, that the crusaders use essentially to conduct their campaign against Islam in the region.
Q. Dr. Bacon, focusing on Government Exhibit 1207, could you please indicate where Manda Bay is located on this map.

A. (Indicating)
Q. How did al-Shabaab react specifically to the U.S. casualties during the Manda Bay attack?
A. It really pointed to those as the purpose of the attack, and this was the first attack on a U.S. base in Kenya by al-Shabaab.
Q. And how do you know that, Dr. Bacon, al-Shabaab's justifications for claiming credit for the casualties?
A. So for all three of the attacks, Dusit, Baledogle and Manda Bay, it put out claims of responsibility and it put them under the label of the Jerusalem Will Not Be Judaized campaign that it was undertaking.
Q. Dr. Bacon, has al-Shabaab participated historically in any attacks relating to airplanes?
A. Yes.
Q. How many times has this occurred?
A. There's been two significant incidents.
Q. Could you describe those two significant incidents?
A. Yes. They both occurred in 2016. One was in February 2016. An al-Shabaab operative was able to get on a plane with an explosive device that was embedded in a laptop, and he detonated the device fairly soon after takeoff, which as a result only killed the operative and pulled him out of the plane, but the plane was able to turn around and land at Mogadishu Airport safely afterwards.

Q. Were there any other examples of airplane or aviation related attacks by al-Shabaab?
A. Yes. The following month at the airport in Beledweyne, security officials detected explosive devices in print cartridges and in a laptop as well, and so they were able to prevent them from getting onto the plane, but they did then detonate and injure several people.
Q. Dr. Bacon, focusing on Government Exhibit 1207, could you please indicate where Beledweyne is located.
A. (Indicating)
Q. Dr. Bacon, did al-Shabaab take credit for either of these attacks?
A. It did. It took credit for the February 2018 attack with the laptop device. It characterized this as being in an effort to revenge western intelligence operations and indicated that the operative was intended to get on a Turkish airline flight, but when that was canceled, he got on a Daalo Airline flight, which is a Somalia airline, so he wasn't able to target the airline that was intended and -- but the purpose of it had been to target western intelligence operations.
Q. How did these attacks align with al-Shabaab's broad goals?
A. These attacks are consistent with al-Shabaab's goals. They were increases in its operational capabilities in terms of the explosive devices, but overall the targeting and the efforts were consistent with al-Shabaab's other operations.

MR. BRADLEY: One moment, your Honor. No further questions, your Honor.

THE COURT: Cross-examination.

MR. ABDULLAH: No.

THE COURT: You may step out.

(Witness excused)

THE COURT: And the government may call its next witness.

MR. BODANSKY: Your Honor, the government calls Joseph Kalum.

LAW CLERK: Can you please state and spell your name for the record.

THE WITNESS: My name is Joseph Kalum.

THE COURT: Sir, if you will draw the microphone closer to you and speak in a louder voice.

THE WITNESS: Thank you, your Honor.

My name is Joseph Kalum from Kenya.

LAW CLERK: Can you please spell that?

THE WITNESS: Joseph J-O-S-E-P-H. Then Kalum is K-A-L-U-M.

JOSEPH KALUM,

called as a witness by the Government,

having been duly sworn, testified as follows:

THE COURT: You may inquire.

DIRECT EXAMINATION

BY MR. BODANSKY:

Q. Good morning.

A. Good morning sir.

Q. In what country do you currently live?

A. I'm from Kenya.

Q. Are you currently employed?

A. Yes.

Q. Where do you work?

A. I work at ATPU, that is Anti-Terrorism Police Unit, which is a unit within national police service of the Republic of Kenya.

THE COURT: Sir, if you will please speak up.

A. Yes, your Honor. I'm from ATPU. ATPU is acronym, Anti-Terrorism Police Unit, which is a national police unit within the Republic of Kenya.

Q. And what is your title with ATPU?

A. I'm chief inspector of police in charge of the digital forensic anti-terrorism police unit.

Q. How long have you been with ATPU?

A. 21 years.

Q. What sorts of cases does ATPU focus on?

A. ATPU is an elite agency investigating all terrorism cases within the Republic of Kenya.

Q. You testified a moment ago that you are the director of digital forensics?
A. Correct, your Honor.
Q. What does that role involve?
A. My role as in charge of digital forensics is to analyze information from electronic media using different forensic tools to support investigation in relation to terrorism cases.
Q. And how long have you had that role?
A. I've been in that office for 13 years.
Q. Did you have a role at ATPU prior to being the director of digital forensics?
A. Yes, I was general investigator in relation, not general investigator, but I was an investigator investigating terrorism in related cases before I was made to be in charge of digital forensic.
Q. What, generally speaking, did you do in that prior role?
A. My role was investigating terrorism-related cases, investigating suspicious parcel and reviewing them, and also presenting suspect before the court of law.
Q. Have you received any training during your time with ATPU?
A. Yes, I receive both training in digital forensic and investigating terrorism-related cases.
Q. What did that training involve?
A. The first training that I was basic terrorism investigation course. Then I received another advance training on

investigating terrorism. I also poster plan investigation, crime scene management investigation, among other courses.
Q. Did you receive any certifications during your time with ATPU?
A. Correct, your Honor.
Q. What certifications have you received?
A. I receive a certification from Strathmore University on digital forensic examiner to be an examiner that allows me to be a digital expert. I also am able analyze and testify in a court of law.
Q. Are you familiar with the DusitD2 hotel and office complex in Nairobi Kenya?
A. Yes, your Honor. I'm aligned to what happened at Dusit2 attack, terrorist attack, that was on 15 January 2019.
THE COURT: Sir, I just wanted to point out that you need not address the questioner, who is a prosecutor, as "your Honor." That is appropriate if you want to address me.
THE WITNESS: I stand corrected, your Honor.
Q. You said that you're familiar with the DusitD2. How are you familiar with it?
A. Your Honor, I was involved in the investigation of DusitD2 attack.
THE COURT: Okay. And if you will look at the jury, they want to listen to you and see you.
THE WITNESS: Very well, your Honor.

Q. Now, you said you were involved in investigating an attack at the DusitD2. What was your role in investigating that attack?
A. Your Honor, my role was to be the team leader in analyzing electronic media at -- all electronic media that was seized at DusitD2 attack.
Q. And did you and your team in fact collect any digital evidence following that attack?
A. Correct, your Honor. Since it was a case of national interest, we collected CCTV footages, we collected mobile phones, computers, laptops from the crime scene.
Q. You mentioned amongst the various types of evidence you collected CCTV footage. In simple terms, what is CCTV footage?
A. Your Honor, CCTV acronym close circuit television is a video footage recorded by cameras used for surveillance and security purposes. The CCTV is commonly used by private organization and public institution to deter crime, to monitor an activity in a given location, and also it assists to provide evidence when an incident occurs.
Q. With respect to CCTV footage specifically, approximately how much such footage did you collect following the DusitD2 attack?
A. Your Honor, after putting a request to management of Dusit2 hotels, they allow us access to collect 17 or thereabouts footages, where we download it to a storage device such as hard

drive.
Q. And just a reminder that you need not address me as your Honor.
A. Correct, your Honor.
THE COURT: So, in other words, if you are talking to me, you can say "your Honor." But when you are answering his question, don't use that term.
THE WITNESS: I stand corrected, your Honor.
Q. Again, with respect to the CCTV footage that you collected, can you briefly describe the process by which you collected that footage?
A. Your Honor, the process of --
THE COURT: So, when you answers questions, you can look at him, and you don't have to say "your Honor."
THE WITNESS: Oh.
THE COURT: If you have a question for me, you could use that term. But when you're answering, you don't need to use that term.
THE WITNESS: Thank you, your Honor.
A. Yes, the process of acquiring CCTV footage is once we have gotten the access by putting our request, then we downloaded all the footages of interest in a case where a number of cameras was installed in the complex, the hotel complex, and we download it in a plane storage device, and we had about 17 or thereabouts CCTV footages.

Q. You referenced putting in a request for that footage. Who did you put in that request to?
A. We put our request to the management of the Dusit2 hotel, whereby they allow us access. And being the team leader, we were able to download 17 or thereabout footages for the investigation analysis of what happened during the attack.
Q. Now, have you reviewed that footage that you collected?
A. Yes, your Honor.
THE COURT: So, sir, just once again, don't use that term. In fact, why don't you just disregard the term altogether while you're here.
THE WITNESS: Thank you.
A. Yes.
Q. Ms. Jim, can you please display what has been marked as Government Exhibit 802 for the witness, the parties and the Court and pause the video.
Inspector Kalum, I'm showing you what's been marked Government Exhibit 802. Do you recognize Government Exhibit 802?
A. Yes, I recognize.
Q. What do you recognize this to be?
A. This is a portion of DusitD2 hotel Central Garden.
Q. Is this a portion of the CCTV footage that you collected?
A. Correct.
Q. And have you reviewed this video prior to testifying today?

A. I reviewed when we were analyzing the footage and that is why I am familiar with it.

MR. BODANSKY: Your Honor, the government offers Government Exhibit 802.

THE COURT: Any objection?

Hearing no objection, it is admitted.

(Government's Exhibit 802 received in evidence))

Q. Ms. Jim, can we please publish this video but keep it paused.

Inspector, looking at this video, do you recognize this location in the video?

A. Very well I recognize the location as Central Garden, which has also inside the central garden has a secret hotel cafe.

Q. And you said this is the central garden, is that correct.

A. Correct.

Q. Is that within the DusitD2 complex?

A. Yes. Yes, your Honor -- sir.

Q. Have you been to this location?

A. Yes, I visited immediately after the attack, I visited the location. I know very well.

Q. And directing your attention to the portion of this location toward the back underneath the tent, have you been to that location?

A. Yes.

Q. And do you recognize that location?

A. Yes, I recognize the location as the secret garden hotel as cafe.
Q. What is that location?
A. It is a hotel called Secret Hotel Cafe.
Q. It's a cafe?
A. It is a cafe, yes.
Q. Inspector, is there a timestamp on this video?
A. Very well, there is.
Q. Where is the timestamp located on this video?
A. It is at the corner of the footage.
Q. Is it in the top right?
A. The top corner.
Q. And what is the date?
A. Date is 15/01/2019.
Q. Is that January 15, 2019?
A. Correct.
Q. During your investigation, were you able to confirm whether or not that timestamp was accurate?
A. Yes, indeed it was accurate.
Q. Now, Inspector, have you reviewed the entirety of this video?
A. Yes.
Q. Can you describe for the jury what this video shows?
A. Yes. This video show individual in suit, black suit moving back and forth while attending a mobile phone -- while on

phone, I mean. Then at some point as he move forth and back, he stood in the middle of secret garden cafe. And then some minutes later he detonated himself. And a blast is seen. Big smoke is seen emitting from the person whom we found to be a suicide bomber.

Q. Ms. Jim, can you please play the video but pause five seconds in.

(Video played)

Q. Inspector, you mentioned a man in a suit. Can you direct the jury's attention to where that man is in this video?

A. Yes. From the footage, we are seeing a person in suit just towards the end of the secret hotel cafe, while in black suit, white shirt, and also if you are careful, you will see him attending a mobile phone and also moving towards -- towards the direction of the hotel.

Q. Inspector, if you touch the screen, it should leave a mark on the screen. Can you please circle that individual?

A. Yes, I have circled that individual.

Q. Thank you.

Ms. Jim, can we please now remove the circle. And play the video.

(Video played)

Q. Inspector, based on your review of that video, can you describe what the source of the explosion was?

A. Yes. The source of the explosion was from the suicide

bomber.

Q. Now, you testified earlier that you are generally familiar with the DusitD2 complex. Can you describe what sorts of visitors that complex receives?

MR. ABDULLAH: Objection.

THE COURT: You may step up.

(Continued on next page)

(At the sidebar)

MR. ABDULLAH: Your Honor, where I discuss the objection to the motions in limine about the Dusit, the footage -- CCTV footage. I admitted because the government claimed that I searched for it. I didn't search so I don't think the prosecutor has go into greater details of explaining who are the visitors or what kind of campus it is. It is the video footage. That's my objection.

MR. BODANSKY: So, your Honor, as the government has proffered before, there will be evidence that the defendant searched for this footage, specifically searched for CCTV footage of the suicide bomber of the DusitD2 attack.

THE COURT: What he's complaining about is to go into a description of the people who would frequent that location.

MR. ABDULLAH: That is the relevance.

MR. BODANSKY: One of the issues is the targeted United States and part of that is al-Shabaab's interest in targeting United States. This was an al-Shabaab attack, as it's been made clear by the prior testimony. What intend to elicit is that this is a hotel frequented by westerners, and in particular, the location of the suicide bomber was a location frequented by westerners particularly often.

THE COURT: So, Dr. Bacon, who I qualified as an expert on al-Shabaab, stated that it was the objective of the organization to attack Americans, and I expect that this

witness is going to say that this is a location that was frequented by Americans and other westerners, and so it is relevant to the case.

MR. ABDULLAH: Your Honor, my concern is this not about the frequency of who the visitors of the hotel and the targets who are at the hotel. It was downloaded, and Dr. Bacon -- and Dr. Bacon surely explain and show a video of that, and claim it was targeted Americans and frequent visitors of hotels. So my explanation is that you already done about the explanation about targets. I think my understanding is Mr. Kalum is here to verify that that footage is that he was the one who retrieved the footage.

MR. BODANSKY: I'm sorry, I'm not sure I caught that.

THE COURT: He said that it was his understanding that the witness is here to verify that he is the one who retrieved the footage.

MR. BODANSKY: That is in part his role here, yes, to authenticate the footage that he retrieved, but he also had a role in investigating the attack and is familiar with this hotel. And so I intended to ask him a very limited set of questions regarding his understanding of the DusitD2 hotel.

THE COURT: Well, a limited set of questions is appropriate. It's one thing for a professor to state that an attack happened. It's another thing to see it, to see a video showing the attack, and so I think that it is not unfairly

prejudicial. The objection is overruled.

MR. BRADLEY: Your Honor, if I just may address one scheduling issue. We are making very good time. Would the Court consider a ten-minute comfort break? We've been here since 9:00 a.m.

THE COURT: We can do that. Did you want to stop at this precise moment?

MR. BODANSKY: I think actually if I could ask just a few more questions, that would be an optimal time for a break.

THE COURT: If you will just state that when you're ready.

MR. BRADLEY: Thank you, your Honor.

(Continued on next page)

(In open court)

THE COURT: Overruled.

Q. Inspector, you testified earlier that you are generally familiar with the DusitD2 complex. What sorts of visitors does that complex receive?

A. The locals and the westerners.

Q. Are there any particular locations that the DusitD2 complex that are frequented by westerners particularly often?

A. Yes.

Q. Which locations?

A. Being secret garden hotel cafe, and then we have another one called Et Cafe.

Q. And the first of the two locations you mentioned, the secret garden cafe, is that visible in the video we just watched?

A. Yes.

Q. Where is it located relative to where the explosion took place?

A. Yes, it is located where the suicide bomber stood. And from the explosion immediately after the explosion, in fact he was in the middle of the secret garden cafe.

MR. BODANSKY: Your Honor, this would be an ideal time for the morning break.

THE COURT: All righty then. We will take a ten-minute break.

I do want to point out, as I'm sure you have observed, members of the jury, that Alternate No. 1 has replaced Juror No. 2. And now Alternate No. 2 is now Alternate No. 1, Alternate No 3 is Alternate No. 2, and Alternate No. 4 is now Alternate No. 3. And sole you can sit in your respective seats. Remember, during the break, you're not allowed to discuss the case amongst yourselves or with anybody else. You're not permitted to have anyone discuss the case in your presence. We will get started promptly in ten minutes.

(Jury not present; witness not present)

THE COURT: 11:35.

(Recess)

(Jury present)

THE COURT: Sir, remember that you are still under oath.

THE WITNESS: Yes.

THE COURT: And you may continue the inquiry. I'm sorry. We are missing number 2. All jurors are present. You may continue the inquiry.

MR. BODANSKY: Thank you.

Q. Inspector just one more question about the video in front of you. The cafe in the background, can you say one more time what the name of that cafe is?

A. The Secret Garden Hotel Cafe.

Q. Is that the Secret Garden, is that what you're saying?

A. Yes, secret.
Q. Ms. Jim, we can take down Government Exhibit 802, please. Now I'd like to turn to a different topic. Did there come a time when you were asked to provide documents to the FBI in connection with this case?
A. Yes.
Q. What type off documents were you asked to provide?
A. Travel documents.

(Continued on next page)

BY MR. BODANSKY:
Q. And did you, in fact, provide travel documents?
A. Indeed I provided FBI with travel document.
Q. And whose travel documents were those?
A. Of one Cholo Abdi Abdullah.

MR. BODANSKY: Ms. Jim, can you please display, for the witness, the parties, and the Court, what's been marked for identification as Government Exhibit 1001.

Q. Now, Inspector, do you recognize this document?
A. Yes, I recognize the document.
Q. What do you recognize it to be?
A. It is a travel document in respect of Cholo Abdi Abdullah.
Q. Are these the travel documents you referenced a moment ago?
A. Yes.
Q. Have you reviewed these records prior to today?
A. Yes.
Q. From where did you collect these records?
A. I collected these records from my office, at least the system from -- installed in my office -- I collected the document from my office in a system, and immigration of Kenya system database is stored in my office.
Q. What is that immigration database called?
A. It is called PISCES, that is, acronym, PISCES, Passenger Identification Secure Evaluation System.
Q. So, you collected these records from that database?

A. Yes.
Q. Is there any particular person within ATPU who is in charge of interfacing with this immigration database?
A. Yes.
Q. Who is that person?
A. Me.
Q. In that role, have you become familiar with this database?
A. Yes, I'm familiar with the database.
Q. Have you become familiar with the records contained within that database?
A. Correct.
Q. Have you become familiar with how those records are collected and maintained?
A. Yes.
Q. Do Kenyan immigration authorities make and keep the records in that database in the ordinary course of their business?
A. Yes.
Q. Are the records in that database made at or near the time of the events recorded in those records by someone with knowledge of the events recorded in those records?
A. Yes.
Q. Is it the normal practice of the Kenyan immigration authorities to maintain those records?
A. Yes.
MR. BODANSKY: Your Honor, the government offers

Government Exhibit 1001.

THE COURT: Any objection?

Hearing no objection, the document is admitted.

(Government's Exhibit 1001 received in evidence)

MR. BODANSKY: Ms. Jim, can we please publish this document.

BY MR. BODANSKY:

Q. Now, Inspector, you testified earlier that these are travel records for Cholo Abdi Abdullah.

Is that reflected anywhere here on this page?

A. Yes.

Q. Where is that reflected? Can you circle that location on the page, by touching the screen?

(Pause)

MR. BODANSKY: If we can now turn to page 2 of this document.

Q. Inspector, generally speaking, what information is reflected on this page of the document?

A. The information reflected in the document, the airport in which the traveler use, which is Jomo Kenyatta International Airport, we have listed as the entry of departure, and then the date, travel method, and we have processing user — that is the immigration officer processing the document, the document of the traveler — document type, then the document number.

MR. BODANSKY: And so if we can just enlarge the first

upper quarter of this page, please.

BY MR. BODANSKY:

Q. Using this first entry as an example, is this a flight into or out of Kenya?

A. It is out of Kenya, is the first entry, showing the departing is Jomo Kenyatta, the location is Jomo Kenyatta International Airport, Nairobi, NBI.

Q. Are you familiar with Jomo Kenyatta International?

A. Yes.

Q. What is that?

A. It is our airport within Nairobi that is the international airport within Nairobi.

Q. What was the date of this travel?

A. The date of travel is on 2nd October, 2017, at around 10:43:17 hours.

Q. And then there's a column titled "Travel Method."

What information is reflected there?

A. The travel destination.

Q. Just under "Travel Method," it says "SV044."

What is that?

A. That is the designation where the traveler was heading to.

Q. And just directing your attention to SV044.

A. Sorry?

Q. SV044, what information is that, the highlighted text?

A. It is the flight information.

Q. Flight information?
What do you mean by that?
A. I mean that the flight that he used to travel.
Q. And beneath that, there's a travel destination; is that correct?
A. Correct.
Q. And is the traveler for this travel listed on this document?
A. Yes.
Q. Who is the traveler?
A. The traveler is Abdullah Abdi, Cholo.
Q. Under "Travel Origin," it says "NBI."
Are you familiar with NBI?
A. NBI is a code for Nairobi.
Q. Over to the right of the page, you referenced this earlier, there's a processing user.
What is the processing user?
A. The processing user is the name of the immigration officer, which is Hiuhu, as reflected.
Q. What is the information to the right of that?
A. The passport -- the document type, that is, passport.
Q. Is that the traveler's passport?
A. Traveler's passport.
Q. In the next row of this document, there is an acronym, NBO.
Are you familiar with the acronym NBO?

A. Yes.
Q. What is that?
A. It is Nairobi.

MR. BODANSKY: Ms. Jim, if we could please turn to page 5 of this document.

Q. Inspector, what information is reflected on this page?
A. It is the image of the traveler and his biometric intake at immigration airport -- immigration office at airport, and this normally is captured by way of biometric while the traveler is being processed to travel.

MR. BODANSKY: Now, Ms. Jim, if we could please turn back to page 3.

Q. Just to be clear, Inspector, you said earlier that NBI is Nairobi; is that right?
A. Correct.
Q. And NBO is Nairobi as well?
A. Correct.
Q. So both of those acronyms, both refer to Nairobi?
A. Yes. NBO -- the acronym for Nairobi is NBI. NBO is Nairobi, and it is a code, code located by International Air Transport Association, which recognizes Jomo Kenyatta International Airport, and a code was assigned as NBO to meet Nairobi. The location is Nairobi, NBO.
Q. Now, directing your attention to page 3.

MR. BODANSKY: And if we could enlarge --

I'm sorry, one moment, your Honor?

(Pause)

MR. BODANSKY: Just one moment, your Honor?

(Pause)

MR. BODANSKY: Apologies.

If we can please enlarge the middle portion of this page.

And a little bit higher, Ms. Jim.

BY MR. BODANSKY:

Q. Inspector, does this page reflect any trips in May of 2019?

A. Yes.

Q. How many trips in May of 2019?

A. Two.

MR. BODANSKY: Ms. Jim, if we could just capture a little bit above this on the page.

Q. When was the first trip in May of 2019?

A. The first trip was on 2nd May 2019, around 06:20:44 hours.

Q. Was this a trip into or out of Kenya?

A. It is into, arriving.

Q. When was the second trip in May of 2019?

A. The second trip was on 15 May 2019, around 14:29:12 hours.

Q. Was that trip into or out of Kenya?

A. It was out of the country, out of Kenya.

MR. BODANSKY: Ms. Jim, if you could now please turn to page 10.

BY MR. BODANSKY:
Q. Inspector, on what date were these images captured?
A. These are a reflection of biometric data entry captured by the immigration officer while the traveler is leaving or arriving the country.
Q. And what was the date that these images were captured?
A. The date was on 2nd May 2019.

MR. BODANSKY: Finally, Ms. Jim, if we could turn to page 11, please.

Q. Inspector, on what date were these images captured?
A. These images were captured on 15 May 2019, at around 14:29:12 hours.

MR. BODANSKY: One moment, your Honor?

(Pause)

MR. BODANSKY: No further questions.

THE COURT: Cross-examination?

MR. ABDULLAH: No.

THE COURT: All righty, then, sir. You may step out.

(Witness excused)

THE COURT: And the government may call its next witness.

MR. BODANSKY: Your Honor, the government calls Shunsuke Otani.

THE LAW CLERK: Can you please state and spell your name for the record.

THE WITNESS: Shunsuke Otani, S-h-u-n-s-u-k-e O-t-a-n-i.

SHUNSUKE OTANI,

called as a witness by the Government,

having been duly sworn, testified as follows:

THE COURT: You may inquire.

MR. BODANSKY: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. BODANSKY:

Q. Good morning.

Are you currently employed?

A. Yes.

Q. Where do you work?

A. In All Asia Aviation Academy.

THE COURT: Sir, if you will draw the microphone close to you and speak out loud.

THE WITNESS: All right.

BY MR. BODANSKY:

Q. Where do you work?

A. In All Asia Aviation Academy.

Q. All Asia Aviation Academy?

A. Yes, that's correct.

Q. Is that also sometimes known as AAA?

A. Yes, that's correct.

Q. What is AAA?

A. It's a -- well, it's a training academy where we train pilots. So it's a flight school.
Q. Where is it based?
A. It's based in the Philippines.
Q. How long have you worked at AAA?
A. Approximately four years now.
Q. What is your title there?
A. Operations manager.
Q. What does that role consist of?
A. Basically overseeing the whole operations of the flight school, as well as the training progress of the students.
Q. Are you a pilot?
A. Yes, that's correct.
Q. What, if any, pilots licenses do you hold?
A. I hold a commercial pilot license, as well as an instrument rating and a flight instructor rating.
Q. You said AAA is based in the Philippines?
A. Yes.
Q. How many facilities does AAA have?
A. We have two facilities, one in Zambales and one in Manila.
Q. Where is Zambales?
A. It's four hours north of Manila.
Q. Can you describe those facilities for the jury?
A. So the Zambales facilities are for the flight trainings, as well as most of the ground trainings. Manila facility is our

corporate office with accountings, and simulator training facilities in Manila as well.

Q. Are you aware of whether or not flight schools need to be accredited?

A. Yes.

Q. Do they need to be accredited?

A. Yes.

Q. Is AAA accredited?

A. Yes, we're accredited as an approved training organization of Civil Aviation Authority of the Philippines.

MR. BODANSKY: May I approach the witness?

THE COURT: You may.

BY MR. BODANSKY:

Q. Captain Otani, I've handed you items marked for identification as Government Exhibits 1123, 1124, 1125, and 1126.

Can you take a moment to look at each of those, and let me know when you're done.

(Pause)

Q. Do you recognize those items?

A. Yes.

Q. What do you recognize them to be?

A. 1123 is our training facility. The picture on top is our Zambales campus, which consists of two hangars and a ground school facility on the left-most side. In the picture at the

bottom on 1123, that's an aerial view of Zambales -- I'm sorry Iba Airport, where our Zambales facility is located in.

The 1124 is our ground school facility. Basically, it's our lecture classroom in Zambales.

And 1125, this is our ramp area along with our fleets.

And 1126, this is located in the Manila facility, and this is our simulator training device.

MR. BODANSKY: The government offers Government Exhibits 1123, 1124, 1125, and 1126.

THE COURT: Any objection?

Hearing no objection, they are admitted.

(Government's Exhibits 1123, 1124, 1125, and 1126 received in evidence)

MR. BODANSKY: Ms. Jim, can we please publish Government Exhibit 1123.

BY MR. BODANSKY:

Q. Now, Captain Otani, can you describe for the jury what's shown in the upper photo on this page?

A. Upper photo shows our flight training facilities in Zambales, located in Iba Airport.

Q. Can you describe what's shown in the lower photograph on this page?

A. The lower photograph is the aerial view of our Iba Airport, which our training facility is located in Zambales.

Q. So, what work, if any, of AAA is conducted at each of these

two facilities?
A. Sorry, can you say that again, please?
Q. What activities are undertaken at these facilities?
A. The ground classes, which is a lecture class, as well as the flight training, taking place in this facilities.
MR. BODANSKY: Ms. Jim, can we please now publish Government Exhibit 1125.
Q. Captain Otani, can you describe for the jury what's shown in this photograph?
A. This is our -- this is taken in our ramp area, in front of our hangars in Iba Airport campus, which shows our students, as well as our fleet.
Q. What type of aircraft are shown in this photograph?
A. Shown a Piper Seneca, which is the multiengine aircraft over there, and then the one behind that is all our Cessna 152 and Cessna 172, which is used on our daily trainings, as well as the King Air, which we used to own, but not anymore.
Q. Can you just describe those one more time, but circle each aircraft as you describe it?
A. Okay.
So this aircraft right here, this is our Piper Seneca. This is our multiengine aircraft training aircraft back in the day.
This, too, right here, this is our Cessna 172 aircraft, which is used on the training.

And the rest of these aircraft, right at the back, those are the Cessna 152, which is used on our commercial and private pilot training as well.

Then we have one King Air over here, which we used to own, but not anymore.

Q. And where is this facility located?

A. This is located in Iba Airport, in Zambales.

Q. In the Philippines?

A. In the Philippines, yes.

MR. BODANSKY: Ms. Jim, can we please now publish Government Exhibit 1126.

Q. Captain Otani, what's shown in these photographs?

A. This is our simulator training device, which basically it's a flight simulator training device.

Q. What is this used for?

A. It's used for simulation IFR condition flight training, which is training for instrument rating.

Q. Is this used with students at the flight school?

A. Yes.

MR. BODANSKY: Finally, Ms. Jim, can you please publish Government Exhibit 1124.

Q. Captain Otani, what is this a photograph of?

A. This is our picture of our classroom in facilities in Iba, Zambales.

Q. What sort of topics are covered in the classroom

instruction?
A. Of course, we start theoretical knowledge for private pilots and commercial pilot licenses.
Q. What types of theoretical knowledge are required for pilots?
A. Of course, the equipment knowledge, as well as aerodynamics, radio navigations, those knowledge.
Q. What are some examples of equipment that pilots need to be acquainted with?
A. Aircraft itself.
Q. What sorts of equipment on the aircraft?
A. Of course, the radios, the instruments, and those.
Q. What sorts of instruments does an aircraft have?
A. Altitude indicator, the alternator, turn coordinators, and VOR, those equipments.
Q. What is VOR?
A. VOR is a navigation aid that is used during the instrument flight condition.

MR. BODANSKY: Ms. Jim, we can take down Government Exhibit 1124.

Q. Captain Otani, are you familiar with Cholo Abdi Abdullah, the defendant in this case?
A. Yes.
Q. How are you familiar with him?
A. He was a student back when I was still a student in the

flight academy.

Q. Were you a student at the flight academy before working there?

A. Yes.

Q. Have you ever met the defendant?

A. Yes.

Q. Approximately how many times?

A. Maybe around five to ten times.

Q. Approximately when was he a student at AAA?

A. He was a student from October of 2017 up to July of 2019.

MR. BODANSKY: Ms. Jim, can you please display for the witness, the parties, and the Court what has been marked for identification as Government Exhibit 1115.

Q. Captain Otani, do you recognize this document?

A. Yes, I do.

Q. What do you recognize it to be?

A. This is our -- well, this is our marketing questionnaire. It's a questionnaire that we give to a potential trainee that -- who inquired to us.

Q. Whose name is listed on this questionnaire?

A. It's listed Cholo Abdi Abdullah.

MR. BODANSKY: The government offers Government Exhibit 1115.

THE COURT: Any objection?

Hearing no objection, it is admitted.

(Government's Exhibit 1115 received in evidence)

MR. BODANSKY: If we could please enlarge the lower half of this page.

BY MR. BODANSKY:

Q. Now, Captain Otani, you said a moment ago that the defendant's name is on this document.

What, if any, information is located to the right of the name?

A. I believe it's an email address.

Q. What email address is listed, if you could read that into the record?

A. Kokotabdull@gmail.com.

MR. BODANSKY: Ms. Jim, if you could now display for the witness, the parties, and the Court what has been marked for identification as Government Exhibit 1114.

Q. Captain Otani, do you recognize this document?

A. Yes, I do.

Q. What do you recognize this document to be?

A. This is our student enrollment contract, which writes down what trainings we are going to give and then what training the trainee is going to accept.

Q. Who is this contract between?

THE COURT: If you'll step up, please.

(Continued on next page)

(At sidebar)

THE COURT: Are you planning to establish that the witness is a custodian and lay a foundation for the business records exception?

MR. BODANSKY: Well, the documents that we're referencing right now are documents that were actually signed by the defendant himself. So they were signed and adopted by the defendant and reflect information that has been added to the document by the defendant. I'm happy to lay additional foundation to establish that.

THE COURT: Well, did this individual witness his signing of the documents?

MR. BODANSKY: I can ask questions as to, in the ordinary course, who would have completed a questionnaire submitted to AAA, if that would be helpful.

THE COURT: That's falling short of the foundation that's necessary for a business document of AAA.

MR. BODANSKY: I certainly can, and will, establish that he is otherwise a custodian for AAA. This witness is in charge of -- as he said, he's the operations manager for AAA, and as part of that role, he is in charge of overseeing all student training programs and in charge of maintaining the student files for each student there. And I will elicit from the witness that these records were all found within the defendant's file maintained by AAA.

THE COURT: And that they were kept in the ordinary course of business? You're going to ask all of the foundational questions?

MR. BODANSKY: I certainly can.

With respect to the student contract, it is signed by -- on its face, signed by Cholo Abdi Abdullah.

THE COURT: I understand that you're representing that, but, of course, it's not because you know that having observed him sign it. In order to get around the hearsay exception, you need to establish a foundation. You know what the foundation is. And so you'll need to lay it.

MR. BODANSKY: Okay. Yes, your Honor.

THE COURT: Okay.

(Continued on next page)

(In open court)

BY MR. BODANSKY:

Q. Captain Otani, you said earlier that you are the operations manager for AAA; is that correct?

A. That's correct.

Q. What, role, if any, do you have in the student training programs?

A. Can you say that again, please?

Q. What role, if any, do you have in overseeing the student training programs at AAA?

A. All right. So, the training progresses and flight hour tracking and all of those things are under myself. So, basically -- what's that -- basically, I oversee what trainings the students lined up for, and what training I will assign, and which instructor I will assign it for.

Q. Does AAA maintain any records with respect to its students?

A. Yes, we do.

Q. What sort of records does AAA maintain with respect to its students?

A. Of course, we do have our pilot -- sorry, flight logs, which identify which flight the students have and which hours are lacking as well. Of course, we track our -- what's that -- student payments as well.

Q. Does it maintain a file on each of its students?

A. Yes, we do, in some extent.

Q. Does the school make and keep the records in a student's file in the ordinary course of its business?
A. Yes.
Q. Is it the normal practice of AAA to maintain the records in a student's file?
A. That's correct.
Q. Are the records contained within a student's file made at or near the time of the information recorded in those records by someone with knowledge of those records?
A. Yes, that's correct.
Q. And in your role as operations manager at AAA, are you familiar with the files on the students at AAA?
A. Yes.
Q. Are you familiar with the methods by which those records are collected and maintained?
A. Yes.

MR. BODANSKY: Ms. Jim, can we please, again, display for the witness, the parties, and the Court what's been marked as Government Exhibit 1114.

Q. Now, Mr. Otani, you said earlier that this is an enrollment contract; is that correct?
A. Yes.

MR. ABDULLAH: Objection, your Honor.

THE COURT: I'm going to permit you to continue asking foundational questions. Go ahead.

BY MR. BODANSKY:

Q. Captain Otani, is this document contained within -- have you reviewed this document before?

A. Yes.

Q. Is this document maintained by AAA?

A. Yes.

Q. Where is this document maintained at AAA?

A. It's in our student files, which is located in our documents room.

Q. Whose student file was this document maintained in?

A. It was in Cholo Abdi Abdullah's files.

MR. BODANSKY: Your Honor, the government offers Government Exhibit 1114.

THE COURT: It is admitted.

(Government's Exhibit 1114 received in evidence)

MR. BODANSKY: Ms. Jim, can we please publish Government Exhibit 1114.

BY MR. BODANSKY:

Q. Captain Otani, who is this contract between?

A. This contract is between All Asia Aviation Academy and Cholo Abdi Abdullah.

Q. What's the date of this contract?

A. 9th day of October, 2017.

MR. ABDULLAH: Objection, your Honor. I have a specific objection.

THE COURT: All right. If you'll step up, please.

(Continued on next page)

(At sidebar)

MR. ABDULLAH: Your Honor --

THE COURT: One second. Let me just let everybody come up.

MR. ABDULLAH: Your Honor, the witness clearly indicated that -- he claimed that when I enrolled at school, he was also a student. So it is appropriate for the person who it lists on my enrollment to testify. He was a student; he was not the person. So it is hearsay.

THE COURT: So, my understanding is that he claimed to be a student at the same time that you were there --

MR. ABDULLAH: Yes, that's correct.

THE COURT: -- and that he is now an administrator at the school.

Am I correct?

MR. BODANSKY: That's correct, your Honor.

MR. ABDULLAH: He says that he's an operational manager. So, operational manager oversees the operations and, like, the flight operations, something like that now.

THE COURT: Go ahead.

MR. BODANSKY: It's correct he was previously a student. He is now the operations manager, and I believe he's now testified that, as part of his current role, he maintains the student files at AAA, he's familiar with those files, he's familiar how those materials are collected and maintained, and

these documents were contained in the defendant's student file at AAA.

THE COURT: So, I don't know if I explicitly heard that he maintains the files. So you can go back and ask that question.

MR. ABDULLAH: Your Honor, one point?

THE COURT: Yes.

MR. ABDULLAH: My concern is, he's going through what's the name, how did he sign. It's time to verify that I was the one to sign that document, but he was not present. He was a student at the time.

THE COURT: So there could be another student by the same name, and you're saying he was not present to witness you sign the document. So these are the types of questions that you ask on cross-examination. So, cross-examine him, if you want to pose those questions, and point out the weaknesses, if any, in the testimony.

But I need for you to ask an additional question.

MR. BODANSKY: I believe up to now, he's testified that he's familiar with how they are maintained. I don't know if I've asked him if he personally is involved in maintaining those records, but I certainly can.

THE COURT: You can probe his degree of familiarity.

MR. BODANSKY: Thank you.

MR. COMMISSIONG: Your Honor, I'm just flagging,

should the document remain on the screen while he's asking those questions?

THE COURT: It's not being shown to the jury, is it?

MR. BODANSKY: It has now been offered and accepted into evidence, yes.

MR. BRADLEY: We can take it down, your Honor.

THE COURT: We will take it down.

(Continued on next page)

(In open court)

MR. BODANSKY: Ms. Jim, we can take down Government Exhibit 1114.

BY MR. BODANSKY:

Q. Captain Otani, you testified a moment ago that the document we were reviewing was in the student file for Cholo Abdi Abdullah; is that correct?

A. Yes, that's correct.

Q. Are you familiar with how the student files at AAA are maintained?

A. Yes, sir.

Q. Are you familiar with how the materials that are added to the file are collected?

A. Yes.

Q. Is it part of your role at AAA to maintain those files?

A. Yes.

MR. BODANSKY: Your Honor, may I publish Government Exhibit 1114?

THE COURT: You may, you may. It is admitted.

BY MR. BODANSKY:

Q. Now, Captain Otani, again, what is the date of this document?

A. 9th day of October, 2017.

MR. BODANSKY: Ms. Jim, if we could please turn to page 6 of this document.

BY MR. BODANSKY:
Q. Captain Otani, is this document signed?
A. Yes.
Q. Who is this document signed by?
A. This is signed by our general manager and Cholo Abdi Abdullah.
MR. BODANSKY: Ms. Jim, we can take down Government Exhibit 1114.
Q. Captain Otani, can you briefly describe the different types of pilot's licenses that are available?
A. Of course, there is a private pilot license, and as well as there is a commercial pilot license, and also there is what we call a ratings, which is instrument ratings, multiengine ratings, and so on.
Q. With respect to those two licenses, the private pilot's license and the commercial pilot's license, what is the difference between those two?
A. A private pilot license, you may exercise the license only if you're not compensated. Commercial pilot license, you're able to be compensated for your services as a pilot.
Q. If somebody wanted a job with an airline, what license would they need?
A. Commercial pilot license.
Q. I believe you referenced, a moment ago, ratings.
A. Yes.

Q. What are ratings?
A. Ratings are -- well, it's a rating which is attached to the license, which has -- which allows you to do different type of flights.
Q. How do ratings relate to licenses?
A. Without the license rating, you won't be able to -- you won't be able to get the rating, as well as in order for you to exercise those ratings, you will need to have a valid license, as well.
Q. So, the license is a prerequisite for the ratings?
A. Yes.
Q. What sort of ratings are available?
A. We do have -- what's that -- instrument rating, which allows you to fly in low visibility conditions. And, also, we have multiengine rating, which allows you to fly aircraft with more than two engines.
Q. Again, if somebody wanted to get a job with an airline, what are the minimum ratings that person would need?
A. A commercial pilot license with an instrument rating would be a minimum.
Q. What program was the defendant enrolled in at AAA?
A. He was enrolled in a private pilot license, commercial pilot license, instrument rating, and multiengine rating course.
Q. How many days per week is that program?

A. If it's on a flight training, it's seven days a week; if it's on-the-ground training, it's five days a week.
Q. Does AAA provide housing for its students?
A. Yes, we do offer a dormitory for our students.
Q. Did the defendant live at AAA for a part of his time in the program?
A. Yes.
MR. BODANSKY: Ms. Jim, can you please display for the witness, the parties, and the Court what's been marked as Government Exhibit 1501.
Q. Captain Otani, do you recognize this?
A. Yes.
Q. What do you recognize this to be?
A. This outlines the minimum requirements for a private pilot license, as well as a commercial pilot license.
Q. Does this accurately capture the requirements for those two licenses?
A. Yes.
Q. Would this aid you in testifying today?
A. Yes.
MR. BODANSKY: Your Honor, the government offers Government Exhibit 1501 as a demonstrative aid to the jury.
THE COURT: Any objection?
MR. ABDULLAH: No.
THE COURT: Hearing no objection, it is admitted as a

demonstrative aid.

(Government's Exhibit 1501 received in evidence)

MR. BODANSKY: Ms. Jim, can you please publish this for the jury.

BY MR. BODANSKY:

Q. Now, Captain Otani, you said this lists the requirements for both the private pilot's license and the commercial pilot's license.

Is the private pilot's license a prerequisite for the commercial pilot's license?

A. Yes, that's correct.

THE COURT: What do you mean by "a prerequisite"?

I'm asking you, Mr. Bodansky.

MR. BODANSKY: Yes.

BY MR. BODANSKY:

Q. What do you mean by prerequisite?

A. In order for you to get the commercial pilot license, you will first need to be licensed as a private pilot.

Q. Using this chart as a guide, can you please explain to the jury what the requirements are to first obtain the private pilot's license?

A. In order for a pilot to obtain a private pilot license, you will need to first undergo at least 110 hours of ground instructions, after which you are able to continue on to your flight training, which is a minimum of 40 hours. And with

those experience, as well as a written examination by Civil Aviation Authority, and upon passing the written examination, you're able to do the practical examination, which is inside the aircraft, what we call a check ride. Once you pass the check ride, you are able to be licensed for private pilot.

Q. With respect to the classroom instruction for the private pilot's license, what topics are covered in that classroom instruction?

A. Of course, meteorologies, as well as aerodynamics, radio navigations, and operational procedures and so on.

Q. And the flight training for a private pilot's license, what does that flight training consist of?

A. Flight training consists of, of course, basic maneuvers of the aircraft, as well as taking off and landing of the aircraft, and standard operational procedures, as well as the emergency procedures.

Q. Are there different types of training flights?

A. Can you say that again, please?

Q. Are there different types of training flights?

A. Yes, that's correct.

Q. What are the different types?

A. There is a dual received flight, which means you're flying with the instructor, and the instructor is under the primary pilot in command. And there is a PIC hours, which is what we call a pilot-in-command hours, which you are in command of the

aircraft, which the instructor is next to you.

And there is a solo flight training, which, as the name suggests, the student all by himself in the aircraft.

Q. With respect to the written exam, what topics are covered on the written exam?

A. Same topics as the topics covered under classroom instructions.

Q. What's covered in the practical exam?

A. Practical examination covers the flight portion of the training, which is basically flying aircraft.

Q. Now, if someone completes all these requirements and obtains a private pilot's license, are they then eligible to pursue a commercial pilot's license?

A. Yes, that's correct.

Q. Again, using this chart as a guide, what are the additional requirements to obtain a commercial pilot's license?

A. Of course, you will need to undergo commercial classroom instructions, which is at least 160 hours, as well as the flight training, which is at least total of 150 flight hours, as well as there is the written examination and the practical exams.

THE COURT: All righty. It is now 12:30, and so we're going to take our lunch break. Remember that you must be ready to walk into the courtroom at 1:30 sharp.

Don't discuss the case amongst yourselves. Don't

permit anyone to discuss the case in your presence. Have a good lunch.

And, sir, you may step down.

(Witness temporarily excused)

(Continued on next page)

(Jury not present)

THE COURT: Anything from either side before we break?

MR. BRADLEY: I just wanted to flag one thing on the schedule, your Honor. As I mentioned earlier, we're actually making fairly remarkable progress in terms of our schedule. We've gone through multiple witnesses. And as I noted yesterday, Captain Otani was expected to be our last witness for the day. We could, depending on time, put on an FBI examiner of the forensic devices. After that, your Honor, we would have two records custodians from Facebook and Google, and then two summary witnesses to go through the electronic evidence from the devices and social media accounts.

So, I guess two things, your Honor:

First, in terms of our plan for the day and the availability of our witnesses, I think we probably will be done before 5:00 o'clock today, and I think that, depending on how the testimony goes and, obviously, the defendant's decision to cross-examine or not witnesses, we could well be in a position where we're resting by early Friday.

THE COURT: Music to my ears.

MR. BRADLEY: Yes, I'm here to deliver good news, I believe.

THE COURT: Wonderful.

All righty. Thank you for letting me know.

MR. BRADLEY: So, to the extent that we are done with

Captain Otani maybe about half an hour or so after the lunch break, would the Court's preference be to adjourn for the day, or should we try to find the last witness?

THE COURT: We want to push on.

MR. BRADLEY: Okay. In terms of our witness availability, just because, for example, the Facebook and Google custodians, you know, they have travel schedules, they're not available today to testify, we could call the forensic examiner from FBI regarding the devices. But in terms of that, I think that would be it for the government for today. I know wrapping early is not ideal, but we've been trying to be respectful of the witnesses' time and travel arrangements, and, obviously, this has been going very quickly in light of the no cross-examination.

THE COURT: All righty. Well, you'll do the best you can in getting witnesses on the stand.

MR. BRADLEY: Yes, your Honor.

THE COURT: Okay. Have a good lunch.

(Luncheon recess)

AFTERNOON SESSION

1:30 p.m.

(In open court)

THE COURT: Please be seated. I understand that the government would like to discuss the schedule?

MR. BRADLEY: Yes, your Honor. And thank you for the opportunity to discuss before the jury comes out. We have been able to line up the FBI forensic examiner for the relevant devices at issue. She will be ready to testify after Captain Otani has concluded his testimony. I think at that point I propose that would be a good opportunity to pause for the day. The reason for that too, your Honor, as my colleague has pointed out is the remaining four witnesses would concern the Facebook and Google records where I know the Court has allowed the defendant an opportunity to respond to the government's brief about those issues.

THE COURT: So you feel that those remaining witnesses will testify Wednesday and Thursday?

MR. BRADLEY: Those remaining witnesses, those last four witnesses, I think tomorrow will be Thursday.

THE COURT: I'm sorry.

MR. BRADLEY: The days are blending together, but I anticipate that we will be able to get through the balance of those witnesses on Thursday, and that we would be in a position to rest.

THE COURT: Okay. Very well. I think we are still waiting for a juror. Oh, the jurors are all here? Okay. You can bring the jurors in, please, and you can have the witness resume the stand.

SHUNSUKE OTANI, resumed.

THE COURT: Mr. Otani, you are still under oath.

You may resume the inquiry.

MR. BODANSKY: Thank you, your Honor.

BY MR. BODANSKY:

Q. Good afternoon.

Ms. Jim, can we again publish Government Exhibit 1501.

Captain Otani, we were discussing the requirements for a private pilot's license and a commercial pilot's license, and I think turning to a commercial pilot's license and the requirements for that, just briefly, what does PPL refer to?

A. PPL refers to private pilot license.

Q. And CPL?

A. Commercial pilot license.

Q. Now, you said that first one has to obtain a private pilot license before they can then pursue a commercial pilot license, correct?

A. That's correct.

Q. Once again, with respect to the commercial pilot license, what are the additional requirements needed to obtain that?

A. For commercial pilot license, you need additional classroom

instruction of at least 160 hours, as well as flight training or flight hour experience a total of 150 hours at minimum.

Q. Is there an additional written exam for the commercial pilot's license?

A. Yes, there is a written exam and a check ride to follow after that.

Q. Is there a check ride for the commercial pilot license?

A. Yes.

Q. And that's the practical exam?

A. Yes, that's correct.

Q. With respect to the additional classroom instruction for commercial pilot license, what sort of topics are covered in that additional classroom instruction?

A. Of course like rating navigation and aerodynamics. The subjects are almost the same as private pilot license. For commercial pilot license, it would dig deeper into the topics.

Q. It would dig deeper?

A. Yes.

Q. And with respect to the additional flight training hours for the commercial pilot's license, what do those additional flight training hours consist of?

A. The additional flight hours consist of piloting command hours for cross-country training, as well as local piloting command training, which consists of adverse maneuvers and emergency procedures.

Q. In fact, could I ask you to raise your voice a little bit to ensure the jury can hear you.
A. Sure.
Q. You discussed earlier there are different types of flight training hours, is that correct?
A. Yes, that's correct.
Q. What are the requirements as to the different categories of flight training hours with respect to the commercial pilot's license?
A. For commercial pilot license there is a minimum required hours of pilot-in-command, which you are to be the command of the aircraft, so basically you're the one -- you're the captain of the aircraft.
Q. And how many hours of that training are required?
A. A minimum of 100 hours for piloting command hours.
Q. You also described solo flights, is that correct?
A. Yes, solo flights. Yes.
Q. How many hours of that are required?
A. Solo flights are required minimum of seven hours.
Q. With respect to the written exam for the commercial pilot's license, what topics are covered with that exam?
A. Almost same as private pilot license. It goes from aerodynamics to radio navigations, to operational procedures and emergency procedures.
Q. What sorts of things would be covered by operational

procedures?
A. That's basic operations of the aircraft. It includes the instruments and radios and other equipment within the aircraft.
Q. What sorts of things would be covered in emergency procedures?
A. Emergency procedures, the procedures that we have to execute during emergency, for example, engine fires or losing engine controls and so on.
Q. Does AAA track the progress of its students across these various requirements for the commercial pilot's license?
A. Yes, we do.
Q. As operations manager for AAA, do you have a role in tracking students' progress across these different requirements?
A. Yes, I do.
Q. Are you familiar with the defendant's training progress while at AAA?
A. Yes, sir.
Q. How far through this process did the defendant get at AAA?
A. For him, it was -- he was at -- he was already finished with the commercial pilot license written examination, and he was already finished with flight hour requirements. He was waiting for the practical examination for commercial pilot.
Q. Just to be clear, had he already obtained a private pilot's license?

A. That's correct.
Q. What, if anything, remained in his training for a commercial pilot's license?
A. Just the practical examination, which we refer to as a check ride.
Q. Just that last step?
A. Yes, that's correct.
Q. You testified earlier that the defendant was also training for certain ratings, is that correct?
A. That's correct.
Q. Remind the jury what ratings was the defendant pursuing?
A. Within his package he had instrument rating, as well as multiengine rating.
Q. What does the instrument rating allow one to do?
A. Instrument rating allows you to fly an aircraft, fly and operate the aircraft with, well basically a low-visibility condition or night conditions.
Q. What does the multiengine rating allow one to do?
A. Multiengine rating allows the pilot to operate an aircraft with more than two engines.
Q. Had the defendant made any progress toward those ratings?
A. Yes. For the instrument rating, he was already mid-training for it. For multiengine rating, not yet.
Q. So focusing on the instrument rating, what are the requirements to obtain an instrument rating?

A. In order for you to obtain an instrument rating in the Philippines, you need to be rated with a commercial pilot's license, and you will need to undergo 40 hours minimum of simulator and extra flight training for the simulated conditions.
Q. Is any coursework required for the instrument rating?
A. Yes, there is classroom instruction as well.
Q. How many hours?
A. I believe it's about 60 hours.
Q. What does the coursework for the instrument rating consist of?
A. Consists of familiarization to navigation aids; so basically how to operate the radio navigation instruments and so on.
Q. And you testified a moment ago there are also flight simulator hours required?
A. Yes.
Q. And flight training hours?
A. That's correct, yes.
Q. With respect to the flight simulator hours, what do those consist of?
A. It consists of simulation -- simulating flying an aircraft in zero visibility condition only with the aid of your instruments.
Q. And where is that training conducted?

A. In Manila.
Q. What kind of device, if any, is it conducted in?
A. It's a -- we use our flight simulator training device.
Q. Did we review a photograph of that earlier?
A. Yes.
Q. And, finally, what do these flight training hours for the instrument rating consist of?
A. Flight training hours of instrument consists of instrument flight time hours. So you will have hours of simulator instrument condition on the actual aircraft flying.
Q. What progress through these various steps had the defendant made toward his instrument rating?
A. For instrument rating, he was already completed with his classroom training, as well as the simulator training was already completed as well. He was -- he had about two to three flights remaining on extra flight training for the instrument rating and examination. The written examination was already done, so he was just waiting for practical exam after that.
Q. So what, if anything, remained in the training for the instrument rating?
A. The practical examination and the two or three flight trainings that he would need for the requirements.
Q. Ms. Jim, we can take down Government Exhibit 1501. And can we please publish Government Exhibit 105P, which is in evidence.

Captain Otani, do you recognize this?
A. Yes.
Q. What is this?
A. This is our -- this is a company issued calling card for employees of All Asia Aviation Academy.
Q. Is this a card for a specific individual?
A. Yes.
Q. Which individual?
A. It belongs to Geraldine Reyes, which she is our licensing officer in our company.
Q. Do you know her?
A. Yes.
Q. Does she have any contact with students in her role?
A. Yes, she does.
Q. Ms. Jim, can you please now publish Government Exhibit 108P, which is also in evidence.

Captain Otani, do you recognize this document?
A. Yes.
Q. What is this?
A. This is our aircraft weight and balance sheet for Cess -- not Cessna, Tecnam P2006T.
Q. Is this an aircraft that AAA uses to train students?
A. That's correct.
Q. To what extent is it typical for a student to have a document like this?

A. It's not common that students have this document with them.
Q. Are they permitted to have the document?
A. They are permitted, yes.
Q. Ms. Jim, can you please now publish Government Exhibit 109P in evidence.
Captain Otani, do you recognize this?
A. Yes, I do.
Q. What is this document?
A. This is our engine -- part of the engine start checklist of P2006T, which is our multi-engine rating training aircraft.
Q. This is a AAA document?
A. Yes.
Q. What's the purpose of this checklist?
A. It's a checklist that pilots are to follow when they are turning on their engine and of course before taxiing and whatnot.
Q. Is this a document that students typically would have?
A. Yes.
Q. Ms. Jim, if you could please publish Government Exhibit 110P also in evidence.
Captain Otani, do you recognize this document?
A. This is our Tecnam P2006T normal operation checklist which includes the preflight inspection portion.
Q. What's the purpose of this document?
A. This checklist is what pilots is going to use when they're

doing the preflight inspection of the aircraft before departure.
Q. Is it also a AAA document?
A. Yes.
Q. Is this also something a student typically would have?
A. Yes.
Q. Ms. Jim, we can take down Government Exhibit 110P.
MR. BODANSKY: Your Honor, may I approach the witness?
THE COURT: You may.
Q. Captain Otani, I've handed you an item marked for identification as Government Exhibit 111. Do you recognize that item?
A. Yes.
Q. What do you recognize it to be?
A. This is a pilot logbook of Cholo Abdi Abdullah.
Q. What is a pilot logbook?
A. Pilots typically measure their experience with flight hours, so pilot logbook is where all the flight hours are logged, which, you know, a person -- if a person flies, they log their flight hours on the pilot logbook.
Q. Generally speaking, who is it that fills in the information in a logbook?
A. The owner of the logbook.
Q. Does AAA maintain a logbook for each of its students?
A. Yes, we do.

Q. Is each logbook assigned to a particular student?
A. Yes.
Q. Is that recorded in any way on the logbook?
A. Yes. We do have a name tag on their logbook.
Q. As operations manager for AAA, are you familiar with the process by which AAA maintains these logbooks?
A. Yes.
Q. And does AAA make and maintain these logbooks for each student in the ordinary course of its business?
A. Yes.
Q. Is the information contained in the logbook made at or near the time of the events recorded in the logbook by someone with knowledge of those events?
A. Yes.
Q. Is that the normal practice of AAA to maintain these logbooks?
A. Yes.

MR. BODANSKY: The government offers Government Exhibit 111.

THE COURT: Any objection?

Hearing no objection, it is admitted

(Government's Exhibit 111 received in evidence)

Q. Captain Otani, can you briefly hold up that logbook so that the jury can see it?

Ms. Jim, can you please display for the witness, the

parties and the Court what's been marked as Government Exhibit 111P

Captain Otani, do you recognize this document?

A. Yes.

Q. What do you recognize this to be?

A. This is the front page of the logbook of Cholo Abdi Abdullah.

Q. Does this document accurately depict the logbook that we were just discussing?

A. Yes.

MR. BODANSKY: The government offers Government Exhibit 111P.

THE COURT: Any objection?

Hearing no objection, it is admitted.

(Government's Exhibit 111P received in evidence)

Q. Ms. Jim, can we please publish this?

Captain Otani, is there a name reflected on this logbook?

A. Yes.

Q. What's the name on this logbook?

A. It's written Cholo Abdi Abdullah.

Q. We now turn to page 3 of the logbook of this document.

Captain Otani, what information, generally speaking, is reflected on this page of the logbook?

A. This page of the logbook records five hours and 35 minutes

of single engine land aircraft, which was recorded in 2018. I believe the 5th of January to 1st of seven.

Q. Is this page reflecting information with respect to training flights?

A. Yes.

Q. What information with respect to training flights is captured in this document?

A. The aircraft ident, which is written 1761, 1762 and 1746 is all the aircraft that belongs to All Asia Aviation Academy.

Q. To the left of this aircraft type, what does that reflect?

A. Aircraft type is the type of the aircraft. So in this case it's indicated C152, which means the Cessna 152.

Q. What kind of aircraft is that?

A. A single-engine land aircraft with two -- with the capacity of two passengers to be on board.

Q. Then it says: Route of flight from and to. What information is captured there?

A. Route of flight, in this case it reflects RPUI to LCL, which means RPUI is the airport calls of Iba Airport in Zambales, and local signifies the local flight. So this basically says that he flew out of RPUI, which is Iba Airport and flew the local vicinity of Iba Airport.

Q. Generally speaking, what sort of information would be reflected in the remarks and endorsements section?

A. Remarks and endorsements section usually is what you did

during the training. So in this case, taxi procedures and high-speed taxiing and small radius turn and so on.
Q. To what extent is it standard procedure to create an entry like this for each training flight?
A. It is the standard procedure.
Q. If we could please turn to page 5 of this document.
Directing your attention the right-hand side of this page, what's reflected there?
A. On the right-hand side of this page, it is a verification stamp from our academy, which signifies that the flight hours up to this page is verified by our system.
Q. In the ordinary course, who would place this stamp on the logbook?
A. The personnel in the operations room.
Q. Would that be AAA personnel?
A. Yes, that's correct.
Q. What would this stamp signify?
A. It signifies that the flight hours, in this case the ten hours and 55 minutes, is verified that he flew in our training organization.
Q. Ms. Jim, can you please slowly flip through the remaining pages in this document.
Captain Otani, generally speaking, what information is reflected on those other pages within this pilot's logbook?
A. It reflects all the flight trainings that he had undergone

during the time that he was in the All Asia Aviation Academy.
Q. When you say "he," who are you referring to?
A. Mr. Cholo Abdi Abdullah.
Q. A few final questions. You mentioned type rating earlier. What is type rating?
A. Type rating is -- well, pilot license is unlike cars, we are required to obtain a license specific to the aircraft that you're going to fly. So type rating refers to the license that is specific to the aircraft that you're going to fly.
Q. You also mentioned MEIR. What does that refer to?
A. Multiengine instrument rating.
Q. And IR, what does that refer to?
A. Instrument rating.
Q. I believe you also referenced 172P. What does that reference?
A. 172P is type of the aircraft that our academy has. It's part of the Cessna 172 family, specifically the type P of the Cessna 172.
Q. What about IFR?
A. IFR is instrumental flight rules, which the flight rules that you will fly under once you are rated with the instrument rating course.
Q. Now, turning back to the logbook we were just discussing, have you reviewed that logbook previously?
A. Yes.

Q. You said those other pages included information as to flight hours?
A. That's correct.
Q. How many flight hours are reflected in total in this logbook?
A. Approximately about 150 hours.
Q. Are you aware, did the defendant have any additional flight hours beyond that?
A. Yes.
Q. Approximately how many?
A. A total of 161 hours and five minutes.
Q. And how many flight hours are required to get a commercial pilots license?
A. 150 hours.

MR. BODANSKY: One moment, your Honor.

No further questions.

THE COURT: Cross-examination.

MR. ABDULLAH: No, your Honor.

THE COURT: All righty then. You may step out.

And the government may call its next witness.

(Witness excused)

MR. BRADLEY: Yes, your Honor. The government calls Jacqueline Lane.

LAW CLERK: Can you please state and spell your name for the record.

THE WITNESS: My name is Jacqueline Lane, spelled J-A-C-Q-U-E-L-I-N-E. Last name Lane, L-A-N-E.

JACQUELINE LANE,

called as a witness by the Government,

having been duly sworn, testified as follows:

THE COURT: All righty. You may inquire.

MR. BRADLEY: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. BRADLEY:

Q. Where do you work, Ms. Lane?

A. I work for the FBI.

Q. What is your title there?

A. I'm a digital forensic examiner.

Q. What is a digital forensic examiner?

A. A digital forensic examiner assists with investigations that deal -- that had digital evidence. So digital evidence can be anything from a computer to a cellphone to a gaming device.

Q. How long have had that position?

A. Eight years.

Q. Where are you currently based, Ms. Lane?

A. I'm currently at the FBI Boston field office. Prior to that, I was at the New York FBI field office. And prior to that, I was at the San Francisco field office.

Q. What is the name of the group at the FBI where digital

forensic examiners work?
A. So the program is called CART C-A-R-T. That stands for computer analysis response team.
Q. You touched on this earlier, but what are your current duties and responsibilities?
A. So I assist with digital evidence for investigations. So that could mean assisting with an on-scene search if there's any digital media on the scene, or if digital evidence is brought back, assisting with our -- or dealing working on the digital evidence back at the lab.
Q. When you say "digital evidence," what are you generally referring to?
A. So digital evidence is essentially digital media. So it's any evidence that is essentially a digital item. It can be a computer, a hard drive, a thumb drive, cellular devices, et cetera.
Q. What is your educational background?
A. Well, I have a bachelor's of science in computer science from Brandeis University, and I have a master's of science in computer science from Brown University.
Q. Have you received any training in the analysis of electronic evidence and forensic examination?
A. Yes. So in the CART program, you first start off as a trainee, and that trainee status is about a year to two years where CART offers a bunch of digital forensic-related courses,

and while you're taking those classes, you're also working on investigations dealing with digital evidence at the same time.
Q. Do you receive any certifications as part of that training?
A. Yes. So I'm a CART -- I'm a certified CART digital forensic examiner. And throughout my career as a digital forensic examiner, you also receive various third-party certifications as well.
Q. Are you required to do annual trainings?
A. Yes.
Q. Are those trainings required to maintain your certification with CART?
A. Yes, they are.
Q. What kind of trainings are those?
A. So it's anything related to the field of digital forensics. So once I'm certified -- so in the certification process, it's going to be how to deal with digital evidence, how to handle digital evidence, recognize digital evidence and the various types of digital evidence there are. So computer will be different from a cellphone. And like even within computers, it's different types of computers, such as Windows or Mac computer. Then afterwards, we're supposed to pick any field within digital forensics. So it can be more advanced analysis of cellphones androids, iPhones or computers again such as Mac, Apple, Apple Mac or Windows or any other -- anything else in the field like gaming systems, vehicles, DVRs, et cetera.

Q. Has your training included the analysis of how to handle storage media, such as USB devices and hard drives?
A. Yes.
Q. What about cellphones?
A. Yes.
Q. Are you familiar with the term forensic image?
A. Yes.
Q. What is a forensic image, Ms. Lane?
A. So a forensic image is essentially a soft copy file of all the data that's on the original digital media. So it's a computer file essentially representing all the data from the original digital device.
Q. And as part of your duties and responsibilities with the FBI, do you assist in creating forensic images of electronic devices?
A. Yes.
Q. What is the purpose of doing that?
A. So once you create a forensic image, you're capturing all the data from the original digital evidence at that time, and now you're working off essentially a copy, a forensic copy of that evidence. So now you no longer have to deal with the original device, you don't have to deal with the original cellphone or the original thumb drive or computer hard drive. You're just dealing with a computer file now. But, again, that computer file represents all the data that was on the original

digital evidence.
Q. What generally happens to a forensic image after you assist in creating one?
A. So after I create a forensic image, that's just a digital file at this point, so it's just ones and zeros. So now we have to make it reviewable so the investigator understands what was actually on the original digital media.
Q. So, in simple terms, does that mean if you make a forensic image of a hard drive, for example, you're creating an exact copy of the contents of that device?
A. Yes.
Q. How often do you -- and is creating those forensic images part of your responsibilities with CART?
A. Yes.
Q. How often do you deal with making or facilitating the creation of forensic images of electronic devices?
A. It's a daily day-to-day occurrence.
Q. Approximately how many electronic devices have you created forensic images of?
A. Definitely in the high hundreds.
Q. How do you verify that the forensic image is identical to the device that you examined?
A. So the forensic tool that creates a forensic image, as it's acquiring that data, it's also creating what's called a hash value. That's a hash signature that basically verifies the

integrity that the data has been copied successfully.

Q. What is a hash value, Ms. Lane?

A. So a hash value is created by what's called a hashing algorithm essentially. So you can think of the algorithm as a mathematical algorithm that takes in input such as ones and zeros. It can be a file or multiple files, whichever, just ones and zeros. It goes through a hashing algorithm, which you can think of as a black box, and it spits out a unique signature, the hash value, which is an alphanumeric string of characters, from 32 characters on up depending on the algorithm you use. And that verifies the integrity of it because with the hash signature, anytime you put the same information through the hashing algorithm, it will always spit out the exact same signature. If a single one or zero got misplaced or altered, the signature will be completely different.

Q. As part of your duties with CART, Ms. Lane, do you also create forensic images of cellphones?

A. I create forensic extractions of cellphones. Forensic extractions are a little bit different, more so because with cellphones we're interacting with the phone at the same time as the forensic tool is communicating with it. But it's essentially a similar forensic process to obtain all the data from the original digital media.

Q. And just to be clear, what do you call that product that comes from the examination of a cellphone?

A. A forensic extraction.
Q. In your capacity as a forensic examiner for the FBI and the CART group, have you conducted or created forensic extractions of cellphones for the FBI?
A. Yes, I have.
Q. Approximately how many cellphones have you examined in your career?
A. Also in the very high hundreds.
Q. I'd like to talk just a little bit more about the process for how you create a forensic image or an extraction of an electronic device. So, generally speaking, who provides you with the electronic devices that you analyze as part of your work?
A. So the electronic devices, the evidence is usually provided by the investigator or the Special Agent. And before we even touch the evidence, we make sure that there is a proper legal authority authorizing us to work on these devices. But then the investigator will be the one providing the evidence, and I sign off on a chain of custody.
Q. When you receive these devices for examination, are they identified by you in any particular way?
A. Yes. So evidence itself is usually identified first by the FBI or the investigator. There is already going to be some kind of identifier for the evidence, but in CART we also give it an additional identifier.

Q. So, in other words, is each device you examine assigned a particular unique identifier?
A. Yes, it is.
Q. Are you familiar with the term 1B number?
A. Yes.
Q. What is 1B number?
A. 1B number is how the FBI identifies certain types of evidence.
Q. So once a device is provided to you by an investigating agent, what do you do with it?
A. So once I have the device, I assign it a CART unique identifier as well. I inspect it to see no damage is to the device, and I also photograph it.
Q. Do you label the device in any way?
A. Yes.
Q. How do you label it?
A. So with that unique identifier that's going to be on a printed sticker, then I also initial and date.
Q. At a high level, and let's focus on forensic images to start, how do you perform a forensic image or create a forensic image of a device that you're looking at?
A. So once I receive a digital device, I connect it to a forensic acquisition tool, so that could either be my forensic computer or could be a stand-alone forensic tool that whose sole purpose is to image the device. So once I connect it,

that connection is going to be read only. It's write blocked. So my forensic tool can't alter any of the data. And then that tool will create a forensic image to whatever destination I specify.

Q. How does that forensic image then become readable to an investigating agent, for example?

A. So once I have that forensic image, again, which is just essentially a computer file at this point, I put it through another tool that will process the image to make it reviewable.

Q. Turning to cellphones, how do you perform a forensic extraction of a cellphone?

A. So generally with a cellphone, the cellphone has to be in an on state. So once I receive it, I try to make sure it's -- if it's powered off, I power it on. If it's already powered on, I leave it powered on. And then if it's pin locked, if I know the pin, I'll enter it and modify any permissions I have so the forensic tool can communicate with the phone. I connect the phone to a forensic workstation running a forensic software, and my forensic software will interact with the phone, and I myself will be as well, and just making sure the permissions are correct. And then it will create a forensic extraction to whichever destination I point it to.

Q. How does that forensic extraction become readable or viewable to the investigating agents on a case?

A. Similar to the forensic image, it will be put into another

forensic tool that will basically process it and make it reviewable.

Q. What's the name of that forensic tool for forensic extractions of cellphones?

A. To create a forensic extraction, it's a tool called Cellebright UFED 4PC.

Q. Ms. Lane, when you make a forensic image or an extraction of a device, can the data on the devices themselves then be altered?

A. Yes, afterwards, but once the -- but the forensic image and extraction, that's an exact copy at the time, and that won't be altered.

Q. So the extractions and the images, those themselves, the metadata, for example, cannot altered?

A. No, not easily.

Q. And what does the term metadata mean?

A. Metadata is just information about the data, so it's just extra information regarding data.

Q. Let's turn to this case. Have you examined any electronic devices as part of your work here?

A. Yes, I have.

Q. Were you otherwise involved at all in the investigation of this case?

A. No.

Q. Do you know who the defendant is? I'll rephrase. Do you

know the defendant?
A. No.
Q. As part of your work on this case, did you create a forensic image of a USB drive?
A. Yes, I did.
Q. Was that device assigned a particular number?
A. Yes.
Q. Was that based on the 1B numbering system we talked about earlier?
A. Yes, it was assigned 1B1.

MR. BRADLEY: Your Honor, may I approach?

THE COURT: You may.

Q. Ms. Lane, do you see the device that you previously testified was marked as 1B1 in front of you?
A. Yes.
Q. Is that 1B1 the device labeled as Government Exhibit 101 for identification?
A. Yes, it is.
Q. Now, before I ask you some additional questions about 1B1, did you image or create extractions of other devices in this case?
A. Yes, I did.
Q. Directing your attention to what's been marked for identification as Government Exhibit 102, do you see that device?

A. Yes, I do.
Q. What is that?
A. It is a gold Samsung cellphone.
Q. Was that gold Samsung cellphone assigned a 1B number as well?
A. Yes.
Q. What was the 1B number on that?
A. 1B5.
Q. Then directing your attention to what's been marked for identification as Government Exhibit 103, do you see that device?
A. Yes, I do.
Q. What is that device?
A. It is a blue Samsung cellphone.
Q. Was that device also an assigned 1B number in this case?
A. Yes.
Q. What was that number?
A. 1B7.
Q. So, Ms. Lane, starting with Government Exhibit 101, was this the same USB device that you created an image of in this case?
A. Yes, it was.
Q. How do you know that?
A. So when I assigned a unique CART identifier to it, there was a sticker bar code or sticker label that I put on, which is

also present on the bag of the Government Exhibit.
Q. You also said earlier that you put your initials on those devices. Did you do that here?
A. Yes. So my initials and the date that I made the label is on it.
Q. Did you review Government Exhibit 101, the 1B1 USB drive before your testimony today?
A. Yes, I did.
Q. How do you know that's the same as the one you reviewed?
A. So on the bag I initialed and dated it, and the date is from yesterday.
Q. Turning to Government Exhibits 102 -- I will start with Government Exhibit 102. Did you perform a forensic extraction or create a forensic extraction of that device?
A. Yes, I did.
Q. How do you know that's the same device you performed an extraction of?
A. Similar to the other government exhibit, the CART sticker label is on it with my initials and date.
Q. And turning to Government Exhibit 103, did you create a forensic extraction of that device?
A. Yes, I did.
Q. How do you know that's the same device that you created a forensic extraction of?
A. The CART sticker label is on it with my initials.

Q. So, Ms. Lane, I would like to focus first on the USB drive, the 1B1 or Government Exhibit 101. Once you created a forensic image of the USB device -- I should say, first, did you create a forensic image of that USB device?
A. Yes, I did.
Q. Did you do that following the same methods that we just discussed today?
A. Yes.
Q. What kinds of software do you use in order to look at the contents of devices such as that after you have imaged them?
A. The one in the software, it's a forensic tool called FTK Imager.
Q. Does FTK change the underlying data on the thumb drive in any way when you use it?
A. No, because I'm looking at the forensic image, not the original evidence at this point.
Q. After you created the forensic image of the thumb drive, did you look at the contents of that thumb drive?
A. Yes.
Q. And by thumb drive, I mean USB drive.
A. Yes.
Q. As part of that review, did you or anyone else on your team identify any encrypted files?
A. Yes.
Q. What was the encryption software that was used to encrypt

those files?
A. The files were encrypted with the software called TrueCrypt.
Q. Were those files decrypted as part of your review?
A. Yes.
Q. Who did that decryption?
A. Another forensic examiner in the CART team.
Q. Did you verify that forensic examiner's work?
A. Yes.
Q. And ultimately whose responsibility was it to perform this forensic image of the USB drive and its contents?
A. It was me.
Q. Turning to Government Exhibits 102 and 103, did you perform forensic extractions of those two devices that you described as gold and blue Samsung cellphones?
A. Yes, I did.
Q. Did you do that using the methods that you just -- that you previously described earlier today?
A. Yes.
Q. Just to be clear, what kinds of programs did you use -- well, did you review the contents of those, of those cellphones after you created the forensic extractions?
A. Yes. So those forensics extractions were then placed in another processing tool called Cellebright physical analyzer, and that processes the contents to make it reviewable.

Q. Are you familiar with the term snapshot?
A. Yes.
Q. What is a snapshot?
A. So it's a -- basically a capture of the device at that moment in time.
Q. Could you provide an example of what that would be?
A. So usually it's like a screenshot. It's a picture of whatever you're taking the screenshot of at that moment in time. So I did create screenshots as well snapshots as well when I was extracting the mobile phones.

MR. BRADLEY: Your Honor, may approach?

THE COURT: You may.

Q. Ms. Lane, I just handed you three disks. They have been marked for identification as Government Exhibits 400, 500 and 600. Government Exhibit 400 contains Government Exhibits 101 -- excuse me -- contains Government Exhibits 401, 402, 403, 404, 405, 406, 407, 408, 409, 410, 411, 412 and 413.

Government Exhibit 500 contains Government Exhibits 501, 502, 503, 504, 505, 506, 507, 508, 509, 510, 511, 512, 513 and 514.

Government Exhibits 600 contains Government Exhibits 601, 602, 603, 604, 605, 606, 607, 608, 609, 610, 611, 612, 613, 614, 615 and 616.

Do you recognize these disks, Ms. Lane?
A. Yes, I do.

Q. How do you recognize them?
A. Well, I initialed and dated them yesterday.
Q. Did you review their contents before you initialed and dated them?
A. Yes, I did.
Q. And did you do that in preparation for your testimony today?
A. Yes, I did.
Q. Starting with government the disk marked for identification as Government Exhibit 400, what does that disk contain?
A. It contains some of the files from 1B1, the thumb drive.
Q. How did you confirm -- does it contain all of the files from the thumb drive?
A. No, it does not.
Q. How did you confirm that the files that are on that disk were from the forensic image of the thumb drive?
A. I opened up the forensic image and viewed the contents of it and matched the files that were basically on the disk to the files that were on the forensic image of 1B1.
Q. Turning to the image of 500, what does that contain?
A. It contains files from 1B5, the gold Samsung.
Q. Does it contain all of the files in the gold Samsung, 1B5?
A. No.
Q. How did you confirm that the exhibits on the disk marked as Government Exhibit 500 are from the extraction of the 1B5

device?
A. I opened up the report that I had previously created for 1B5 and then looked for the files that were on the disk, and found the same files on the report.
Q. When you mention report, what are you referring to?
A. The digital report I created for -- that's been processed to make the data reviewable to investigators.
Q. Was that the Cellebrite platform that you talked about?
A. Yes.
Q. Finally, what does Government Exhibit 600 contain?
A. It contains files from 1B7, the blue Samsung.
Q. Does it contain all of the files from the 1B7 device?
A. No.
Q. How did you confirm that the exhibits or files on that disk are from the 1B7 device?
A. Similar to the other disk, I opened up the Cellebrite report I had previously created for 1B7 and found the files that were on this disk to the -- and I found the same files on a Cellebrite report.
MR. BRADLEY: Your Honor, the government offers Government Exhibits 401 through 413 inclusive, Government Exhibits 501 through 514 inclusive, and Government Exhibit 601 through 616 inclusive.
THE COURT: Any objection?
Hearing no objection, they are admitted

(Government's Exhibits 401-413, 501-514 and 601-616 received in evidence)

Q. Finally, Ms. Lane, just to confirm, after you performed these extractions and created these images, did you have any other involvement in this investigation?

A. No, I did not.

MR. BRADLEY: No further questions, your Honor.

THE COURT: Cross-examination.

MR. ABDULLAH: No.

THE COURT: All righty. You may step out.

(Witness excused)

THE COURT: Will there be any further witnesses today?

MR. BRADLEY: No, your Honor.

THE COURT: All righty then.

Members of the jury, you will be able to leave on the early side today. So you will have to return tomorrow at 9:00 a.m. sharp. remember, don't discuss the case amongst yourselves. Don't permit others to discuss the case in your presence. It's really important that you get here on time.

Thank you. Have a good rest of the day.

(Jury not present)

THE COURT: You may be seated. Is there anything that the parties would like to raise?

MR. BRADLEY: One moment, your Honor.

Your Honor, I just conferred briefly with standby

counsel. I think in terms of scheduling a path forward, I think we just wanted to propose or at least discuss just kind of what I guess our now more truncated trial schedule might look like. I expect that with our expected witness order tomorrow, I expect the government will call four witnesses, and that we likely will be in a position where we rest tomorrow, barring anything unforeseen.

It might make sense at that point -- and of course we defer to the Court's scheduling preference -- to perhaps have the charge conference on Friday, with an eye toward closings on Monday, but we just wanted to throw that out for the Court's consideration.

THE COURT: That's fine. So I will be getting the charge, the proposed charge to you.

Anything from the defense?

MR. COMMISSIONG: Yes, your Honor. You instructed Mr. Abdullah should respond to the government's letter by letter. Mr. Abdullah has asked standby counsel to write the letter on his behalf. And I'm just sort of thinking that through logistically to make sure that we comport with your Honor's rulings with respect to hybrid representation. We would write the letter -- discuss the issues with him, write the letter, see him tomorrow before court, and go over the letter with him, and then we would maybe give a hard copy to your Honor, to the government, and then file it.

THE COURT: That's fine. So long as Mr. Abdullah is directing your participation, that's fine.

MR. COMMISSIONG: Understood, your Honor.

MR. BRADLEY: I think that makes sense, your Honor. I think as long as the record is clear, and I'm sure it will be, that ultimately the -- what standby counsel is doing is facilitating what is ultimately the defendant being in control of his own case and his own decisions regarding his own representation.

THE COURT: And that is your understanding, Mr. Commissiong, is that correct?

MR. COMMISSIONG: That is, which is why I'm raising it and putting it on the record, your Honor.

THE COURT: Very well then. See you tomorrow morning.

(Trial continued November 31, 2024 at 8:45 a.m.)

o0o

INDEX OF EXAMINATION

Examination of: Page

TRICIA BACON

Direct By Mr. Bradley . . . . . . . . . . . . . 128

JOSEPH KALUM

Direct By Mr. Bodansky . . . . . . . . . . . . . 201

SHUNSUKE OTANI

Direct By Mr. Bodansky . . . . . . . . . . . . . 225

JACQUELINE LANE

Direct By Mr. Bradley . . . . . . . . . . . . . 270

GOVERNMENT EXHIBITS

Exhibit No. Received

1201 and 1207 . . . . . . . . . . . . . . . . 149

1303 . . . . . . . . . . . . . . . . . . . . 171

1302 . . . . . . . . . . . . . . . . . . . . 173

801A and 801B . . . . . . . . . . . . . . . . 194

802 . . . . . . . . . . . . . . . . . . . . . 207

1001 . . . . . . . . . . . . . . . . . . . . 219

1123, 1124, 1125, and 1126 . . . . . . . . . 228

1115 . . . . . . . . . . . . . . . . . . . . 233

1114 . . . . . . . . . . . . . . . . . . . . 238

1501 . . . . . . . . . . . . . . . . . . . . 247

111 . . . . . . . . . . . . . . . . . . . . . 264

111P . . . . . . . . . . . . . . . . . . . . 265

401-413, 501-514 and 601-616 . . . . . . . . 288