UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

v. 20 Cr. 677 (AT)

CHOLO ABDI ABDULLAH,

Trial

Defendant.
------------------------------x

New York, N.Y.
November 4, 2024
8:45 a.m.

Before:

HON. ANALISA TORRES,

District Judge

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
NICHOLAS S. BRADLEY
JONATHAN L. BODANSKY
Assistant United States Attorneys

CHOLO ABDI ABDULLAH, Pro Se

ADAMS & COMMISSIONG LLP
KARLOFF C. COMMISSIONG, Standby Counsel

SAHLI LAW PLLC
EMILEE A. SAHLI, Standby Counsel

ALSO PRESENT: SABRINA JIM MUNOZ, Paralegal Specialist (USAO)
SEAN ZERGER, Special Agent (FBI)

(Trial continued; jury not present)

THE COURT: Good morning. Please make your appearances.

MR. BRADLEY: Good morning, your Honor. Nicholas Bradley and Jonathan Bodansky for the government, along with Sabrina Jim Munoz, a paralegal specialist in our office and Special Agent Sean Zerger of the FBI.

MR. ABDULLAH: Cholo Abdullah, the defendant.

MS. SAHLI: Emilee Sahli, standby counsel. Mr. Commissiong just stepped, out but he will be back momentarily.

THE COURT: All righty. Please be seated.

Is there anything before I give my pre-summation instructions?

MR. BODANSKY: Just one brief matter, your Honor. At the last appearance, the Court inquired about specifics regarding the defendant's upcoming prison call. The government has confirmed that the defendant has a call scheduled for tomorrow, and it is scheduled for 90 minutes.

THE COURT: Do you know what time?

MR. BODANSKY: 11:00 a.m. I believe.

THE COURT: Presumably, he will be here.

MR. BODANSKY: I believe tomorrow is a Court holiday.

THE COURT: I'm sorry, that's right. Tomorrow is Election Day, I forgot. Very good. Thank you.

Anything from the defense?

MR. ABDULLAH: Nothing from the defense.

THE COURT: All right. Then we will start as soon as we have all of our jurors. I see that Mr. Commissiong is joining us now.

MR. COMMISSIONG: Sorry, Judge.

THE COURT: Is there anything that you would like to say, Mr. Commissiong?

MR. COMMISSIONG: No.

THE COURT: All righty.

MR. COMMISSIONG: Well, you know what, let me just say that Mr. Abdullah told the Court that he would not be giving a closing, and his frame of mind is the same as it was when your Honor asked him the last time. Nothing has changed.

THE COURT: Thank you.

(Recess)

(Jury present)

THE COURT: Please be seated.

Good morning jurors.

THE JURY: Good morning.

THE COURT: Members of the jury, all of the evidence in this case has been presented. The next stage of the trial is the government's summation. The defendant has the option of giving a summation but has decided not to do so.

After the government's summation, I will instruct you

as to the laws, rules and principles of law that will guide you during your deliberations in rendering your verdict. In making its summation, the government will review the evidence that you have heard and seen during the course of the trial and will suggest to you certain inferences or conclusions, which in its opinion may be properly drawn from the evidence in the case.

If you find that the government's analysis of the evidence is correct and accurate, then you are at liberty to adopt such inferences and conclusions in whole or in part. On the other hand, if you find that the government's analysis of the evidence is not correct and not accurate, then you are at liberty to disregard such inferences and conclusions in whole or in part.

Now, we will have the summation of the government by Assistant United States Attorney Nicholas Bradley.

MR. BRADLEY: Thank you, your Honor.

For every flight test that he passed, for every hour flying a plane, for every minute in the flight simulator, for every video he took of himself while flying, for every progress report he wrote to his handler, Cholo Abdi Abdullah, this man right here, was one step closer to his goal — all to recreate the September 11th terrorist attacks, to target and murder Americans, all in the name of the vicious terrorist group, al-Shabaab.

Supporting al-Shabaab was the reason the defendant

attended months of military training, and it was the reason he enrolled in the flight school in the Philippines, and he pursued his goal with relentless focus. The result of his focus is chilling.

While the defendant was spending hundreds of hours training with al-Shabaab to attack this country, he researched pilot jobs, airplane security, Boeing 737 cockpit doors, and how to open cockpit doors from the outside. He researched everything he would need to know to commandeer a plane in a terrorist attack. And as he researched each milestone, as he reached each milestone in his flight training, he updated his al-Shabaab handler.

In those progress reports, the defendant explained his attack planning, how he tested airplane security by bringing nail cutters on the plane, how he tested which seats had the best view of the cockpit, and how he researched airplane hijackings after September 11th. You saw these progress reports in black and white. And the defendant encrypted these updates so he could share his attack plans while trying to avoid law enforcement. And in those moments, those moments he never thought would be showed in a federal United States courtroom, he told his al-Shabaab handler about the brothers during 9/11, and how he had reached a very important conclusion from his research that in his words, the only successful hijack after 9/11 was because it was hijacked by the pilot himself.

The defendant told his handler, again in his own words, that for a very successful mission, we need a pilot in the cockpit, which means I should apply for a job for the airlines.

After sitting through this trial, you know exactly what his mission was: The defendant was inches away from getting a commercial pilot's license so that he could hijack a passenger airplane and crash it into a building in the United States. You know that he was inches away from being able to recreate the horrors of September 11th for al-Shabaab and its mission to murder Americans wherever it could.

Over this past week, you have seen overwhelming evidence that the defendant joined and trained with al-Shabaab, knowing that it was a terrorist group that attacked civilians and targeted Americans. You heard about the al-Shabaab operatives that he knew, the defendant knew from his months of training in Somalia, and how the defendant knew two of them were part of al-Shabaab's attack on an office complex in Nairobi, Kenya in January of 2019. He researched this deadly attack right after it happened, right after his handler briefed him on it.

And what did the defendant do next? He doubled down. He accelerated his attack planning. The defendant was so devoted to al-Shabaab and his mission that he researched things like Delta flights, tallest buildings in Atlanta, Bank of America Plaza, a 55-story skyscraper in Atlanta, airplane

hijackings and ways to get entry into the United States. He did this just days after that al-Shabaab attack in Nairobi.

Members of the jury, you have now heard the evidence in this case, and that includes the witnesses, the pictures, the videos, the mountain of electronic evidence from his devices and his accounts. And you know that that evidence leads to only one conclusion: That the defendant is guilty.

This summation is our opportunity to review the evidence that you saw and heard during the trial and explain how that evidence proves that the defendant is guilty beyond a reasonable doubt of the charges in this case. So I plan to do three things today:

First, I'll quickly review the charges in this case. Second, I will go over what the evidence shows. And it clearly shows what the defendant did, what he agreed to do, and these are the facts, the videos, the pictures, the testimony, all of the proof and how that proof fits together. We will go through that.

And after sitting through this trial, you know full well what it shows -- the defendant joined and trained with al-Shabaab. The defendant knew that al-Shabaab engaged in terrorist activity. The defendant trained to become a pilot to carry out a terrorist attack. And the defendant agreed to murder U.S. nationals.

Finally, I will go over the elements of the six

charges in this case and how the evidence proves each of these counts and shows that the defendant is guilty. And, of course, always remember that what Judge Torres says on the law controls, and you will hear her instructions on the law very soon.

So first let's start very quickly with the charges in the indictment. There are six charges in this case, and they all relate to the defendant's support of al-Shabaab and his effort to carry out a terrorist attack against the United States.

Counts One and Two charge the defendant with conspiring or agreeing to provide material support to a foreign terrorist organization, and actually doing so. And that foreign terrorist organization here is al-Shabaab. Count Three charged the defendant with conspiring outside the United States to murder U.S. nationals. Count Four charges the defendant with conspiracy to commit aircraft piracy. Count Five charges the defendant with conspiracy to destroy aircraft. And Count Six charges the defendant with conspiracy to commit acts of terrorism transcending national boundaries. These are the charges against the defendant. And after paying close attention during this trial, you know that the evidence for all of these counts is devastating.

So let's talk about what that evidence shows. And again, members of the jury, there is no mystery here. The

evidence of the defendant's actions and his intent is clear for each of these counts. So let's go now through the evidence and how it proves all of this beyond a reasonable doubt and how you know that when you see evidence like Government Exhibit 408, you know why it is such damning proof of his guilt.

I'm going to start with this document, and I'm going to finish with this document, members of the jury, because this is one of the progress reports that the defendant wrote to his handler. It shows the defendant admiring the brothers during 9/11, the research that he conducted for his attack. You can see it all right here. Now I'm just going to read from some of this, members of the jury.

"I read almost all the hijack incident that has ever happened, and I chose the above because it is within our interest."

And you can see, members of the jury, how he concluded that based on this research, the only successful hijack after 9/11 was because it was hijacked by the pilot himself. And you can also see at the bottom part of the screen the section that he labeled "my ideas" and how he concluded, he concluded that for a very successful mission, he would need to get a job with the airlines. He needed to become a pilot.

You know that when the defendant wrote that progress report, he had been working for years with high-ranking al-Shabaab members like Stella Grace and Brother, the leaders

who gave him his hijacking mission that he readily accepted; that he eagerly pursued. That mission was to commit a terrorist attack against this country to murder innocent civilians, and the defendant clearly provided material support to al-Shabaab when he trained to become a pilot as part of these goals. It was part of his mission, and he logged hundreds of hours to learn the licenses and ratings that he needed to get that pilot job, to get into that cockpit. So with that in mind, let's talk about all the ways that you know the defendant joined and trained with al-Shabaab.

Let's start here at the very beginning. The defendant joined al-Shabaab in 2015. You heard this from Special Agent Kevin Song. He is the one who interviewed the defendant on the plane back from the Philippines. This is page 50 of the transcript. Special Agent Song told you about how the defendant admitted that he took a bus from Kenya specifically to join al-Shabaab.

"Q. What, if anything, did he say about whether there came a time in 2015 that he left Kenya?

"A. He said that he left Kenya at a point in 2015 to get on the bus to go to Somalia.

"Q. Did he say why he was going to Somalia?

"A. He said he was going to join al-Shabaab."

The defendant didn't just travel alone though. He joined al-Shabaab with his friend, Ali Salim. The defendant

told Special Agent Song that Ali Salim became one of the leaders of the Dusit attack in 2019. That's the name of that office complex in Nairobi that al-Shabaab attacked, and you heard about that during the trial. This is page 57 of the transcript right here. And this attack happened while the defendant was training for his al-Shabaab mission at the flight school.

This matters because you heard Special Agent Song testify that the defendant referenced the Dusit attack often during this interview. He knew what happened during this attack, and now so do you. He knew, the defendant knew al-Shabaab did it, how they did it, and the reasons they did it. And even then the defendant pressed on with his attack planning.

Let's look right here.

"Q. What did he say about Ali Salim?

"A. Ali Salim is his friend that rode the bus with him from Kenya to Somalia to join al-Shabaab. He is also a Dusit attacker.

"Q. Did the defendant reference the Dusit attack at any other time during the interview?

"A. Yes.

"Q. Approximately how many times did the defendant reference the Dusit attack during the course of your interview?

"A. A number of times."

Now, right from the start, you heard from Special Agent Song how the defendant described interacting with significant figures in al-Shabaab when he got to Somalia. Right at the outset of his training, he told Special Agent Song that he talked to an intelligence officer from al-Shabaab. His name was Azzam. And he later also became one of the Dusit attackers. That was the defendant saying it again. This is on page 57 of the transcript.

"Q. What did he say about Azzam?

"A. Azzam is the al-Shabaab intelligence officer he spoke on the phone at the police station. He also said that he is one of the Dusit attackers."

During the months of training that followed, the defendant met weekly with Azzam. He also met with other high-ranking al-Shabaab members, like his safe house leader and that safe house leader's boss, the one that he knew as Brother, the man who gave the defendant his hijacking mission.

And the defendant didn't just join al-Shabaab to go to meetings or talk about attack planning. That would have been bad enough, but he went far beyond that. The defendant trained with them for months. He told this again to Special Agent Song. This is on page 63 of the terrorist. Al-Shabaab gave him military-style training, which included learning how to fire an AK-47 assault rifle and making different size bombs using ammonium nitrate, the types of things a training

terrorist would learn from his terrorist organization, the types of things the defendant learned from al-Shabaab.

Let's look what he explained to Special Agent Song right here.

"Q. Can you describe what the defendant said as to what they did in the Boni Forest during that time?

"A. Yes. They did military-style type training. They hiked for long distances with heavy -- heavy things in their packs. They hid different caches or supplies of food in the ground in the Boni Forest for other members of al-Shabaab to find."

Answer later: "At this second safe house, they learned about explosives. They learned how to make a bomb using ammonium nitrate. They learned how to build large bombs that he described that were two feet by two feet. And they learned how to build smaller bombs that were the size of two fists."

And you learned about the defendant's time and training in stark detail. You heard the defendant spend months in different safe houses in Somalia in places like Jilib and the Boni Forest. Here is Government Exhibit 1207, this is that map that Dr. Bacon talked about. You can see those locations circled, Jilib and the Boni Forest. Dr. Bacon testified about this as part of her evidence that you saw in this case.

Here is page 153 of the transcript:

"A. So Jilib is basically al-Shabaab's de facto capital."

And then how about this, the Boni Forest? Look at what will Dr. Bacon explained on page 189.

"Al-Shabaab has carved out sort of a safe haven in the Boni Forest where it plans operations, sometimes it brings kidnapping victims. It's really exploited that terrain to carve out a footprint there to conduct operations." So you know that when the defendant said to Special Agent Song that he was in Jilib and the Boni Forest, you know again that these are al-Shabaab strongholds.

By the way, that term "operation" that you heard in this case, you know from Dr. Bacon what that means. It's just another word that al-Shabaab uses for attacks, the types of terrorist attacks that this organization conducts. She said that on page 167 of the transcript right there.

That word operation is significant because that is exactly the word the defendant used in his progress reports to his al-Shabaab handler, the same ones where he was describing his own hijacking and attack plan.

Here is Government Exhibit 406 where he talks about right in the red box on the top "the operation of 14 Riverside." You've seen his searches for that address. You've seen al-Shabaab's propaganda about that address too. That is the Dusit complex in Nairobi that al-Shabaab attacked in January 2019, the same place that Ali Salim and Azzam were attackers, which is just another way that you know the

defendant's knowledge of al-Shabaab, his attacks, and his overarching goals to kill Americans. That's why he writes in that Government Exhibit 406, "I also have a feeling that Americans may be involved." He knows who he is targeting.

Let's talk next about how al-Shabaab is a designated foreign terrorist organization. This is relevant to Counts One and Two of the indictment. And beyond that, you know that the defendant clearly knew that al-Shabaab was engaged in acts of terrorism and terrorist activities while he was at the flight school and while he was training with al-Shabaab in Somalia. This is also an element of Counts One and Two.

First, there is no dispute that al-Shabaab is a designated foreign terrorist organization. It's been designated by the United States Government, and it has been since February of 2018. That is in Government Exhibit 1403. And you heard that from Dr. Bacon in her testimony.

I'm just going to read the red boxes here.

"Al-Shabaab is a designated foreign terrorist organization and has been designated a foreign terrorist organization by the United States Secretary of State since February 26, 2008." That matters for Counts One and Two because the defendant is charged with providing material support to a foreign terrorist organization. So that has been established here.

But let's take a step back, because you heard a lot

from Dr. Bacon about al-Shabaab's goals, its organization as a group, and its methods. You heard about its deep connections to al Qaeda and how it strove to be recognized as an al Qaeda affiliate, and how it pledged allegiance to al Qaeda in 2012. Al-Shabaab from the beginning was aligned with al Qaeda's "broader objective to overthrow the United States and create an Islamic caliphate that spans multiple countries." That's Dr. Bacon's testimony on page 151 of the transcript.

Dr. Bacon also testified on page 152 that al-Shabaab believes you can't achieve this objective without overthrowing the United States, and that the United States is the main impediment to this long-term objective.

And Dr. Bacon also described in stark detail on page 160 of the transcript: "Al-Shabaab was kind of born with the idea that the United States was one of its primary enemies."

You may be asking where you've heard something like this before during this trial. You heard about it from the defendant. Remember Special Agent Song's testimony about what the defendant said. This is right here on pages 110 and 111 of the transcript.

"Q. Did the defendant say anything as to why al-Shabaab was interested in attacking the United States?

"A. Yes.

"Q. What did he say?

"A. He talked about al-Shabaab, the enemy of the -- the enemy

of al-Shabaab is the United States."

The defendant openly admitted why al-Shabaab, the group he was a member of, was interested in attacking United States. It was simple: The enemy of al-Shabaab is the United States of America. He knew full well al-Shabaab's aims and its goals, and he did all of this anyway.

This wasn't just the defendant saying this though. You heard Dr. Bacon's testimony. This is on page 183 of the transcript. You heard Dr. Bacon testify that after al-Shabaab was designated as a foreign terrorist organization by the United States Government, she said:

"A. It affirmed its view that the United States was its enemy, but shortly after the designation, there was an airstrike that killed the senior al-Shabaab operative, and it really pointed to that event as a justification to 'hunt the United States.'"

So, in other words, the defendant joined and trained with a terrorist group that he knows views the United States as an enemy, and one that even said it would hunt the United States. Violence, including against innocent civilians is also a key part of al-Shabaab's mission. You heard that from Dr. Bacon as part of her testimony as well.

Here is Dr. Bacon on page 162 and 163 of the transcript. She testified that al-Shabaab engages in violent attacks like assassinations, suicide bombings, armed assaults on hotels, restaurants, beaches -- beaches, and an array of

civilian targets to pursue its goals.

Here is Dr. Bacon on 178 of the transcript. Al-Shabaab frequently uses suicide bombings, either using vehicles or suicide vests on people as part of its attacks, along with armed attackers.

Finally, at page 185 of the transcript. Al-Shabaab has claimed responsibility for multiple terrorist attacks outside of Somalia.

You heard that these attacks are known as external operations, and you also heard multiple examples of these external operations. Here is Government Exhibit 1201. This is one of those maps of East Africa that Dr. Bacon walked us through. I want to go through this again with you, members of the jury, because you saw on pages 185 through 187 of the transcript that Dr. Bacon talked about some of these major al-Shabaab attacks. These were all civilian targets against westerners and U.S. citizens, such as the July 2010 bombing of a restaurant in Kampala, Uganda during a World Cup watch party which killed a U.S. citizen and 70 others. That's on page 185 of the transcript.

In September 2013, al-Shabaab killed another 70 people and injured others, including a U.S. citizen, at the Westgate Shopping Mall in Nairobi, Kenya. That's on page 186 of the transcript.

And, finally, you heard Dr. Bacon testify that in May

of 2014, al-Shabaab conducted a suicide bombing at a restaurant in Djibouti City which killed three people and wounded others. That's on page 186 and 187 of the transcript.

You heard Dr. Bacon explain that a common thread through all of these attacks was al-Shabaab retaliating against countries that received U.S. backing for their role in the Africa mission.

So, again, the United States yet again is a powerful motivator for al-Shabaab's attacks against civilians at restaurants, at bars, always the civilians.

The defendant also described how al-Shabaab was clear about its intentions, particularly against the United States. In May of 2015, it issued a statement that encouraged its supporters to conduct attacks in shopping malls in the United States. That's on page 188 of the transcript.

And you also heard in 2015 that al-Shabaab attacked a university in Garissa, Kenya, and they did so to explicitly kill the Christian students and faculty at the university to incite sectarian violence. That's on pages 188 and 189 of the transcript. Killing students, killing faculty.

So you know the multiple ways about al-Shabaab's designation, its history of terrorist attacks, and you know from this trial that the defendant was fully aware of al-Shabaab's terrorist activities.

In fact, the defendant was on video describing the

Garissa attack that we just talked about. This is Government Exhibit 913H. It's one of the video clips of the defendant's interview after he got to the U.S. Here he is explaining that the attack, that Garissa attack, happened before he joined al-Shabaab, but he still knew full well that al-Shabaab killed students in attack. This is just an excerpt of that conversation, and you can listen to it yourselves during your deliberations. But I want to just look at this here.

"AGENT KLOSE: Umm, and, and forgive me if I mispronounce this, but the Garissa University massacre.

"DEFENDANT: No. It happened before me joining al-Shabaab.

"DEFENDANT: They killed students, right?

"DEFENDANT: Al-Shabaab killed students."

Those are his own words are. So when he says this, you see yet again his knowledge that al-Shabaab was engaged in terrorist activities. And it is not even close.

Also, as you saw through this trial, you learned that the defendant consumed terrorist propaganda from figures that are important to al-Shabaab. This is just more evidence that the defendant's knowledge and his intent — what was going through his mind when he was at the flight school and planning his hijacking attack. And more evidence too of the obvious conclusion that the defendant knew about al-Shabaab's terrorist activities. And that's really the whole point here — how

committed he was to the cause and his mission.

Here is Government Exhibit 913I. Again, this is just an excerpt of a video. Here is the defendant describing how he listened to Anwar al-Awlaki every day in the lead-up to him joining al-Shabaab.

"AGENT SONG: Online? So have you listened to Anwar al-Awlaki every day?

"DEFENDANT: Yeah, it was every day."

You heard from Dr. Bacon that Anwar al-Awlaki was a very important figure for al-Shabaab because he endorsed the group early on. Dr. Bacon explained this on page 168 of the transcript. Anwar al-Awlaki was a high-profile senior figure in al-Shabaab's affiliate in Yemen known as al Qaeda in the Arabian peninsula.

Here is what Dr. Bacon said:

"A. He was really the first senior al Qaeda idealogue to directly name al-Shabaab and point out the organization specifically; not just its cause writ large but the organization specifically as pursuing an objective consistent with al Qaeda and an objective that he viewed as religiously valid."

What else did you see? Well, the defendant's own statements about listening al Qaeda members like Anwar al-Awlaki are corroborated by the defendant's own electronic accounts, his own search history. Remember the defendant's

Google accounts, the ones that he admitted to Special Agent Song were his.

Here is Government Exhibit 353 where the defendant visited the website that is excerpted below in Government Exhibit 702. The complete archive of Sheikh Imam Anwar al-Awlaki audio lectures. You saw that audio file in Government Exhibit 702. You heard Special Agent Corey testify about that Google search and web history for these accounts. He went to this website, and you heard some of this propaganda on that website for yourself in Government Exhibit 702AC. You heard Anwar al-Awlaki mock Americans as no longer safe, including at airports.

Here is another quick example: The defendant's own Google records show other examples of him searching out other al Qaeda figures that are revered by al-Shabaab. Here is the defendant's own web history for one of the defendant's accounts where he looked at the obituary for Abu Yahya al-Libi. You heard about al-Libi's importance for al-Shabaab.

Dr. Bacon testified about this on page 167 of the transcript. She explained that Abu Yahya al-Libi was a very high-profile, very senior figure in al Qaeda, often referred to as the number two or number three within the group, who really publicly embraced al-Shabaab early on. Dr. Bacon described how significant his early endorsement was for al-Shabaab and how al-Libi continues to be admired by al-Shabaab even years after

his death. That's on page 168 of the transcript.

So when you see the defendant search for people like Abu Yahya al-Libi and Anwar al-Awlaki, you know that he is searching for people who are important to him as a dedicated member of al-Shabaab, all additional evidence of his knowledge and intent in this case.

Just a couple of examples here, ladies and gentlemen, of the defendant's search history that again just reinforces his dedication to al-Shabaab and its cause. This is Government Exhibit 356 and 358. These are more searches from the defendant's own Google accounts searching for al-Shabaab leader message on September 11, 2017. September 11 of all days. And just weeks prior to that, he searched Fazul al Qaeda and visited the *Wikipedia* page for someone you heard Special Agent Corey describe as Harun Fazul. Dr. Bacon explained that Harun Fazul was an al Qaeda operative involved in terrorist attacks in East Africa and later rose to a senior position in al-Shabaab for covert operations. She said that on pages 164 and 165 of the transcript.

So again, every step of the way, the evidence clearly establishes that the defendant knowingly joined al-Shabaab and provided material support to al-Shabaab while fully aware of its terrorist activities and its goals. And that throughout the planning his hijacking attack, he continued to search for and view propaganda and other information on important figures

for al-Shabaab. And we'll come back to this later, ladies and gentlemen, but this establishes several of the elements that you will be asked to consider in your deliberations.

So what's next? What did the defendant do after all those months of training with al-Shabaab on how to become a terrorist in all that time in the safe houses in Jilib and the Boni Forest? He joined a flight school in the Philippines, and he threw himself into pilot training for more than a year. Let's talk about how you know that and how you know that he did it for al-Shabaab as part of his hijacking plot.

First, you heard from Special Agent Song that the defendant admitted that during his firearms and explosives training in Somalia, his safe house leader, Abdul Salam, introduced the defendant to his boss, his superior, the person he knew as Brother. That's on page 64 of the transcript.

"A. He described being introduced to another al-Shabaab member named Brother.
"Q. Who did he say introduced him to Brother?
"A. Abdul Salam.
"Q. And how, if at all, did he say Abdul Salam described Brother?
"A. Abdul Salam described Brother as his superior."

The defendant described how he met Brother in a vehicle outside of one of the safe houses where he was staying in Jilib. The defendant said that Brother told him he had

bigger plans for the defendant which made him feel important. That's on page 65 of the transcript right there. Halfway through that quote there:

"A. The defendant said that Brother told him that he should not worry about explosives and fighting; that he has a bigger plan for him.

"Q. What, if anything, did the defendant say as to how that made him feel?

"A. The defendant said it made him feel important."

And how after sitting through this trial you know what those bigger plans were. You know what these bigger plans were particularly because the defendant described them to Special Agent Song and because you've seen the defendant's electronic records and his progress reports to his handlers. You know that his bigger plans were to hijack a plane and crash it into building in the United States. That establishes several of the other elements that you will be asked to consider in your deliberations.

So let's look at page 66 of the transcript, what the defendant told Special Agent Song. The defendant stayed alone at an unguarded safe house in Jilib for three months.

"He said he was there because he had a greater plan."

Another quote here: "His understanding was that he was meant for something bigger than the fighting and the explosives."

And then finally, he "described getting visits from Azzam, Abdul Salam and also Brother."

Those are all the senior al Qaeda people that he talked about throughout his interview, the people he was meeting with in Somalia during his training.

The defendant also detailed what his greater plan was. This is on page 67 and page 68 of the transcript. The defendant said that: "Brother had asked him if he would like to be an airline pilot."

He also said that: "Brother said that they had been watching him for a long time, and they believe that he's very intelligent; and that he was hand selected for this mission." The defendant readily believed it. He accepted this assignment. And he was soon introduced by Brother to his handler Stella Grace. And he would stay in touch with Stella Grace over Facebook and other secure platforms that he talked about to keep both Brother and Stella Grace updated on his progress and his attack planning in the months that followed.

Now, ladies and gentlemen, what did follow? There is really no serious question what he did. He enrolled in a flight school in the Philippines. He told that to Special Agent Song, and you see that all over his electronic accounts and his devices.

Here is an email that he sent from one of his Google accounts in Government Exhibit 311. He was asking about

joining a pilot academy in December 2016. Let's read the subject line right here. "Am Cholo Abdi please send me your fee structure since I would like to join pilot academy." That's just one of many examples that you saw from his own accounts that he admitted were his.

You also saw multiple pictures of the defendant either flying planes or at the All Asia Aviation Academy, that very same flight school that he enrolled in at the Philippines. Here he is in a plane in Government Exhibit 615. Here he is with one of his instructors in Government Exhibit 204. And you saw pictures not only of these, but pictures of his coursework and his logbook, this logbook right here that was used to record his flight progress. You heard Captain Otani testify about this as well. This is Government Exhibit 111 right here.

And as you heard from Captain Otani, learning how to fly a plane isn't like figuring out how to drive a car or learning how to do a stick shift. It's way more complicated than that. It takes hundreds of hours of study, practice and dedication; and the defendant did all of this at the flight school in the Philippines.

Here is just another picture of him in Government Exhibit 609 from one of his cellphones. And remember, members of the jury, that he had no legitimate reason to be there. The hours he was dedicating to the flight school to his pilot training was all for al-Shabaab, that special mission that he

got from Brother and he was updating about to him and Stella Grace over and over.

Now you've seen this slide before, members of the jury. This is what Captain Otani talked about during his testimony regarding all the requirements you need to get a pilot license. And later, more importantly for the defendant, the commercial pilot license, the one that he would need to be able to fly passengers for an airline, for a U.S. airline.

Captain Otani testified that the defendant was enrolled, actually a student, at the All Asia Aviation Academy from October 2017 up to July of 2019. That's nearly two years. And you also heard all the different programs the defendant was enrolled in at the academy; not just for his private and commercial pilot licenses but also for the ratings, those special designations, those ratings that Captain Otani explained would allow you to fly in low-visibility conditions and on aircrafts with multiple engines. That's on pages 245 and 259 of the transcript.

Members of the jury, you heard Captain Otani walk through this chart and each of the steps you need along the way in your pilot training; how you first need to get your private pilot license. And you see those requirements right in front of you right there: At least 110 hours of classroom training, 40 hours of flight training, that's in a plane, a written examination, a practical exam. That's what Captain Otani

described as the checkride, what was done inside the aircraft. And you need all that alone just to have a private pilot license.

And on top of it, to get the commercial pilot license, that one that you need to get a job with an airline, just the bare minimum, you need at least another 160 hours of classroom instruction, at least 150 hours of flight training, that's time in the plane, along with another written exam and another practical exam.

You also heard from Captain Otani how intense these programs are. This was a seven-day a week program. You're flying actual planes like those shown here in Government Exhibit 1125. You are spending hours in a flight simulator that's shown on Government Exhibit 1126. This takes commitment, this takes time, this takes dedication, and it takes money.

You also heard from Captain Otani just how far the defendant got in his progress at the All Asia Aviation Academy, AAA. He already obtained his pilot license. He did the classroom instruction. He did the flight training. He did the written exam. And he did his checkride. He did all of that.

So he had his private pilot license right there. Then he was almost done getting his commercial pilot license too. He did the classroom instruction, that 160 hours that he needed. He did the additional flight training. You heard

Captain Otani testify about that, and you saw that document right here in his logbook. He had also done the written exam. And he was just waiting for his practical exam, that checkride, that last step before getting his commercial pilot's license. So you can see how many hours he had poured into his mission. That's all on pages 157 and 158 of the transcript. He came chillingly close to getting his commercial pilot license.

You also know from Captain Otani on pages 245 and 260 of the transcript that the commercial pilot license with what he called the instrument rating are just the minimum requirements to get a job with an airline. You learned how the defendant had completed his classroom and simulator training for that special instrument rating, along with his written exam. So again, he was just steps away from having all of the certifications that he needed to become a commercial pilot as part of his bigger, greater mission for al-Shabaab.

So right here on the transcript of Captain Otani's testimony at 245:

"A. A commercial pilot license with an instrument rating would be a minimum." That is if someone wanted to get a job at an airline.

How about transcript page 260:

"A. For instrument rating, he" - as in the defendant - "was already completed with his classroom training, as well as the simulator training was already completed as well. He was -- he

had about two to three flights remaining on extra flight training for the instrument rating and examination. The written examination was already done, so he was just waiting for practical exam after that." That was from Captain Otani.

So what was this greater mission, members of the jury? You know this too. And you know it was overwhelmingly established at trial through the defendant's own statements, his electronic messages, and his progress reports to Stella Grace and Brother found on the USB drive. He was going to use that pilot license so he could hijack a plane and crash it into a building in the United States, to murder U.S. nationals in support of al-Shabaab's terrorist goals. And you'll hear how those goals are relevant to Counts Three, Four, Five and Six of the indictment.

So first, just to set the scene here. It's important to remember that al-Shabaab was hellbent on killing Americans at the time the defendant was planning to attack this country, and at times it was achieving this goal to deadly effect. You heard from Dr. Bacon that targeting Americans has always been a core mission for al-Shabaab. But in May of 2018, both al-Shabaab and al Qaeda, the group that al-Shabaab was enthralled to, were uniquely focused on retaliating against the United States for its decision to move its embassy in Israel to Jerusalem. You know from Dr. Bacon that al-Shabaab called this mission Operation Jerusalem Will Never be Judaized, and that it

claimed responsibility for three major attacks under this banner.

She described them on the transcript at page 190.

"A. So in January 2019, there was an attack on a hotel office and restaurant complex in Nairobi. Later that year in September, there was an attack on a U.S. base in Somalia in Baledogle. Then in January 2020, there was an attack on a U.S. base within a Kenyan base in Manda Bay, Kenya."

Those were all part of the Operation Jerusalem that al-Shabaab was engaging in at this very time the defendant was working on his attack plan.

You also saw that January 2019 attack, how al-Shabaab explicitly claimed the massacre at the DusitD2 office complex in Nairobi under this Jerusalem Operation and how it specifically targeted and killed an American citizen in addition to other U.S. citizens and westerners that were part of its target list. These were all screenshots of the video you saw in Government Exhibit 801A from al-Shabaab's propaganda article, that group that Dr. Bacon told you was called al-Kataib. You will notice here how al-Shabaab called the Dusit 14 Riverside Drive business complex. It corroborates what Dr. Bacon explained, and you can see it all laid out here based on these transcripts right here that I'm going to read.

First, on Tuesday, 15 January 2019, Mujahideen fighters from Saleh an-Nabhan battalion stormed 14 Riverside

Drive business complex.

Next, the operation was the first in a series of attacks code named al-Qudsu Lan Tuhawwad (Jerusalum Will Never Be Judaized) targeting American and Zionist targets and interests worldwide.

The attack was successful by the grace of Allah and resulted in the death of more than 50 disbelievers, including Americans and other western nationals.

As Dr. Bacon put it, al-Shabaab announcements about the Dusit attack emphasized its view that the compound was a home to American and western businesses. You saw that in the propaganda video, but that's on page 193 of the transcript as well.

(Continued on next page)

MR. BRADLEY: You also heard from Inspector Joseph Kalum, the antiterrorism officer from Kenya, who discussed how the Secret Garden hotel cafe was where the suicide attack happened at the Dusit complex, and how that was also frequented by Westerners. That's on page 214, where you can see his testimony. How does all of this relate to the defendant and his own role for al-Shabaab?

First, his hijacking plot occurred against the backdrop of this Jerusalem operation. You know that because two of the al-Shabaab operatives that he knew from his training in Somalia were part of the Dusit attack. His handler, Stella Grace, was involved in planning the Dusit attack. And you know the defendant himself knew full well about the Dusit attack and its horrific consequences.

But, for starters, you don't have to look much further again than the defendant's own words to Special Agent Song. You heard that the defendant's mission was what he admitted, that he was training to become a pilot on behalf of al-Shabaab so that he could highjack a plane. That's on page 40 of the transcript.

He also said that he was specifically conducting research on how to get a visa, a transit visa, to travel to Atlanta from the Bahamas so that he could highjack a U.S. airliner. That's pages 72 and 73 of the transcript.

And the defendant also described how he needed to be a

pilot as part of this plan so that he could physically highjack the plane, to carry out the attack. So, as he put it to Special Agent Song, quote, so that if he was a pilot, he can already be in the cockpit. He could drug the other pilot and take control of the plane. That's page 73.

The defendant told Special Agent Song that he had researched his attack, he had researched the feasibility of taking a knife onboard an airplane by using nail clippers to test security. That's page 73.

He also explored the thought of being a flight attendant on an aircraft versus a pilot, and he concluded that, based on this research, that being a pilot would be better to highjack a plane because he would have access to the cockpit. That's on page 110 of the transcript.

And let's be clear. The defendant knew full well what would happen during this highjacking. He said he expected others to be killed or injured when he was highjacking the plane. He expected to die. That's on page 111 of the transcript.

"Q. Did the defendant say anything about what he expected would happen to others during the course of highjacking an aircraft?
"A. Yes.
"Q. What did he say?
"A. He expected others to be killed and/or injured.

"Q. Did the defendant say anything about what he expected to happen to himself in the course of highjacking an aircraft?
"A. Yes. He expected to die."

And as troubling as this is, members of the jury, you know what the remaining details of his plans were — from his Google searches and the updates to his handler on his USB drive — that even what the defendant admitted was not the full scope of his plans.

What else can you look at besides his own words?

Well, remember his Google searches, his website history, that show exactly how the defendant was methodically, relentlessly, planning his attack every step of the way. Here are Government Exhibits 363, 365, 368, and 369. They're all part of his search and web history. You can see the defendant's search for plane cockpit door on August 27, 2018. That's disturbing enough, members of the jury, but he searched over and over again for airline jobs, instructor training, and evenly possible interview questions to get a job with an airline.

Here is: "Airline possible interviews, questions and answers."

"20 Aviation interview questions to nail."

"Flight instructor jobs in Kenya."

"Flight instructor jobs in USA."

"Flight instructor training in Kenya."

"And how long does it take to become a pilot."

This is not just curiosity. This is not just idle Googling. You don't search for things like this time and time again unless you're serious. And the defendant was deadly serious about this terrorist attack. He was researching the best ways to highjack a plane and attack this country.

But that's not all. Here are even more searches on December 16, 2018. These are all within 15 minutes of each other. This is Government Exhibits 371 and 372. You can see how the defendant continues to research security on airplanes, whether air marshals are on every flight, and, again — again — cockpit doors.

Security in a commercial airplane. That is the top search.

There's an article that he visited, where at the end of the web address, it says, "Are air marshals on every flight?" There were two articles that he visited that we'll talk about in a moment. And then in between those, "Boeing 737 cockpit door."

Let's talk about those websites you saw, that ABC news article. You heard Special Agent Corey talk about the websites the defendant actually visited from his Google records. And they, again, show how he was focused on airplane cockpits. And, again, there's no mystery here, members of the jury. He said these were his Google accounts. There's no question that

they were his.

So what was this website that he visited right here? It's an ABC news article from 2003, about pilots carrying guns in the cockpits, which is certainly something a highjacker or a would-be highjacker would want to know when getting ready to commandeer a plane. He actually went to this website as part of his planning.

And the same day, within that 15-minute window, he went to another article. You heard Special Agent Corey talk about this, too, the L.A. Times article, about how do you open a cockpit door from the outside.

This is all part of the defendant's research, his attack planning. And you saw the fruits of this, not only from his Google records, but also from the progress reports that he sent to his al-Shabaab handler on that USB drive.

And remember how his plan continues to change and evolve. He told Special Agent Song that he was gauging whether it would be better or easier for him to get a job as a flight attendant, until he realized that being a pilot was the best way for him to physically get access to the cockpit and take over the plane.

But against all, members of the jury, what is perhaps the most telling about the defendant's knowledge, intent, his plans, what was going through his mind, is how he described hearing about the Dusit attack from his handler, Stella Grace,

and what he did afterward. Here is the defendant, in Government Exhibit 913F, talking about the Dusit attack and getting briefed about it from Stella Grace, his handler.

We're going to go through this in a moment, but remember this is where the defendant talked about how Stella Grace told him his friend, Ali Salim, the one he joined al-Shabaab with, had died for the cause. He died in the Dusit attack. And the defendant described how he and Stella Grace used this for encouragement, so he would become stronger.

Let's go through these key parts together. And, remember, you can watch this video for yourself, not just these clips, when you go through your deliberations.

Agent Klose: "When did you learn about the Dusit attack?"

Defendant: "I learn on the news. Also, I was -- I was briefed by Stella Grace."

Agent Klose: "And then Stella Grace reached out and what -- what did they say or what did he say?"

Defendant: "He said your dear friend now, he's no more. He's already joined...he's already died for the cause."

"And so you become strong like that...and -- and encouragement and..."

Agency Klose: "I'm sorry?"

Defendant: "Like encouragement."

So you can see here, members of the jury, again

Government Exhibit 913F, the most important thing that the defendant got from this news about the Dusit attack — it was encouragement, to keep going, to press on with his attack plans.

I want to pause on this for a moment because this is important. Remember just how connected the defendant was to these Dusit attackers. More proof of his knowledge and his intent behind his own planning for al-Shabaab, what he and Stella Grace were working on.

Here is Government Exhibit 911, the book of pictures that Special Agent Song showed the defendant, where he identified Ali Salim right here on the left side of the screen.

And where have you seen that picture before? Well, here is Government Exhibit 801A and 801B. Remember, Ali Salim is also featured in al-Shabaab's propaganda video about the Dusit attack, where al-Shabaab takes credit. That's in Government Exhibit 801A, 801B, compared right there. And you can see how Ali Salim is described as an operation leader, which is how Dr. Bacon also described him from her own research.

Here is one more example from that photo, that book of pictures that Special Agent Song showed the defendant. This is Azzam, the al-Shabaab intelligence officer that the defendant spoke with almost right at the outset when he joined al-Shabaab, who frequently met with the defendant when he was

training in Somalia.

The defendant also identified Azzam in that photo book. That's Government Exhibit 911, right there. And Azzam, just like Ali Salim, is featured prominently in that al-Shabaab propaganda video, taking credit, glorifying the Dusit attack. That's Government Exhibit 801A.

So, you have two important al-Shabaab operatives the defendant knew from his training with the group in Somalia. He knew exactly what they did, and he still went into his terrorist attack plans with laser focus, knowing full well the consequences that befell them.

What does the defendant do after getting briefed by Stella Grace, after learning about the Dusit attack? He goes to Google. He searches for footage of the attack. That's in Government Exhibit 375. This is on January 17, 2019, two days after the Dusit attack started. He searched for leaked CCTV footage of suicide bomber Nairobi, and then he visited an article that we're going to look at in just a minute.

Sure enough, that article, right here, in Government Exhibit 712, that web browsing history shows that the defendant went to a website featuring pictures of a CCTV footage that you saw outside the Secret Garden cafe, the same place where the suicide bomber detonated himself. That's Government Exhibit 712 right there. And you remember that footage that Inspector Klose showed you in Government Exhibit 802. We're

not going to show that again, but you heard about this website, and you know that those pictures come from that video that you saw. More evidence of the defendant's intent because he knew what happened, how an al-Shabaab attacker detonated himself at the compound.

Just two days later — that's on January 19, 2019 — the defendant continued to search for and view websites about the Dusit attack, including this article in Government Exhibit 713 from his web history in Government Exhibit 377. And you can see here these websites talk about Ali Salim being described as one of the masterminds of the Dusit attack.

So you can see the defendant, from his own Google records, searching about the attack over and over. And this all just demonstrates, yet again, his knowledge, his state of mind, his intent, while he works on his own highjacking plan.

But one other really troubling fact, members of the jury, is that this was not the first time he searched for the Dusit complex. Far from it. Here is Government Exhibit 355. You saw that the defendant searched multiple times for the Dusit address, 14 Riverside Drive in Nairobi, in May of 2017. 2017. That's 20 months before the attack. This is two years after he joined al-Shabaab with Ali Salim and spending months at a safe house with Azzam, Brother, and others. Just think about that, members of the jury, here is the defendant searching for the same address where a deadly al-Shabaab

terrorist attack took place, months later. And you know from his search history that he looked up this address after the attack as well.

And there's more. Here is Government Exhibit 353. You can see that just two months earlier, January 2017, he was searching again as a full-fledged member of al-Shabaab for American companies in Kenya. So you know why he's looking up the Dusit complex and why he's researching American companies, even in 2017. It's as simple as it is frightening — he's looking for American targets. More knowledge of his intent, his knowledge, of al-Shabaab's goals and of his own goals.

So, what about his searches just 11 days after this, after looking up American companies in Kenya? Well, you heard from Special Agent Corey. Here is Government Exhibit 354. The defendant searches, on January 18, 2017, for C4, which you heard from Special Agent Corey is a type of plastic explosive. That's on page 379 of the transcripts. A trained terrorist researching explosives while training to attack and planning to attack the United States. You have his admissions, you have his attendance at the flight school, and you have his internet history. There is no doubt what he was intending to do.

So by now, the defendant has been in al-Shabaab for years, he's enrolled in the flight school, he's working with laser focus on his goal to become an airline pilot for this highjacking plot.

In January 2019, Stella Grace, his handler, briefs him about the Dusit attack and tells him that Ali Salim dies — your dear friend died for the cause. Does that prompt any reexamination of his plans? His life? Does he take a step back? Maybe he doesn't want to get involved in this? Maybe he doesn't want to share the same fate as Ali Salim and Azzam?

No. He doubles down. He accelerates his attack planning, just like he told Special Agent Song. He got instructions from Stella Grace on topics to research online, including highjacking plots after September 11th.

Here is the defendant on January 19, 2019, two days after looking up the suicide bomber in the Dusit attack, researching Delta flights, Atlanta, and tallest building in Atlanta. That's Government Exhibits 376 and 378.

And let me let that sink in for a moment, members of the jury. He searched for tallest buildings in Atlanta. He told Special Agent Song that these searches were part of his plan to research transit visas between Bahamas and Atlanta because it was known to be a busy airport hub with lots of flights between Atlanta and the Bahamas. And that's on page 74 of the transcript.

Not only that, he continued his research on January 19th to find a list of the tallest buildings in Atlanta, before identifying the Bank of America Plaza. You heard that from Special Agent Corey when he visited that

website, that same Wikipedia page that you see in website history in Government Exhibit 378.

You saw exactly what website came up when you clicked on that website from the defendant's own web and search history. That's Government Exhibit 715. The defendant was looking at a list of the tallest buildings in Atlanta, with the Bank of America Plaza listed as number one, all 1,023 feet of it, all 55 floors, the tallest building in Atlanta. He was searching for targets, and he was moving ahead with his highjacking and terrorist plans, looking for the best target in a city that that Wikipedia page described as home to at least 39 skyscrapers over 400 feet tall.

What does the defendant do days later? Exactly what he described to Special Agent Song. It's all corroborated by the electronic evidence. He was researching plane highjackings since September 11th, and continuing to look for opportunities to get into the United States. These are all searches and websites visited from the Google accounts that he told the FBI were his. And you can see what was going through his mind. His plotting to commit a highjacking attack, he had a list of aircraft highjackings, the search for plane highjackings after September 11th, the American transit visa, that's all here in Government Exhibits 380 and 381.

Now we're going to come back to that list of aircraft highjackings, that Wikipedia page he visited, because you might

remember that also appears, copied and pasted, in his own words, into one of his progress reports in Government Exhibit 408, and we'll get to that in just a couple of minutes.

And, by the way, when the defendant told Special Agent Song that he kept in touch with his handler, Stella Grace, over Facebook, he wasn't kidding. Here is a page from Special Agent Brumby's presentation that cites to the Facebook search records that he reviewed. Between December 2016 and January of 2019, the defendant searched for Stella Grace and his related accounts hundreds of times. And these are the accounts that he said were his, the defendant said were his. Abdul Abdi, Ali Blow, John Moses, those are the defendants' accounts. He admitted those. Stella Grace, Lara Smith, Kimani Mthame, those are all Stella Grace. The defendant told you that they were all using these burner accounts. So, right here, Abdullah Abdi searched for Stella Grace 646 times. That's Government Exhibit 202.

In that same exhibit, you see that Abdullah Abdi searched for Lara Smith 14 times.

How about Government Exhibit 207? Ali Blow, the defendant, searched for Kimani Mthame, Stella Grace, 239 times.

And then, finally, John Moses, searched for Stella Grace 257 times.

Again, it's the defendant searching for Stella Grace because he was his handler and he was keeping him updated on

his progress for the attack planning. His admissions all corroborated by electronic evidence.

Now, I want to just talk briefly about Stella Grace because you heard a lot about him during this trial, and his Facebook records corroborate everything the defendant said Stella Grace was. Just like he said -- just like the defendant said to Special Agent Song, Stella Grace is an al-Shabaab operative, and an important one. And you don't just have to take the defendant's word for it. You know from the other Facebook records that Special Agent Brumby talked about with you, that he was using other Facebook accounts, all linked together, to plot other al-Shabaab attacks, specifically targeting Americans, and coordinating the Dusit attack.

Here is Government Exhibit 233, where Stella Grace was using that Adamu Chege account to get updates on potential American targets, where the user, Dallas Dala, tells him, "We have not been able to be going around because of lack of fuel, but we have the targets somewhere well organized, but not Americans." That's Government Exhibit 233.

And here is why that matters: Stella Grace wasn't just some guy on the internet. He was a high-ranking al-Shabaab official, who was actively targeting Americans and working simultaneously with the defendant as part of his broader efforts, as part of al-Shabaab's broader efforts, to target and murder Americans.

You know that Stella Grace was also using accounts to be involved in the planning of the Dusit attack, before it happened. You saw Facebook messages that Stella Grace sent on this Korio Kiis account. This is Government Exhibit 294. This is just five days before the Dusit attack, on January 10 of 2019. Five days before the Dusit attack where Stella Grace volunteers, "How's if I add to the group an additional," blank, "with vest? Can you get for him a good place that contains many goats so that he can start the game for you and secure good number for you?"

You heard about those rectangles there and how Special Agent Brumby was able to check how those were loaded in a special font in Microsoft Word and how those rectangles are actually an icon for a man in a suit. So that's on pages 339 and 340 of the transcript.

I just want that to sink in for a second. Here is the defendant's al-Shabaab handler describing whether to supply a suicide bomber, just days before the Dusit attack. And what does this other person say?

"That addition is good if you can afford it...that would add to their devastation."

You also saw in Government Exhibit 292A how Stella Grace was also using the Elusive Router Facebook account to get and send updates about the Dusit attack while it was happening, on January 15, 2019.

Here are two pictures that Stella Grace sent. And you can see the same pictures of Ali Salim and the intelligence officer, Azzam, that the defendant later identified to Special Agent Song. And this is all, you'll later remember, featured in that same video from Al-Kataib glorifying, taking credit for the Dusit attack.

Just one more example I wanted to show from these Stella Grace accounts, and specifically from that Elusive Router account, which just further shows how the defendant's closest al-Shabaab contacts were coordinating the broader Jerusalem operation for al-Shabaab. Stella Grace even asks whether the plast -- or blast happened at the Secret Garden, the same name of the cafe where you heard that the suicide bomber detonated himself from Inspector Kalum's testimony. That is all even more corroboration of the defendant's involvement in al-Shabaab's broader operation to target and murder Americans.

And, of course, who ends up briefing the defendant about the attack and how Ali Salim died? It was Stella Grace, the man who knew everything that was happening.

So, there's one source of corroboration of information that we haven't talked about yet. It's that USB drive. It's the defendant's USB drive. The thing that contained all of those progress reports he was writing for Stella Grace, that he compiled for him and Brother to further prove that his plan was

to crash a highjacked plane into the United States.

And though he denied it was his USB drive in his interview, there's no serious question that it was his. Special Agent Song testified that he read parts of two of the reports found on the drive to the defendant during his interview, and the defendant eventually admitted that he wrote them. Those are from Government Exhibits 408 and 409, two reports that were found on the USB drive.

And one of the reports, Government Exhibit 409, describe in detail how to find the Marshall Stewart account on Facebook, which the defendant admitted was one of his own accounts.

Here is the Marshall Stewart example in Government Exhibit 409. I'm just going to read it. "The Facebook details: Name: Marshall Stewart," there's some description after that, and then the next box, "With the above details, you can find me."

The defendant said to Special Agent Song that Marshall Stewart was one of his accounts, and that name was even written on one of the notebooks brought with him on the flight to New York. But here is the transcript on page 108:

"Q. Did there come a time during your interviews of the defendant that he referenced the name Marshall Stewart?

"A. Yes. The defendant said that this was his Facebook account."

So, you know that that USB drive is his, members of the jury. It's not a close call. There are progress reports that he admitted that he wrote. And he also talked about how to find him in one of those progress reports over Facebook, on an account he said was his.

And even more, these progress reports corroborate what the defendant told Special Agent Song about his research for the highjacking plot. Here is one of them, Government Exhibit 405. And I want to go through this one with you, members of the jury, because you can see repeatedly what the defendant is trying to do.

First, he talks about his view of the cockpit while testing out a flight. Let's look at that red box on the top. He noticed that "They don't close the curtain which separates business and economy and the other one which separates cockpit and business, so it's easy to watch what happens in and out of the cockpit."

So, once again, that fixation of cockpits, on the cockpit door, because you know why the defendant was looking and talking about that. It's part of his highjacking plot. He's trying to figure out the best view of the cockpit so he can figure out the best way to commandeer the plane.

And next, you see the defendant even reporting on the details of getting through security and how he was going to handle the money that Stella Grace had paid him for the flight

school, even saying that he had "good cover of school if asked by the authority."

What kind of person needs to have good cover because they're traveling with a lot of money to pay for flight school in all cash? A terrorist planning an attack.

Here is another progress report in Government Exhibit 408, another thing from the USB drive, where the defendant was talking about, complaining about, changes to the Kenyan passport renewal process, and how he thinks that the Americans may be involved. That's in the second and third boxes on the screen there. And he noticed, particularly, that these changes happened after the Dusit attack, which he talked about and described as the operation of 14 Riverside.

"Brother, what make me think is, is that this process was started right after the operation of 14 Riverside."

To the next boxes on the bottom of the excerpt: "I also have a feeling that maybe Americans involved. So I have decided that I will apply for it, inshallah, when it's absolutely necessary."

Members of the jury, this is, once again, a telling and damning admission of the defendant's knowledge and participation in al-Shabaab's overarching plot to murder U.S. nationals, to murder American citizens. Why else would he even be writing about this? Because he was planning another attack, and was game-planning how to react to potential hurdles, the

renewal of his passport. These reports, members of the jury, are devastating. On top of the defendant's own statements, on top of his own electronic communications, on top of his own Google and internet search history, you have in writing, right there, his updates and progress reports to his handlers.

These progress reports are also remarkable because you can see all the ways that he's thinking and deciding about his plans. You heard, because I just mentioned, that he will apply for it, his new passport, when it's absolutely necessary, and he did that based on his suspicions that Americans would be involved. Again, another overwhelming piece of evidence about his plans and his state of mind.

Finally, members of the jury, I told you we'd come back to Government Exhibit 408. I'd like to end where we began because this really captures everything, this one progress report, that the defendant was trying to do with his piloting skills for al-Shabaab.

You heard Special Agent Corey testify about this document, that he reviewed, and how he had copy pasted a lot of highjackings that had occurred after September 11th.

Let's go through how the defendant wrote this update. This is just the first excerpt, "Brother, all is well. I would like to brief you on some things, inshallah. Firstly, have a gleam of some of the attempt that happened after 9/11 (below, which I copy pasted from Wikipedia)."

What's he briefing his handler on? Some of the highjacking attempts that happened after September 11th. And let's take a look at this. Here is a comparison right here, members of the jury, between the list the defendant pasted in Government Exhibit 408, that's the progress report — and part of the Wikipedia page on highjackings, the one that he visited on February 1, 2019, just two weeks after learning about the Dusit attack and how Ali Salim had died in the attack, and how he had needed to use that attack to become stronger, for encouragement.

You can see how each of these line up between each other, between the defendant's own Google records and the progress report that he sent to his handlers. So, you see up there the Qantas flight, 1737, May 2003.

Next, the Turkish Airlines flight, October 3, 2006.

Then February 2007, the Air Mauritanie Boeing 737.

The Atlas Jet, MD80.

And the Eagle Airways flight, February 2008.

Again, overwhelming evidence that all of these reports, these progress reports, were written by him. There's really no question. But you can see how the defendant not only pasted these entries into his progress report, he also apparently removed at least one entry, which showed that he studied the listing before he gave it to his handler. And all that research, all that work, members of the jury, that leads

to his conclusion, in this next part of this letter, the part that we talked about at the very beginning of this submission. And I want to go through this one with you as well, because you can see his planning and his intent every step of the way.

Starting at the top: "I read almost all the highjacking incidents have ever happen, but I chose the above because it is within our interest. And I found out that in 1970s is when most of the highjack happened," to stop the first quote. And then the next, the second box or the third box, "And Brothers during 9/11 did something completely unexpected in a more creative way, study for piloting."

And based on that, you can see that last conclusion, the one in the box at the bottom of that excerpt — again, that's Government Exhibit 408 — "Brother, according to the above information, the only successful highjack after 9/11 was the one of the Ethiopian Airlines, and it is so because it was highjacked by the pilot himself."

Which leads him to that list — the my list he talked about. You saw some of this in Special Agent Corey's testimony, and how, from that list, he, the defendant, arrived at his number one idea, after admiring the Brothers during 9/11, that number one idea, his idea, was that for a very successful mission, we need a pilot in the cockpit, which means I should apply for the airlines. To become a pilot, to get into the cockpit, to highjack a plane, and attack this country.

That is proof of his guilt, the defendant's guilt, beyond a reasonable doubt.

I'm almost done. I want to quickly turn back to the charges in this case. Remember, members of the jury, there are six charges in this case. Five of them are what are called conspiracies, and you're going to hear from Judge Torres what a conspiracy is, but, at a high level, I expect you'll hear that these are essentially, basically, unlawful agreements between at least two people to commit a crime.

And, remember, the first two counts talk about conspiring to and actually providing material support to a foreign terrorist organization.

Count Three is a conspiracy to murder U.S. nationals.

Counts Four and Five are conspiracies to commit aircraft piracy and to destroy aircraft.

And Count Six is a conspiracy to commit acts of terrorism transcending national boundaries.

I want to go through these counts very quickly with you. Counts One and Two charge the defendant with conspiring to and actually providing material support to a foreign terrorist organization.

That foreign terrorist organization here, you know, is al-Shabaab. Judge Torres will provide you with more detailed instructions, but, for now, I expect you'll hear that these crimes require the government to prove the following elements

beyond a reasonable doubt:

That, first, the defendant provided or, in the case of a conspiracy, agreed with others, to provide material support or resources to a foreign terrorist organization. As charged here, that's al-Shabaab;

And, second, that the defendant acted knowingly and intentionally, including with knowledge that al-Shabaab was either a foreign terrorist organization or was engaged in terrorist activity, or was engaged in acts of terrorism;

And, finally, that after the offense occurred, the defendant was either brought into the United States or the offense occurred in or affecting interstate and foreign commerce.

Members of the jury, you heard the evidence at trial, and you know what it proves. The defendant not only trained for al-Shabaab, he spent over a year at a flight school to get a pilot license to carry out a terrorist plot for al-Shabaab. That's material support. And the defendant knew full well of the defendant's history of terrorist activities, including the Dusit attack. And you know, from Special Agent Song, that the defendant was brought into the United States after the offense.

So, the government has met its burden of proof for Counts One and Two.

Now, Count Three, that conspiracy to murder U.S. nationals, I expect that you will hear has four elements that

the government must prove beyond a reasonable doubt:

First, that there was an agreement between two or more people to murder U.S. nationals, which basically means U.S. citizens;

Second, that the defendant knowingly and willfully became a member of that conspiracy;

Third, that someone in that conspiracy took an overt act, in other words, some kind of action to advance that conspiracy's goal;

And, finally, that the defendant was a member of the conspiracy while outside the United States.

The proof for this count, members of the jury, is also overwhelming. We went through it. You heard how the defendant agreed with his al-Shabaab handlers, like Stella Grace and Brother, to effect an highjacking attack in the United States. The defendant knew full well al-Shabaab's goals of murdering Americans. And he said to Special Agent Song that the enemy — the enemy — of al-Shabaab is the United States. He knew about the Dusit attack and other al-Shabaab terrorist attacks. And he even researched American targets. And you saw the evidence of his coconspirators in the Jerusalem operation targeting Americans as well.

You also know from this trial that there were multiple overt acts taken, those concrete steps, in furtherance of the conspiracy, including the defendant traveling to the

Philippines and spending hours at the flight school. So you can be confident that the government has met its burden of proof beyond a reasonable doubt for Count Three as well.

Counts Four and Five are very similar.

Count Four charges a conspiracy to commit aircraft piracy. And, again, this all relates to the defendant's highjacking plot. I expect you'll hear that, as with the other conspiracies, the government must prove that there was an agreement between two or more people to commit aircraft piracy, and that the defendant knowingly and willfully became a member of that conspiracy.

What does aircraft piracy mean? What is the object of that conspiracy, the goal of that conspiracy? I expect you will hear that it has four elements, and these are also very straightforward. They basically involve highjacking a plane. It requires a person to exercise or seize control of an aircraft, and to do so by use of force, violence, threat, and intimidation; to act with wrongful intent; and that it occurred within the special aircraft jurisdiction of the United States.

You'll hear that wrongful intent basically means to act without permission when taking control of the aircraft, which is clearly the case here, and that special aircraft jurisdiction means a lot of things, but one thing it does mean is aircraft flying in the United States, which you know was one of the goals of this conspiracy.

The proof here, ladies and gentlemen, is crushing and compelling for the defendant. You heard how he admitted to Special Agent Song that he agreed with Brother to go to flight school, to become a pilot, and highjack a plane in the United States for al-Shabaab. He tested getting knives onboard the plane, and he believed that he would need to kill or injure people when he was physically taking over the plane.

That's proof beyond a reasonable doubt. And the government has met its burden of proof for Count Four as well.

Count Five charges a different conspiracy. It's called conspiring to destroy aircraft. You'll see the same elements of a conspiracy here — that there are two objects, that there was an agreement or a conspiracy between two or more people to destroy aircraft; and that, second, the defendant knowingly and willfully became a member of that conspiracy.

So, what is a conspiracy to destroy aircraft? What are the objects of that?

Well, you'll hear that there are two objects, and you will need to be unanimous as to one or both of them. But the first one essentially requires a person to willfully destroy or damage an aircraft in several different ways; and that the aircraft was in the special aircraft jurisdiction of the U.S.; or something called a civil aircraft used in interstate, foreign, or overseas, or foreign air commerce.

The second object of the conspiracy in Count Five is

really focused more on the people who are authorized to fly the aircraft. This object requires a person to willfully interfere with or disable any person involved in the authorized operation of the aircraft; and to do so with reckless intent -- or with intent to endanger the safety of any person or the reckless disregard for the safety of human life; and, finally, there is that special aircraft jurisdiction point that I just mentioned there.

You know the evidence at the trial, members of the jury, and you know beyond a reasonable doubt that the government has met its burden here clearly. Almost all of the same evidence that we just discussed applies here. And, remember, the defendant repeatedly searched for ways to get into a cockpit, including from the outside, how he tested getting weapons onboard a plane, and how he told Special Agent Song that one of his plans was to drug the pilots, to incapacitate them. But make no mistake, he fully planned to destroy that plane in the United States after he highjacked it. You know that because he told Special Agent Song that he expected to die in the attack. You know that because he was researching highjackings that happened after 9/11, after September 11, and he talked about the Brothers during 9/11, that he was admiring in his progress reports to Brother and Stella Grace. And he was researching which buildings to fly a plane into, that tallest building in Atlanta, and this was all

about airplanes in the United States.

So, the government has met its burden of proof for Count Five as well.

Finally, Count Six charges a conspiracy to commit acts of terror transcending national boundaries. And, again, those same elements of conspiracy apply here. The object of the conspiracy charged in Count Six is, in many respects, similar to what we've talked about earlier.

First, it requires a person to, among other things, knowingly kill, maim, or injure, or create serious bodily injury with a dangerous weapon, or create a substantial risk of serious bodily injury to any person by destroying certain kinds of property in the United States.

It also requires that the conduct involved transcend national boundaries, meaning that some of the conduct involved in what was part of the agreement occurred outside the U.S., as well as would have occurred inside the U.S.

And, third, that the conduct, that object of the conspiracy, would also have violated the laws of any state or of the U.S. Government, which includes the crimes charged in this indictment.

And, finally, that during the crime, or as part of the commission of the crime, any facility of interstate or foreign commerce was used in furtherance of the offense, or that if the offense, if completed, would have affected interstate and

foreign commerce.

Members of the jury, there's a lot to take in there, but the proof for Count Six is also overwhelming. And you know that. The defendant agreed with others in al-Shabaab to carry out terrorist attacks involving the murder of Americans, the highjacking of planes, the destruction of commandeered planes. The conspiracy involved conduct in Somalia and in the Philippines. But its ultimate goal you know was, as the defendant admitted, to highjack a plane in the United States, which is why he kept looking up transit visas from the Bahamas, ways to get into the country. And time and again, the defendant researching targets, such as the tallest building in Atlanta.

And, as for facilities of interstate commerce, I expect you'll hear that that essentially means a means of communication. And there is evidence all over this case about the defendant using his cell phones, his Google accounts, his Facebook accounts, in furtherance of this offense.

Once again, the government has more than met its burden of proof for Count Six beyond a reasonable doubt.

Finally, you'll need to address venue. Here, you'll be asked to determine if the point of entry where the defendant was first brought into the United States was in the Southern District of New York. That's pretty simple here. Special Agent Song testified, on page 44 of the transcript, that the

defendant first entered the United States through Stewart International Airport, which is in the Southern District of New York.

"Q. And where did the plane next land after Japan?
"A. It landed at Stewart International Airport in New Windsor, New York.
"Q. Is that located within the Southern District of New York?
"A. Yes.
"Q. Approximately when did the aircraft land there?
"A. December 15, 2020."

Members of the jury, I'm about to sit down. You have heard, and you have seen, the overwhelming evidence in this case. You know what the defendant did and what he agreed to do. He agreed to and, in fact, provided material support to al-Shabaab by training to become a pilot in the Philippines. He agreed to participate in a conspiracy to murder U.S. nationals, all as part of an al-Shabaab plot to highjack a plane and crash it into a building in this country, to recreate the September 11th terrorist attacks, and to retaliate against this country.

At the beginning of this trial, Mr. Bodansky asked you to use your common sense, to apply that common sense to the evidence and to the law. That common sense will tell you that the evidence in this case leads to only one, inescapable, conclusion. This is a serious case, but it is not a close

case.

The defendant is guilty.

THE COURT: Members of the jury, the government has completed its summation, but we are still not done with the trial. There is one more stage left, and that is my instructions to you on the law.

We're going to take a ten-minute break. So, the same old rules apply: You're not yet ready to deliberate. You won't be ready to deliberate until I tell you that it's time to do so. So, don't discuss the case amongst yourselves or with anyone else. Don't permit anyone to discuss the case in your presence.

I will call you back in ten minutes.

(Jury not present)

THE COURT: You may be seated.

(Recess)

(In open court; jury present)

THE COURT: Members of the jury, you will find my instructions on the law on your seats. I would like you to turn to page 4 and read along with me.

Members of the jury, we are now approaching the most important part of this case, your deliberations. It has been obvious to me and to counsel that until now you have faithfully discharged your duty to listen carefully and to observe each witness who testified. I ask that you give me that same careful attention as I read these instructions.

You have now heard all the evidence in the case, as well as the final argument of the government. My duty at this point is to instruct you on the law. It is your duty as jurors to follow the law as I state it, and to apply the law to the facts as you find them from the evidence presented.

On these legal matters, you must take the law as I give it to you. If an attorney has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow. Moreover, you should not single out any instruction as alone stating the law. Instead, you should consider my instructions as a whole when you retire to deliberate in the jury room.

You should not, any of you, be concerned about the wisdom of any rule that I state regardless of any opinion that you have as to what the law may be or as to what it should be.

It is your sworn duty to base your verdict on the law as I give it to you.

Your final role is to pass upon and decide the factual issues in this case. You, the members of the jury, are the sole and exclusive judges of the facts. You pass upon the weight of the evidence. You determine the credibility of the witnesses. You resolve such conflicts as there may be in the testimony, and you draw whatever reasonable inferences you decide to draw from the facts as you have determined them.

I shall later discuss with you how to determine the credibility or believability of the witnesses.

In determining the facts, you must rely upon your own recollection of the evidence. What the lawyers or the defendant have said during the trial is not evidence. Nothing that I may have said during the trial or may say during these instructions constitutes evidence.

Questions asked by the attorneys or the defendant or even myself are not in and of themselves evidence. Only questions coupled with answers are evidence. Therefore, you may not infer any fact from the mere asking of a question. Moreover, you may not consider any answer that I directed you to disregard or that I directed struck from the record.

The evidence in this case consists of the sworn testimony of the witnesses and the exhibits received in evidence. By contrast, you may not consider exhibits that were

marked for identification or any other document you may have seen but not received as evidence. Only those exhibits actually received may be considered as evidence.

Obviously anything that you may have seen or heard outside the courtroom is not evidence. Nothing I said or did should be used by you to determine whether the government has met its burden of proof. I have no view as to whether the government has met its burden, and you should not infer that I do from anything that I said or did.

You should draw no inference or conclusion for or against any party by reason of any party making objections. Parties have not only the right, but the duty to make legal objections when they think that such objections are appropriate.

Also, do not draw any inference from any of my rulings. The rulings I made during trial are not any indication of my views of what your decision should be as to whether or not the defendant has been proven guilty beyond a reasonable doubt. You should draw no inference or conclusion of any kind, favorable or unfavorable, with respect to any witness or any party in the case by reason of any comment, question or instruction of mine.

The defendant has pleaded not guilty to the charges in the indictment. The indictment itself is not evidence. It merely contains the charges that the government must prove

beyond a reasonable doubt. The government is not required to prove each and every allegation in the indictment. The government is required to prove only the elements of the charges contained in the indictment which I will explain to you shortly.

Because the defendant has pleaded not guilty, the burden is on the prosecution to prove guilt beyond a reasonable doubt. This burden always remains with the government and never shifts to the defendant. Indeed, the law never imposes upon a criminal defendant the burden of proving his innocence or even the duty of calling any witness or producing any evidence at all.

The law presumes a defendant innocent of all charges against him. I, therefore, instruct you that you must presume the defendant innocent throughout your deliberations until such time, if ever, that you as a jury are unanimously satisfied that the government has proven the defendant's guilt beyond a reasonable doubt.

The defendant began the trial with a clean slate. This presumption of innocence alone is sufficient to acquit unless you are unanimously convinced beyond a reasonable doubt of the defendant's guilt, after careful and impartial consideration of all of the evidence against him. If the government fails to overcome the presumption of innocence and does not sustain its burden of proving guilt beyond a

reasonable doubt with respect to the defendant, you must find the defendant not guilty.

The presumption of innocence was with the defendant when the trial began and remains with him even now as I speak. It will continue into your deliberations, unless and until you are convinced that the government has proven the defendant's guilt beyond a reasonable doubt.

In determining whether the government has satisfied its burden of proving the defendant's guilt beyond a reasonable doubt, you may consider all the evidence presented. In doing so, remember that throughout the trial, the burden of proof remains on the government.

I said that the government must prove the defendant's guilt beyond a reasonable doubt. The question is what is a reasonable doubt? The words almost define themselves. It is a doubt based upon reason and common sense. It is a doubt that a reasonable person has after carefully weighing all the evidence. It is a doubt which would cause a reasonable person to hesitate to act in a matter of importance in his or her personal life. Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her own affairs. A reasonable doubt is not a caprice or whim. It is not a speculation or suspicion. It is not an excuse to avoid the performance of an

unpleasant duty. And it is not sympathy.

In a criminal case, the burden is at all times on the government to prove beyond a reasonable doubt the guilt of the defendant. The law does not require that the government prove guilt beyond all possible doubt or to a mathematical certainty. On the other hand, it is not sufficient to prove that the defendant is probably guilty. Proof of guilt beyond a reasonable doubt is proof that leaves you so firmly convinced of the defendant's guilt that you have no reasonable doubt of the existence of any element of the crime or of the defendant's identity as the person who committed the crime.

A reasonable doubt may arise from evidence or lack of evidence. If, after fair and impartial consideration of all the evidence, you are satisfied of the defendant's guilt beyond a reasonable doubt as to the charge you are considering, you must find the defendant guilty. On the other hand, if after fair and impartial consideration of all the evidence you have a reasonable doubt, you must find the defendant not guilty of that charge.

There are two types of evidence which you may properly use in deciding whether the defendant is guilty or not guilty of the charged crime: Direct and circumstantial evidence. Direct evidence is evidence that proves a disputed fact directly. For example, if a witness testifies as to what he or she saw, heard, or observed, that is called direct evidence.

Circumstantial evidence by contrast is evidence that tends to prove a disputed fact by proof of other facts. To remind you of the example I gave you at the beginning of the trial, suppose that when you came into the courthouse today, the sun was shining, and it was a nice day, but that the courtroom shades were drawn, and you could not look outside. Then later, as you were sitting here, someone walked in with a dripping wet umbrella, and, soon after, someone else walked in with a dripping wet raincoat. Now, on our assumed facts, you cannot look outside of the courtroom, and you cannot see whether or not it is raining. So you have no direct evidence of that fact. But on the combination of facts about the umbrella and the raincoat, it would be reasonable for you to conclude that it had been raining.

That is all there is to circumstance evidence. Using your reason and experience, you infer from established facts the existence or nonexistence of some other fact. Many material facts, such as a person's state of mind, are not easily proved by direct evidence. Usually such facts are established by circumstantial evidence and the reasonable inferences you draw. Circumstantial evidence is of no less value than direct evidence for it is a general rule that the law makes no distinction between direct and circumstantial evidence but simply requires that before convicting a defendant, the jury must be satisfied of the defendant's guilt

beyond a reasonable doubt from all of the evidence in the case.

Now, whether the circumstantial evidence leads you inevitably to a particular inference is another matter. Let me give you another example. Let's say that one evening you go into a subway station. It is a local stop, and it's not rush hour. You arrive at the platform, and you are surprised to find a large crowd of people waiting on the platform. You didn't expect there to be so many people. There are lots of people waiting. Now, you might infer from this fact that there must not have been a train for quite some time, but is that an inference you must draw from the circumstantial evidence of a crowded subway platform?

It is certainly a weaker inference than the one about the umbrella and raincoat because if you think more about it, maybe there are other equally plausible explanations. Maybe there was a train just a minute ago that went out of service, and they said, "Everybody off the train." Or maybe it's 10:30 p.m. and you are waiting at the 50th Street stop of the No. 1 train and a Broadway show has just let out. There is more than one plausible explanation. So in this example you wouldn't have a stronger basis for drawing any one particular inference.

An important part of your decision in this case will involve making judgments about the testimony of the witnesses you listened to and observed. In making these judgments, you

should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified, and any other matter in evidence that may help you to decide the truth and the importance of each witness's testimony.

Your decision whether or not to believe a witness may depend on how that witness impressed you. Was the witness, candid, frank, and forthright? Or did the witness seem to be evasive or suspect in some way? Was the witness consistent or contradictory? Did the witness appear to know what he or she was talking about? Did the witness strike you as someone who was trying to report his or her knowledge accurately? What was the witness's demeanor like? These are the examples of the kinds of common sense questions you should ask yourselves in deciding whether a witness is or is not truthful.

In addition, you may consider whether a witness had any possible bias or relationship with a party or any possible interest in the outcome of the case. Such a bias or relationship does not necessarily make the witness unworthy of belief. These are simply factors that you may consider.

If you find that a witness has testified falsely as to any material fact, you may reject that witness's testimony in its entirety or you may accept only those parts that you believe to be truthful or that are corroborated by other independent evidence in the case.

You should also consider whether the witness had an

opportunity to observe the events he or she testified about and whether the witness's recollection of facts stands up in light of the other evidence in the case. In other words, what you must try to do in deciding credibility is to size up a person just as you would in any important matter where you are trying to decide if a person is truthful, straightforward, and accurate in his or her recollection.

You are not required to accept testimony even though the testimony is uncontradicted and the witness's testimony is not challenged. You may reject it because of the witness's bearing or demeanor or because of the apparent improbability of the testimony or for other reasons sufficient for you to conclude that the testimony is not worthy of belief. It is for you, the jury, and for you alone — not the lawyers or the witnesses or me as the judge — to decide the credibility of witnesses who appeared here and the weight that their testimony deserves.

I referred to the two separate decisions that the jury must make in evaluating witnesses: Credibility and weight. When you decide whether you believe what a witness says, you decide credibility. When you decide how much to allow that evidence to affect your decision on any issue, you decide the weight to give to the testimony.

In evaluating the credibility of the witnesses, you should take into account any evidence that the witness who

testified may benefit in some way from the outcome of this case. Such an interest in the outcome may create a motive to testify falsely and may sway the witness to testify in a way that advances his or her own interest. Therefore, if you find that any witness whose testimony you are considering may have an interest in the outcome of this trial, then you should bear that factor in mind when evaluating the credibility of his or her testimony and accept it with great care. This is not to suggest that a witness who has an interest in the outcome of the case will testify falsely. It is for you to decide to what extent, if at all, the witness's interest has affected or colored his or her testimony.

You are to perform the duty of finding the facts without bias or prejudice as to any party. You are to perform your final duty in an attitude of complete fairness and impartiality.

The case is important to the government, for the enforcement of United States criminal law is a matter of prime concern to the community. Equally, it is important to the defendant who is charged with serious crimes. The fact that the prosecution is brought in the name of the United States of America entitles the government to no greater consideration than that accorded to any other party to a litigation. By the same token, it is entitled to no less consideration. The parties, whether the government or an individual, stand as

equals at the bar of justice.

Under your oath as jurors, you are not to be swayed by sympathy. You are to be guided solely by the evidence in this case, and the crucial question that you must ask yourselves as you sift through the evidence is: Has the government proven the guilt of the defendant beyond a reasonable doubt?

It is for you, and you alone, to decide whether the government has proven that the defendant is guilty of the crimes charged, solely on the basis of the evidence and subject to the law as I instruct you. It must be clear to you that once you let fear, prejudice, bias or sympathy interfere with your thinking, there is a risk that you will not arrive at a true and just verdict.

If you have a reasonable doubt as to the defendant's guilt, you should not hesitate to find the defendant not guilty. But, on the other hand, if you find that the government has met its burden of proving the defendant's guilt beyond a reasonable doubt, you should not hesitate to find the defendant guilty.

Under your oath as jurors, you cannot allow consideration of possible punishment that may be imposed upon the defendant, if convicted, to influence you in any way or to enter into your deliberations. The duty of imposing sentence is mine, and mine alone. Your function is to weigh the evidence and to determine whether the defendant is or is not

guilty based on the evidence and the law. Therefore, I instruct you to not consider punishment or possible punishment during your deliberations.

The defendant, Cholo Abdi Abdullah, has been charged in an indictment. The indictment is a document containing the charges or counts against the defendant. It is not evidence or proof of the defendant's guilt. You are directed to not consider or discuss how the indictment was obtained. Before you begin your deliberations, you will be provided with a copy of the indictment. Therefore, I will not read the entire indictment to you at this time. Instead, I will summarize in general terms the offenses charged. Then I will explain in detail the elements of those offenses. An element is an essential component of an offense. You must find that the government has established all elements of an offense beyond a reasonable doubt to find the defendant guilty of that offense.

The indictment contains six charges, or counts, against the defendant, each of which is alleged to have occurred between 2016 and 2019. The government alleges that the defendant participated in a conspiracy to provide material support, and did provide or attempt to provide material support, to a foreign terrorist organization; namely Harakat al-Shabaab al-Mujahideen, commonly known as al-Shabaab. Count One charges the defendant with conspiracy to provide material support to a foreign terrorist organization. Count Two charges

the defendant with providing and attempting to provide material support to a foreign terrorist organization. Count Three charges the defendant with participating in a conspiracy to murder U.S. nationals. Count Four charges the defendant with participating in a conspiracy to commit aircraft piracy. Count Five charges the defendant with participating in a conspiracy to destroy aircraft. Finally, Count Six charges the defendant with participating in a conspiracy to commit acts of terrorism transcending national boundaries.

In a moment, I will instruct you on each of these charges in more detail. As I said, the indictment contains a total of six counts against the defendant. Each count constitutes a separate alleged crime. You must consider each count of the indictment separately, and you must return a separate verdict on each count in which the defendant is charged. Whether you find the defendant guilty or not guilty as to one offense should not affect your verdict as to any other offense charged.

As I just described, most counts in the indictment are conspiracy counts, and one count is what is referred to as a substantive count. A conspiracy charge, generally speaking, alleges that two or more persons agreed to commit a crime. The focus of a conspiracy count, therefore, is on whether there was an unlawful agreement. So even if a conspiracy fails and the crime is not actually committed, the conspiracy is still

punishable as a crime.

A substantive charge by contrast is based on the actual commission of an offense. A substantive offense, therefore, may be committed by a single person, and it need not involve an agreement with anyone else. If a defendant both agrees to commit a crime and then actually commits that crime, the defendant may be guilty of both the conspiracy and the substantive crime.

Let me first turn to the substantive crime, which is Count Two of the indictment. Then I will address the conspiracy counts.

Count Two charges the defendant with providing and attempting to provide material support to a foreign terrorist organization in violation of Title 18, United States Code, Section 2339B(a)(1), (d)(1)(C), (E) and (F), Section 3238, and Section 2. Count Two alleges that the defendant provided and attempted to provide material support or resources to a foreign terrorist organization; in this case, al-Shabaab.

In order to find the defendant guilty of Count Two, the government must prove the following three elements beyond a reasonable doubt:

First, that the defendant provided material support or resources to a foreign terrorist organization; namely, al-Shabaab.

Second, that the defendant acted knowingly and

intentionally, including with knowledge that al-Shabaab: (1) was a designated foreign terrorist organization, (2) has engaged in or engages in terrorist activity, or (3) has engaged in or engages in terrorism; and

Third, that one of the jurisdictional requirements, which I will explain shortly, is satisfied.

I will describe each of these elements in greater detail now.

The first element is that the defendant provided material support or resources to a foreign terrorist organization, as charged here, al-Shabaab. For an organization to qualify as a foreign terrorist organization, it must have been designated as such by the United States Secretary of State.

I instruct you as a matter of law that al-Shabaab was designated as a foreign terrorist organization by the U.S. Secretary of State on February 26, 2008, and that it has been so designated since that date.

The term material support or resources means any service or personnel. The defendant does not need to have joined or become a member of the foreign terrorist organization in order to have provided material support or resources to the organization. The word "personnel" includes the defendant himself. It can also include other people. A person provides personnel if he provides al-Shabaab with himself or one or more

individuals to work under al-Shabaab's direction or control. However, individuals who act entirely independently of al-Shabaab to advance its goals or objectives are not considered to be working under al-Shabaab's direction and control.

A person provides services when a person performs work, commanded or paid for by another or done for the benefit of another; here, al-Shabaab. Only work performed in coordination with, at the direction of, or for the benefit of al-Shabaab meets the definition of service.

If you find beyond a reasonable doubt that the defendant provided material support or resources, then this element is satisfied. However, as part of your finding, you must agree unanimously with respect to at least one of the forms of material support or resources that was provided.

The second element is that the defendant acted knowingly and intentionally. To prove that the defendant acted knowingly, the government must prove that he acted voluntarily and not because of a mistake or accident.

To prove that the defendant acted intentionally, the government must prove that the defendant acted deliberately and purposefully; that is, the defendant's acts must have been the product of his conscious objective decision.

The government must also prove that the defendant had one or more of the following three types of knowledge: (A)

knowledge that al-Shabaab was designated by the Secretary of State as a foreign terrorist organization, (B) knowledge that al-Shabaab engaged in or engages in terrorist activity, or (C) knowledge that al-Shabaab engaged in or engages in terrorism.

The term "terrorist activity" includes hijacking or sabotaging an aircraft, vessel, vehicle, train or other conveyance; seizing, detaining, or threatening to kill, injure or further detain another person to compel or coerce some third party, including a government, to do or abstain from doing some act; a violent attack upon an internationally protected person, including employees and officials of governments or international organizations; assassination; use of any explosive, firearm, or other weapon or dangerous device other than for monetary gain and with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property; and a threat, attempt or conspiracy to do any of the foregoing.

The term "terrorism" means premeditated, politically motivated violence perpetrated against non-combatant targets by sub-national groups or clandestine agents.

The government has satisfied its burden of proof with respect to this element if you conclude beyond a reasonable doubt that the defendant had knowledge that al-Shabaab was designated by the Secretary of State as a terrorist organization, or that al-Shabaab engaged in or engages in

terrorist activity of the type I have listed, or that al-Shabaab engaged in or engages in terrorism as I have defined that term, and that the defendant acted intentionally. To find that the government has met its burden on this element, you must unanimously agree as to at least one of the three categories of knowledge that the defendant had.

To satisfy the third element, the government must prove one of the following jurisdictional requirements: (1) after the conduct required for the charged offense occurred, the defendant was brought into or found in the United States, even if the conduct required for the charged offense occurred outside the United States; or (2) the offense occurred in or affected interstate or foreign commerce.

The term "interstate or foreign commerce" includes the movement of goods, services, money, and individuals between any combination of states, territories, or possessions of the United States or between the United States and a foreign country. In demonstrating that an offense occurs in or affects interstate or foreign commerce, the government must prove that the offense could have a potential effect on interstate or foreign commerce in any way, no matter how minimal. It is not necessary to prove that the defendant's particular acts affected interstate or foreign commerce as long as the offense as a whole could have had such a potential effect. Finally, the government is not required to prove that the defendant knew

that he was affecting or could potentially affect interstate or foreign commerce. To find that the government has met its burden on this element, you must unanimously agree that at least one of the jurisdictional requirements is satisfied.

With respect to this substantive count, Count Two, the first theory on which the defendant can be guilty of the substantive offense is by committing it directly. I just provided those instructions to you. There is one more theory on which the defendant can be guilty of the substantive offense indirectly: By attempting to commit the offense.

Under 18 United States Code, Section 2339B(a)(1), the same law that criminalizes the direct substantive offense, a defendant also commits an offense if he attempts to commit the substantive offense; that is, a person who attempts to provide material support to a designated foreign terrorist organization is just as guilty of the offense as someone who successfully commits the offense.

For the defendant to be convicted under an attempt theory, the government must prove two elements beyond a reasonable doubt:

First, the government must prove that the defendant intended to commit the crime charged; and

Second, the government must prove that the defendant willfully took some action that was a substantial step in an effort to bring about or accomplish the crime.

The mere intention to commit a specific crime does not amount to an attempt. In order to convict the defendant under a theory of attempt, you must find beyond a reasonable doubt that he intended to commit the crime charged and that he took some action which was a substantial step toward the commission of that crime.

In determining whether the defendant's actions amounted to a substantial step toward the commission of the crime, you must distinguish between mere preparation on the one hand and the actual doing of the criminal deed on the other. Mere preparation, without more, is not an attempt. On the other hand, some preparations when taken together may amount to an attempt. The acts of a person who intends to commit a crime will constitute an attempt where the acts themselves indicate an intent to willfully commit the crime and the acts are a substantial step in a course of conduct planned to culminate in the commission of the crime.

There is no requirement that the attempt be successful or that the defendant actually had carried out the crime he was trying to commit.

Now that I have explained the indictment's substantive count, I am going to explain its conspiracy counts. Here, there are five conspiracy offenses charged. They are: In Count One, a conspiracy to provide material support to a foreign terrorist organization; in Count Three, a conspiracy to

murder U.S. nationals; in Count Four, a conspiracy to commit aircraft piracy; in Count Five, a conspiracy to destroy aircraft; and in Count Six, a conspiracy to commit acts of terrorism transcending national boundaries. Because these counts charge conspiracy offenses, let me explain to you what a conspiracy is. These instructions about conspiracy apply to all five counts.

A conspiracy is a kind of criminal partnership — a combination or agreement of two or more persons to join together to accomplish some unlawful purpose. The crime of conspiracy to violate a federal law is an independent offense. It is separate and distinct from the violation of any specific federal laws, which I referred to as substantive crimes.

If a conspiracy exists, even if it should fail in its purpose, it is still punishable as a crime. Indeed, you may find the defendant guilty of conspiracy to commit an offense even if the substantive crime which was the object of the conspiracy was not actually committed. Congress has deemed it appropriate to make conspiracy, standing alone, a separate crime even if the conspiracy is not successful.

In order for the defendant to be guilty of conspiracy, the government must prove beyond a reasonable doubt the following two elements.

First, that the charged conspiracy existed; and

Second, that at some point during the conspiracy's

existence, the defendant knowingly and willfully joined the conspiracy.

In addition, and with regard only to Count Three, conspiracy to murder U.S. nationals, the government must also prove a reasonable doubt a third element: That an overt act occurred; that is, that someone within the conspiracy took some action to advance the conspiracy's goal or goals.

Now, let us separately consider these elements.

Starting with the first element, what is a conspiracy? A conspiracy is an agreement or understanding between two or more people to accomplish by concerted action one or more unlawful purposes. For example, the unlawful purpose alleged to be one of the objects of the conspiracy charged in Count One is to provide material support to a foreign terrorist organization, and the unlawful purpose alleged to be the object of the conspiracy charged in Count Three is to murder U.S. nationals. I will give you instructions on each of these unlawful purposes, or objects, of the conspiracies later on, but it is the different objects of the alleged conspiracies that make them distinct federal crimes.

The essence of the crime of conspiracy is the unlawful agreement of two or more people to commit a crime. The ultimate success of the conspiracy, or the actual commission of the crime; that is, the object of the conspiracy, is not required for a conspiracy to have existed. Rather, the

government is required to prove beyond a reasonable doubt only that two or more people came to an agreement to accomplish the unlawful object.

To prove the existence of a conspiracy, the government is not required to show that two or more people sat around a table and entered into an express or formal agreement, orally or in writing, stating that they formed a conspiracy to commit a crime. Similarly, you need not find that the alleged co-conspirators stated, in words or in writing, what the scheme was, or its object or purpose, every precise detail of the scheme, or the means by which its object or purpose was to be accomplished. What the government must prove is that there was a mutual understanding, either spoken or unspoken, between two or more people, to cooperate with each other to accomplish an unlawful act.

It is rare that a conspiracy can be proven by direct evidence of an explicit agreement. Rather, in determining whether there has been an unlawful agreement as alleged in the indictment, you may consider the actions and conduct of all the alleged co-conspirators that were meant to carry out the apparent criminal purpose. The old adage "actions speak louder than words" applies here. Often, the only evidence that is available with respect to the existence of a conspiracy is that of disconnected acts and conduct on the part of the individual co-conspirators. When taken all together and considered as a

whole, however, these acts and conduct may warrant the inference that a conspiracy existed just as conclusively as more direct proof, such as evidence of an express agreement.

Further, although the indictment alleges that the conspiracy began in or around 2016 and continued up to or around 2019, it is not essential that the government prove that the conspiracy in question started and ended on those dates or that it existed throughout the entire period. Rather, it is sufficient to satisfy the first element if you find that the charged conspiracy was formed and that it existed for any time within the charged period.

If you conclude that the government has proven beyond a reasonable doubt that a charged conspiracy existed, then you must consider the second element, whether the defendant participated in the conspiracy knowingly and willfully with knowledge of its unlawful purpose or purposes and in furtherance of its unlawful object or objects.

I have previously charged you on what it means to act knowingly and willfully.

As a reminder, to act knowingly means to act voluntarily and deliberately rather than mistakenly or inadvertently. To act willfully means to act voluntarily and with a wrongful purpose. An act is done knowingly and willfully if it is done purposefully and deliberately.

It is not necessary for the government to show that

the defendant was fully informed as to all the details of the conspiracy in order for you to infer knowledge on his part. Nor does the defendant need to know the full extent of the conspiracy or all of its participants. Indeed, it is not necessary that the defendant knew more than one other member of the conspiracy. It is also not necessary that the defendant received any monetary benefit for participating in the conspiracy. It is enough if he participated in the conspiracy knowingly and willfully as I defined those terms.

(Continued on next page)

THE COURT: (Continuing) You have heard testimony and saw evidence during the trial about certain organizations, like al-Shabaab, al Qaeda, and others. You need not find that the defendant or anyone else mentioned during this trial was a member of any of these particular groups, or any other organization, to find that the defendant was a member of the conspiracy in question.

If you determine that the defendant became a member of the conspiracy, the duration and extent of the defendant's participation has no bearing on the issue of the defendant's guilt.

Some coconspirators play major roles, while others play minor roles. An equal role is not what the law requires. In fact, even a single act may be sufficient to draw the defendant within the ambit of the conspiracy if it meets the elements I described. The defendant also need not have joined the conspiracy at the outset. The defendant may have joined it at any time — at the beginning, in the middle, or at the end — and the defendant will still be held responsible for all that was done during the conspiracy's existence when the defendant was a member. However, I want to caution you that mere association with a member of a conspiracy does not make a person a member of the conspiracy, even when that association is coupled with knowledge that the second person is committing a crime.

Mere presence at the scene of a crime, even coupled with knowledge that a crime is taking place, is not sufficient to support a conviction. In other words, knowledge without participation is not sufficient to satisfy the second element. What is necessary is that the defendant participated in the conspiracy with knowledge of its unlawful purpose and with the intent to aid in the accomplishment of its unlawful object or objects.

In sum, if you find that the defendant, with an understanding of the unlawful nature of the charged conspiracy, intentionally engaged, advised, or assisted in the conspiracy for the purpose of furthering the illegal undertaking, you should conclude that the defendant became a knowing and willing participant in the unlawful agreement — that is to say, a conspirator.

As I mentioned Earlier for Count Three, conspiracy to murder U.S. nationals, the government must prove a third element beyond a reasonable doubt. Specifically, as to Count Three only, the government must prove that at least one of the conspirators, but not necessarily the defendant, committed at least one overt act in furtherance of the conspiracy. In other words, there must have been something more than an agreement — some overt step or action must have been taken by at least one of the conspirators in furtherance of the conspiracy.

The government may satisfy the overt act element by proving that at least one overt act was committed in furtherance of the alleged conspiracy. It is not necessary for the government to prove all, or even any, of the particular overt acts alleged in the indictment, nor must you find that the defendant himself committed an overt act.

Similarly, it is not necessary for the government to prove that each member of the conspiracy committed or participated in an overt act. It is sufficient if you find that at least one overt act was in fact performed by at least one conspirator, whether the defendant or another coconspirator, to further the conspiracy within the time frame of the conspiracy. Remember, the act of any one of the members of a conspiracy done in furtherance of the conspiracy becomes the act of all the members under the law. To be a member of the conspiracy, it is not necessary for the defendant to have committed an overt act.

In addition, an overt act alleged in the indictment need not have been committed at precisely the time alleged in the indictment, that is, between 2016 and 2019. It is sufficient if you are convinced beyond a reasonable doubt that it occurred at or about the time and place stated.

Finally, bear in mind that an overt act standing alone may be an innocent, lawful act. However, a lawful act may satisfy the overt act element if it is a step in carrying out,

promoting, aiding, or assisting a conspiratorial scheme.

You will recall that I admitted into evidence against the defendant the acts and statements of others because these acts and statements were committed or made by people who, the government alleges, were coconspirators of the defendant.

The reason for allowing this evidence to be received against the defendant has to do, in part, with the nature of the crime of conspiracy. As I said, a conspiracy is often referred to as a partnership in crime. As in other types of partnerships, when people enter into a conspiracy, each and every member becomes an agent for the other conspirators in carrying out the conspiracy.

Therefore, the reasonably foreseeable declarations, statements, and omissions of any member of the conspiracy made in furtherance of the common purpose of the conspiracy are deemed, under the law, to be the acts of all of the members, and all of the members are responsible for such acts, declarations, statements, and omissions.

If you find, beyond a reasonable doubt, that the defendant was a member of a conspiracy charged in the indictment, then any acts done or statements made in furtherance of the conspiracy by a person also found by you to have been a member of the same conspiracy may be considered against the defendant. This is so even if such acts were committed or such statements were made in the defendant's

absence, and/or without his knowledge.

Count One charges the defendant with conspiracy to provide material support to a foreign terrorist organization. In order to prove the defendant guilty of Count One, the government must establish the following two elements beyond a reasonable doubt:

First, that the conspiracy charged in Count One of the indictment existed, that is, that there was an agreement or understanding between two or more people to provide material support to a foreign terrorist organization;

Second, that the defendant knowingly and willfully became a member of the conspiracy.

You should follow the instructions that I previously provided to you about conspiracies in general. However, the conspiracy charged in Count One has a different object or criminal goal than the other conspiracy counts. Remember, the objects of a conspiracy are the illegal goals that the conspirators agree on.

The object of Count One's conspiracy is providing material support to a foreign terrorist organization. I have also already explained to you the relevant definitions for this crime in my instructions for Count Two, and you should apply those instructions here.

Count Three charges the defendant with conspiracy to murder U.S. nationals. In order to prove the defendant guilty

of Count Three, the government must establish the following four elements beyond a reasonable doubt:

First, that the conspiracy charged in Count Three existed, that is, that there was an agreement or understanding between two or more people to murder U.S. nationals;

Second, that the defendant knowingly and willfully became a member of the conspiracy;

Third, that an overt act occurred, that is, that someone within the conspiracy took some action to advance the goal of the conspiracy;

And, fourth, that the defendant was a member of the charged conspiracy while outside of the United States.

You should follow the instructions that I previously provided to you about conspiracies in general. However, the conspiracy charged in Count Three has a different object than the conspiracy charged in the other conspiracy counts. The object of Count Three's conspiracy is the murder of U.S. nationals.

"Murder" is the unlawful killing of a human being with what is called malice aforethought. To act with malice aforethought means to act willfully, with the intent to kill another person. Malice aforethought is the state of mind that would cause a person to act without regard to the life of another. To act with malice, one must have acted consciously with the intent to kill another person. However, the

government does not need to prove a subjective intent to kill; it is enough for the government to prove reckless and wanton conduct, which conduct so grossly deviated from a reasonable standard of care that the person who undertook such conduct was aware of the serious risk of death he was causing. The government need not prove spite, malevolence, hatred, or ill will.

A "national of the United States" means a citizen of the United States. You should follow the instructions that I previously provided to you about overt acts in general. As a reminder, the overt act element requires that there must have been something more than an agreement; the government must prove beyond a reasonable doubt that some overt step or action was taken by at least one of the conspirators in furtherance of the conspiracy.

Count Four charges the defendant with conspiracy to commit aircraft piracy. The indictment alleges that the defendant conspired to seize and exercise control of an aircraft, inside the special aircraft jurisdiction of the United States, by force, violence, threat of force, or violence, and intimidation, and with wrongful intent.

In order to prove the defendant guilty of Count Four, the government must establish the following two elements beyond a reasonable doubt:

First, that the conspiracy charged in Count Four

existed, that is, that there was an agreement or understanding between two or more people to commit aircraft piracy;

And, second, that the defendant knowingly and willfully became a member of the conspiracy.

You should follow the instructions that I previously provided to you about conspiracies in general. However, the conspiracy charged in Count Four has a different object than the conspiracy charged in the other conspiracy counts. The object of Count Four's conspiracy is aircraft piracy. I will now describe the elements of aircraft piracy. A person commits aircraft piracy if:

First, the person seized or exercised control, or attempted to seize or exercise control, of an aircraft;

Second, the person seized or exercised control of the aircraft by the use of force, violence, threat, or intimidation;

Third, the person acted with wrongful intent;

And, fourth, the seizure or exercise of control of the aircraft occurred in the special aircraft jurisdiction of the United States.

Now I will explain each of these four elements of aircraft piracy in more detail.

As to the first element, to seize or exercise control of an aircraft means to deprive the flight crew of control of the aircraft. This does not require that the perpetrator

actually enter the cockpit and personally navigate the aircraft, but it does require that he take control of the aircraft in that the flight crew follows his directions with respect to the operation of the aircraft.

The second element is seizing or exercising control of the aircraft by the use of force, violence, threat, or intimidation. Displaying a dangerous weapon is a use of force sufficient to satisfy this element. Other conduct, such as handing a threatening note to a member of the flight crew or a flight attendant, is sufficient to satisfy this element if the conduct would place an ordinary and reasonable person in fear of imminent harm.

The third element is acting with wrongful intent. This means to act knowingly in seizing or exercising control of an aircraft without the legal right to do so. I have previously instructed you as to the definition of the word "knowingly," and you should apply those instructions here as well.

Finally, as to the fourth element, the term "special aircraft jurisdiction" means an "aircraft in flight" in the United States (or a civil aircraft of the United States in flight out of United States airspace or a foreign aircraft in flight that has its next scheduled destination or last scheduled departure in the United States). The phrase "aircraft in flight" has a special meaning under the aircraft

piracy statute. It means an aircraft from the moment all external doors are closed following boarding through the moment when one external door is opened to allow passengers to leave aircraft. Therefore, an aircraft may be "in flight" under this definition even though it is not airborne.

Count Five charges the defendant with conspiracy to destroy aircraft. In order to prove the defendant guilty of Count Five, the government must establish the following two elements beyond a reasonable doubt:

First, that the conspiracy charged in Count Five existed, that is, that there was an agreement or understanding between two or more people to destroy aircraft;

And, second, that the defendant knowingly and willfully became a member of the conspiracy.

You should follow the instructions that I previously provided to you about conspiracies in general. However, the conspiracy charged in Count Five has a different object than the conspiracy charged in the other conspiracy counts. The objects of Count Five's conspiracy are willfully damaging or destroying an aircraft and willfully interfering with or disabling anyone involved in the operation of an aircraft.

It is not necessary for the government to prove that the defendant conspired to commit both objects of the conspiracy. You must, however, be unanimous as to the object or objects of the conspiracy, if any.

I will now describe these two illegal objects in greater detail.

Willfully damaging or destroying an aircraft has the following two elements:

First, that the perpetrator willfully set fire to, damaged, destroyed, disabled, or wrecked an aircraft;

And, second, the aircraft was either in the special aircraft jurisdiction of the United States or was a civil aircraft used, operated, or employed in interstate, overseas, or foreign air commerce.

The second object of the conspiracy charged in Count Five involves willfully interfering with or disabling anyone involved in the operation of an aircraft. The elements of this object are:

First, that the perpetrator willfully interfered with or disabled any person involved in the authorized operation of an aircraft;

Second, that the perpetrator did so with intent to endanger the safety of any person or with a reckless disregard for the safety of human life;

And, third, the aircraft was either in the special aircraft jurisdiction of the United States or was a civil aircraft used, operated, or employed in interstate, overseas, or foreign air commerce.

I have already instructed you as to the definition of

"special aircraft jurisdiction" in my instructions for Count Four, and you should follow those instructions here.

Count Six charges the defendant with conspiracy to commit acts of terrorism transcending national boundaries. In order to prove the defendant guilty of Count Six, the government must establish the following two elements beyond a reasonable doubt:

First, that the conspiracy charged in Count Six existed, that is, that there was an agreement or understanding between two or more people to commit acts of terrorism transcending national boundaries;

And, second, that the defendant knowingly and willfully became a member of the conspiracy.

You should follow the instructions that I previously provided to you about conspiracies in general. However, the conspiracy charged in Count Six has a different object than the other conspiracy counts. The object of Count Six's conspiracy is committing acts of terrorism transcending national boundaries. I will now describe the elements of that substantive crime:

First, that the perpetrator knowingly killed, maimed, committed an assault resulting in serious bodily injury to, or assaulted with a dangerous weapon, one or more persons within the United States, or knowingly created a substantial risk of serious bodily injury to any person by destroying any

structure, conveyance, or other real or personal property within the United States;

Second, that the conduct in question transcended national boundaries;

Third, that the conduct in question violated the laws of any state or the United States;

And, fourth, that one of the jurisdictional requirements that I will describe in a moment is satisfied.

Now, I will explain each of these four elements of committing acts of terrorism transcending national boundaries.

As to the first element, the term "maim" means to cripple or mutilate in any way; to inflict upon any person an injury which deprives him of the use of any limb or member of the body, or to render him lame or defective in bodily vigor; or otherwise to seriously wound, disfigure, or disable.

"Serious bodily injury" means bodily injury that involves a substantial risk of death; extreme physical pain; protracted and obvious disfigurement; or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

A "dangerous weapon" means a device or instrument, material, or substance, animate or inanimate, that is used for, or readily capable of, causing death or serious bodily injury, except that the term does not include a pocket knife with a blade of less than 2.5 inches in length.

As to the second element, the term "transcended national boundaries" means that some of the conduct involved in the object of the offense occurred outside the United States, in addition to other conduct occurring within the United States.

As to the third element, you must find that the perpetrator's conduct constituted an offense that violated the law of the United States. I instruct you, as a matter of law, that the offenses of conspiring to, and providing material support and resources to, a foreign terrorist organization, as charged in Counts One and Two, conspiring to murder U.S. nationals, as charged in Count Three, conspiring to commit aircraft piracy, as charged in Count Four, and conspiring to destroy aircraft, as charged in Count Five, each violate the law of the United States. Consequently, if you find beyond a reasonable doubt that the perpetrator committed such offenses, this element is satisfied.

Finally, as to the fourth element, jurisdiction, the government must prove beyond a reasonable doubt that at least one of the two jurisdictional elements is satisfied:

(A) the mail or any facility of interstate or foreign commerce was used in furtherance of the offense;

Or (B) the offense, or the results of the offense, if completed, would have affected interstate and foreign commerce.

A facility of interstate or foreign commerce includes

a means of transportation and communication. I have previously instructed you as to the definition of "interstate or foreign commerce" in my instructions for Count Two, and you should rely on those.

Although you must be unanimous as to the existence of at least one of these jurisdictional circumstances beyond a reasonable doubt, the government is not required to prove that the defendant actually knew of the existence of such a circumstance.

In addition to considering the elements of the offenses I have described for you, you must decide with respect to each count whether venue is proper in this district. I instruct you that the Southern District of New York includes all of Manhattan, the Bronx, Westchester, Sullivan, Rockland, Putnam, Dutchess, and Orange Counties, and all the waters surrounding Manhattan, Brooklyn, and Staten Island, the air above those waters and the bridges over those waters.

For each of the charged counts in the indictment, Congress has determined that acts begun or committed outside the territorial jurisdiction of the United States are chargeable under the statutes in the indictment. Therefore, for those counts, the government need not prove that the crime was committed in this district or that the defendant himself was present here. Instead, it is enough if you find that the point of entry where the defendant was first brought into the

United States was in the Southern District of New York.

On this issue, and this issue alone, the government need not prove venue beyond a reasonable doubt, but only by a preponderance of the evidence. The government has satisfied its burden on this issue if you conclude that it is more likely than not that venue is proper in this district. But I remind you that the government must prove all other elements of the offenses beyond a reasonable doubt.

You will note that the indictment alleges that the charged crimes occurred in or about 2016 to 2019. It doesn't matter if the evidence you heard at trial indicates that a particular act occurred on a different date. The law requires only a substantial similarity between the date alleged in the indictment and the date established by the evidence.

The defendant did not testify in this case. Under our Constitution, a defendant has no obligation to testify or to present any evidence because it is the government's burden to prove a defendant guilty beyond a reasonable doubt. That burden remains with the government throughout the entire trial and never shifts to a defendant. A defendant is never required to prove that he is innocent.

You may not attach any significance to the fact that the defendant did not testify. No adverse inference against him may be drawn by you because he did not take the witness stand. You may not hold this against him or consider it in any

way in your deliberations in the jury room.

The defendant has a constitutional right under the Sixth Amendment to the United States Constitution to represent himself. His decision to exercise that right and represent himself has no bearing on whether he is guilty or not guilty, and it must not affect your consideration of the case. You are not to draw any inferences from the defendant's decision to exercise his right to represent himself.

Because the defendant has decided to act as his own lawyer, you may have heard him speak at various times during the trial, such as when he exercised his right to make objections. I want to remind you that when the defendant spoke during the trial, he was acting as a lawyer in the case, not as a witness, and thus his words are not evidence. The only evidence in this case comes from witnesses who testify under oath on the witness stand and from exhibits that are admitted. I also want to remind you that although the defendant had the right to cross-examine witnesses, present an opening statement, or make closing arguments, he had no obligation to do so, and you are not to draw any inferences from the defendant's decision not to do so.

You heard the testimony of some witnesses who are U.S. or foreign law enforcement officers. The fact that a witness works for the government or in law enforcement does not mean that that witness' testimony is, by virtue of the witness'

position, deserving of more or less consideration, or greater or lesser weight, than that of any other witness. The testimony of such a witness should not be regarded as more or less truthful or accurate than that of any other witness simply based on the witness' employment. It is your decision, after reviewing all of the evidence, whether to accept the testimony of the law enforcement witness and to give that testimony whatever weight, if any, you find it deserves.

You heard testimony from what we call an expert witness. An expert is a witness who, by education or experience, has acquired learning or experience in a specialized area of knowledge. Expert witnesses are permitted to express their opinions as to relevant matters in which they have special knowledge, skill, experience, and training, and to give their reasons for their opinions. Expert testimony is presented to you on the theory that someone who is experienced in the field can assist you in understanding the evidence or in reaching an independent decision on the facts.

Your role in judging credibility applies to experts in the same manner it applies to other witnesses. In weighing an expert's testimony, you may consider the witness' qualifications, his or her opinions, the reasons for testifying, as well as all of the other considerations that ordinarily apply when you are deciding whether or not to believe a witness' testimony. You may give the expert witness'

testimony whatever weight, if any, you find it deserves in light of all of the evidence. You should not, however, accept expert witness testimony merely because I allowed the witness to testify concerning his or her opinion. Nor should you substitute it for your own reason, judgment, and common sense.

The determination of the facts in this case rests solely with you. As with the testimony of any other witness, you may decide to accept all, some, or none of the testimony of any expert witness. If you should decide that the opinion of an expert was not based on sufficient education or experience or on sufficient data, or if you should conclude that the trustworthiness or credibility of an expert is questionable for any reason, or if the opinion of the expert was outweighed in your judgment by other evidence in the case, then you may disregard the opinion of the expert entirely or in part. On the other hand, if you find the opinion of an expert is based on sufficient data, education, and experience, and the other evidence does not give you reason to doubt his or her conclusions, you would be justified in placing reliance on his or her testimony.

You have heard evidence during the trial that witnesses have discussed the facts of the case and their testimony with the lawyers before the witnesses appeared in court.

Although you may consider that fact when you are

evaluating a witness' credibility, I should tell you that there is nothing either unusual or improper about a witness meeting with lawyers before testifying so that the witness can be aware of the subjects he or she will be questioned about, focus on those subjects, and have the opportunity to review relevant exhibits before being questioned about them. Such consultation helps conserve your time and the Court's time. Indeed, it would be unusual and surprising for a lawyer to call a witness without such consultation.

Again, the weight you give to the fact or the nature of the witness' preparation for his or her testimony and what inferences you draw from such preparation are matters completely within your discretion.

There are several people whose names you heard during the course of the trial, but who did not appear here to testify. I instruct you that each party had an equal opportunity, or lack of opportunity, to call any of these witnesses. Therefore, you should not draw any inferences or reach any conclusion as to what they would have said if they had been called to testify. Their absence should not affect your judgment.

You should, however, remember my instruction that the law does not impose on a defendant in a criminal case the burden or duty of calling any witness or producing any evidence. The burden remains with the government to prove the

defendant guilty beyond a reasonable doubt.

Some of the exhibits were submitted in the form of charts and summaries. For the charts and summaries that were admitted into evidence, you should consider them as you would any other evidence.

At certain times during the trial, the government used demonstrative aids to assist you in considering the evidence or testimony at trial. You may consider these aids if you find them useful in assessing the evidence or testimony.

You have heard testimony that when law enforcement officers apprehended the defendant, they seized evidence from him. The evidence allegedly obtained at the time of the arrest was properly admitted in this case and may be properly considered by you. Whether you approve or disapprove of how it was obtained should not enter into your deliberations.

Therefore, regardless of your personal opinions, you may give this evidence full consideration, along with all the other evidence in the case, in determining whether the government has proved the defendant's guilt beyond a reasonable doubt.

You have heard evidence that law enforcement officials recovered certain evidence during certain searches. This evidence was properly admitted in this case and may properly be considered by you.

Whether you approve or disapprove of how this evidence

was obtained should not into your deliberations because I now instruct you that the government's use of this evidence is entirely lawful.

You must, therefore, regardless of your personal opinions, give this evidence full consideration along with all the other evidence in the case in determining whether the government has proved the defendant's guilt beyond a reasonable doubt.

You also have heard evidence of certain statements allegedly made by the defendant to the FBI. Evidence of these statements was properly admitted in this case and may be properly considered by you. Whether you approve or disapprove of the use of these statements may not enter into your deliberations. Ultimately, you are to give the statements such weight, if any, as you feel they deserve in light of all the circumstances.

You heard reference in the arguments of counsel to the fact that certain investigative techniques were or were not used by law enforcement authorities. You may consider these facts in deciding whether the government has met its burden of proof because you should look to all of the evidence or lack of evidence in deciding whether the defendant is guilty. However, there is no legal requirement that law enforcement agents investigate crimes in a particular way or that the government prove its case through any particular means. The government

and its techniques are not on trial. Although you are to carefully consider the evidence presented, you need not speculate as to why law enforcement used the techniques they did, or why they did not use other techniques.

Your concern is to determine whether or not, based on the evidence or lack of evidence, the guilt of the defendant has been proven beyond a reasonable doubt.

The government has introduced evidence in the form of audio and video recordings.

Whether you approve or disapprove of the recording of these conversations may not enter into your deliberations. I instruct you that these recordings were made in a lawful manner, and that no one's rights were violated, and that the government's use of this evidence is lawful, and it was properly admitted into evidence at this trial. You must, therefore, regardless of any personal opinions, give this evidence consideration along with all the other evidence in the case in determining whether the government has proven guilt beyond a reasonable doubt.

If you wish to hear any of the recordings again, they will be made available to you during your deliberations.

Some of the people who may have been involved in the events leading to this trial are not on trial. You may draw no inference, favorable or unfavorable, toward the government or the defendant from the fact that certain persons other than the

defendant were not named as defendants in the indictment. Nor may you speculate as to the reasons why other persons are not on trial. Those matters are wholly outside your concern and have no bearing on your function as jurors. There is no requirement that all people jointly engaged in a criminal activity be charged and prosecuted, or tried together, in the same proceeding.

During the trial, you have heard the attorneys use the term "inference" or "infer." In their arguments, they have asked you to infer, on the basis of your reason, experience, and common sense, from one or more established facts, the existence of some other fact.

An inference is not a suspicion or a guess. It is a logical, factual conclusion that you might reasonably view from other facts that have been proven. In drawing inferences, you should exercise your common sense.

So, while you are considering the evidence presented to you, you are permitted to draw, from the facts that you find to be proven, such reasonable inferences as would be justified in light of your experience.

There are occasions when particular established facts, whether proved circumstantially or directly, might yield an inference in one direction or in the opposite direction. The government might ask you to draw one inference.

You are the ones who make up your mind about what, if

any, inferences to draw, nobody else — not me, not the lawyers.

Here again, let me remind you that whether based on direct or circumstantial evidence, or on the logical, reasonable inferences to be drawn from the evidence, you must be satisfied of the guilt of the defendant beyond a reasonable doubt before you may convict him.

Your verdict must be based solely upon the evidence developed at trial or the lack of evidence. In reaching your decision as to whether the government sustained its burden of proof, it would be improper for you to consider any personal feelings, positive or negative, you may have about the defendant's race, religion, national origin, sex, or age. The defendant and the government are both entitled to a trial free from prejudice, and our judicial system cannot work unless you reach your verdict through a fair and impartial consideration of the evidence.

I'm also going to ask you, and advise you, to not decide the case based on implicit biases. Everyone, including me, has feelings or assumptions or perceptions or fears or even stereotypes, and they're referred to as "implicit biases," and you might not even be aware of them. These hidden thoughts can impact what we see and hear, how we remember what we see and hear, and how we make important decisions. For example, you should draw no conclusions from the defendant's choice of attire. That is not evidence and should not be considered.

Because you are making important decisions in this case, I strongly encourage you to evaluate the evidence carefully and to resist jumping to any conclusions based on personal likes or dislikes, generalizations, gut feelings, prejudices, sympathies, stereotypes, or biases.

Before you retire to deliberate, there are a few more areas I need to instruct you on.

Your job is to decide whether the evidence establishes the guilt of the defendant with respect to the crimes charged in the indictment beyond a reasonable doubt.

Deliberations must take place in the jury room with all jurors present. If any juror leaves the room — say, for a bathroom break — all deliberations must stop, and may resume only when every juror is present.

In order to return a verdict, each and every juror must agree to such verdict. You have the duty, as jurors, to consult with one another and to deliberate with a view towards reaching an agreement, if it can be done without giving up individual judgment.

As jurors, each one of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors.

No juror should give up any honestly held conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of

returning a verdict.

During the course of your deliberations, you, as individuals, should not hesitate to reexamine your own views and change your opinion if convinced it is erroneous.

For those of you who took notes during the trial, remember that any notes that you took are to be used only to refresh your own memory during deliberations. They may not be used as authority to persuade your fellow jurors as to what a witness did or did not say. Your notes are not superior to your or your fellow jurors' independent recollection. Those of you who did not take notes should not be influenced by the fact that another juror has taken notes; rather, you should rely on your own independent recollection of the evidence.

If there is any question as to what the testimony was or what my instructions to you were, you should ask to have that portion of the testimony or the instructions read back to you.

Your notes and the notes of your fellow jurors are not a substitute for the official record or for the governing principles of law that I set forth.

The Court's transcript prevails over a juror's notes.

You will have in the jury room a laptop with the exhibits introduced into evidence should you wish to consult them. This laptop can connect to the large monitor in the jury room.

If, during the course of your deliberations, your recollection of any part of the testimony should fail, or if you should find yourself in doubt concerning my instructions to you on the law, you have the option to return to the courtroom for the purpose of having such testimony or instructions read back to you. If you want any further explanation of the law as I explained it to you, you may also request that from the Court. If there is any doubt or question about the meaning of any part of this charge, you should send me a note asking for clarification or for a further explanation. Your requests for exhibits or testimony — in fact, any communications with the Court — should be made to me in writing, signed by your foreperson, and given to one of the court security officers.

Your foreperson, Juror No. 1, should write out your request and give it to the Court security officer, who will deliver the note to me. Please write the note on one of the jury note sheets of paper and place it in an envelope for the court security officer.

As soon as the attorneys, the defendant, and court staff are assembled in the courtroom, you will be called back to the courtroom, and I will promptly respond to your request. During any readback of testimony, keep in mind how the witness' demeanor appeared to you as you observed the witness testify.

In any event, do not tell me or anyone else how the jury stands on the issue of whether or not the defendant is

guilty until after a unanimous verdict is reached.

I'm going to repeat that. Don't tell me or anyone else how the jury stands on the issue of whether the defendant is or is not guilty until a unanimous verdict is reached.

In order to reach a verdict, all 12 members of the jury must agree. Whenever all your members are in agreement on a verdict, you must report your verdict to the Court. When you have reached a verdict, simply tell the court security officer you have reached a verdict, but not what the verdict is, and you will be promptly called back into the courtroom to announce your verdict. We have prepared a verdict form for you to use in recording your decisions. After you have reached a verdict, the foreperson should fill in the verdict sheet, sign, and date it. Then give a separate note to the court security officer outside your door, stating that you have reached a verdict. Do not specify what the verdict is in your note, and do not include the verdict sheet with the note. Instead, the foreperson should retain the verdict sheet and hand it to me in open court, when you are called in.

So, if you have reached a unanimous verdict, and that verdict sheet has been filled out, that stays in the jury room with you. You give a separate note stating that you have reached a verdict, if you have, to the court security officer. And if and when you do reach your unanimous verdict, the foreperson comes out with the verdict sheet, which will be

handed to me when I make that request.

Because the trial jury is about to retire to deliberate, I now charge, and I emphasize, that there must be no further communication or contact between the trial jury and the alternate jurors. The alternates are not to discuss this case with anyone, including yourselves. Nor are you to read, watch, or listen to anything from any source concerning anything touching on the subject matter of the case, nor are you to permit anyone to discuss the case with you or in your presence. Nor are you to form any opinion as to factual issues in this case, nor are you to form or express any opinion as to the guilt or innocence of the defendant, unless and until such time as you may be requested to participate in the trial jury's deliberations.

The alternates may leave the courthouse. However, you still may be called upon to replace a juror, so you must remain reachable by telephone, text, and email, and you must be able to return to the courthouse within one hour of being contacted by my staff.

During your deliberations, lunch will be provided. You should not leave the jury room during deliberations unless you are instructed to do so.

I do have lunch for the alternates. You will pick up your lunch in the vestibule, not inside the jury room.

Are there any smokers on the jury?

If you are a smoker, as I will not be in the jury room with you, should you desire a smoking break, you must make the request to your jury foreperson. Should the foreperson declare a break, the court security officer must be notified. During this break, all deliberations must cease. As smoking is not permitted inside the building, the smokers will be escorted by the court security officer outside the building to smoke. During this recess, the smokers outside the building cannot discuss this case, and the nonsmokers in the jury deliberation room cannot discuss the case.

You may not resume your deliberations until all of you are back in the jury room. So, this goes for any kind of recess: If one person takes a bathroom break or a cigarette break, deliberations must halt, and you must await until that person comes back and everyone is in the room.

Does everyone understand?

JURY MEMBERS: Yes, your Honor.

THE COURT: Please approach.

(At sidebar)

THE COURT: Are there any exceptions to the charge?

MR. BRADLEY: Not from the government, your Honor.

MR. ABDULLAH: No.

THE COURT: All righty, then. Please step back.

(In open court)

THE COURT: The alternates will not be returning to

the jury room. You'll go to the vestibule to collect your lunch, and you will let my staff know if you have any belongings in the jury room, and my staff members will retrieve them for you.

Now, I am about to submit this case to you for your final determination. As I previously stated, the law and your oath require that you render a fair and impartial verdict without fear, favor, or sympathy.

Now, take this case, and in the fulfillment of your oath and in accordance with the instructions of the Court, render a true and impartial verdict.

(Marshal sworn)

(At 12:50 p.m., the jury retired to deliberate)

THE COURT: Please be seated.

I handed out the verdict sheet, and I heard no comments. And so am I correct that there is no objection to the verdict sheet?

MR. BRADLEY: That's correct, your Honor.

MR. ABDULLAH: That is correct.

THE COURT: So, I don't require the parties to remain in the courtroom while the jury is deliberating. I just require that you be attentive to your phone and your emails in case I need to contact you.

Do the parties agree that I can have the evidence sent back into the jury room, or do you want me to wait for them to

make specific requests?

MR. BRADLEY: We have no objection to the evidence going back to the jury room.

MR. ABDULLAH: No objection from the defense.

THE COURT: It's my practice, if they want a readback, to send back a transcript, or at least to offer them that, but if they want a readback, I'm happy to do it the old-fashioned way.

Is there anything before we break?

MR. BRADLEY: Not from the government.

MR. ABDULLAH: Nothing from the defense.

THE COURT: All right.

So, I will be in touch.

(Recess pending verdict)

(In open court; jury not present)

THE COURT: I received two notes from the jury.

The first one came at 1:12 p.m. It's signed by the foreperson and has today's date. It says, "When we fill out the verdict under final instruction, do we sign with our real names?"

The second note came at 1:41 p.m., also signed by the foreperson, and dated today's date. It states, "We've reached a verdict."

Do the parties want me to have the jurors come out so that I may respond to note number 1 or do you want me to just take the verdict at this time?

MR. BRADLEY: Your Honor, I guess my only hesitance to that is just that the jurors would be properly fill out the verdict form, which is my recollection is there is room for them all to sign for them to put their signatures on it. So I would just want to make sure that they were properly instructed on how to fill out the verdict form.

THE COURT: Okay. So they will come out. I will answer their question, which is going to be yes, but that the names will not appear on the public docket. Then I will send them back.

MR. BRADLEY: Well, maybe one alternate approach, if it's acceptable to the defendant, is perhaps just to pass -- just to write -- for the Court to write a response to the

foreperson just on the note itself and then send it back, your Honor, just to avoid the two trips.

THE COURT: I don't do that.

MR. BRADLEY: Okay.

THE COURT: Everything I do is in the courtroom and on the record.

MR. BRADLEY: Understood.

THE COURT: So I can ask, I can make the inquiry as to whether or not they signed it at the time that I tell them that they should sign it. And if Juror No. 1 says yes, then I can just take the verdict form.

MR. BRADLEY: That makes sense, your Honor.

THE COURT: All right. Please have the jurors brought in.

(Jury present)

THE COURT: I received two notes from the jury. The first came in at 1:12 p.m. It's signed by the foreperson dated today's date. It states, "When we fill out the verdict under final instruction, do we sign with our real names?"

I've made this Court Exhibit No. 1.

I received a second note from the jury at 1:41 p.m. signed by the foreperson dated today's date. It states, "We've reached a verdict."

I'm making this Court Exhibit No. 2.

I am just going to let you know that, yes, you do sign

the verdict sheet, but it is not made public. So I am going to ask Juror No. 1 to give me a yes or no answer to the following question: Are the names signed on the verdict sheet? I'm asking you for a yes or no.

JUROR: You say names?

THE COURT: The signatures, do the signatures with the real identity of the jurors, is that signed on the verdict sheet? Because if it is not, then you will go back in the jury room to do so.

JUROR: No, just one.

THE COURT: Okay. So then go back to the jury room, please. That is, of course, if you've reached a unanimous verdict only.

LAW CLERK: Jurors exiting.

(Jury not present)

THE COURT: Would you have the jurors brought in, please.

(Jury present)

THE COURT: Please be seated.

Juror No. 1, have you reached a unanimous verdict?

JUROR: Yes, we have, your Honor.

THE COURT: Would you please pass the verdict sheet to me.

The verdict of the jury is as follows:

Count One: Conspiracy to provide material support to

a foreign terrorist organization. Guilty.

Count Two: Provision of material support to a foreign terrorist organization. Guilty.

Count Three: Conspiracy to murder U.S. nationals. Guilty.

Count Four: Conspiracy to commit aircraft piracy. Guilty.

Count Five: Conspiracy to destroy aircraft. Guilty.

Count Six: Conspiracy to commit acts of terrorism transcending national boundaries. Guilty.

Juror No. 1, the foreperson, is that your verdict?

JUROR: Yes, it is your Honor.

THE COURT: Juror No. 2?

JUROR: It is.

THE COURT: Juror No. 3?

JUROR: It is.

THE COURT: Juror No. 4?

JUROR: It is.

THE COURT: Juror No. 4?

JUROR: Yes, your Honor.

THE COURT: Juror No. 6?

JUROR: It is.

THE COURT: Juror No. 7?

JUROR: Yes.

THE COURT: Juror No. 8?

JUROR: Yes.

THE COURT: Juror No. 9?

JUROR: Yes.

THE COURT: Juror No. 10?

JUROR: Yes.

THE COURT: Juror No. 11?

JUROR: Yes.

THE COURT: Juror No. 12?

JUROR: Yes.

THE COURT: I will make the verdict sheet Court Exhibit number 3.

Members of the jury, thank you for your service as jurors, for the time and attention that you've given to your deliberations.

We live in a democracy, a democracy that will endure, and a democracy such as ours could not function without the willingness of people, such as you, to serve as jurors. Serving as a juror is one of the highest duties an American citizen can be called upon to perform. Now, what you have said amongst yourselves may remain secret. You do not have to disclose this to anyone. However, you are now free to discuss the case if you choose. I would like to thank you personally in the jury room, so please wait for me in there.

LAW CLERK: Jury exiting.

(Jurors discharged)

THE COURT: Please be seated.

Have the parties discussed a motion schedule?

MR. BRADLEY: No, your Honor.

THE COURT: Mr. Abdullah, do you intend to make any post verdict motions?

MR. ABDULLAH: Your Honor, up to this moment, your Honor, I have not, your Honor, I have not considered what I should write because some of the things I know I think is out of comprehension for many people, even they are in this court, they cannot understand what they know. And it is very difficult for me to be understood by many people, so I will try, you know, if your Honor I would consider the time that you give me, and I will try to explain your Honor why -- to explain myself. But as for considering to be, you know, representing myself, I will continue representing myself as I have been representing myself for the past 34 years. I will not consider anyone advice, and I would only, you know, use my own, you know, decisions and my ideas, and I would not consider anyone advice. That is something that I want to be on the record.

THE COURT: You're saying you could not consider what?

JUROR: Anyone's advice.

THE COURT: So you have standby counsel, which I am requiring you to have, and so he is obligated to offer his advice. You can reject it, but he still remains as your standby counsel.

So I am going to afford you an opportunity to discuss any potential post verdict motions with him. He will know what is the proper subject of a post verdict motion, and I'm going to set a motion schedule. Any motion that you make must be in writing, and it is due by December 6, the government's response by January 6, and the defendant's reply by January 20th. I'm going to set sentencing for Monday, March 10 at 10:00 a.m.

Mr. Abdullah, the probation department will eventually want to interview you in connection with a presentence report that it will prepare.

Mr. Commissiong, would you want to be present if there were to be such an interview?

MR. COMMISSIONG: Yes, your Honor.

THE COURT: So I'm going to direct that there shall be no interview unless standby counsel is present.

MR. ABDULLAH: One moment, your Honor.

(Counsel and defendant consult)

MR. ABDULLAH: Your Honor, about the probation interview, is it a must I should talk to them or it's my choice?

THE COURT: It's your choice.

MR. ABDULLAH: So I will not talk to anyone, your Honor.

THE COURT: All right. But I am going to still leave you with the option of changing your mind because what they say

is important to me in determining the sentence, and so it is to your advantage to speak to them so that I can hear all the information that they collect from you.

MR. ABDULLAH: I understand your concern, your Honor. But as for me, I will not talk to anyone. This is something that I will never change my mind. You already know about me. That I will stay rigid like this, your Honor.

MR. COMMISSIONG: Your Honor, we can schedule the probation interview. In fact, at the time of scheduling the probation interview he decides he doesn't want to speak to probation, then that will be what it is.

THE COURT: So if you change your mind and you decide to speak to the probation officer, make sure that anything that you say is truthful and accurate. I am going to read the report carefully in advance of sentencing. It's important to me in considering what sentence to impose. You and your standby counsel have a right to examine the report and comment on it at the time of sentencing. I urge you to read the report and to discuss it with standby counsel. If there are any mistakes in it, point them out to him so he can point them out to me. The government shall provide the probation officer with its factual statement within seven days. Standby counsel must arrange for Mr. Abdullah to be interviewed by probation within the next two weeks. The defense sentencing submission is due two weeks prior to sentencing, and the government submission is

due one week prior to sentencing.

I want to thank the lawyers for their hard work on the case, your professionalism and your civility, and the respectful way in which you have treated each other and the Court.

I'm going to ask the jurors if they are willing to speak with you. Does either side want to speak with the jurors?

MR. BRADLEY: I don't believe from the government's perspective, your Honor. But thank you.

MR. COMMISSIONG: Not from standby counsel's perspective.

THE COURT: All righty then. The matter is adjourned.

(Trial concluded)