UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

CHOLO ABDI ABDULLAH,

                    Defendant.

20 Cr. 677 (AT)

### THE GOVERNMENT'S SENTENCING MEMORANDUM

MATTHEW PODOLSKY
Acting United States Attorney
Southern District of New York

Jonathan L. Bodansky
Nicholas S. Bradley
Assistant United States Attorneys
    - *Of Counsel* -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ................................................................................................................... 3

I.    Overview ................................................................................................................. 3

II.   Al-Shabaab ............................................................................................................. 5

III.  Al-Shabaab's "Operation Jerusalem Will Never Be Judaized" Campaign ........................... 8

IV.   The Aviation Plot ................................................................................................... 12

      A.    The Defendant Joined and Trained with al-Shabaab ............................................ 12

      B.    The Defendant Trained to Become a Pilot to Carry Out a Terrorist Attack
            for al-Shabaab ................................................................................................ 14

      C.    The Defendant Agreed to Murder U.S. Nationals for al-Shabaab ....................... 16

V.    The Charges and Trial ........................................................................................... 22

DISCUSSION ................................................................................................................... 23

I.    Applicable Law ..................................................................................................... 23

II.   The Undisputed Guidelines Sentence Is Life Imprisonment .................................... 24

III.  The Terrorism Enhancement Indisputably and Appropriately Applies ..................... 25

IV.   The Statutory Sentencing Factors Call for a Sentence of Life Imprisonment ................. 29

      A.    The Nature and Seriousness of the Defendant's Conduct and the Need for
            Just Punishment Warrant a Sentence of Life Imprisonment ............................... 29

      B.    A Sentence of Life Imprisonment Is Necessary to Protect the Public from
            Further Crimes of the Defendant ..................................................................... 34

      C.    A Sentence of Life Imprisonment Is Necessary to Afford Adequate
            Deterrence and Promote Respect for the Law .................................................. 37

      D.    A Sentence of Life Imprisonment Will Avoid Creating Unwarranted
            Sentence Disparities ....................................................................................... 40

CONCLUSION .................................................................................................................. 44

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Gall* v. *United States*, 552 U.S. 38 (2007) ................................................................ 23, 40

*United States* v. *Abdul Hakim Murad*, No. 93 Cr. 180 (LAK) (S.D.N.Y. 1998) .......................... 41

*United States* v. *Babafemi*, No. 13 Cr. 109, 2021 WL 1210313 (E.D.N.Y. 2021) ....................... 38

*United States* v. *Booker*, 543 U.S. 220 (2005) ............................................................ 23

*United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005) .................................................. 23

*United States v. Fagans*, 406 F.3d 138 (2d Cir. 2005) .................................................. 3

*United States* v. *Fernandez*, 443 F.3d 19 (2d Cir. 2006) ................................................ 40

*United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011) .............................................. 37

*United States v. Karrem Nasr*, 24 Cr. 19 (AT) (S.D.N.Y.) ................................................ 38

*United States v. Lindh*, 227 F. Supp. 2d 565 (E.D. Va. 2002) ........................................... 27

*United States v. Meskini*, 319 F.3d 88 (2d Cir. 2003) ........................................... passim

*United States v. Mohammed Mansour Jabarah*, No. 02 Cr. 1560 (BSJ) (S.D.N.Y. 2008) .......... 41

*United States v. Mumuni Saleh*, 946 F.3d 97 (2d Cir. 2019) ............................................. 43

*United States v. Oussama Kassir*, No. 04 Cr. 356 (JFK) (S.D.N.Y. 2009) ................................. 41

*United States v. Rahimi*, No. 16 Cr. 760 (RMB) (S.D.N.Y.) ........................................ 41, 42

*United States* v. *Rattoballi*, 452 F.3d 127 (2d Cir. 2006) .............................................. 40

*United States v. Richard Reid*, No. 02 Cr. 10013 (WGY) (D. Mass. 2003) ................................ 41

*United States v. Rizzo*, 349 F.3d 94 (2d Cir. 2003) ...................................................... 3

*United States* v. *Rubenstein*, 403 F.3d 93 (2d Cir. 2005) .............................................. 40

*United States* v. *Stewart*, 590 F.3d 93 (2d Cir. 2009) ........................................ 25, 27, 37

*United States v. Ullah*, No. 18 Cr. 16 (RJS) (S.D.N.Y.) ......................................................... 42, 43

**Statutes**

18 U.S.C. § 2332(b) ............................................................................................. 22, 23, 26

18 U.S.C. § 2332b ............................................................................................. 23, 25, 26, 44

18 U.S.C. § 2339B ............................................................................................. 22, 26

18 U.S.C. § 32 ............................................................................................. 23, 26

18 U.S.C. § 3553(a) ............................................................................................. passim

49 U.S.C. § 46502 ............................................................................................. 22, 24, 26

**Other Authorities**

Executive Order 13224 ............................................................................................. 6

Immigration and Nationality Act Section 219 ............................................................. 6

U.S.S.G. § 2A5.1 ............................................................................................. 24

U.S.S.G. § 3A1.4 ............................................................................................. 24, 25, 26, 28

U.S.S.G. § 3D1.2 ............................................................................................. 24

U.S.S.G. § 3D1.3 ............................................................................................. 24

U.S.S.G. § 5A ............................................................................................. 25

Violent Crime Control and Law Enforcement Act of 1994 ....................................... 26

**Rules**

Federal Rule of Criminal Procedure 32(i)(3)(A) ........................................................ 3

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the March 10, 2025 sentencing of Cholo Abdi Abdullah ("Abdullah" or the "defendant").

The defendant is an avowed terrorist and operative for the vicious terrorist organization Harakat al-Shabaab al-Mujahideen ("al-Shabaab"). For years, he worked with high-ranking al-Shabaab members to devise and carry out a chilling plot to hijack a commercial airplane, crash it into a building in the United States, and recreate al Qaeda's horrific September 11, 2001 terrorist attacks. The defendant first trained with al-Shabaab for months in Somalia, learning to fire AK-47 assault rifles and make deadly explosives. Then, the defendant enrolled in a flight school in the Philippines and devoted hundreds of hours earning the flight certifications necessary to fly large commercial aircraft. All the while, the defendant researched how to obtain pilot jobs, how to test airplane and airport security, how to breach cockpit doors, and, frighteningly, the tallest buildings in Atlanta, Georgia, including the 55-story Bank of America Plaza. And he shared his research in progress reports to his al-Shabaab handler, including his informed conclusion that "for a very successful mission we need a pilot in the cockpit (which means I should apply for the airlines)." The defendant's goals were clear—to bring terror to the United States by commandeering a plane, crashing it into a building, and murdering as many U.S. citizens as possible. Law enforcement thwarted the defendant's plot shortly before he obtained his commercial pilot's license—inches away from bringing his murderous plans to fruition. The gravity of this conduct cannot be overstated.

As explained below, the Government respectfully submits that the Court should sentence the defendant to a term of life imprisonment, which is the sentence called for by the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") and recommended by the Probation Office. Such a sentence is necessary and appropriate to reflect the abhorrent nature and extreme

seriousness of the defendant's terrorism crimes, to provide just punishment for his conduct, to protect the public from potential future acts of terrorism by the defendant, to deter others from pursuing the path chosen by the defendant and seeking to perpetrate a similar attack on U.S. soil, and to avoid creating unwarranted sentencing disparities between the defendant and other similarly situated defendants who have been sentenced to life imprisonment after themselves plotting terrorist attacks that were thwarted or otherwise unsuccessful.

The depravity and extraordinary seriousness of the defendant's conduct is beyond dispute and, standing alone, merits a sentence of life imprisonment. The defendant spent nearly two years devoted to an al-Shabaab-financed operation to become a commercial pilot to carry out a devastating terrorist attack on U.S. soil, and he worked for hundreds of hours earning the certifications and ratings that he needed to fly the types of passenger jets he planned to hijack. The defendant poured his efforts into a seven-day-a-week pilot training program, and he spent hours in flight simulators and flying actual planes. In the months before he was arrested in the Philippines in July 2019, the defendant spoke with his al-Shabaab handler about the group's deadly attack on the DusitD2 hotel and office complex in Nairobi, Kenya (the "DusitD2 Attack")—part of the same al-Shabaab initiative to target Americans. As the defendant later admitted to agents from the Federal Bureau of Investigation (the "FBI"), his handler—the one he called "Stella Grace"—told the defendant how his friend and fellow al-Shabaab operative died in the DusitD2 Attack, and how the defendant used that news as a source of strength and encouragement for his own murderous efforts. Indeed, the defendant drew on the encouragement of his friend's death committing a terrorist attack to accelerate his own attack planning. All told, the defendant secured his private pilot's license and came terrifyingly close to getting his commercial pilot's license just before he

was arrested. The defendant's terrorism crimes, combined with his specialized, al-Shabaab-financed pilot skills, which he will have for the rest of his life, underscore that he poses a real and ongoing threat to innocent lives around the world. He remains a skillful, well-educated, and highly-trained terrorist who is readily capable of hijacking a commercial aircraft to commit a terrorist act. A sentence of life imprisonment—again, consistent with the Guidelines and recommendation of the Probation Office—is necessary and appropriate in this case.

## **BACKGROUND**

### I.    **Overview**

The defendant plotted to hijack a commercial airplane and crash it into a building in the United States to reprise the September 11, 2001 terrorist attacks (the "Aviation Plot"). (PSR ¶ 13). He did so in connection with his affiliation with al-Shabaab, a deadly terrorist organization that has committed attacks around the globe and has publicly declared its hatred for America and its desire to target Americans and American interests. (*Id.*)[1] The defendant, in concert with other al-Shabaab operatives that he knew as "Brother" and "Stella Grace," planned to work as a commercial pilot so that he could violently commandeer an aircraft and use it in his attack on the United States. (*Id.*). And this was no idle chatter—the defendant took multiple concrete steps to carry out the

---

[1] The defendant has lodged no objections to the facts in the PSR, which are all supported by the trial record, and the Court should treat the facts set forth in the PSR and described below as admitted by the defendant for purposes of sentencing. *See* Fed. R. Crim. P. 32(i)(3)(A) ("At sentencing, the court . . . may accept any undisputed portion of the presentence report as a finding of fact."); *United States v. Fagans*, 406 F.3d 138, 142 (2d Cir. 2005) ("Since the defendant made no objections to the facts contained in the PSR, the fact [contained therein] may be taken as admitted."); *see also United States v. Rizzo*, 349 F.3d 94, 99 (2d Cir. 2003) (noting that if a defendant does not challenge a fact in a PSR, the defendant waives the right to contest such a fact on appeal).

Aviation Plot and murder innocent Americans before law enforcement disrupted the plot. For example, and as detailed further below, the defendant, among other things, (i) traveled to the Philippines to attend flight school; (ii) obtained training and certifications necessary to fly large passenger aircraft; (iii) conducted research into security onboard aircraft, prior aircraft hijackings, how to breach an airplane's closed cockpit door, and potential targets for an attack in the United States; (iv) consumed terrorist propaganda; and (v) provided regular progress updates to his handler, Stella Grace, a high-level al-Shabaab operative who was responsible for coordinating the deadly January 2019 DusitD2 Attack claimed by al-Shabaab that resulted in the deaths of approximately 21 people, including a U.S. citizen.[2] (*Id.*).

The Aviation Plot was part of a broader al-Shabaab operation known as "Operation 'Al-Qudsu Lan Tuhawwad (Jerusalem Will Never Be Judaized),'" which targeted U.S. citizens in retaliation for the United States' decision in 2018 to move its embassy in Israel to Jerusalem, and which has resulted in the murder of approximately four Americans ("Operation Jerusalem Will Never Be Judaized"). In addition to the Aviation Plot, al-Shabaab's Operation Jerusalem Will Never Be Judaized also included: (i) the January 2019 DusitD2 Attack referenced above; (ii) a September 2019 attack on a U.S. military installation at the Baledogle airfield in Somalia, in which one U.S. service member was injured; and (iii) a January 2020 attack on a U.S. military installation in Manda Bay, Kenya, in which one U.S. service member and two U.S. defense contractors were killed.

---

[2] That murdered U.S. citizen was prominently featured in al-Shabaab propaganda following the DusitD2 Attack, including in an infamous video published by the al-Shabaab media outlet Al-Kataib that was shown at trial. (GX 801A-B).

## II.    Al-Shabaab

Al-Shabaab is a terrorist organization based in Somalia and active in other locations in East Africa. (PSR ¶ 15). It emerged through a coalition of insurgent groups including the Islamic Courts Union, which, among other things, fought against Somalia's Transitional Federal Government, which was established under international auspices in 2004. (*Id.*) Since then, al-Shabaab has relied on violence, including "assassinations, suicide bombings, armed assaults on hotels, restaurants, beaches, and an array of civilian targets" to pursue its goals. (Tr. 162-63). Such assassinations have historically targeted civilians, journalists, and U.S. military personnel. (PSR ¶ 15). In addition, al-Shabaab has used improvised explosive devices, rockets, mortars, automatic weapons, and suicide bombings to undermine the Somali government, quell the Somali population, and force the withdrawal of foreign troops. (*Id.*) Indeed, Dr. Tricia Bacon explained at trial that al-Shabaab "frequently uses suicide bombings either using vehicles or as suicide vests on people as part of its attacks," along with armed attackers, and has claimed responsibility for multiple terrorist attacks outside of Somalia, which the group calls its "external operations."[3] (Tr. 178-79, 185, 189).

Historically, al-Shabaab developed close ties with al Qaeda and strove to be recognized as an al Qaeda affiliate; indeed, in 2012, the then-Emir of al-Shabaab swore allegiance to Ayman al Zawahiri, the then-Emir of al Qaeda who succeeded Osama bin Laden after his death in 2011, which led to al-Zawahiri announcing that al-Shabaab "will hereby merge into al Qa'ida." (PSR ¶ 16). As an al Qaeda affiliate, al-Shabaab's goals include "al Qaeda's broader objective to

---

[3] As noted below, and consistent with Dr. Bacon's testimony, the defendant also referred to al-Shabaab attacks as "operations" in his own correspondence with Stella Grace. (Tr. 167; GX 406 (describing the "operation of 14 RIVERSIDE," referring to the DusitD2 Attack)).

overthrow the United States and create an Islamic caliphate that spans multiple countries." (*Id.*; Tr. 152). To that end, al-Shabaab has declared that its ultimate goal is the imposition of Sharia, or strict Islamic law, throughout Somalia, and it has engaged in ongoing recruitment efforts that have resulted in fighters from other countries, including the United States, traveling to Somalia to engage in violent jihad—*i.e.*, a purported holy war waged on behalf of Islam as a religious duty. (PSR ¶ 16). And al-Shabaab, like al Qaeda, has hated America since its very inception; indeed, Dr. Bacon explained that "al-Shabaab was kind of born with the idea that the United States was one of its primary enemies." (Tr. 160). The defendant later acknowledged this same hateful sentiment to the FBI, telling Special Agent Kevin Song that "the enemy of al-Shabaab is the United States" and that was why al-Shabaab was interested in attacking the United States. (Tr. 110-11).

On February 26, 2008, the United States Secretary of State designated al-Shabaab as a foreign terrorist organization ("FTO") under Section 219 of the Immigration and Nationality Act, and as a Specially Designated Global Terrorist under Section 1(b) of Executive Order 13224. (PSR ¶ 17). Al-Shabaab remains a designated FTO. (*Id.*; GX 1403). Since its designation, al-Shabaab has repeatedly declared its intent to target the West and kill Americans. (PSR ¶ 18). In April 2008, for example, in response to the United States' designation of al-Shabaab as an FTO, al-Shabaab released a statement expressly declaring its intent to target the United States. (*Id.*) The next month, in May 2008, al-Shabaab publicly declared that its fighters would "hunt the U.S. government," and threatened that governments supporting the United States and Ethiopia should keep their citizens out of Somalia. (*Id.*; Tr. 183).

Consistent with its threats, al-Shabaab has repeatedly engaged in mass-casualty attacks targeting Americans. (PSR ¶ 19). On July 12, 2010, al-Shabaab claimed responsibility for the

suicide bombings that took place in Kampala, Uganda on July 11, 2010, which killed approximately 70 people, including an American citizen. (*Id.*; Tr. 185). On September 25, 2013, al-Shabaab claimed responsibility for the attack on the Westgate shopping mall in Nairobi, Kenya on September 21, 2013, which killed approximately 72 people and wounded at least 175 people, including American citizens. (PSR ¶ 19; Tr. 186). In May 2014, al-Shabaab conducted a suicide bombing at a restaurant in Djibouti City, Djibouti, which killed three people and wounded others. (PSR ¶ 20; Tr. 186-87). Al-Shabaab's publicly stated motivations for these attacks was retaliating against countries that received U.S. backing for their role in the African Union mission. (PSR ¶ 20). And on February 21, 2015, al-Shabaab posted a video online encouraging its followers to conduct attacks in shopping malls in the United States and elsewhere. (*Id.*; Tr. 188). In 2015, al-Shabaab also killed multiple students and faculty in an attack on a university in Garissa, Kenya, in which the group specifically targeted Christian students and faculty to incite sectarian violence. (PSR ¶ 20; Tr. 188-89).

As part of its campaign against the United States and the West, al-Shabaab, like other al Qaeda affiliates, has also specifically sought to commit acts of terrorism involving commercial aircraft. (PSR ¶ 21). On February 2, 2016, for example, a bomb hidden inside a laptop computer detonated onboard an international flight operated by the Somali carrier Daallo Airlines, killing the bomber who detonated the device. (*Id.*) On February 13, 2016, al-Shabaab claimed responsibility for the attack, stating that it was "retribution for the crimes committed by the coalition of Western crusaders and their intelligence agencies." (*Id.*) As Dr. Bacon explained, the aviation attacks were "consistent with al-Shabaab's goals," reflected "increases in its operational

capabilities in terms of the explosive devices," and "overall the targeting and the efforts were consistent with al-Shabaab's other operations." (Tr. 199).

### III.    Al-Shabaab's "Operation Jerusalem Will Never Be Judaized" Campaign

In May 2018, the United States officially moved its embassy in Israel from Tel Aviv to Jerusalem. (PSR ¶ 22; Tr. 190). That same month, al-Shabaab issued a statement re-introducing its so-called "Jerusalem Brigade." (*Id.*) Al-Shabaab described the brigade as "a practical response from the movement [*i.e.*, al-Shabaab] to the decision of US president Donald Trump to transfer his embassy from Tel Aviv to Jerusalem as the capital of the Zionists, in violation of all international conventions and UN resolutions and condemnations of the Islamic world." (PSR ¶ 22). Al-Shabaab also announced that it would participate in an al Qaeda-driven campaign to retaliate against the United States for its decision to move its embassy in Israel to Jerusalem, called "Operation 'Al-Qudsu Lan Tuhawwad (Jerusalem will never be Judaized).'" (*Id.*) Al-Shabaab subsequently claimed, in public statements, responsibility for three major terrorist attacks carried out under Operation Jerusalem Will Never Be Judaized (Tr. 190-91):

*DusitD2 Attack*: The January 15, 2019 attack on the DusitD2 hotel and office complex in Nairobi, Kenya, which included, among other things, a suicide bomber detonating an explosive device in front of a U.S. citizen, killing him; and four other armed individuals attacking the hotel grounds with AK-47s and grenades, killing more than 20 additional people. (PSR ¶ 22). The suicide bomber detonated himself in front of the Secret Garden Hotel Café, which was frequented by Westerners. (*Id.*). As Inspector Joseph Kolum testified, the Secret Garden Hotel Café was one of the locations within the DusitD2 complex that was specifically and often visited by Westerners. (Tr. 214). In a series of public statements, al-Shabaab spokespersons claimed responsibility for the

attack and proclaimed that it was carried out as part of Operation Jerusalem Will Never Be Judaized. (PSR ¶ 22). Dr. Bacon explained that, in justifying the DusitD2 Attack, al-Shabaab "really emphasized its perception that the Dusit compound was a home to American and western businesses. And it portrayed this [attack] as avenging the deaths of Muslims caused by the United States." (Tr. 193). For example, a video released by al-Shabaab's media wing, Al-Kataib, described the DusitD2 complex (which it called the "14 Riverside Drive business complex") as "home to a variety of U.S. and Zionist owned companies." (PSR ¶ 22; GX 801A-B). That same video announced that the DusitD2 Attack was "the first in a series of attacks code-named 'Al-Qudsu Lan Tuhawwad (Jerusalem Will Never Be Judaized)' targeting American and Zionist targets and interests worldwide," and was "successful, by the grace of Allah, and resulted in the deaths of more than 50 disbelievers, including Americans and other Western nationals." (*Id.*) A screenshot of that

propaganda video showing some of the heavily armed attackers is included below, along with other

screenshots from the video describing the attack and al-Shabaab's motivations (GX 801A-B):





THE OPERATION WAS THE FIRST IN A SERIES OF ATTACKS CODE-NAMED 'AL-QUDSU LAN TUHAWWAD (JERUSALEM WILL NEVER BE JUDAIZED)' TARGETING AMERICAN AND ZIONIST TARGETS AND INTERESTS WORLDWIDE.

*Baledogle Attack*: A September 30, 2019 attack on a U.S. military airfield (the "Baledogle Base") in Somalia, which resulted in an injury to a U.S. service member and the deaths of 10 attackers. (PSR ¶ 22). During and following the attack, al-Shabaab released statements claiming responsibility for the attack on the airfield, which it described as a home to U.S. military personal and aircraft, and again proclaiming that it was carried out as part of Operation Jerusalem Will Never Be Judaized. (*Id.*)

*Manda Bay Attack*: A January 5, 2020 attack on a U.S. military installation and airfield located in Manda Bay, Kenya, which resulted in the killings of three U.S. nationals, including one U.S. service member, and the damage or destruction of several civilian and military U.S.-registered aircraft. (*Id.*) Shortly after the attack, al-Shabaab claimed credit for it and, in a formal statement, stated that "[t]he Mujaahideen will, by the Will of Allah, continue targeting the American invaders, until they [*sic*] are expelled from all Muslim lands and until they stop their blind support for the Zionist Jews who are oppressing our Muslim families in Palestine." (*Id.*) Later that same day, al-

Shabaab released a series of photographs describing the Manda Bay airfield attack as "Part of 'Al-Quds (Jerusalem) Will Never Be Judaized' Operations." (*Id.*)

## IV.    The Aviation Plot

### A.    The Defendant Joined and Trained with al-Shabaab

The defendant first joined al-Shabaab in 2015. (PSR ¶ 23). He joined al-Shabaab with his friend, Ali Salim, who later became a leader of the DusitD2 Attack.[4] (*Id.*) The defendant and Ali Salim first traveled by bus from Nairobi, Kenya to Somalia, where they made contact with local al-Shabaab representatives, including an al-Shabaab intelligence officer named Azzam, who—like Ali Salim—also later became one of the attackers in the DusitD2 Attack. (PSR ¶ 23; Tr. 56-57). The defendant spent approximately the next year at a series of al-Shabaab safehouses in Somalia, where he met with other high-ranking al-Shabaab members, including the man he knew as "Brother," who later recruited the defendant into the Aviation Plot. (PSR ¶ 24). While staying at these al-Shabaab safehouses, the defendant received "military-style type training" from al-Shabaab, as he explained to Special Agent Song. (Tr. 63). His military training included learning how to fire an AK-47 assault rifle and how to make different size bombs using ammonium nitrate. (*Id.*; PSR ¶ 24). The training did not stop there. The defendant told Special Agent Song they "hiked for long distances with heavy—heavy things in their packs" and "hid different caches or supplies of food in the ground . . . for other members of al-Shabaab to find." (Tr. 63). The defendant stayed in al-Shabaab-controlled areas in Somalia during his training, including Jilib (al-Shabaab's de facto

---

[4] As the defendant later told the FBI, the defendant and Stella Grace used Salim's death in the January 2019 DusitD2 Attack as a source of strength and encouragement in the defendant's hijacking plans. (GX 913F).

capital) and the Boni Forest, a safe haven that al-Shabaab uses to plan operations (specifically, terrorist attacks) and to which it sometimes brings kidnapping victims. (*Id.*; Tr. 153; GX 1207).

In statements to the FBI, the defendant explained that he knew about al-Shabaab's terrorist activities even before he joined the group, and how the enemy of al-Shabaab is the United States. (PSR ¶ 25; Tr. 110-111). He described to FBI agents how, even before joining al-Shabaab, he knew about the Garissa University attack in 2015, and he knew that al-Shabaab had killed students during the attack. (PSR ¶ 25). Specifically, the defendant explained that the Garissa University massacre "happened before me joining al-Shabaab," and how "al-Shabaab killed students." (GX 913H). The defendant also told FBI agents that he listened to Anwar al-Awlaki[5] every day in the lead-up to joining al-Shabaab. (PSR ¶ 25; 913I).

Electronic evidence from the defendant's search and web history showed that the defendant visited websites featuring al-Awlaki's audio lectures, including a website featuring an audio clip of al-Awlaki mocking Americans as no longer safe, including at airports. (PSR ¶ 26; GX 353, GX 702). The defendant also searched for and visited websites featuring other al Qaeda figures revered by al-Shabaab adherents, including Abu Yahya al Libi (a senior al Qaeda figure who publicly embraced al-Shabaab and is still invoked by al-Shabaab today) and Harun Fazul (an al Qaeda operative in East Africa who rose to a senior position in al-Shabaab). (PSR ¶ 26; GX 352, GX 356, GX 358, GX 701, Tr. 164-65, 167-69, 368-69). To punctuate the defendant's involvement in the

---

[5] Al-Awlaki was a high-profile, senior figure in al Qaeda's affiliate in Yemen—known as al Qaeda in the Arabian Peninsula—and he was the first senior al Qaeda idealogue to directly name al-Shabaab as an organization that, in al-Awlaki's view, was pursuing goals consistent with that of al Qaeda. (PSR ¶ 25; Tr. 168).

Aviation Plot, he even searched for al-Shabaab propaganda—"al shabaab leader message"—on the anniversary of the September 11 attacks he was seeking to recreate. (PSR ¶ 26; GX 358).

### B. The Defendant Trained to Become a Pilot to Carry Out a Terrorist Attack for al-Shabaab

During his training with al-Shabaab in Somalia, the defendant's safe house leader introduced the defendant to a senior al-Shabaab official whom the defendant knew as "Brother." (PSR ¶ 27; Tr. 64). Brother told the defendant that he had bigger plans for him, which the defendant later said in his post-arrest statement made him feel important. (PSR ¶ 27; Tr. 65). After meeting with Brother, the defendant stayed at an unguarded safehouse in Jilib for three months, where he received multiple visits from senior al-Shabaab operatives—the same ones he met with during his al-Shabaab training—such as Azzam and Brother. (PSR ¶ 27). As he explained to Special Agent Song, the defendant "said he was there because he had a greater plan." (Tr. 66-67). Around this time, Brother asked the defendant if he would like to become an airline pilot. (PSR ¶ 27). Brother said that they had been watching the defendant for a long time, that the defendant was very intelligent, and that the defendant had been hand-selected for this mission, one that would be "bigger than the fighting and the explosives." (*Id.*; Tr. 67-67). Brother soon introduced the defendant to his al-Shabaab handler, Stella Grace, over Facebook. (PSR ¶ 27). In the months and years that followed, the defendant would regularly send progress reports to Stella Grace over Facebook and other secure platforms to keep both Stella Grace and Brother updated on his attack planning. (*Id.*)

In late 2016, the defendant actioned the first steps in the Aviation Plot. Specifically, in December 2016, the defendant contacted a flight school in the Philippines called All Asia Aviation Academy ("AAA Academy") to inquire about enrollment. (PSR ¶ 28; GX 311). The defendant

later traveled to the Philippines, formally enrolled in AAA Academy, and spent hundreds of hours

training to become a commercial airline pilot. (*Id.*) The defendant's electronic devices contained

multiple pictures of him at flight school and flying planes, including the below examples (GX 204,

GX 609, with the instructor's faces redacted):

 

It takes immense practice, study, and dedication to earn private and commercial pilot

licenses. (PSR ¶ 29). The defendant was enrolled as a student at the flight school for nearly two

years—from October 2017 to July 2019—until his arrest in the Philippines. (*Id.*; GX 1114-15, GX

1112). During his enrollment, the defendant participated in multiple training programs, including

for his private and commercial pilot licenses, and also for the ratings—or special designations—

that a pilot would need in order to fly in low visibility conditions (*i.e.*, an instrument rating) or on

aircraft with multiple engines (*i.e.*, a multi-engine rating). (PSR ¶ 29). The training requirements

for a private pilot license included at least 110 hours of classroom training, 40 hours of flight

15

training, a written examination, and a practical examination inside the aircraft. (*Id.*; Tr. 245, 247-49). To get a commercial pilot license, there are even more training requirements: at least another 160 hours of classroom instruction, at least 150 total hours of flight training, another written examination, and another practical examination. (*Id.*) The instrument and multi-engine ratings included yet more requirements, including hours in flight simulators. (*Id.*; GX 1126). The defendant completed all the requirements for a private pilot license, as described above, and completed all the additional requirements for a commercial pilot license, apart from his last practical exam. (PSR ¶ 30). The defendant had also completed his classroom training, simulator training, and written exam required for his instrument rating, with only a few additional flight hours and the practical examination remaining. (*Id.*) As Captain Otani from AAA Academy testified, that "commercial pilot license with an instrument rating would be a minimum" set of ratings required to get a job as a pilot with a major airline. (Tr. 245, 260). The defendant was far along that path, and had nearly completed that intensive training program when he was arrested. (PSR ¶ 30).  Indeed, he was inches away from having all the certifications he needed to become an airline pilot in service of his "bigger" mission for al-Shabaab. (*Id.*)

### C.    The Defendant Agreed to Murder U.S. Nationals for al-Shabaab

The evidence at trial indisputably proved that the defendant was planning to use his pilot training to hijack a plane and crash it into a building in the United States—to murder U.S. nationals in support of al-Shabaab's terrorist goals and as part of al-Shabaab's ongoing Operation Jerusalem Will Never Be Judaized campaign that specifically sought to retaliate against the United States for its decision to move its embassy in Israel to Jerusalem. (PSR ¶ 31).

The defendant candidly admitted his hijacking plans to FBI agents. (PSR ¶ 32). Specifically, the defendant told Special Agent Song:

- He was training to become a pilot on behalf of al-Shabaab so that he could hijack a plane. (Tr. 40).

- He researched transit visas from The Bahamas to Atlanta that made it feasible to hijack a U.S. airliner. (Tr. 72-73).

- He needed to be a pilot to physically hijack a plane. "So that if he was a pilot, he can already be in the cockpit. He could drug the other pilots and take control of the plane." (Tr. 73).

- He researched "the feasibility of taking a knife on board an airplane by using nail clippers to test security." (Tr. 73).

- He "explored the thought of being a flight attendant on an aircraft versus a pilot," and "concluded being a pilot would be better to hijack a plane because he would have access to the cockpit." (Tr. 110).

The defendant coldly and bluntly admitted that he expected others to be killed or injured when he was hijacking the plane, and that he himself expected to die in the attack. (PSR ¶ 32).

The defendant's electronic accounts, including his online search and web history, show that the defendant continued to research his attack plans even during his rigorous training at the flight school in the Philippines. (PSR ¶ 33; GX 363, GX 365, GX 368, GX 369). The defendant searched online multiple times for information concerning airplane cockpit doors, as well as airline jobs, instructor training, and possible interview questions for airline jobs. (*Id.*) In December 2018, the defendant searched for information concerning security on airplanes, including whether air marshals are on every flight, and "Boeing 737 cockpit door." (PSR ¶ 33; GX 371, GX 372). The defendant visited websites discussing pilots carrying guns inside airplane cockpits, and an article on how to open an airplane cockpit door from the outside. (*Id.*; GX 717, GX 714).

17

While the defendant was in flight school, he was also "briefed" by Stella Grace regarding the January 2019 DusitD2 Attack. (PSR ¶ 34; GX 913F). As noted above, the defendant knew closely two of the DusitD2 attackers from his training with al-Shabaab in Somalia, Ali Salim and Azzam, and identified their pictures in an interview with the FBI. (PSR ¶ 34; GX 911).[6] The defendant told FBI agents that Stella Grace explained to the defendant that his friend, Ali Salim—with whom he joined al-Shabaab in 2015—had died in the DusitD2 Attack "for the cause," and explained how Stella Grace used this fact as encouragement for the defendant to become stronger. (PSR ¶ 34) The defendant openly admitted this to the FBI agents in stark detail, in his own words below (GX 913F):

- Special Agent Klose: "When did . . . you learn about the Dusit attack?"

- Defendant: "I learn on the news, also I was . . . briefed by Stella Grace."

- Special Agent Klose: "And then Stella Grace reached out and what did they say, or what did he say?"

- Defendant: "He said your dear friend now he's no more. He's already joined . . . he's already died for the cause. And so you become strong like that . . . and and encouragement and . . ."

- Special Agent Klose: "I'm sorry?"

- Defendant: "Like encouragement."

After he was briefed about the DusitD2 Attack, the defendant repeatedly searched online about the attack, including for "leaked cctv footage of suicide bomber nairobi," and visited a

---

[6] So integral were Ali Salim and Azzam to the DusitD2 Attack that their pictures—the same ones the defendant identified to the FBI—were featured in the Al-Kataib propaganda glorifying the attack. (GX 801A-B).

website showing a screenshot of the suicide blast at the DusitD2 outside the Secret Garden Hotel Café. (PSR ¶ 34; GX 375, GX 377, GX 712, GX 713).

Although the defendant repeatedly searched for information regarding the DusitD2 Attack after it happened, it was not the first time he researched the DusitD2 complex. (PSR ¶ 35). Specifically, electronic evidence from the defendant's Google accounts showed that the defendant searched multiple times for the DusitD2's address—14 Riverside Drive in Nairobi—in May 2017, 20 months before the attack and two years after the defendant joined al-Shabaab. (*Id.*; GX 355). Earlier, in January 2017, the defendant searched for "American companies in Kenya," and 11 days later, the defendant searched for the plastic explosive C4. (PSR ¶ 35; GX 353, GX 354).

On January 19, 2019, two days after looking up the suicide bomber footage from the DusitD2 Attack, the defendant doubled down on his attack planning. He researched online for "Delta flights," "Atlanta," and "Tallest building in Atlanta." (PSR ¶ 36; GX 376, GX 378; Tr. 74). The defendant later told the FBI that he researched Atlanta because it was known to be a busy airport hub with many flights to and from The Bahamas. (PSR ¶ 36). As Special Agent Song testified, Atlanta is indeed the hub for Delta, a major U.S. airline that the defendant searched, underscoring the seriousness and accuracy of the defendant's deadly plotting. (Tr. 74). The defendant's search history also showed that he continued to research the tallest buildings in Atlanta, including visiting a Wikipedia page listing the tallest skyscrapers in the city, and even specifically searching for Bank of America Plaza, a 55-story building standing 1,023 feet tall according to the Wikipedia page the defendant visited. (*Id.*; GX 378, GX 380, GX 381, GX 715). Days later, the defendant researched plane hijackings since September 11 and American transit visas. (PSR ¶ 36; GX 380, GX 381).

19

As the defendant admitted to FBI agents during his interview, he regularly stayed in contact with Stella Grace regarding his attack planning over Facebook and other encrypted means. (PSR ¶ 37). The defendant also admitted that Stella Grace financed the defendant's operational planning, including his attendance at flight school, providing the defendant with approximately $100,000 that the defendant understood was from money that al-Shabaab raised through its "taxation" of the civilian population in Somalia. (*Id.*; Tr. 80-83). As Dr. Bacon explained, al-Shabaab's "taxes" of the Somali population are "essentially extortion," by which al-Shabaab "demands that people pay a certain amount of their business proceeds, their animal herds, anything they import, and if they don't pay, they use violence against them." (Tr. 162, 181-82). To stay in contact, the defendant searched for Stella Grace's Facebook accounts hundreds of times between December 2016 and January 2019. (PSR ¶ 37; GX 202, GX 207, GX 212).

Stella Grace was a high-ranking al-Shabaab operative who was working with the defendant as part of his and al-Shabaab's broader efforts to target and murder Americans under the Operation Jerusalem Will Never Be Judaized campaign. (PSR ¶ 38; Tr. 67-68, 70-71). In addition to coordinating the Aviation Plot with the defendant, Stella Grace used multiple Facebook accounts to plot with other al-Shabaab operatives and co-conspirators regarding:[7]

- The logistics of terrorist plans targeting Americans and other Westerners in Kenya (PSR ¶ 38; *see also, e.g.*, GX 233 ("We have not been able to be going around because of lack of fuel bt we have the targets somewhere well organized but not Americans"), GX 234 ("Which specific targets you have in naiv.? Amricns?"), *id.* ("Bro the last time we were together we asked you about a silencer pipe.is it easy to get it there")).

- How to construct explosives with volatile chemicals (PSR ¶ 38; *see also, e.g.*, GX 243 ("Ia do you need any chemicals . . . eg like conc.nitric acid etc"), GX

---

[7] All grammatical and typographical errors are reflected in the original exhibits introduced at trial.

244 (showing a photograph of black gloves with the message, "Acid proof gloves I'm buy for as well"), *id.* (showing a photograph of a respirator with the message, "This is for covering the nose u can use it ia or give to the Bros who miX the mada")).

- Reconnaissance of the DusitD2 complex and plans to add a suicide bomber to the planned attack (PSR ¶ 38; *see also, e.g.*, GX 293 ("The guards at the entrance one was armed"), GX 294 ("How's if I add to the group an additional [man emoji] with vest? Can u get for him a good place that contains many goats so that he can start the game for u and secure good number for you ia?")).

- Live updates regarding the progress of the DusitD2 Attack as it unfolded. (PSR ¶ 38; *see also, e.g.*, GX 292A ("pics of chickens bodies are alreay on the social media . . ."), *id.* (photographs of the DusitD2 attackers from al-Shabaab), *id.* ("kuffars [*i.e.*, nonbelievers] are terrified"), *id.* ("total silence only dying chicken around"), *id.* (a photograph of dead bodies at the DusitD2 complex with the message, "this is how's the outside looks"), *id.* ("kuffars are advancing"), *id.* ("heavey fire xchange being heard again . . . they says\"), *id.* ("seeds running out")).

Finally, the defendant also provided regular progress reports to his al-Shabaab handlers on his attack planning through encrypted messages found on his USB drive. (PSR ¶ 39; *e.g.*, GX 408, GX 409; Tr. 79-81). In those progress reports, the defendant described how:

- He researched his attack planning by taking flights and seeing where he had the best view of the airplane cockpit door (GX 405 ("One thing I notice about Ethiopian airline . . . is that they dont close the curtain which separates business and economy and the other one which separates cockpit and business, so its easy to watch what happens in and out of the cockpit")).

- He transported al-Shabaab-sourced money from Stella Grace through airport security (*id.* ("i was afraid maybe they open the bag since it had all the money you send me . . . i didn't even hide the money i just put ti into the small pcket of my bag; because you know i have good cover of school if asked by the authority")).

- He was suspicious about the Kenyan government changing its passport renewal process "right after the operation of 14 RIVERSIDE" (referring to the DusitD2 Attack) because "i also have a feeling that americans maybe involved. So i have decided that i will apply for it inshallah when its absolutely necessary" (GX 406).

21

- He conducted detailed research on post-September 11 hijacking attempts (GX 408 ("i would like to brief you on some things . . . some of the attempt that happened after 9/11")).

The defendant's progress report concerning his research on post-September 11 hijacking attempts described his meticulous findings and, more importantly, the conclusions he drew from them. (PSR ¶ 40; GX 408). The defendant explained how he had "read almost all the hijack incident has ever happen, but I chose the above [examples] because it is within our interest," and how the "brothers during 9/11 did something completely unexpected in a more creative way, 'study for piloting.'" (*Id.*) In that same report, the defendant—in his words—concluded that "the only successful hijack after 9/11 was the one of the Ethiopian Airlines, and it is so because it was hijacked by the pilot himself." (*Id.*) The defendant's progress report then described a list of "My ideas" that the defendant created and arrived at for a successful hijacking operation. His number one idea was that "for a very successful mission, we need a pilot in the cockpit (which means I should apply for the airlines)." (*Id.*)

Before the defendant could complete his commercial pilot license training and carry out the final, deadly steps of the Aviation Plot, he was arrested, in July 2019, by authorities in the Philippines. He was transferred to U.S. custody in December 2020. (PSR ¶ 41).

## V.    The Charges and Trial

On December 10, 2020, the defendant was charged in a six-count Indictment with (i) conspiracy to provide material support to an FTO, in violation of 18 U.S.C. § 2339B (Count One); (ii) provision of material support to an FTO, in violation of 18 U.S.C. § 2339B (Count Two); (iii) conspiracy to murder U.S. nationals, in violation of 18 U.S.C. § 2332(b) (Count Three); (iv) conspiracy to commit aircraft piracy, in violation of 49 U.S.C. § 46502 (Count Four);

(v) conspiracy to destroy aircraft, in violation of 18 U.S.C. § 32 (Count Five); and (vi) conspiracy to commit acts of terrorism transcending national boundaries, in violation of 18 U.S.C. § 2332b (Count Six). (PSR ¶¶ 1-7; Dkt. 1). The defendant arrived in the United States from the Philippines and was first brought to the Southern District of New York on December 15, 2020. (Dkt. 5).

On November 4, 2024, following a trial that began on October 28, 2024, a jury returned a verdict of guilty on all six counts. Sentencing is scheduled for March 10, 2025.

## DISCUSSION

### I.    Applicable Law

The Guidelines continue to provide strong guidance to district courts following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). While *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. at 264. As the Supreme Court explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider the seven factors outlined in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant"; the four legitimate purposes of sentencing, as set forth below; "the kinds of sentences available"; the applicable Guidelines range itself; any relevant policy statement by the Sentencing Commission; "the need to avoid unwarranted sentence disparities among defendants"; and "the need to provide restitution to any victims." 18 U.S.C. §§ 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## II.    The Undisputed Guidelines Sentence Is Life Imprisonment

It is undisputed that the Guidelines call for a sentence of life imprisonment.  As set forth in the PSR, the defendant's Guidelines offense level is calculated as follows:

- All six counts in the Indictment are grouped together into a single Group, pursuant to U.S.S.G. § 3D1.2(b). (PSR ¶ 47).

- Pursuant to U.S.S.G. § 3D1.3(a), the offense level applicable to the Group is the highest offense level of the counts within the Group, which in this case is the offense level applicable to Count Four (conspiracy to commit aircraft piracy, in violation of 49 U.S.C. § 46502). (*Id.*)

- The Guideline that applies to Count Four is U.S.S.G. § 2A5.1. Pursuant to U.S.S.G. § 2A5.1(a), the base offense level for Count Four is 38. (PSR ¶ 48).

- Pursuant to U.S.S.G. § 3A1.4(a), because Count Four is a felony that involved, or was intended to promote, a federal crime of terrorism, 12 levels are added. (PSR ¶ 50).

- Pursuant to § 3A1.1(a), because the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived national origin of any person, three levels are added. (PSR ¶ 51).

- Accordingly, the total offense level is 53.  (PSR ¶ 54).

24

- Because this is one of those "rare cases" where the offense conduct yields a Guidelines offense level higher than 43—which is the maximum offense level in the Sentencing Table set forth in the Guidelines—the offense level is treated as 43 for purposes of applying the Sentencing Table. U.S.S.G. § 5A (Commentary, Application Note 2). (PSR ¶ 57).

The defendant does not have any known criminal convictions. (PSR ¶¶ 58-60). However, because the offense involved a federal crime of terrorism, the applicable criminal history category ("CHC") is VI, pursuant to U.S.S.G. § 3A1.4(b). (PSR ¶ 60). Accordingly, based on an offense level of 43 and a CHC of VI, it is undisputed that the applicable Guidelines range—or, in this case, Guidelines sentence—is life imprisonment.[8] (PSR ¶ 75); *see id.* at 22 (no objections received from either party regarding Guidelines calculation set forth above).[9]

## III. The Terrorism Enhancement Indisputably and Appropriately Applies

There is no dispute that the terrorism enhancement under U.S.S.G. § 3A1.4 applies to the unique and heinous conduct in this case. And appropriately so. In 1994, Congress mandated that the Sentencing Commission establish a Guidelines enhancement for terrorism offenses to ensure that those convicted of such crimes receive punishment commensurate with the extraordinary nature of their conduct. *See United States v. Stewart*, 590 F.3d 93, 172 (2d Cir. 2009) (citing Violent

---

[8] The statutory maximum term of imprisonment applicable to Counts One, Two, and Five is 20 years; the statutory maximum term of imprisonment applicable to Counts Three is life; the statutory maximum term of imprisonment application to Count Four is life, with a mandatory minimum term of imprisonment of 20 years; and the statutory maximum term of imprisonment applicable to Count Six is life, which must be served consecutively to any other count of imprisonment. (PSR at 1-2; 18 U.S.C § 2332b(c)(2)).

[9] Consistent with his statements after the verdict, the defendant declined to speak with the Probation Office. (Tr. 577-78; PSR ¶¶ 64-73). As the Court is aware, the defendant made multiple evidentiary objections at trial and actively participated in jury selection. (*E.g.*, Tr. 174-75 (claiming during objection that Dr. Bacon inaccurately testified about the meaning of the emblem on the al-Shabaab flag)). The defendant has not, to date, filed a sentencing submission or any objections to the PSR, and will have another opportunity at sentencing to confirm whether he has any objections.

Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 120004, 108 Stat. 1796, 2022). The resulting terrorism enhancement at U.S.S.G. § 3A1.4 reflects Congress's intent that defendants, like Abdullah, convicted of terrorism offenses serve sentences that are appropriate in light of their uniquely dangerous crimes. As Judge Walker explained in his concurrence in *Stewart*:

> The import of this enhancement "could not be clearer": It reflects Congress' and the Commission's policy judgment "that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."

*Id.* at 172-73 (quoting *United States v. Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003)).

As relevant here, U.S.S.G. § 3A1.4(a) provides that, "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels." Application Note 1 to U.S.S.G. § 3A1.4 provides that, "[f]or purposes of this guideline, 'federal crime of terrorism' has the meaning given that term in 18 U.S.C. § 2332b(g)(5)." Section 2332b(g)(5), in turn, defines a "federal crime of terrorism" as an offense that "(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of" certain enumerated statutes, including each of the offenses of which the defendant was found guilty at trial—specifically, 18 U.S.C. § 2339B (Counts One and Two), 18 U.S.C § 2332(b) (Count Three), 49 U.S.C. § 46502 (Count Four), 18 U.S.C. § 32 (Count Five), and 18 U.S.C. § 2332b (Count Six). As explained above, the defendant's conduct was clearly "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5). The defendant sought to carry out the Aviation Plot for al-Shabaab, a terrorist group whose goals include

murdering Americans and overthrowing the U.S. Government, as part of Operation Jerusalem Will Never Be Judaized, which explicitly sought to retaliate against the U.S. for its decision to move its embassy in Israel. As such, the terrorism enhancement squarely applies.

The enhancement appropriately reflects the seriousness of the conduct in this case. As set forth above, the defendant's activities in support of al-Shabaab included plotting to carry out a mass-casualty terrorist attack against the United States by crashing a hijacked commercial passenger jet into a building. As part of this plot, the defendant spent nearly two years and hundreds of hours at a Philippines flight school to earn a commercial pilot's license; regularly updated his al-Shabaab handler on his progress and research into successful hijackings; and searched for airline pilot jobs while simultaneously determining how he could breach flight deck doors and commandeer aircraft filled with innocent civilian passengers, and researching specific attack sites in the United States. This conduct falls squarely within the class of dangerous activity that Congress has deemed worthy of significant punishment through the application of the terrorism enhancement. Indeed, it is worth noting that, even without the terrorism enhancement, the defendant's total offense level would be 41, just two levels below the maximum offense level provided for under the Guidelines. Furthermore, the effect of the terrorism enhancement on the applicable CHC reflects the Sentencing Commission's assessment of the high likelihood of recidivism, and the corresponding need for deterrence, in terrorism cases such as this one—an assessment the Second Circuit has repeatedly endorsed. *See Stewart*, 590 F.3d at 143 (citing *Meskini*, 319 F.3d at 92); *see also United States v. Lindh*, 227 F. Supp. 2d 565, 571 (E.D. Va. 2002) ("Although the defendant has no prior criminal record, he is appropriately categorized in Criminal History Category VI, rather than I, pursuant to USSG § 3A1.4.").

In short, the defendant sought to carry out a large-scale terrorist attack in the United States on behalf of a terrorist group. His crimes are quintessential terrorism offenses of the utmost seriousness, and the Guidelines appropriately and correctly calculate a life sentence with the addition of the terrorism enhancement. The Probation Office recommends imposing a life sentenced as prescribed by the Guidelines. (PSR at 23-25). In explaining its recommendation, the Probation Office detailed the offense conduct, the Guidelines analysis, and the relevant 18 U.S.C. 3553(a) factors that weigh heavily toward a sentence of life imprisonment, including the defendant's lack of remorse or acceptance of responsibility for his crimes:

> Abdullah has exhibited no remorse for his actions and appears to be maintaining his innocence. After hearing and weighing the evidence at trial, the defendant was found guilty on all counts. The defendant was attempting to reenact an incident that caused the death of thousands of innocent U.S. citizens. If his actions went undetected by law enforcement, it is a possibility that he could have caused harm and death to countless Americans. Abdullah's membership to the terrorist organization al Shabaab further reinforces that the defendant has subscribed to the belief that he must inflict as much harm to innocent Americans as possible. Although his pursuit of this terroristic goal was unsuccessful at this point, we believe that an extensive term imprisonment is warranted to protect the public. Furthermore, we have not identified any mitigating factors that outweigh the seriousness of the offense and a variance from the guideline range is not recommended. The nature of the case must not be overlooked as terrorism is at the apex of the crime grid. As such, we believe that a total sentence of life imprisonment as reflected in the sentencing recommendation chart above, is sufficient, but not greater than necessary to satisfy the sentencing objectives of punishment, promoting respect for the law, deterrence, and protection of the community.

(PSR at 24-25).

As explained below, the statutory sentencing factors, *see* 18 U.S.C. § 3553(a), also call for the imposition of a sentence of life imprisonment.

**IV.    The Statutory Sentencing Factors Call for a Sentence of Life Imprisonment**

**A.    The Nature and Seriousness of the Defendant's Conduct and the Need for Just Punishment Warrant a Sentence of Life Imprisonment**

The defendant pledged his allegiance to al-Shabaab's murderous agenda, collaborated with high-level al-Shabaab operatives, and was the critical component of the Aviation Plot, a sophisticated international scheme to execute a mass-casualty terrorist attack in which the defendant planned to hijack a commercial airliner and crash it into a building in the United States. The defendant, like his al-Shabaab co-conspirators, fully intended to kill as many unsuspecting and innocent American men, women, and children as possible. The defendant was educated, well-financed, and acquired sophisticated knowledge and skills piloting aircraft. Moreover, at every turn, the defendant demonstrated his singular focus on carrying out the Aviation Plot to its devastating and deadly end. The nature and seriousness of the defendant's conduct, and the need to impose just punishment, weigh decidedly in favor of a sentence of life imprisonment. *See* 18 U.S.C §§ 3553(a)(1), (a)(2)(A).

The defendant's conduct was extraordinarily serious and placed countless innocent lives in danger. As noted above, and as the Probation Office explained, "[t]he defendant was attempting to reenact an incident that caused the death of thousands of innocent U.S. citizens. If his actions went undetected by law enforcement, it is a possibility that he could have caused harm and death to countless Americans." (PSR at 24). This conduct was also the result of years of calculation and planning. In 2015, the defendant left his home in Kenya to join al-Shabaab after regularly consuming terrorist propaganda by Anwar al-Awlaki. While in Somalia, he dedicated himself to al-Shabaab's military-style training, which included instruction on firing automatic weapons and building explosives. He trained alongside other al-Shabaab operatives like Ali Salim and Azzam,

who later took leadership roles in the DusitD2 Attack. The defendant quickly gained the trust of senior al-Shabaab officials like Brother, who hand-selected the defendant for the Aviation Plot, specifically because of his intelligence and capabilities. The defendant readily admitted to the FBI how this assignment made him feel important—how he knew he was being saved for the "bigger plans" of the Aviation Plot.

By October 2017, the defendant was enrolled in an intensive flight training program at AAA Academy in the Philippines, where he devoted hundreds of hours building the sophisticated skillset required to fly a modern aircraft. Captain Otani testified as to the licenses and ratings required to fly not only private planes, but also the large, multi-engine commercial jets that ferry passengers by the hundreds to, from, and across the United States every day. (*E.g.*, Tr. 244-46).

The defendant had no legitimate reason for being at the flight school. Instead, he was the driving force and key to the Aviation Plot's success. He was training for one reason: as he admitted to the FBI, he wanted to become a pilot precisely so that he could hijack a plane in an attack in which he expected to die. The tens of thousands of dollars in tuition fees that the defendant paid to AAA Academy came from al-Shabaab, and the defendant knew it was sourced from the sophisticated extortion network that the group uses to "tax" the Somali population under threats of violence. And there was no ambiguity in the defendant's intentions: he was there to execute the Aviation Plot and kill as many American civilians as possible in the name of al-Shabaab. As an avowed member of al-Shabaab, the defendant accurately summarized his and al-Shabaab's motivations behind the attack—in the defendant's own words, the "enemy of al-Shabaab is the United States." (Tr. 110-11).

The defendant's willingness to play such a critical role in the Aviation Plot also underscores the uniquely heinous nature of his crimes:

First, all terrorist attacks, by their nature, are designed not only to inflict senseless casualties, but also to psychologically scar their victims by inflicting emotional pain, fear, and torment for years—if not a lifetime. Terrorists thrive by robbing their victims of their innocence, safety, and security. Anwar al-Awlaki gloated over such anguish in an audio "lecture" on a website the defendant visited while consuming his terrorist propaganda. (GX 353, 702, 702A-C ("To the American people, I say, do you remember the good old days when Americans were enjoying the blessings of security and peace? When the word 'terrorism' was rarely invoked, and when you were oblivious to any threats . . . You were a nation at ease")). For many, it may be hard to fathom a terrorist attack as collectively life-altering and emotionally disturbing as the September 11, 2001 attacks. This is precisely the anguish that the defendant sought to recreate.  Indeed, the defendant's knowledge of the tragedy of 9/11 ran deep. He callously researched terrorist propaganda on the anniversary of September 11, and praised the "brothers during 9/11" for their "completely unexpected" and "more creative" hijacking tactics in his progress reports to his al-Shabaab handler. (GX 358, GX 408). The defendant's premeditated and carefully calculated efforts to recreate these attacks—going so far as to research a specific 55-story building during his flight training—reflect his reprehensible and repugnant conduct.

Second, the nature of his planned hijacking demonstrates the evil and terror at the heart of his plans. Commercial passenger aircraft carry hundreds of passengers at a time. Those passengers every day place their lives and safety in the trust of the skilled members of the cabin crew, including pilots who have logged countless hours in their flight training and experience. No airline passenger

31

should live in fear that their flight could be commandeered and intentionally crashed by someone who abuses that trust and exploits the skills necessary to fly a modern aircraft. The opening pages of the 9/11 Commission Report are filled with the devastating accounts of loved ones who received calls from the passengers on the hijacked American and United Airlines jets. *See* The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States at 4-14 (July 22, 2004). A critical focus of our country's national security mission since September 11 has been to ensure such attacks never happen again.

Third, the defendant's actions were not the result of whim, caprice, or aberrant behavior. Being selected to train and execute the Aviation Plot made him feel important. He was a hands-on al-Shabaab operative, hardened by extreme terrorist propaganda, who trained with machineguns and explosive devices in Somalia. That training alone, even without his participation in the Aviation Plot, would merit a significant sentence. But the defendant went far beyond that. Indeed, the defendant's statements and electronic accounts reflect the reality of the length and depth of his commitment to al-Shabaab and the Aviation Plot. Approximately 20 months before the DusitD2 Attack, in May 2017, the defendant searched for its very address. (GX 355). This was two years after he joined and trained with al-Shabaab and came to be trusted by its high-level operatives. Even earlier than that, in January 2017, the defendant searched for "american companies in kenya" and C4 explosives. (GX 353, GX 354). So when the defendant was finally "briefed" on the DusitD2 Attack, and the death of his friend Ali Salim, he knew exactly what the DusitD2 was because he had been researching it as early as 2017. Moreover, the defendant's drive and focus on carrying out the Aviation Plot to completion shows another disturbing aspect to his conduct: at every turn, when confronted with an obstacle, the defendant recommitted to his terrorist goals.

32

When the defendant needed to enroll in flight school, he flew thousands of miles away to the Philippines to join one. When the defendant needed to finance his tuition at the flight school, he got funding from Stella Grace through al-Shabaab's "taxes" and even flew back to Kenya to retrieve the money. When the defendant apparently learned about the difficulties of breaching a flight deck door from the outside, he decided he needed to get a job as a pilot so he would have direct access to the plane controls. And when the defendant learned that his friend Ali Salim died in al-Shabaab's vicious attack on the DusitD2 complex, he accelerated his attack planning, researching the "tallest building in atlanta" and the 55-story Bank of America Plaza building just days after the attack. (GX 378).

At every turn, and for years, the defendant had an opportunity to step back and re-examine his life and the horrifying direction in which he was driving it. He had every opportunity and the intelligence and means to change his course and not participate in a terrorist plot to kill innocent civilians. Instead, each time he encountered even the slightest hurdle in his terrorist path, he continued to pursue his terrorist goals, and even accelerated his plotting, knowing that he would die in his hijacking attack the way Ali Salim and other al-Shabaab operatives died in the DusitD2 Attack. As the Probation Office noted, "Abdullah's membership to the terrorist organization al-Shabaab further reinforces that the defendant has subscribed to the belief that he must inflict as much harm to innocent Americans as possible." (PSR at 24). A life sentence is both appropriate and necessary to reflect the horrific nature and seriousness of the defendant's crimes. Against that backdrop, the Probation Office appropriately explained that a "variance from the guideline range is not recommended," as the "nature of the case must not be overlooked as terrorism is at the apex of the crime grid." (*Id.* at 24-25).

That the defendant ultimately did not succeed in completing the final act of his terrorist plot—hijacking a plane and attacking the United States—should not inure to his benefit at sentencing. The defendant failed in murdering innocent civilians not because he thought better of his murderous goals, but because the plot was disrupted by law enforcement and he was arrested in the Philippines. Had the attack played out as the defendant had planned, scores of American lives would have been lost, and countless others would have been forever traumatized as a result of the mass casualty attack that the defendant was prepared to carry out on behalf of al-Shabaab. The good work of law enforcement should not result in leniency. The defendant's conduct, standing alone, merits a sentence of life in prison.

### B. A Sentence of Life Imprisonment Is Necessary to Protect the Public from Further Crimes of the Defendant

The defendant's abhorrent conduct is not all the Court must consider, and is far from the only thing that speaks to the need for a life sentence. The need to protect the public from further crimes of this defendant, *see* 18 U.S.C. § 3553(a)(2)(C), is a paramount consideration here, and also strongly supports the imposition of a life sentence. Terrorism is a crime with high recidivism rates and the rehabilitation of terrorists like the defendant is notoriously difficult. *See Meskini*, 319 F.3d at 91-92 (noting the link between "the difficulty of deterring and rehabilitating" terrorists and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time"). The defendant's willingness to kill innocent civilians and martyr himself for al-Shabaab, his absolute commitment to al-Shabaab at the time of his arrest, combined with his lack of remorse, powerfully support a single conclusion: the incapacitation of the defendant—a trained pilot who learned his craft solely for the purpose of reenacting the September 11 terrorist attacks—should be total and lifelong. Bluntly, anything short of a life sentence would leave the public at risk.

34

As discussed above, the defendant openly acknowledged to the FBI how he joined al-Shabaab, benefitted from the terrorist group's military training, and consumed terrorist propaganda throughout his pilot training. He was so dedicated to al-Shabaab that he quickly gained the respect of high-level operators like Brother and Stella Grace, who entrusted him with the Aviation Plot. For years, he plotted and planned to slaughter innocent Americans by abusing the piloting skills that he spent nearly two years honing at a flight school in the Philippines. As the defendant's log book made clear (GX 111, GX 111P), the defendant spent hours flying actual planes, knowing full well that he intended to apply those skills in a mass-casualty attack for an al-Shabaab external operation. And, as noted above, he rededicated himself to his terrorist mission time and again, even after knowing the full scope of the DusitD2 Attack and researching the suicide blast in the immediate aftermath. In short, the facts leave no doubt that the defendant's commitment to al-Shabaab, its terrorist agenda, the Aviation Plot, and Operation Jerusalem Will Never Be Judaized, was absolute.

Moreover, the defendant is a young man, now 34 years old, and fully capable of continuing his avowed support for al-Shabaab and its radical Islamic ideology. His age only reinforces the grave risks that he poses. The defendant recorded multiple videos and pictures of himself flying planes in the Philippines, both with an instructor pilot (GX 615) and—as he became more skilled—by himself (GX 505). The characteristics and skills that made him an attractive and valuable operative to al-Shabaab are the defendant's intellect and ability to grasp and master complicated concepts like flying planes, combined with his radical terrorist ideology and commitment to killing innocent people in support of al-Shabaab. Those skills will remain with the defendant for the rest of his life, and all the evidence supports the conclusion that so, too, will his radical terrorist

ideology. As the defendant explained to the FBI, he was hand-picked for the Aviation Plot because of his intellect and shunted away from "the fighting and the explosives." While there is conceivably an argument that fighting skills diminish with age and the physical infirmities it brings, the defendant will be able to fly an airplane for the rest of his life. That skillset, combined with his radical al-Shabaab ideology, immediately makes the defendant a danger to society. The defendant could also easily apply that knowledge to educating other attackers on the mechanics of flying planes for other attacks. Even the smaller planes the defendant filmed himself flying in could cause death and destruction if he were ever to get back into a cockpit. And the Court has every reason to believe that he will, if given the opportunity. Not only did the defendant openly espouse his al-Shabaab membership and ideology with the FBI agents after his arrest, he has also done nothing to disavow that life.

Instead, the defendant's conduct demonstrates that he still bears allegiance to al-Shabaab and would, if given the opportunity, continue to serve its jihadist mission to murder Americans. Rather than express remorse for his conduct, or his belief in al-Shabaab's repugnant mission statement, the defendant has claimed to have done nothing wrong, and instead argued he was a victim of U.S. government oppression. (*E.g.*, Tr. 425 ("I told the Court numerous times that I will remain passive in this case, that I will not produce any evidence or any witness, due to the obstacles that were placed intentionally by the government to oppress me.")).

Such actions indicate that if the defendant receives less than a life sentence, he is likely to leave prison and continue his support for the extremist and violent ideology espoused by al-Shabaab and other terrorist organizations. He is also likely to return to trying to kill Americans in furtherance of those beliefs using his skills as a professionally trained terrorist pilot or by other

36

means. The defendant should not be given that opportunity. Such recidivism concerns are particularly heightened in terrorism cases and do not diminish with time and age. In *United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011) (internal citations omitted), the Eleventh Circuit explained that, "[a]lthough recidivism ordinarily decreases with age, we have rejected this reasoning as a basis for a sentencing departure for certain classes of criminals, namely sex offenders. We also reject this reasoning here. '[T]errorists[], [even those] with no prior criminal behavior[,] are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation'" (quoting *Meskini*, 319 F.3d at 92). Here, the nature of his crimes was heinous, wanton, and life threatening, and if the defendant is ever again at liberty in the community, he would pose a clear and present danger and threat to society. The protection of the public from the defendant warrants a life sentence. In sum, the need to protect the public from the defendant overwhelmingly militates in favor of a Guidelines sentence of life imprisonment.

### C.    A Sentence of Life Imprisonment Is Necessary to Afford Adequate Deterrence and Promote Respect for the Law

A Guidelines sentence of life imprisonment also is necessary to serve the sentencing goals of adequately deterring criminal conduct—in this case, terrorism aimed at murdering Americans—and to promote the law prohibiting such horrific conduct. *See* 18 U.S.C. §§ 3553(a)(2)(A), 3553(a)(2)(B). As Judge Walker stated in his concurrence in *Stewart*, "[i]n no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life." *Stewart*, 590 F.3d at 181.

General deterrence remains exceedingly important in this case as well. "General deterrence is essential here so that the severe consequences of choosing terrorism are apparent to all who

might consider it." *United States v. Babafemi*, No. 13 Cr. 109, 2021 WL 1210313, at *6 (E.D.N.Y. Mar. 31, 2021). This rationale is particularly applicable given the ongoing threat posed by al-Shabaab and its mission to murder Americans and overthrow the U.S. government.[10] In today's environment, so many young men and women in the West, including Americans, have gravitated toward al-Shabaab and other terrorist groups' online calls to embrace and pursue violent jihad, and have either traveled to the Middle East to join and fight for al-Shabaab or have sought to perpetrate terrorist attacks in the name of al-Shabaab in their home countries.[11] It is vital for our country's national security that other young men and women, when exposed to hateful extremist teaching, are deterred from choosing to follow a path similar to the defendant's and engaging in potentially devastating conduct in support of al-Shabaab or other terrorist groups. Only a sentence of life imprisonment—the sentence called for by the Guidelines—will adequately serve this pressing and ongoing need for such deterrence. Those who are considering devoting themselves to terrorism must know a simple truth: if they kill or conspire to kill innocent American men, women, and children, as the defendant did, when they are caught, they will be prosecuted in an Article III court and then imprisoned for life.

---

[10] A United Nations Security Council report in October 2024 noted that Al-Kataib's annual Eid propaganda video in June 2024 featured the heading, "How can we be content with abandoning jihad?" The video also showed dozens of "special forces" training at a terrorist training ground. United Nations Security Council, Letter Dated 15 October 2024 . . . Concerning Al-Shabaab Addressed to the President of the Security Council at 11, *available at* https://digitallibrary.un.org/record/4066421?v=pdf#files.

[11] For example, earlier this year, a former New Jersey resident pled guilty before this Court to attempting to provide material support to al-Shabaab after taking steps to join and receive military training from the group. *United States v. Karrem Nasr*, 24 Cr. 19 (AT) (S.D.N.Y.).

With respect to specific deterrence, for the reasons discussed above, a life sentence is warranted to protect the public from further terrorism crimes of this particular defendant, in light of the nature of his conduct, his professional pilot skills he learned in service of a mass-casualty terrorist attack, his demonstrated intellect and ability to acquire new and potentially more advanced deadly skills, and his unabashed admission to being a member of al-Shabaab. Those same reasons apply to the specific deterrence analysis, and dictate the conclusion that a Guidelines sentence of life imprisonment is needed to adequately deter Abdullah from resuming support for al-Shabaab— by preventing him from having the opportunity to do so. *See Meskini*, 319 F.3d at 91-92 (difficulty of deterring terrorism defendants supports longer periods of incarceration in such cases).

Against that backdrop, it is worth noting that the Probation Office did not "identif[y] any mitigating factors that outweigh the seriousness of the offense and a variance from the guideline range is not recommended." (PSR at 24-25). Although the record is perhaps not fully developed because the defendant refused to participate in the presentence investigation, the Probation Office is nonetheless correct. There is no indication the defendant devoted himself to al-Shabaab because of poverty, lack of family role models, familial instability, or mental health problems. He was not overly young, or misguided and impressionable; he was smart and focused enough to learn how to fly planes and pass flight school exams to further his terrorist goals. And while the defendant appears, from his social call schedule at the MDC, to have family connections, he has refused to make those scheduled calls on multiple occasions, even after the trial and as recently as December 10, 2024. Moreover, the defendant has given the Court reason to be skeptical of any claims to the contrary, given his dubious suggestions regarding his access to legal research and his discovery materials. (Tr. 426-28).

In sum, society's interest in effective deterrence overwhelmingly calls for a Guidelines sentence of life imprisonment.

### D.    A Sentence of Life Imprisonment Will Avoid Creating Unwarranted Sentence Disparities

The need to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" strongly supports the imposition of a Guidelines sentence of life imprisonment in this case.  *See* 18 U.S.C. § 3553(a)(6).

As an initial matter, the undisputed Guidelines imprisonment range is life. As the Second Circuit has explained, "the guidelines cannot be called just another factor in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors." *United States* v. *Rattoballi*, 452 F.3d 127, 131 (2d Cir. 2006) (internal quotation marks and citations omitted); *cf. Fernandez*, 443 F.3d at 28 (stating that "the Guidelines range should serve as 'a benchmark or a point of reference or departure' for the review of sentences" (quoting *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005))). "[T]o secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall*, 552 U.S. at 50. Indeed, it is precisely because the Guidelines function as a national "benchmark" that a Guidelines sentence here will advance "the need to avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a)(6). As discussed above, a life sentence is commensurate with the extreme seriousness of the defendant's terrorism crimes. Indeed, the Guidelines offense level applicable to the defendant's conduct is 53, which is well above the offense level of 43 that triggers a Guidelines range of life imprisonment irrespective of a defendant's criminal history.

While a sentence of life imprisonment is not routine, life sentences are regularly imposed in federal courts in cases where, as here, the defendant knowingly and willfully associates himself

with a foreign terrorist organization—like al-Shabaab, al Qaeda, or al Qaeda in the Arabian Peninsula—that is dedicated to murdering U.S. citizens and attacking U.S. interests. Importantly for purposes of this case, courts both within and outside of this District have imposed life sentences in terrorism cases where, as here, a defendant conspired or attempted to carry out an attack targeting Americans, but the plot ultimately was thwarted or unsuccessful such that nobody was hurt, and life imprisonment was not mandatory. *See, e.g.*, *United States v. Mohammed Mansour Jabarah*, No. 02 Cr. 1560 (BSJ) (S.D.N.Y. Jan. 18, 2008) (life sentence for al Qaeda operative who conspired to bomb U.S. embassies in Singapore and the Philippines); *United States v. Richard Reid*, No. 02 Cr. 10013 (WGY) (D. Mass. Jan. 30, 2003) (life sentence for al Qaeda supporter who attempted to detonate shoe bomb during international flight); *United States v. Abdul Hakim Murad*, No. 93 Cr. 180 (LAK) (S.D.N.Y. May 15, 1998) (life sentence for al Qaeda operative who participated in plot to place bombs on airliners bound for United States from Asia); *see also United States v. Oussama Kassir*, No. 04 Cr. 356 (JFK) (S.D.N.Y. Sept. 15, 2009) (life sentence for al Qaeda supporter who attempted to establish a jihad training camp in the United States and disseminated bomb-making manuals).

Other cases are similarly illustrative. For example, in *United States v. Rahimi*, No. 16 Cr. 760 (RMB) (S.D.N.Y.), Judge Berman sentenced the then 30-year-old defendant, Ahmad Rahimi, to a term of life imprisonment. Rahimi was convicted at trial of charges arising from his September 27, 2016 attack in New York, which caused injuries to more than 30 people. Rahimi's attack was motivated by propaganda from terrorist groups, including AQAP, and was the culmination of Rahimi's desire to follow these groups' directives to carry out jihad against the United States. (*See* 16 Cr. 760, Dkt. 188 at 1). In sentencing Rahimi to life imprisonment, Judge Berman noted that

Rahimi's crime was, "heinous, wanton, life-threatening and luckily it didn't kill anybody." (No. 16 Cr. 670, Dkt. 205, Feb. 13, 2018 Sent. Tr. at 80). Judge Berman continued, saying of Rahimi's targeting of innocent people, that "[i]t's inexplicable that anybody would do that intentionally, but it's clear from the record and the evidence that you did." (*Id.*). The Court recognized the impact on Rahimi of "virulent anti U.S. driven terrorist propaganda" and ultimately found that:

> And there was a period, maybe it's just an unusual period in an otherwise long life, but of scheming and extensive preparation to try and kill innocent people . . . there is no explanation that I have for why that could justify anything but a life sentence. Reflecting on the seriousness of the offenses. Those actions you took there could hardly be anything more serious than that.  So that supports a life sentence.

(*Id.* at 81).

Then District Judge Sullivan reached a similar conclusion in *United States v. Ullah*, No. 18 Cr. 16 (RJS) (S.D.N.Y.). There, the 31-year-old defendant attempted to carry out a lone-wolf pipe bomb attack in the Port Authority subway in support of the Islamic State of Iraq and Syria (ISIS). Like Rahimi, Ullah was convicted, after trial, of material support and firearms offenses. At sentencing, defense counsel argued that the defendant was "reformed," "remorseful," and "disavowed allegiance to radical and violent ideals and organizations." *See* No. 18 Cr. 16, Dkt. 116 at 27. In sentencing the defendant to life imprisonment, the statutory maximum, Judge Sullivan stated:

> Your personal experience is important but your conduct here is truly heinous. I mean this is about as bad a crime as there is. This was not a crime of passion, this was not an exercise in bad judgment. This was not a crime of violence motivated by greed like a robbery or drug dealing or something. This is not any of those things. This was a calculated premeditated decision to kill as many people as you could, injure others, all in the name of an organization that is dedicated to spreading terror. That's what it was. And it seems to me that the enormity of that crime eclipses the other positive aspects of your character.

* * *

So, this is about as serious a crime as there is. Now, you ultimately failed in the execution. You didn't execute this as well as you might have – thankfully – but it doesn't make you less culpable. It doesn't make your intent any less sinister or, frankly, evil. I agree with [defense counsel], I don't think you are an evil man. I don't throw that word around lightly but this act was evil, this act was designed to kill people and hurt them without a thought as to what it was going do in their lives. So, I have to say, in terms of a just punishment, it seems to me that a life sentence is appropriate.

(*Id.* at 37-38.)

The logic of *Ullah* applies equally here, where the defendant's intent to commit a large-scale, suicide terrorist attack was clear but, fortunately, did not happen thanks to the efforts of law enforcement. And as is apparent from the foregoing discussion, many of these same circumstances, and considerations, are present here. The result should accordingly be no different. Indeed, "when it comes to sentencing terrorism, Congress and the United States Sentencing Commission plainly intended for the punishment of crimes of terrorism to be significantly enhanced without regard to whether, due to events beyond the defendant's control, the defendant's conduct failed to achieve its intended deadly consequences." *United States v. Mumuni Saleh*, 946 F.3d 97, 112-13 (2d Cir. 2019). The defendant should be sentenced to life imprisonment.

43

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should sentence the defendant to life imprisonment—the sentence called for by the Guidelines—as such a sentence is sufficient but not greater than necessary to comply with the purposes of sentencing pursuant to 18 U.S.C. § 3553(a).[12]

Dated: New York, New York
        March 3, 2025

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney
Southern District of New York

By:    _____/s/_____
       Jonathan L. Bodansky
       Nicholas S. Bradley
       Assistant United States Attorneys
       212-637-2385 / -1581

---

[12] The Government respectfully submits that the sentence should be apportioned as follows: 20 years' imprisonment on each of Counts One, Two and Five; and life imprisonment on Counts Three and Four. As required by statute, the sentence imposed for Count Six must run consecutively to all other terms of imprisonment imposed. 18 U.S.C. § 2332b(c)(2).