LAW OFFICE OF ANTHONY CECUTTI
217 Broadway, Suite 707
New York, New York 10007
Phone: (212) 619-3730
Cell: (917) 741-1837
anthonycecutti@gmail.com

December 2, 2025

**BY ECF**
The Honorable Analisa Torres
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

## SENTENCING MEMORANDUM

### Re: United States v. Cholo Abdi Abullah; 20 Cr. 677 (AT)

Dear Judge Torres:

#### *"My arrest was my rescue"*

Cholo Abdi Abdullah shared these five words in a meeting with me earlier this year at MDC Brooklyn. We sat in a locked room separated by plexi glass. White noise was in the background. Mr. Abdullah had been brought handcuffed by staff and entered through one door. I entered the opposite door, which was then locked by other staff. ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████ He accepted responsibility for his actions. He also expressed regret. Since then, he has been subjected to solitary confinement, while under Special Administrative Measures ("SAMs"). Mr. Abdullah has suffered significant psychological distress and pain, enduring conditions of confinement that no person should ever have to tolerate and experience; conditions that have damaged him. During these last five years, Mr. Abdullah has tried to stay "close" to his mother and brothers, who live in Isiolo, Kenya where Mr. Abdullah was born. In monthly phone calls, Mr. Abdullah's family shares with him the happenings of their lives and their support and love for him, especially his mother. Mr. Abdullah

1

yearns for this connection. Though an inmate and convicted of serious crimes, he is still very much and foremost human.

The Supreme Court has recognized that the underlying principle of sentencing is that the "punishment should fit the offender and not merely the crime,"[1] and that "for the determination of sentences, justice generally requires consideration of *more* than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender"[2] (emphasis added).

The Government seeks a life sentence. Or, death by incarceration. This will effectively mean that Mr. Abdullah, only 35 years old, will never be able to see and embrace his mother, brothers and family, or return to his home in Kenya and experience all the things of life there that he so misses and once enjoyed. He will remain under highly restrictive conditions in a United States federal prison, and over time, continue to deteriorate psychologically, emotionally and socially, until he dies. Such a fate should only be reserved for the "worst of the worst;" those that are "inherently evil" and incapable of redemption. Cholo Abdi Abdullah is not that. He is deserving of a lesser punishment.

It is our hope that this memorandum, along with the attached psychological evaluation by Dr. Adeyinka Akinsulure-Smith, *see* Exhibit "A," provides the Court with further understanding of who Cholo Abdi Abdullah is and where he came from, the circumstances that led to him joining al Shabaab, the manipulative tactics and efforts to control Mr. Abdullah by al Shabaab leadership, ███████████████████ and inhumane conditions of confinement, so that it can impose a sentence that is "sufficient, but not greater than necessary." I respectfully submit that a sentence of no more than 360 months' incarceration, is appropriate and just based on the factors set forth in 18 U.S.C. § 3553(a).

## Cholo Abdi Abdullah's Experience of Oppression as a Muslim that Resulted in Him Leaving Kenya and Joining al Shabaab

Cholo Abdi Abdullah was born on October 22, 1990 in Isiolo, Kenya. Isiolo, which is located in the upper eastern area of Kenya, contains a large Somali and Muslim population. Mr. Abdullah's family, which is of Somali heritage, is Muslim. As such, he was raised in a Muslim family and community. He grew up in poverty and without electricity. His father worked as security officer for a local university and later became a farmer and herded cows and goats. Mr. Abdullah went to school. After school and on weekends, beginning at 10, he helped care for the livestock and delivered baby goats. Sadly, Mr. Abdullah's father died from a heart attack when Mr. Abdullah was 13 years old. As such, he was primarily raised by his mother, along with three brothers. Mr. Abdullah is the second oldest. Mr. Abdullah's mother had a small grocery store that she ran. He shared a close relationship with his mother, especially after his father died. Mr. Abdullah also had a large extended family and his aunts and uncles assisted financially, especially after extreme droughts and famines that occurred in 2008 and 2011, resulting in the death of much of his family's livestock.

---

[1] *See Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011).

[2] *See Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937).

Mr. Abdullah's family was not particularly religious. He enjoyed playing soccer, and enjoyed supporting his favorite soccer team, Manchester United. Raised speaking Swahili and Borano, he learned English by watching American television shows, such as "King of Queens." He also liked school. While in high school, he became interested in current affairs and became the head of the journalism club. He also liked reading and writing and struggled with sciences. Mr. Abdullah had an active social life. He played soccer, cooked, hung out with his friends, and had girlfriends, with one later dying from malaria which devastated him. Following his high school graduation in 2010, he completed two years of a four-year degree in journalism from the Nairobi Institute of Business Studies. There, he won two awards for journalism. He was particularly interested in understanding political corruption within Kenya. Unfortunately, Mr. Abdullah had to discontinue his university studies in 2012 because he could no longer afford to attend.

Growing up, Mr. Abdullah read the works of Pan-African writers, such as Chinua Achebe, Wole Soyinka and Ngugi wa Thiong'o, who, in the 1950s and 1960s, described the effects of Western colonization of Africa and failures and corruption of Kenya's ruling class. Mr. Abdullah was moved by their works, which included Ngugi wa Thiong'o's *The Trial of Dedan Kimathi*, a play he co-wrote with Micere Githae Mugo that centered on the trial of Dedan Kimathi, a Kenyan activist who resisted colonialism in Kenya.

While gaining understanding of Western colonization, Mr. Abdullah came to believe that as a Muslim within a predominantly Christian country, he was inferior and "second class." Further, he learned that the Kenyan government was untrustworthy, corrupt and violent; that it would not protect him or his family and community because of their Somali heritage and Muslim faith. He recalls stories his grandmother shared with him of the Garisa massacre in 1980 in which Kenyan security forces invaded a village and murdered 3,000 Muslim Kenyan-Somalis. They burned down the village, raped women and created a concentration camp where they starved people to death. This was after a Muslim Kenyan-Somali individual set fire to a Defense Forces camp in the region, killing six soldiers. He did so to retaliate for the ongoing persecution of Muslim Kenyan Somalis through political oppression and economic exclusion by the Kenyan government. Mr. Abdullah's family also described to him about the Wagalla massacre that occurred four years later, on February 10, 1984. Approximately 5,000 Muslim Kenyan-Somali men were taken by Kenyan soldiers from Wajir in northeastern Kenya and brought to an airstrip. There, they were detained for five days and deprived of food and water, and then executed by Kenyan soldiers. Years later, in 2008, the Truth, Justice and Reconciliation Commission ("TJRC") was established in Kenya. The TJRC determined that the Wagalla massacre was the worst human rights violation in Kenya's history.

In October 2011, following Kenya's military invasion into Somalia, terrorist attacks in Kenya increased significantly. "[T]here were at least 70 grenade and gun attacks in Nairobi, Mombasa and Garissa between 2011 and 2014, with at least 30 attacks in 2012 alone."[3] Al-Shabaab claimed responsibility for many of these attacks. During this time, the Kenyan government, specifically, Kenya's Anti-Terrorism Police Unit (ATPU) carried out ongoing

---

[3] Human Rights Watch, *Kenya: Killings, Disappearances by Anti-Terror Unit*, Aug. 18, 2014 (available at https://www.hrw.org/news/2014/08/18/kenya-killings-disappearances-anti-terror-police).

killings and disappearances of individuals, and engaged in abuse and harassment of those accused of participating in terrorism.[4]  People were "shot dead in public places, abducted from vehicles and courtrooms, beaten badly during arrest, detained in isolated blocks, and denied contact with their families and lawyers."[5]  Mr. Abdullah, who was in his early twenties and growing in his Muslim faith, was impacted by the increased attacks and actions taken by the ATPU.

On August 27, 2012, a high-profile and controversial cleric, Aboud Rogo, was assassinated by the Kenyan government.  Rogo was outspoken about the oppression of Muslims and advocated for violence as a response.  Facing criminal charges related to recruiting for al Shabaab, he was fatally shot in his car while he was driving outside Mombasa.  At the time, Rogo was with his wife and other passengers.  His wife was also shot and hospitalized.  Following his burial the same day, riots erupted and continued the next day in response to the suspected involvement of the Kenyan government in Rogo's death.  Cars were set on fire, churches were vandalized and people were killed.  Over 20 people were arrested.

Rogo's assassination was an inflection point for many Muslims, including Mr. Abdullah, who was 22 years old.  He came to see Rogo's message as rational, logical and rooted in Islam.  In turn, he grew even more distrusting of the Kenyan government and increased his commitment to his Muslim faith.  As a young person, with a long personal and family history and experience of oppression, he deeply desired change and wanted to be part of ending the oppression and discrimination for Muslims in Kenya and Somalia.  Lost, angry and frustrated, he increased his study of Islam, listened to Islamic scholars online, and spent more time at mosques.  Such mosques were later identified by law enforcement as having links to al Shabaab, which was having a growing presence in northeastern Kenya and actively recruiting in the area.  In short, he was increasingly exposed to jihadist propaganda.  He was drawn to the ideology of al Shabaab, which he came to believe was the answer to oppression, and creating lasting and real change for Muslims in the northeastern region of Kenya and Somalia.  He also met other young people, such as Ali Salim, who shared similar views. And since al Shabaab was rooted in Islam, Mr. Abdullah believed that its leadership was incapable of corruption and manipulation; a belief he later learned to be untrue.

Mr. Abdullah's experience is corroborated by the Government's expert at trial, Dr. Tricia Bacon, Ph.D., and Associate Professor at American University's School of Public Affairs and director of the Policy Anti-Terrorism Hub at American University.  In her report, "Inside the Minds of Somalia's Ascendant Insurgents: An Identity, Mind, Emotions and Perceptions Analysis of Al-Shabab," she discusses the motivations of Kenyan al Shabaab members.  "Many of the Kenyans in the group are radicalized and mobilized by grievances in Kenya, rather than al-Shabaab's agenda in the Somalia.  Their grievances are rooted in the Kenyan government's mistreatment of Muslims as well as the broader socio-economic disadvantages Muslims experience in Kenya."[6]  Dr. Bacon further states,

---

[4] *Id.*

[5] *Id.*

[6] Tricia Bacon, *Inside the Minds of Somalia's Ascendant Insurgents: An Identity, Mind, Emotions and Perceptions Analysis of Al-Shabab*, Program on Extremism, The George Washington University, at 17 (2022).

Al-Shabaab perceives Kenya as ripe for radicalization and thus recruits heavily there. Kenyans are the group's largest and most organized foreign fighter cadre and have been so for at least a decade. To recruit, much of al-Shabaab's propaganda on Kenya focuses on local grievances, such as the crackdowns by the Kenyan government on Somalis in Kenya and the plight of Kenyan Muslims who reside primarily in the northeastern and coastal regions of the country. It also accuses the Kenyan government of conducting atrocities against Muslims in Kenya, regularly citing the 1984 Wagalla massacre that killed as many as 1,000 ethnic-Somali Kenyans. Invoking the concept of a "Greater Somalia," the group declares that the border between Somalia and Kenya is artificial, and further claims Kenya annexed and subsequently occupies the northeast and coastal areas. This rhetoric certainly aims to encourage Kenyans in the region to join support the group, and Swahili has become the second most prominent language in its propaganda after Somali.[7]

In a 2012 study, "Understanding Drivers of Violent Extremism: The Case of al-Shabab and Somali Youth," Muhsin Hassan, a graduate of Princeton's School of Public and International Affairs, describes "push" and "pull" factors that al Shabaab recruits experience.[8] "Push factors are the negative social, cultural, and political features of one's societal environment that aid in "pushing" vulnerable individuals onto the path of violent extremism. Push factors are what are commonly known as "underlying/root causes" such as poverty, unemployment, illiteracy, discrimination, and political/economical marginalization.""[9] For Mr. Abdullah, his experience of "discrimination" and "political/economical marginalization" were key "push" factors. As a Muslim, he and his family experienced ongoing oppression and marginalization. He felt "second class." Following the assassination of Cleric Aboud Rogo, he was destabilized and brought to a breaking point. "Pull factors, on the other hand, are the positive characteristics and benefits of an extremist organization that "pull" vulnerable individuals to join. These include the group's ideology (e.g., emphasis on changing one's condition through violence rather than "apathetic" and "passive" democratic means), strong bonds of brotherhood and sense of belonging, reputation building, prospect of fame or glory, and other socialization benefits."[10] For Mr. Abdullah, he was "pulled" by al Shabaab's ideology – the liberation of Muslims and restoration of Somalia. Unemployed and no longer in university, he was drawn by idealism and moved by his desire for belonging and purpose in participating in change. As described below, al Shabaab leaders quickly learned his grievances against the Kenyan government and his vulnerabilities. Knowing his experience of marginalization and discrimination, they sought to further radicalize and manipulate him, with the aim of giving him identity and significance.

---

[7] *Id.* at 53.

[8] Muhsin Hassan, *Understanding Drivers of Violent Extremism: The Case of al-Shabab and Somali Youth*, CTC Sentinel, Vol. 5, Issue 8 (August, 2012).

[9] *Id.*

[10] *Id.*

In 2015, after three years of exposure to extremism and radicalization through online lectures and engagement at certain mosques, Mr. Abdullah decided to travel to Somalia to join al Shabaab, an organization that he ultimately viewed at the time as a defender of Kenyan Muslims and Somalis, and oppressed people.



Mr. Abdullah also learned about al Shabaab's intelligence network and that al Shabaab, as a security measure, had eyes and ears everywhere. They relied on an untold number of informants that reported to al Shabaab and had many of its members involved in mainstream employment and the Somali government.[11]

**Al Shabaab's Radicalization of Cholo Abdi Abdullah**



---

[11] During Mr. Abdullah's trial, Dr. Bacon described al Shabaab's use of informants. She testified: "Because the conflict in Somalia is blurry in a lot of ways, which is to say that people will have multiple affiliations. For example, there are people in the government who used to be in al-Shabaab. There are people working as businessmen, for example, who double as informants for al-Shabaab. Al-Shabaab has really penetrated Somali government institutions and society in a way that's hard to understand necessarily the allegiances of people you're talking to." Trial transcript at 134.



"Stella Grace" was a leader and high-ranking al Shabaab operative. He used several Facebook accounts to communicate with Mr. Abdullah and other al Shabaab members and operatives regarding attacks against Americans and Westerners, the construction of explosives, and the DusitD2 attack that occurred in January, 2019 in Nairobi, Kenya.

Mr. Abdullah traveled back to Kenya and researched schools in Europe, Asia and North America. He determined it was too difficult to get a visa for the United States. He concluded the same for Europe. He attempted to get a visa to travel to Canada, however, his application was denied. He ultimately settled on Asia and located the All Asia Aviation Academy ("AAA") based

in the Philippines, which did not require a visa. 

Upon his arrival in Manila, he enrolled in AAA.

## Cholo Abdi Abdullah's Desire to Leave al Shabaab and Impossibility

In 2017, Mr. Abdullah grew disillusioned with al Shabaab because of the organization's targeting of Somali civilians in two attacks – the "Zoobe Attack" (October, 2017 attack killing over 500 people in Mogadishu) and "Pizza Hut Attack" (June, 2017 attack killing at least 20 people in Mogadishu). As stated by Dr. Bacon, the [October 2017 truck bombing at the Zoobe junction] was sufficiently damaging to public opinion that al-Shabaab did not claim responsibility."[12]

Mr. Abdullah's experience and belief he could not withdraw from al Shabaab is corroborated by Dr. Bacon. In discussing "path dependency." She writes,

> Once the decision is made to join al-Shabaab, there is a high degree of path dependency, and a range of factors work against members leaving the organization. Not least, it is difficult to leave al-Shabaab and extremely dangerous to try to defect. The group does not allow people living in its territory to readily leave either. Not only is there substantial risk to any individual attempting to leave the organization, but also to their family. *Thus, some members may not be genuinely motivated to remain in the organization; rather they stay in the organization because of the costs and risks associated with seeking to leave.*[13] (emphasis added).

From October 2017 to March 2018, Mr. Abdullah lived in a dorm room by himself and took classes at AAA. Al Shabaab leaders told Mr. Abdullah that he was not to have any roommates and to limit his interactions with other students. In March 2018, he failed his final practical exam to learn his private pilot license ("PPL"). He returned to Nairobi in April 2018 and then traveled

---

[12] *Id.* at 42.

[13] *Id.* at 97.

to Jilib, where he met with "Brother." "Brother" told him to return to AAA and Mr. Abdullah did so in September 2018. Mr. Abdullah passed his final practical exam and obtained his PPL. He continued his flight training at AAA to obtain his commercial pilot license ("CPL").



In December 2018, Mr. Abdullah traveled back to Nairobi and rented an apartment, financed by al Shabaab. He returned to AAA at the end of December, 2018. He continued to pursue his CPL at AAA from January 2019 to May 2019.

From January 15 to 16, 2019, while Mr. Abdullah was in the Philippines, an attack occurred at the DusitD2 complex in Nairobi, Kenya.[14] Al Shabaab claimed responsibility. Ali Salim, who traveled with Mr. Abdullah to join al Shabaab, was one of five attackers and leader of the operation. He and the other attackers died. Twenty-two people were killed, including an American. Mr. Abdullah was not involved in the planning or preparation of the operation. In fact, he only heard about it after it happened, from "Stella Grace."



Throughout this time, al Shabaab, specifically, "Stella Grace" continued to finance Mr.

Mr. Abdullah was eventually arrested by Philippines authorities in early July, 2019.

---

[14] Following the attack arrests were made. On June 19, 2025, a Kenyan court sentenced two architects of the attack - Hussein Mohammed Abdile and Mohamed Abdi Ali to 30 years' incarceration. Both had been convicted after trial of financing and facilitating the attack.



**The Impossibility of Cholo Abdi Abdullah Committing a September 11th Attack in the United States**

In its sentencing memorandum, the Government states, "The defendant's goals were clear – to bring terror to the United States by commandeering a plane, crashing it into a building, and murdering as many U.S. citizens as possible. Law enforcement thwarted the defendant's plot shortly before he obtained his commercial pilot's license – *inches away* from bringing his murderous plans to fruition." Gov't Sent. Memo at 1. This "plot" had no chance of success. It was not *inches*, but rather *leagues away* from ever happening. Mr. Abdullah did not have his CPL. He also did not have a visa to enter the United States. In fact, he had previously determined that it was too difficult to get such a visa and had been denied a visa to enter Canada. Even if he somehow was able to obtain a visa, it is extremely improbable that he, as a Kenyan Muslim with a CPL from a flight school in the Philippines would be able find employment as a pilot with a commercial airliner in the United States, such as Delta.[15] Accordingly, it was practically impossible, even if it was Mr. Abdullah's goal, which it was not, to pilot a "commercial airplane, crash it into a building in the United States, and recreate al Qaeda's horrific September 11, 2001 terrorist attacks." *Id.*

**Cholo Abdi Abdullah's Perseverance and Deterioration While Incarcerated Under Inhumane Conditions Pursuant to Special Administrative Measures ("SAMs") at MCC and MDC Brooklyn**

Since his extradition to the United States on December 16, 2020, Mr. Abdullah has been subjected to the harshest of prison conditions; conditions that involve severe isolation dictated by SAMs. As outlined in the attached report by forensic psychologist Dr. Adeyinka Akinsulure-Smith, *see* Exhibit "A" (Psychological Evaluation), the conditions under which Mr. Abdullah has been held meet criteria for the definition of torture - "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person." (U.N. Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art.1, para.1).

---

[15] Based on the general pilot requirements of Delta, Mr. Abdullah would not be hired. *See* https://www.delta.com/us/en/careers/pilots/hiring-faqs. He lacked legal authorization to work in the United States and sufficient travel documents; did not have a college or university degree; could not meet the FAA requirements or flight time requirements or other requirements.



### Cholo Abdi Abdullah's Loving and Close Relationships with his Mother, Brothers and Family

Growing up in Isiolo, Mr. Abdullah enjoyed his family and spent a lot of time with his brothers. When his father tragically died when he was 13 years old, he helped his mother grieve her loss. They became closer and developed a bond. He lives with deep regret and pain that because of his actions and misguided ways, he is separated from her, and his brothers.

---

[16] In a call between Mr. Abdullah and his brothers, Hussein Abdullah and Rashid Abdullah on May 9, 2023, Rashid asked Mr. Abdullah how he was doing. Mr. Abdullah stated that "not very many people can be able to handle being in solitary confinement" and "were it not for the help of Allah, someone can commit suicide."

Since his incarceration at MCC and MDC Brooklyn, Mr. Abdullah has sought to maintain contact with his mother, brothers and family by way of phone calls.[17] The calls are supposed to be monthly, but have been irregular. Their communications, which are in Swahili, are recorded and summary translations are generated by the FBI. They are a lifeline for Mr. Abdullah. He hears about the current events within Isiolo and Kenya and the happenings of his brothers. He receives updates about the health and deaths of relatives and births of children. They share their reflections from the Quran and Islam, generally. Mr. Abdullah also advises his brothers and supports and comforts his mother. And he confides in her, in turn receiving strength. For instance, in call between Mr. Abdullah and his mother on May 16, 2023, Mr. Abdullah expressed his remorse for his actions. His mother told him that she "prays for him." Mr. Abdullah responded that "Allah wants them (i.e. his family) to make prayers of forgiveness." Most of all, in their calls they hear each others' voices. They share their lives. They laugh. They cry.

Mr. Abdullah and his family hope to stay in as close contact as possible while he serves his sentence. He cares about them and they care about him. He loves them and they love him. And for his mother, Mr. Abdullah deeply loves her and she loves him. Mr. Abdullah yearns for the day when he can be with her again in the present life, or in the afterlife. They shared such desires in a call on June 10, 2021 in which his mother, while crying, told Mr. Abdullah that she "prays that [Allah] helps her and Cholo meet again on this earth." In response, he said that he is "persevering" and that he "hears [her] voice and misses her." Later, in a call on May 3, 2022, Mr. Abdullah, in a call with his mother, said to her that "being close to his mother and helping her is a great deed in the eyes of Allah" and that the "only devotion there is in Islam is to worship Allah only and to honor ones parents."

**Procedural History and Sentencing Guidelines Analysis**

On December 10, 2020, the Government filed an indictment, charging Mr. Abdullah with the following: Count 1 - Conspiracy to Provide Material Support to a Foreign Terrorist Organization, 18 U.S.C. § 2339B(a)(1), (d)(1)(C), (E), and (F), and 3238; Count 2 - Providing Material Support to a Foreign Terrorist Organization 18 U.S.C. § 2339B(a)(1), (d)(1)(C), (E), and (F), and 3238, and 2; Count 3: Conspiracy to Murder U.S. Nationals 18 U.S.C. § 2332(b) and 3238; Count 4 - Conspiracy to Commit Aircraft Piracy 49 U.S.C. § 46502 and 18 U.S.C. § 3238; Count 5 - Conspiracy to Destroy Aircraft 18 U.S.C. §§ 32(a)(8) and 3238; and Count 6 - Conspiracy to Commit Acts of Terrorism Transcending National Boundaries 18 U.S.C. §§ 2332b(a)(2) and 3238. Mr. Abdullah was arrested in the Philippines and brought to the United States on December 15, 2020. He appeared in the Southern District of New York on December 16, 2020, and was detained at the Metropolitan Correctional Center ("MCC"). He was later transferred to the Metropolitan Detention Center ("MDC Brooklyn"). He has been incarcerated under SAMs since December 16, 2020.

---

[17] The Government acknowledges that Mr. Abdullah, based on his social call schedule at the MDC, has "family connections," but has refused to make "scheduled calls on multiple occasions, even after the trial and as recently as December 10, 2024." *See* Gov't Sent. Memo at 39. To the extent that the Government is suggesting that Mr. Abdullah lacks family support or does not care for his family, that is entirely false. Over the course of my representation, he has made every call to his family that MDC Brooklyn afforded him. And when MDC Brooklyn did not afford him his monthly family call, it destabilized him causing significant difficulty in my work with him.

On October 28, 2024, Mr. Abdullah, acting *pro se* proceeded to trial on all six counts in the indictment. After a 1-week trial, Mr. Abdullah was convicted of all six counts.

Based on information provided in trial transcripts, as well as by the Government, the United States Department of Probation ("Probation") drafted a pre-sentence report ("PSR"). Mr. Abdullah did not participate in a pre-sentence interview ("PSI") or otherwise in the pre-sentence process. As a result, Probation was unable to provide any essential information with respect to Mr. Abdullah, in the following sections of the PSR: (1) Personal and Family Data, (2) Physical Condition, (3) Mental and Emotional Health, (4) Substance Use Disorder, (5) Educational, Vocational and Special Skills, and (6) Employment Record. As the Court is aware, the absence of such information is critical, as the above categories are essential factors that the Court is mandated to consider in arriving at a sentence that is sufficient but not greater than necessary to reach the sentencing goals of Congress as set forth in 18 U.S.C. §3553(a). *See also* 18 U.S.C. §3661.

We do not object to the Guidelines analysis calculated by Probation. Because Mr. Abdullah was convicted of multiple offenses, Probation performed a multiple-count analysis, pursuant to U.S.S.G. § 3D1.1(a). Counts 1 through 6 were grouped because they involved the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. *See* U.S.S.G. § 3D1.2(b). Because the highest offense level was produced by Count 4, Conspiracy to Commit Aircraft Piracy, Probation utilized U.S.S.G. § 2A5.1. *See* U.S.S.G. § 3D1.3(a). As a result, the base offense level calculated by Probation was 38. *See* U.S.S.G. § 2A5.1. Probation included two victim-related adjustments. The first, resulting in a 12-level increase of the base offense level, was added because the offense was a felony that involved, or was intended to promote, a federal crime of terrorism. *See* U.S.S.G. § 3A1.4(a). Probation also included a 3-level victim-related adjustment, if the Court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, disability, or sexual orientation of any person. *See* U.S.S.G. § 3A1.1(a). Probation did not include a 3-level downward adjustment for acceptance of responsibility. *See* PSR at ¶ 56. The total offense level as calculated by Probation was 53. However, where the total offense level is calculated in excess of 43 – the maximum offense level set forth in the Sentencing table – the offense level will be treated as a level 43. Probation assigned Mr. Abdullah a criminal history score of zero, which placed Mr. Abdullah in Criminal History Category I. However, where the offense involved a federal crime of terrorism, the Criminal History Category is VI. *See* U.S.S.G. § 3A1.4(b). A total offense level of 43 results in a Guidelines range of Life imprisonment regardless of Mr. Abdullah's Criminal History Category.

\*　　\*　　\*

Sentencing courts must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue."[18] Further, it must not presume the Guidelines as reasonable or be

---

[18] *Pepper v. United States*, 562 U.S. 476 (2011) (*quoting Koon v. United States*, 518 US 81, 113 (1996)).

restricted or bound by the Guidelines Range.[19]  As such, a sentencing court must conduct an "independent review of the sentencing factors" in all cases for each defendant.[20] The aim is to fashion a sentence that is "sufficient, but not greater than necessary," based on an analysis of the § 3553(a) factors as they pertain to a particular individual offender, such as the purposes of sentencing, including, punishment, deterrence, incapacitation and treatment and rehabilitation, and consideration of the individual offender and his life history and background.  This conforms with 18 U.S.C. § 3661, which provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."[21]  In *Pepper*, the Supreme Court cited § 3661 as an important means of achieving just sentences: "[p]ermitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'"[22]

As this Court is well aware, *United States v. Booker*, 543 U.S. 220 (2005), and its progeny provide this Court the authority to vary from a strict application of the Guidelines.  A substantial downward variance from the Guidelines is warranted in this case, based on the individualized assessment and consideration of the § 3553(a) factors as applied to Cholo Abdi Abdullah.  The Guidelines Range is primarily constructed by and driven by aggravating factors, using points and numbers.  Mitigating factors are not part of the Guidelines calculation.   Further, the sentence of Cholo Abdi Abdullah, or any individual, should not be left to an algorithm, enhancements, points, or mathematical formula.  "No chart of numbers will ever fully contemplate, quantify and cipher the endless variations of the human experience.  While it might provide a normalizing force in sentencing, we cannot, with a system of points and categories, reduce justice to a universal formula."[23]  Rather, the aim must be to impose a sentence that is fair and just given the particular

---

[19] *See Nelson v. United States*, 550 U.S. 350, 351 (2009);  *see also United States v. Dorvee*, 604 F.3d 84, 93 (2d Cir. 2010) ("[i]n conducting this review [of the § 3553(a) sentencing factors], a district court needs to be mindful of the fact that it is 'emphatically clear' that the Guidelines are guidelines – that is, they are truly advisory'"), *quoting United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (requiring district courts not to presume that a Guidelines sentence is reasonable for any particular defendant).

[20] *See id.*

[21] Likewise, in 21 U.S.C. § 850, which specifically pertains to narcotics offenses and their penalties, Congress further determined that "… no limitation should be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence …" 21 U.S.C. § 850.  *See also United States v. Murillo*, 902 F.2d 1169, 1172 (5th Cir. 1990).

[22] 562 U.S. at 488, *quoting Wasman v. United States*, 468 U.S. 559, 564 (1984); *see also Gall v. United States*, 552 U.S. 38, 50 (2007) (sentencing courts must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented"); *See also Cavera*, 550 F.3d at 189 (2d Cir. 2008) (en banc) (requiring district courts to conduct an "independent review of the sentencing factors" in all cases); *Gall*, 552 U.S. at 50 (sentencing courts must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented"); *United States v. Johnson*, 567 F.3d 40, 50-51 (2d Cir. 2009) (same).

[23] *United States v. Coughlin*, 2008 WL 313099 (W.D. Ark. Feb. 1, 2008).

facts of this case and the facts relative to Cholo Abdi Abdullah, and consistent with the purposes of sentencing.

With the focus on numbers, the Guidelines can become a gravitational pull on the ultimate sentence. This has been described by academic scholars as the "anchoring effect."[24] The "anchoring effect" is recognized by psychologists as a cognitive shortcut that has a strong tendency to undermine judgments in making difficult and complex decisions. Through an earlier disclosed number, the "anchor," the judgment of a decision-maker is influenced. Although *Booker* granted judges great discretion, sentences are often "anchored" by the particular Guidelines Range in a case. The Honorable Jed S. Rakoff described the phenomenon of the "anchoring effect" of the Guidelines as follows: "[T]he very first thing a judge is still required to do at sentencing is to calculate the Guideline range, and that creates a kind of psychological presumption from which most judges are hesitant to deviate too far."[25] We urge the Court to be mindful of such "psychological presumption." Additionally, while the Guidelines are the "starting point," and the Court must consider, Mr. Abdullah's sentence should not be directly derived from a mathematical analysis. Rather, it should be based on an individualized assessment of all the § 3553(a) factors.

As stated, and as this Court is also well aware, the overarching goal in any case is to fashion a sentence that is "sufficient, but not greater than necessary." And "[w]hile there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding of 'the diverse frailties of humankind,' and a 'generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain."[26] Mercy too, *must* play a role in determining a just and fair individualized sentence (emphasis added).[27] For the reasons set forth in this memorandum, a sentence well below the Guidelines - 360 months' incarceration or less is more than "sufficient, but not greater than necessary" for Cholo Abdi Abdullah.

---

[24] *See* Mark W. Bennett, *Confronting Cognitive "Anchoring Effect" and "Blind Spot" Biases in Federal Sentencing: A Modest Solution for Reforming a Fundamental Flaw,* 104 J. Crim. L. & Criminology 101, 132 (2014) (*citing United States v. Newhouse*, 919 F. Supp. 2d 955, 958 n.1 (N.D. Iowa 2013) (Bennett, J.). "Comprehensive data from the USSC establishes that the [post-*Booker/Gall*] discretion has, for the most part, had a surprisingly limited impact on federal sentencing. This is due primarily to the robust anchoring impact of first computing the advisory Guideline range before considering the other non-numerical § 3553(a) sentencing factors." *Id.* at 533-534. *See also, United States v. Ingram*, 721 F.3d 35, 40 (2d Cir. 2013) (Calabresi, J., concurring) (discussing how "anchoring effects" influence judgments and noting that the court "cannot be confident that judges who begin" at a higher guideline range "would end up reaching the same 'appropriate' sentence they would have reached" if they started from a lower guideline range). *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1353 n. 6, (2016) (Alito, J concurring in part) (Noting the "anchoring" effect of Guidelines).

[25] Hon. Jed S. Rakoff, *Why the Federal Sentencing Guidelines Should be Scrapped*, 26 Fed. Sent'g 6, 8 (Oct. 1, 2013).

[26] *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017).

[27] *United States v. Kloda*, 133 F. Supp. 2d 345, 349 (S.D.N.Y. 2001).

**Analysis of the Purposes of Sentencing as they Relate to Cholo Abdi Abdullah Favors a Sentence of No More than 360 Months' Incarceration**

Pursuant to § 3553(a), the Court must consider the purposes of sentencing, including "just punishment," deterrence, recidivism and incapacitation as they relate to Cholo Abdi Abdullah.

### a. "Just Punishment"

Section 3553(a)(2)(A) requires a sentencing judge to consider "the need for the sentence imposed … to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." There is no question that Mr. Abdullah was convicted of and committed serious offenses and that he must be held accountable. Mr. Abdullah understands and accepts that he will receive a sentence of at least twenty years' incarceration in an American prison and endure the severe consequences that will follow, including years of separation from his mother, brothers and family and the reality that he may never see them again.

A sentence of life imprisonment is unjust. Mr. Abdullah's "collaboration with high-level al-Shabaab operatives," came about because of their manipulation of him, rather than a genuine intention on his part to "execute a mass-casualty terrorist attack" in the United States. *See* Govt's Sent. Memo at 29. He did not "fully intend[] to kill as many unsuspecting and innocent American men, women, and children as possible." *Id.* ████████████████████████████████████████████████████████████████ And for this reason, he now states, **"my arrest was my rescue."** Further, other significant punitive consequences, including his torturous incarceration conditions under SAMs and separation from his family, mitigate against a life sentence.

### b. Deterrence, Recidivism and Incapacitation

Section 3553(a)(2)(B) and (C) require a sentencing judge to consider "the need for the sentence imposed" to "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant." Here, in this case, for Cholo Abdi Abdullah, a sentence no more than 360 months' incarceration satisfies these sentencing purposes of deterrence, both specific and general, and incapacitation.

Mr. Abdullah is not the same person when he joined al Shabaab approximately ten years ago, when he was 25 years old. He has different beliefs and does not believe in extremism. As stated, he was motivated to join al Shabaab based on his experience of oppression and had been radicalized. He continued to be radicalized after joining al Shabaab through leadership's intentional use of propaganda with him. Leaders and high-level operatives, such as "Brother" and "Stella Grace," in seeing Mr. Abdullah's vulnerabilities, worked to take advantage of him and

manipulated him for their own cause. They gave him significance, belonging and purpose.



Mr. Abdullah's change in ideology and allegiance to Islam, differences with al Shabaab, ████████████████████████████████, and regret and disappointment with himself, collectively counsel against a life sentence for the purposes of deterrence and incapacitation.[28]

As for general deterrence, the Court should also not overlook the adversities Mr. Abdullah has experienced, the circumstances that led him to joining al Shabaab and the dangers that prevented him from leaving, his brutal and inhumane conditions of solitary confinement over the last five years and the love and support from his family, solely to "send a message" to others. As the Court is aware, the impact of general deterrence is difficult, if not impossible, to quantify. After all, vast amounts of research on general deterrence show that the chance of being arrested—that is, "caught"—is a substantially more powerful deterrent than the severity of punishment. Multiple courts have relied on such data and research and concluded the same.[29] At bottom, general deterrence is served by making arrests and convicting defendants of crimes that, regardless of the length of jail sentences, cause severe and debilitating real-life consequences. In Mr. Abdullah's case, the message is clear: if you engage in terrorism offenses, you will face a substantial and life-altering sentence and be separated from your family, and be detained under inhumane conditions, such that you will suffer in every possible way. And lastly, there is no evidence that a sentence greater than our request, including a life sentence, will drive home that message any harder or louder to anyone considering joining a terrorist organization. Rather, it is through constructive educational and rehabilitation efforts that aim at curtailing extremist ideology, rather than the imposition of life sentences, which will deter "young men and women … from choosing to follow a path similar to [Mr. Abdullah's] and engaging in potentially devastating conduct in support of

---

[28] The Government argues that "anything short of a life sentence would leave the public at risk." Gov't Sent. Memo at 34. Aside from the cited reasons why a life sentence is inappropriate for the purposes of deterrence and incapacitation, the Government fails to appreciate that should the Court impose a sentence that we are seeking, Mr. Abdullah will be a much older man. Upon release, he will not return to any battlefield. Further, with technological advancements, his pilot skills, which he learned over a relatively short period of time and will not use for decades, will likely have little to no value. Finally, should he remain confined under similar conditions while serving his sentence, Mr. Abdullah will undoubtedly further deteriorate psychologically making him a liability to his family and community. No terrorist organization will be interested in exploiting him again for their purposes.

[29] See, e.g., United States v. Browning, 2021 WL 795725, at *5 (E.D. Mich. Mar. 2, 2021) ("In terms of both specific and general deterrence, there is overwhelming evidence in the scientific literature that the certainty of being caught is a vastly more powerful deterrent than the severity of the punishment."); United States v. Lawrence, 254 F. Supp. 3d 441, 444 (E.D.N.Y. 2017) (accepting expert testimony that "[m]ost of the studies agree that there is very little deterrent effect associated with lengthy [] punishment"); see also Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 Crime & Just. 199, 201 (2013) ("[T]here is little evidence of a [] deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased [by longer sentences].").

al-Shabaab or other terrorist groups." *See* Gov't Sent. Memo at 38.

**Sentences Imposed on Other Defendants Convicted of Similar Terrorism Offenses Support a Sentence of No More Than 360 Months' Incarceration for Cholo Abdi Abdullah**

As this Court is well aware, a sentencing court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In its sentencing memorandum, the Government contends that a life sentence for Mr. Abdullah is needed to "avoid unwarranted sentence disparities." The Government is incorrect.

The Government focuses on two cases prosecuted in this District: *United States v. Rahimi*, 16 Cr. 760 (RMB) and *United States v. Ullah*, 18 Cr. 16 (RJS). Both Rahimi and Ullah were convicted after trial where the evidence showed that they planned and committed *actual* attacks in New York City, causing injuries to others. Rahimi, motivated by propaganda from terrorist groups, placed two explosives in Chelsea and detonated them. Thirty people were injured and hundreds of thousands of dollars in property damage resulted. He also planted another explosive device in New Jersey and detonated it. In his backpack, he had six other explosive devices. Finally, at the time of his arrest, he fired multiple shots at police officers, striking and injuring multiple officers. Rahimi was sentenced to life imprisonment. Ullah, during morning rush hour, detonated a pipe bomb that had been strapped to his chest in a subway station under the Port Authority Bus Terminal in midtown Manhattan. One person was injured, two others lost their hearing and hundreds more were terrified. He did so on behalf of ISIS. He began researching how to build a bomb about a year before the attack. He built the pipe bomb in the weeks leading up to the attack at his Brooklyn apartment. After his arrest, he told law enforcement that he chose a busy weekday morning in Manhattan for the attack to "terrorize as many people as possible." And he succeeded. Finally, while at the MCC, he threatened staff and told them that "more is coming … You started this war, we will finish it. 'More is coming. You will see." He too was sentenced to life imprisonment. Mr. Abdullah is easily distinguishable from both and should receive a lesser sentence. He did not participate in any attacks abroad or in the United States, or actually come close to it. Additionally, unlike Rahimi and Ullah, Mr. Abdullah changed his ideology because of his differences with al Shabaab, ██████████ ████████████████████████, and lives with great regret and disappointment with himself.

The four other cases relied upon by the Government also fall short in support of a life sentence for Mr. Abdullah as they, like *Rahimi* and *Ullah*, involved more serious conduct and aggravating factors:

1. *United States v. Mohammed Mansour Jabarah*, 02 Cr. 1560 (BSJ) (SDNY): Jabarah was a member of al Qaeda who conspired to kill American citizens by bombing United States embassies in Singapore and the Philippines. He had personal relationships with Usama Bin Laden and Khalid Sheikh Mohammed ("KSM"). KSM sent Jabarah from Pakistan to Southeast Asia to meet with another terrorist organization to plan and execute the attacks on American embassies. Following his arrest, he initially cooperated and was housed in a FBI-arranged facility. However, his cooperation was short lived. Unbeknownst to the FBI agents and prosecutors, Jabarah was planning a "martyrdom mission" to murder the "infidel" agents and prosecutors he considered

responsible for his capture. During an impromptu search of his quarters, agents found weapons, directions on making explosives, pictures of Bin Laden and Mohammed Atta, and handwritten materials bearing the initials of agents and prosecutors whom Jabarah met. There were also volumes of writings drafted by Jabarah while in FBI custody in which he described his commitment to waging "jihad" against the "infidels" and killing his captors. It was Jabarah's offense conduct *and* his post-arrest "martyrdom mission" that resulted in a sentence of life imprisonment.

2. *United States v. Richard Reid*, 02 Cr. 10013 (WGY) (D. Mass.): Reid, the infamous "shoe bomber," was an al Qaeda member who had trained in Pakistan and Afghanistan. On December 22, 2001, he boarded an American Airlines flight between Paris and Miami. He wore shoes packed with explosives and attempted to detonate them, when he was subdued. He was arrested and convicted. At his sentencing, Reid lacked remorse and was combative. He stated that he was an "enemy" of the United States and a "soldier" under the command of Usama Bin Laden. He further stated that "the [American] flag will come down on the day of judgment." Based on his offense conduct, which involved premeditation and planning, and actually getting on an American commercial airliner with explosives, along with his disrespect for the court and process and confrontational nature, Reid was sentenced to life imprisonment.

3. *United States v. Abdul Hakim Murad*, 93 Cr. 180 (LAK) (SDNY): Murad participated in plot that involved a three-phase terrorist attack with Ramzi Yousef and KSM. It never materialized. They intended to assassinate Pope John Paul II, blow up 11 airliners from Asia to the United States and crash a plane into the CIA headquarters in Langley, Virginia. Murad, along with his co-conspirators tested a bomb on a flight from Manila to Tokyo. The bomb exploded and killed a passenger and badly injured several others. He was sentenced to life imprisonment.

4. *United States v. Oussama Kassir*, 04 Cr. 356 (JFK) (SDNY): Kassir conspired with others to establish a "jihad" training camp in Oregon. The "jihad" training camp was established as a site where Muslims could receive various types of training, including military-style "jihad" training, in preparation to fight "jihad" in Afghanistan or to continue with additional "jihad" training in Afghanistan. Kassir informed others that he supported Usama Bin Laden and al Qaeda, and that he had previously undertaken "jihad" training in Pakistan. Kassir also had a compact disc that contained instructions on how to make bombs and poisons. After leaving Oregon, Kassir traveled back to Seattle, Washington, and resided in the Dar Us Salaam Mosque in Seattle for approximately two months. At the mosque, Kassir provided the men at the mosque with "jihad" training lessons, including lessons on how to assemble and disassemble AK-47's and how to alter an AK-47 to launch a grenade. Finally, he established at least six different terrorist websites, which he operated from approximately December 2001 until the time of his arrest. The websites contained instructions about how to make bombs and poisons and featured such materials as "The Mujahideen Explosives Handbook" and "The Mujahideen Poisons Handbook." He was convicted after trial and sentenced to life imprisonment.

Lastly, the Government refers to *United States v. Mumuni*, 946 F.3d 97 (2d Cir. 2019) in failed support of a life sentence for Mr. Abdullah. *See* Gov't Sent. Memo at 43. Mumuni received authorization from Junaid Hussain, a Syria-based ISIS operative, to conduct a suicide attack against law enforcement. When FBI agents came to his home to execute a search warrant, Mumuni concealed a knife behind his back, feigned compliance, then lunged at an FBI agent, stabbing him multiple times in the chest in an attempt to murder him. The agent survived only because a metal ammunition magazine in his vest deflected some of the near-fatal stabs. Undeterred, Mumuni attempted to reach for the trigger of another agent's M4 assault rifle before being subdued. Mumuni had previously planned potential attacks in Times Square or the Freedom Tower, using explosive devices. The Sentencing Guidelines called for 85 years, the statutory maximum. He was sentenced to 204 months' imprisonment (300 months following remand from the Second Circuit). *Mumuni* demonstrates that even where a defendant plans, intends and actually commits an attack against American law enforcement and is motivated to do so, a life sentence is still excessive.

The need to avoid unwarranted sentencing disparities supports a sentence of no more than 360 months' imprisonment. A review of comparable cases makes clear that life sentences should be reserved for *only* the most extreme and heinous conduct – defendants who plan and *actually* commit violent terrorist attacks. Nonetheless, even those who actually committed violent terrorist attacks have received non-life sentences. They include:

1. *United States v. Saado Mohamed Ibrahim*, 96 Cr. 660 (AJ) (SDFL): Ibrahim was convicted of aircraft piracy related to an incident on July 26, 1996. Specifically, he forced his way into the cockpit of Iberia Flight 6621 en route from Madrid to Havana on July 26, 1996, and threatened to blow it up. The aircraft carrying 231 passengers and crew landed in Miami and Ibrahim surrendered and was arrested. Ibrahim was convicted after trial on April 25, 1997. On August 25, 1997, he was sentenced to 240 months' imprisonment.

2. *United States v. Muhanad Mahmoud Al Farekh*, 15 Cr. 268 (BMC) (EDNY): Al Farekh, an American citizen, joined al Qaeda. He became a member of, and ultimately ascended to, a leadership role within al-Qaeda's external operations group, which specialized in planning and executing attacks against the U.S. and its Western allies. Over seven years, he conspired to kill Americans, including by assisting with building an explosive device that was used to attack a U.S. military installation in Afghanistan in 2009. The attack led to several serious injuries. On September 29, 2017, he was convicted after trial, of conspiracy to murder United States nationals, conspiracy to provide material support to a foreign terrorist organization and terrorists, and several weapons charges including the use of explosives, conspiracy to use a weapon of mass destruction, and conspiracy to bomb a government facility. On March 13, 2018, he was sentenced to 45 years' imprisonment.

3. *United States v. Cesar Sayoc*, 18 Cr. 820 (JSR) (SDNY): Sayoc, who had nine prior convictions, mailed 16 improvised explosive devices ("IEDs") to 13 specific victims around the country. The IEDs contained explosive powder, chlorine, and shards of glass. His mailings were a culmination of many years of threats, and months of planning. Sayoc repeatedly expressed his intent to intimidate and kill or injure his victims, mainly prominent political figures. Sayoc mailed the IEDs to private residences and government buildings, targeting George Soros, Hillary Clinton, Barack Obama, Eric Holder, Joe Biden,

Kamala Harris, Corey Booker, and others. The Sentencing Guidelines called for a sentence of life. Probation recommended a life sentence. The Government sought a life sentence. On August 7, 2019, Sayoc was sentenced to 240 months' imprisonment.

4. *United States v. Trevor Bickford*, 23 Cr. 91 (PKC) (SDNY): On December 31, 2022, Bickford traveled from Maine to New York City to "wage jihad" and "kill as many of his targets as possible." He researched his target location, Times Square, and settled on his plan of attack. He then committed a terrorist attack during New Year's Eve celebrations. He attempted to murder three New York City Police Department officers. While they survived, they suffered serious injuries. One suffered a brain injury. Another suffered a skull fracture. The officers requested that Bickford receive a life sentence. The Sentencing Guidelines called for a sentence of 1,440 months or 120 years' imprisonment. Probation recommended a sentence of 600 months' imprisonment. The Government sought a sentence of at least 600 months' imprisonment. On May 10, 2024, Bickford was sentenced to 324 months' imprisonment.

5. *United States v. Cole Bridges*, 21 Cr. 65 (LJL) (SDNY): Bridges joined the U.S. Army with the goal of infiltrating its ranks on behalf of ISIS, and provided extensive sensitive military information to people he believed to be ISIS operatives, including detailed diagrams and materials on U.S. Army tactics, techniques, and procedures, information on troop movements and locations, as well as guidance on how ISIS could use this information to successfully defeat U.S. military units. He did so with the explicit purpose of murdering fellow U.S. soldiers in an ambush. Bridges also provided information to people he believed to be ISIS operatives on methods for selecting targets in New York, and advice on how to maximize casualties using military tactics. He disseminated violent propaganda on social media, and filmed his own ISIS propaganda video praising what he believed would be an imminent attack on U.S. military personnel based on the information he had provided. In the video, he urged all Americans, as well as his fellow soldiers, to take up arms for ISIS. The Sentencing Guidelines called for a life sentence. Government advocated for a sentence of 40 years' imprisonment, the statutory maximum. On October 11, 2024, Bridges was sentenced to 168 months' imprisonment.

Accordingly, the above case comparisons provide further support for a sentence of no more than 360 months' incarceration for Cholo Abdi Abdullah.

**Conclusion**

When Mr. Abdullah was growing up in Isiolo, Kenya, he and his family experienced ongoing oppression and discrimination because of their Islamic faith. He desired change and the end of oppression and discrimination for Muslims in Kenya and Somalia. A budding investigative journalist, he sought to expose corruption within the Kenyan government. Following Kenya's military invasion into Somalia in October, 2011, terrorist attacks increased significantly in Kenya's major cities. In response, Kenya's military forces, including the ATPU, engaged in violence. They killed, kidnapped, abused, harassed anyone suspected of engaging in terrorism. At the time, Mr. Abdullah was in his early twenties. In 2012, after no longer able to pay for his university education and being unemployed, he experienced an inflection point – the assassination of Cleric Aboud

Rogo by the Kenyan government, which resulted in widespread protests. It also resulted in Mr. Abdullah, who had become destabilized, deepening his study of Islam and becoming drawn to the extremist ideology of al Shabaab. Ultimately, he decided to join al Shabaab in 2015 and did so out of idealism and to help liberate oppressed Muslims. He regrets his choice to do so.

After joining al Shabaab, Mr. Abdullah was targeted by its leadership. He was young, smart and idealistic. He also had vulnerabilities and a desire for significance, identity and purpose. Al Shabaab, in particular "Brother" and "Stella Grace," recognized that in Mr. Abdullah. This lasted until he was arrested by Philippines authorities in 2019.

**"My arrest was my rescue."** For Mr. Abdullah, his arrest was his only way out of al Shabaab. He accepted responsibility for his actions and expressed regret for his decisions. He has done the same with his mother, brothers and family and asked that his mother "pray" for him and that she and the family "pray for forgiveness." He has further affirmed his allegiance only to Islam and desires to be as "close" as he can to his mother and to honor and respect her. And, for the last five years, Mr. Abdullah has been subjected to conditions that involve severe isolation and restrictions dictated by SAMs. Such conditions and restrictions, which have amounted to torture, have inflicted great psychological distress and suffering upon Mr. Abdullah. Continued incarceration under these conditions will inevitably cause him permanent damage. Consequently, based on the circumstances in this case and for this person – Cholo Abdi Abdullah, along with the aforementioned case comparisons, a life sentence, which should be reserved only for the "worst of the worst," is excessive and inappropriate. Mr. Abdullah should not die in an American prison by incarceration. As such, we respectfully request that the Court impose a sentence of no more than 360 months' incarceration for Mr. Abdullah. Such a sentence is "sufficient, but not greater than necessary," based on all the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

*Anthony Cecutti*

Anthony Cecutti, Esq.

# Exhibit "A"

(Filed Under Seal)