

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

December 8, 2025

**BY ECF**
The Honorable Analisa Torres
United States District Judge
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Cholo Abdi Abdullah*, 20 Cr. 677 (AT)

Dear Judge Torres:

    The Government respectfully writes in response to the defendant's December 2, 2025 sentencing submission (the "Def. Br."), in which the defendant requests a substantially below-Guidelines sentence of 30 years' imprisonment. Nine months earlier, the Government filed its sentencing submission on March 3, 2025 (the "Government Sentencing Memo," Dkt. 163) and explained why the Guidelines sentence of life imprisonment—as recommended by the Probation Office—was amply supported by the Section 3553(a) factors. In response, the defense submission both minimizes the seriousness of the offense conduct and creates an alternate narrative that is squarely contradicted by the trial record. The defendant did not join al-Shabaab with good intentions; he was not disillusioned; and he did not "feign" commitment to his murderous mission. The Court should reject these attempts at mitigation, and it should look skeptically on the defendant's representations to the Court, particularly given his track record of dubious claims. (Trial Transcript ("Tr.") 426-28 (the Court explaining it did not credit the defendant's claim that he was denied access to research and discovery, after evaluating the representations of the Government and the Bureau of Prisons)).



The Honorable Analisa Torres
December 8, 2025
Page 2 of 7



The Honorable Analisa Torres
December 8, 2025
Page 3 of 7

**The Defendant Was Not Disillusioned with Al-Shabaab, and He Did Not Accept Responsibility**

The defendant now boldly claims that he "accepted responsibility for his actions" despite going to trial (which was, of course, his right); not being forthcoming with Special Agent Song; and asserting mitigation arguments based on the purported "impossibility" of the Aviation Plot, joining al-Shabaab with good intentions, and feigning interest in its mission to murder U.S. nationals. Just as the Court rejected the defendant's false claims that he was denied access to research and discovery (Tr. 427), the Court should reject the defendant's attempt to minimize his shocking offense conduct, nearly all of which is contradicted by the trial record.

Throughout his submission, the defendant repeatedly claims that by 2017, two years prior to his arrest, he had become disillusioned with al-Shabaab and wished to leave the terrorist organization. (Def. Br. at 8-9, 17-18). He argues that he was purportedly unable to extricate himself from the group due to safety concerns, and that as a result of his change of heart, he had no intention of carrying out a terrorist attack on the group's behalf. (*Id.* at 8, 11, 17). But the trial record shows who the defendant truly was—a devoted and hardened al-Shabaab operative, including from 2017 onward. The defendant's electronic devices and search history show that, in the privacy of his thoughts, he relentlessly researched and planned his attacks. Chillingly, the trial record shows that the defendant researched the address of the DusitD2 hotel and office complex in Nairobi, Kenya in May 2017—20 months before his friend Ali Salim played an integral role in al-Shabaab's deadly attack there in January 2019. (GX 355). Earlier, in January 2017, the defendant searched for "american companies in kenya" and, eleven days later, for "c4" explosives. (GX 353, 355). Those are just some examples of the defendant looking for American targets during his so-called disillusionment from al-Shabaab. The defendant also continued consuming al-Shabaab propaganda through 2017, including searching online for "al shabaab leader message jihadology" in September 2017 and for senior al-Shabaab and al Qaeda operative Harun Fazul in August 2017. (GX 356, 358).

Indeed, as the Government Sentencing Memo noted, the defendant doubled down on his terrorist goals at every perceived obstacle. After the DusitD2 attack in January 2019, and after the defendant learned that his friend Ali Salim died in the attack, the defendant researched the "tallest building in atlanta" and transit visas between The Bahamas and Atlanta. (GX 376, 378; Tr. 74). Then, in February 2019, the defendant researched "plane hijacking since 911" and "american transit visa," showing that he was still planning his attack and seeking ways to enter the U.S. (GX 380, 381). That research was what the defendant included in his progress reports to his al-Shabaab handler. (*See, e.g.*, GX 408 (the defendant sending his handler a list of "My ideas" for how best to carry out the hijacking plot, including "need[ing] a pilot in the cockpit (which means i should apply for the airlines)," and noting that "the only successful hijack after 9/11 was the one of the ethiopian airlines and it is so because it was hijacked by the pilot himself").

Such electronic evidence shows exactly what the defendant was doing during the period he now baselessly claims he was just feigning interest in terrorist attacks. And, of course, the Court is well aware that the defendant did all this while spending hundreds of hours at the Philippines

The Honorable Analisa Torres
December 8, 2025
Page 4 of 7

flight school, which included classroom instruction, written exams, and flying actual planes. (Tr. 245, 260, 257-58). Disturbingly, the defendant now minimizes this conduct by claiming the Aviation plot "had no chance of success" and was "extremely improbable." (Def. Br. at 11).

The defendant's attempt to recast his time with al-Shabaab also strains against the reality of the trial record. The defendant claims he initially joined al-Shabaab "out of idealism," and only later realized that the group targeted civilians in its attacks, which was something he "could not and would not do." (Def. Br. at 8, 23). But the defendant told Special Agent Song exactly the opposite. The defendant told Special Agent Song that he knew about al-Shabaab's 2015 massacre of civilians at a university in Garissa, Kenya, that "al-Shabaab killed students" during the attack, and that "it happened before me joining al-Shabaab." (GX 913H; Tr. 188-89). Moreover, the defendant specifically described how he listened to the notorious al Qaeda ideologue Anwar al-Awlaki every day in the lead up to him joining al-Shabaab. (GX 913I; *see also* Tr. 168 (Dr. Bacon describing al-Awlaki's importance to al-Shabaab because of his early endorsement of the group)). Likewise, the defendant's detailed discussion about his military training in Somalia, which included the use and handling of automatic weapons and building homemade explosives (Tr. 60, 63-64), render his now-stated "assumption" that he would only "be involved in the marketing efforts of al-Shabaab" so contrary to his already baseless claims of accepting responsibility that the Court should reject it entirely. (Def. Br. at 6).

Furthermore, the defendant's own statements in the trial record contradict his claims that he was "trapped" and "could not conceive of a way to leave." (Def. Br. at 8). For instance, his progress report describing his reconnaissance flights to test airplane security on an Ethiopian Airlines flight ended with the coda, "Brother just know I miss you mujahidin so much more." (GX 405). In that same letter, the defendant announced, in all capital letters, that he had completed key parts of his pilot training, which the trial record showed required hundreds of hours of commitment. (*Id.*). The defendant's phone records further show that he researched and took notes on aircraft interception procedures in January 2019 (GX 502); he researched Florida aviation schools in March 2019 (GX 503); he researched the address of the DusitD2 complex and cabin crew jobs at Kenya Airways in March 2019 (GX 503); and he had a saved document from the Kenya Airways careers site (GX 513).[2]

In short, the trial record fatally undermines the defendant's attempt to minimize the gravity of his conduct. He was not forced or pressured to conduct the terrorist research that he did. He did not have to consume terrorist propaganda and meticulously research his plots. He did not have to take test flights to report back on airport and airplane security measures. He was half a world away from his al-Shabaab handler. He could have easily failed to progress in his extensive pilot training if he did not believe in al-Shabaab's mission. Instead, the defendant was the driving force in the Aviation Plot. As he himself explained in GX 408, "*I* read almost all the hijack incident that has ever happened"; "*I* chose the above because it is within our interest"; "*I* found out that in [the]

---

[2] The defendant's Kenya Airways job searches undermine what little weight the Court should place on the defendant's somewhat offensive claim that it would be "extremely improbable" that he could get a job with Delta Airlines "as a Kenyan Muslim" who went to flight school in the Philippines. (Def. Br. at 11). Indeed, Kenya Airways is part of the SkyTeam airline alliance that includes Delta and other major commercial airlines.

The Honorable Analisa Torres
December 8, 2025
Page 5 of 7

1970s is when most of the hijack happened and there were numerous incidents in the U.S."; and "*My* ideas" included how "*we* need a pilot in the cockpit (which means *I* should apply for the airlines)" (emphasis and capitalization added).

### The Defendant's Conditions of Confinement

Finally, the defendant argues that he should receive a reduced sentence on account of the Special Administrative Measures ("SAMs") he has been subject to since December 2020, relying in large part on a psychological "evaluation" from Dr. Akinsulure-Smith.

As the Court is aware, the SAMs impose certain restrictions on the defendant's communications, based on the substantial risk that his "communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons." 28 C.F.R. § 501.3(a); *see also United States v. Stewart*, 590 F.3d 93, 111-12 (2d Cir. 2009) ("We have no basis upon which to entertain a doubt as to the authority of the Attorney General of the United States to ensure that reasonable measures are designed and implemented in an attempt to prevent imprisoned criminals who are considered dangerous despite their incarceration from engaging in or facilitating further acts of criminality from their prison cells."). During this case, the Government has responded to multiple complaints and issues raised by the defendant regarding his SAMs, including the necessity of white noise in his unit, his receipt of mail, and the placement of his social calls. (Dkts. 97, 99, 122; *see also* December 15, 2023 letter regarding defendant's appropriate access to medical treatment (submitted under seal)).

The defendant's and Dr. Akinsulure-Smith's suggestion that the SAMs have amounted to torture is preposterous. SAMs are not unique to this defendant, but rather are a lawful precaution applied by the Bureau of Prisons (the "BOP") in extremely limited cases, such as this one, involving particularly egregious offense conduct and ongoing safety concerns for particularly dangerous defendants who are incarcerated. There is no allegation, much less evidence, that the SAMs were not faithfully administered by the BOP in this case in accordance with established protocols.[3]

Furthermore, although the SAMs are, by design, restrictive, the BOP and the Federal Bureau of Investigation (the "FBI") have done what they can to ensure that the defendant is afforded the social interactions to which he is entitled. During his time under SAMs, the BOP and

---

[3] Dr. Akinsulure-Smith defines torture as "any act that deliberately inflicts severe physical or emotional pain or suffering on an individual to obtain from that person or another person— information or a confession, or to punish or intimidate or force them to do anything, or for any reason based on any type of discrimination, when such pain or suffering is inflicted by or at the instigation of or with the consent of a person acting in an official capacity." Even putting aside the question of whether the SAMs "inflict[] severe physical or emotional pain or suffering," the SAMs were of course not put in place to obtain anything from the defendant, or to punish or intimidate or force the defendant to do anything. Rather, they were put in place in response to legitimate safety concerns, based on the extraordinary nature of the defendant's crimes and criminal associations.

The Honorable Analisa Torres
December 8, 2025
Page 6 of 7

the FBI have facilitated social calls for the defendant on approximately 43 separate days—often facilitating multiple calls per day—which calls have totaled approximately 172 hours. The BOP and the FBI have also, among other things, approved dozens of, if not more than 100, books and magazines for the defendant to receive.

To the extent that the timing of the defendant's social calls has been "irregular," as he claims, that is in large part due to his own actions. To the best of the Government's knowledge, since being under SAMs, the defendant's social calls were once cancelled due to a technical issue at the prison, and once cancelled due to a nationwide BOP lockdown. Other delays and/or cancellations have been the defendant's own doing:

- On approximately eight occasions, the defendant refused to make his scheduled calls (often after FBI Special Agents had already traveled to the facility, based on the defendant's earlier representation that he wished to make the calls); and

- For approximately seven months, the defendant lost telephone privileges due to an infraction at MDC—specifically, that the defendant had a concealed digital clock within his cell.

In short, the BOP and the FBI have done what they can to afford the defendant regular, monthly social calls, in accordance with the SAMs, and it has typically been the defendant that has stood in the way of such calls taking place.

The Government also notes that the defendant has, for years, raised a series of allegations against the BOP related to his conditions of confinement and access to discovery, and the Court has previously determined that such allegations are unfounded. (*See, e.g.*, Tr. at 427 (the Court stating, in response to a claim from the defendant that he was denied access to research materials: "So, I understand that that's your claim, and the government and the Bureau of Prisons have stated otherwise. They have stated otherwise, and I believe what they are saying. So, I don't believe that you have been denied access.") The defendant's present claims concerning his confinement should be scrutinized with this context in mind—particularly given that the defendant chose not to speak with the Probation Office in advance of sentencing, despite having had an opportunity to do so.[4] Similarly, the Court should place little weight on Dr. Akinsulure-Smith's report because, by her own admission, the defendant refused to complete the necessary evaluation. (Def. Br., Ex. A at 2).

\*          \*          \*

For years, the defendant worked with other high-ranking members of al-Shabaab, a vicious foreign terrorist organization, to devise and carry out a plot to hijack a commercial airliner, crash it into a building in the United States, and recreate al Qaeda's horrific September 11, 2001 terrorist attacks. Thankfully, law enforcement thwarted this plot before the defendant could bring it to

---

[4] The defendant references, for example, social calls with family members in which he has expressed despair. But, in a call from May 2024, the defendant informed his mother that the most recent Ramadan was the best in is life, and that he had felt "a lot of peace."

The Honorable Analisa Torres
December 8, 2025
Page 7 of 7

fruition, but, as the Government has argued previously, the depravity and seriousness of the defendant's conduct cannot be overstated.

Thus, and as further argued in the Government Sentencing Memo, the Court should reject the defendant's request for a downward variance to no more than 30 years' imprisonment. The Government believes that a sentence of life imprisonment—the sentence called for by the Guidelines and recommended by the Probation Office—is sufficient but not greater than necessary to meet the purposes of sentencing under Section 3553(a).

The Government is available to answer any additional questions that the Court may have.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:     /s/
Jonathan L. Bodansky
Nicholas S. Bradley
Assistant United States Attorneys
(212) 637-2385 / -1581

cc: Anthony Cecutti, Esq.