LAW OFFICE OF ANTHONY CECUTTI
217 Broadway, Suite 707
New York, New York 10007
Phone: (212) 619-3730
Cell: (917) 741-1837
anthonycecutti@gmail.com

December 2, 2025

**BY ECF**
The Honorable Analisa Torres
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**SENTENCING MEMORANDUM**

**Re: United States v. Cholo Abdi Abullah; 20 Cr. 677 (AT)**

Dear Judge Torres:

***"My arrest was my rescue"***

Cholo Abdi Abdullah shared these five words in a meeting with me earlier this year at MDC Brooklyn. We sat in a locked room separated by plexi glass. White noise was in the background. Mr. Abdullah had been brought handcuffed by staff and entered through one door. I entered the opposite door, which was then locked by other staff. [redacted]

[redacted] He accepted responsibility for his actions. He also expressed regret. Since then, he has been subjected to solitary confinement, while under Special Administrative Measures ("SAMs"). Mr. Abdullah has suffered significant psychological distress and pain, enduring conditions of confinement that no person should ever have to tolerate and experience; conditions that have damaged him. During these last five years, Mr. Abdullah has tried to stay "close" to his mother and brothers, who live in Isiolo, Kenya where Mr. Abdullah was born. In monthly phone calls, Mr. Abdullah's family shares with him the happenings of their lives and their support and love for him, especially his mother. Mr. Abdullah

yearns for this connection. Though an inmate and convicted of serious crimes, he is still very much and foremost human.

The Supreme Court has recognized that the underlying principle of sentencing is that the "punishment should fit the offender and not merely the crime,"[1] and that "for the determination of sentences, justice generally requires consideration of *more* than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender"[2] (emphasis added).

The Government seeks a life sentence. Or, death by incarceration. This will effectively mean that Mr. Abdullah, only 35 years old, will never be able to see and embrace his mother, brothers and family, or return to his home in Kenya and experience all the things of life there that he so misses and once enjoyed. He will remain under highly restrictive conditions in a United States federal prison, and over time, continue to deteriorate psychologically, emotionally and socially, until he dies. Such a fate should only be reserved for the "worst of the worst;" those that are "inherently evil" and incapable of redemption. Cholo Abdi Abdullah is not that. He is deserving of a lesser punishment.

It is our hope that this memorandum, along with the attached psychological evaluation by Dr. Adeyinka Akinsulure-Smith, *see* Exhibit "A," provides the Court with further understanding of who Cholo Abdi Abdullah is and where he came from, the circumstances that led to him joining al Shabaab, the manipulative tactics and efforts to control Mr. Abdullah by al Shabaab leadership, [redacted] and inhumane conditions of confinement, so that it can impose a sentence that is "sufficient, but not greater than necessary." I respectfully submit that a sentence of no more than 360 months' incarceration, is appropriate and just based on the factors set forth in 18 U.S.C. § 3553(a).

**Cholo Abdi Abdullah's Experience of Oppression as a Muslim that Resulted in Him Leaving Kenya and Joining al Shabaab**

Cholo Abdi Abdullah was born on October 22, 1990 in Isiolo, Kenya. Isiolo, which is located in the upper eastern area of Kenya, contains a large Somali and Muslim population. Mr. Abdullah's family, which is of Somali heritage, is Muslim. As such, he was raised in a Muslim family and community. He grew up in poverty and without electricity. His father worked as security officer for a local university and later became a farmer and herded cows and goats. Mr. Abdullah went to school. After school and on weekends, beginning at 10, he helped care for the livestock and delivered baby goats. Sadly, Mr. Abdullah's father died from a heart attack when Mr. Abdullah was 13 years old. As such, he was primarily raised by his mother, along with three brothers. Mr. Abdullah is the second oldest. Mr. Abdullah's mother had a small grocery store that she ran. He shared a close relationship with his mother, especially after his father died. Mr. Abdullah also had a large extended family and his aunts and uncles assisted financially, especially after extreme droughts and famines that occurred in 2008 and 2011, resulting in the death of much of his family's livestock.

[1] *See Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011).

[2] *See Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937).

Mr. Abdullah's family was not particularly religious. He enjoyed playing soccer, and enjoyed supporting his favorite soccer team, Manchester United. Raised speaking Swahili and Borano, he learned English by watching American television shows, such as "King of Queens." He also liked school. While in high school, he became interested in current affairs and became the head of the journalism club. He also liked reading and writing and struggled with sciences. Mr. Abdullah had an active social life. He played soccer, cooked, hung out with his friends, and had girlfriends, with one later dying from malaria which devastated him. Following his high school graduation in 2010, he completed two years of a four-year degree in journalism from the Nairobi Institute of Business Studies. There, he won two awards for journalism. He was particularly interested in understanding political corruption within Kenya. Unfortunately, Mr. Abdullah had to discontinue his university studies in 2012 because he could no longer afford to attend.

Growing up, Mr. Abdullah read the works of Pan-African writers, such as Chinua Achebe, Wole Soyinka and Ngugi wa Thiong'o, who, in the 1950s and 1960s, described the effects of Western colonization of Africa and failures and corruption of Kenya's ruling class. Mr. Abdullah was moved by their works, which included Ngugi wa Thiong'o's *The Trial of Dedan Kimathi*, a play he co-wrote with Micere Githae Mugo that centered on the trial of Dedan Kimathi, a Kenyan activist who resisted colonialism in Kenya.

While gaining understanding of Western colonization, Mr. Abdullah came to believe that as a Muslim within a predominantly Christian country, he was inferior and "second class." Further, he learned that the Kenyan government was untrustworthy, corrupt and violent; that it would not protect him or his family and community because of their Somali heritage and Muslim faith. He recalls stories his grandmother shared with him of the Garisa massacre in 1980 in which Kenyan security forces invaded a village and murdered 3,000 Muslim Kenyan-Somalis. They burned down the village, raped women and created a concentration camp where they starved people to death. This was after a Muslim Kenyan-Somali individual set fire to a Defense Forces camp in the region, killing six soldiers. He did so to retaliate for the ongoing persecution of Muslim Kenyan Somalis through political oppression and economic exclusion by the Kenyan government. Mr. Abdullah's family also described to him about the Wagalla massacre that occurred four years later, on February 10, 1984. Approximately 5,000 Muslim Kenyan-Somali men were taken by Kenyan soldiers from Wajir in northeastern Kenya and brought to an airstrip. There, they were detained for five days and deprived of food and water, and then executed by Kenyan soldiers. Years later, in 2008, the Truth, Justice and Reconciliation Commission ("TJRC") was established in Kenya. The TJRC determined that the Wagalla massacre was the worst human rights violation in Kenya's history.

In October 2011, following Kenya's military invasion into Somalia, terrorist attacks in Kenya increased significantly. "[T]here were at least 70 grenade and gun attacks in Nairobi, Mombasa and Garissa between 2011 and 2014, with at least 30 attacks in 2012 alone."[3] Al-Shabaab claimed responsibility for many of these attacks. During this time, the Kenyan government, specifically, Kenya's Anti-Terrorism Police Unit (ATPU) carried out ongoing

---

[3] Human Rights Watch, *Kenya: Killings, Disappearances by Anti-Terror Unit*, Aug. 18, 2014 (available at https://www.hrw.org/news/2014/08/18/kenya-killings-disappearances-anti-terror-police).

killings and disappearances of individuals, and engaged in abuse and harassment of those accused of participating in terrorism.[4] People were "shot dead in public places, abducted from vehicles and courtrooms, beaten badly during arrest, detained in isolated blocks, and denied contact with their families and lawyers."[5] Mr. Abdullah, who was in his early twenties and growing in his Muslim faith, was impacted by the increased attacks and actions taken by the ATPU.

On August 27, 2012, a high-profile and controversial cleric, Aboud Rogo, was assassinated by the Kenyan government. Rogo was outspoken about the oppression of Muslims and advocated for violence as a response. Facing criminal charges related to recruiting for al Shabaab, he was fatally shot in his car while he was driving outside Mombasa. At the time, Rogo was with his wife and other passengers. His wife was also shot and hospitalized. Following his burial the same day, riots erupted and continued the next day in response to the suspected involvement of the Kenyan government in Rogo's death. Cars were set on fire, churches were vandalized and people were killed. Over 20 people were arrested.

Rogo's assassination was an inflection point for many Muslims, including Mr. Abdullah, who was 22 years old. He came to see Rogo's message as rational, logical and rooted in Islam. In turn, he grew even more distrusting of the Kenyan government and increased his commitment to his Muslim faith. As a young person, with a long personal and family history and experience of oppression, he deeply desired change and wanted to be part of ending the oppression and discrimination for Muslims in Kenya and Somalia. Lost, angry and frustrated, he increased his study of Islam, listened to Islamic scholars online, and spent more time at mosques. Such mosques were later identified by law enforcement as having links to al Shabaab, which was having a growing presence in northeastern Kenya and actively recruiting in the area. In short, he was increasingly exposed to jihadist propaganda. He was drawn to the ideology of al Shabaab, which he came to believe was the answer to oppression, and creating lasting and real change for Muslims in the northeastern region of Kenya and Somalia. He also met other young people, such as Ali Salim, who shared similar views. And since al Shabaab was rooted in Islam, Mr. Abdullah believed that its leadership was incapable of corruption and manipulation; a belief he later learned to be untrue.

Mr. Abdullah's experience is corroborated by the Government's expert at trial, Dr. Tricia Bacon, Ph.D., and Associate Professor at American University's School of Public Affairs and director of the Policy Anti-Terrorism Hub at American University. In her report, "Inside the Minds of Somalia's Ascendant Insurgents: An Identity, Mind, Emotions and Perceptions Analysis of Al-Shabab," she discusses the motivations of Kenyan al Shabaab members. "Many of the Kenyans in the group are radicalized and mobilized by grievances in Kenya, rather than al-Shabaab's agenda in the Somalia. Their grievances are rooted in the Kenyan government's mistreatment of Muslims as well as the broader socio-economic disadvantages Muslims experience in Kenya."[6] Dr. Bacon further states,

---

[4] *Id.*

[5] *Id.*

[6] Tricia Bacon, *Inside the Minds of Somalia's Ascendant Insurgents: An Identity, Mind, Emotions and Perceptions Analysis of Al-Shabab*, Program on Extremism, The George Washington University, at 17 (2022).

> Al-Shabaab perceives Kenya as ripe for radicalization and thus recruits heavily there. Kenyans are the group's largest and most organized foreign fighter cadre and have been so for at least a decade. To recruit, much of al-Shabaab's propaganda on Kenya focuses on local grievances, such as the crackdowns by the Kenyan government on Somalis in Kenya and the plight of Kenyan Muslims who reside primarily in the northeastern and coastal regions of the country. It also accuses the Kenyan government of conducting atrocities against Muslims in Kenya, regularly citing the 1984 Wagalla massacre that killed as many as 1,000 ethnic-Somali Kenyans. Invoking the concept of a "Greater Somalia," the group declares that the border between Somalia and Kenya is artificial, and further claims Kenya annexed and subsequently occupies the northeast and coastal areas. This rhetoric certainly aims to encourage Kenyans in the region to join support the group, and Swahili has become the second most prominent language in its propaganda after Somali.[7]

In a 2012 study, "Understanding Drivers of Violent Extremism: The Case of al-Shabab and Somali Youth," Muhsin Hassan, a graduate of Princeton's School of Public and International Affairs, describes "push" and "pull" factors that al Shabaab recruits experience.[8] "Push factors are the negative social, cultural, and political features of one's societal environment that aid in "pushing" vulnerable individuals onto the path of violent extremism. Push factors are what are commonly known as "underlying/root causes" such as poverty, unemployment, illiteracy, discrimination, and political/economical marginalization.""[9] For Mr. Abdullah, his experience of "discrimination" and "political/economical marginalization" were key "push" factors. As a Muslim, he and his family experienced ongoing oppression and marginalization. He felt "second class." Following the assassination of Cleric Aboud Rogo, he was destabilized and brought to a breaking point. "Pull factors, on the other hand, are the positive characteristics and benefits of an extremist organization that "pull" vulnerable individuals to join. These include the group's ideology (e.g., emphasis on changing one's condition through violence rather than "apathetic" and "passive" democratic means), strong bonds of brotherhood and sense of belonging, reputation building, prospect of fame or glory, and other socialization benefits."[10] For Mr. Abdullah, he was "pulled" by al Shabaab's ideology – the liberation of Muslims and restoration of Somalia. Unemployed and no longer in university, he was drawn by idealism and moved by his desire for belonging and purpose in participating in change. As described below, al Shabaab leaders quickly learned his grievances against the Kenyan government and his vulnerabilities. Knowing his experience of marginalization and discrimination, they sought to further radicalize and manipulate him, with the aim of giving him identity and significance.

---

[7] *Id.* at 53.

[8] Muhsin Hassan, *Understanding Drivers of Violent Extremism: The Case of al-Shabab and Somali Youth*, CTC Sentinel, Vol. 5, Issue 8 (August, 2012).

[9] *Id.*

[10] *Id.*

In 2015, after three years of exposure to extremism and radicalization through online lectures and engagement at certain mosques, Mr. Abdullah decided to travel to Somalia to join al Shabaab, an organization that he ultimately viewed at the time as a defender of Kenyan Muslims and Somalis, and oppressed people. [redacted] Mr. Abdullah also learned about al Shabaab's intelligence network and that al Shabaab, as a security measure, had eyes and ears everywhere. They relied on an untold number of informants that reported to al Shabaab and had many of its members involved in mainstream employment and the Somali government.[11]

**Al Shabaab's Radicalization of Cholo Abdi Abdullah**

[redacted]

[redacted]

[11] During Mr. Abdullah's trial, Dr. Bacon described al Shabaab's use of informants. She testified: "Because the conflict in Somalia is blurry in a lot of ways, which is to say that people will have multiple affiliations. For example, there are people in the government who used to be in al-Shabaab. There are people working as businessmen, for example, who double as informants for al-Shabaab. Al-Shabaab has really penetrated Somali government institutions and society in a way that's hard to understand necessarily the allegiances of people you're talking to." Trial transcript at 134.

[redacted]

[redacted]

[redacted]

"Stella Grace" was a leader and high-ranking al Shabaab operative. He used several Facebook accounts to communicate with Mr. Abdullah and other al Shabaab members and operatives regarding attacks against Americans and Westerners, the construction of explosives, and the DusitD2 attack that occurred in January, 2019 in Nairobi, Kenya.

Mr. Abdullah traveled back to Kenya and researched schools in Europe, Asia and North America. He determined it was too difficult to get a visa for the United States. He concluded the same for Europe. He attempted to get a visa to travel to Canada, however, his application was denied. He ultimately settled on Asia and located the All Asia Aviation Academy ("AAA") based

in the Philippines, which did not require a visa. [redacted] Upon his arrival in Manila, he enrolled in AAA.

**Cholo Abdi Abdullah's Desire to Leave al Shabaab and Impossibility**

In 2017, Mr. Abdullah grew disillusioned with al Shabaab because of the organization's targeting of Somali civilians in two attacks – the "Zoobe Attack" (October, 2017 attack killing over 500 people in Mogadishu) and "Pizza Hut Attack" (June, 2017 attack killing at least 20 people in Mogadishu). As stated by Dr. Bacon, the [October 2017 truck bombing at the Zoobe junction] was sufficiently damaging to public opinion that al-Shabaab did not claim responsibility."[12] [redacted]

Mr. Abdullah's experience and belief he could not withdraw from al Shabaab is corroborated by Dr. Bacon. In discussing "path dependency." She writes,

> Once the decision is made to join al-Shabaab, there is a high degree of path dependency, and a range of factors work against members leaving the organization. Not least, it is difficult to leave al-Shabaab and extremely dangerous to try to defect. The group does not allow people living in its territory to readily leave either. Not only is there substantial risk to any individual attempting to leave the organization, but also to their family. *Thus, some members may not be genuinely motivated to remain in the organization; rather they stay in the organization because of the costs and risks associated with seeking to leave.*[13] (emphasis added).

From October 2017 to March 2018, Mr. Abdullah lived in a dorm room by himself and took classes at AAA. Al Shabaab leaders told Mr. Abdullah that he was not to have any roommates and to limit his interactions with other students. In March 2018, he failed his final practical exam to learn his private pilot license ("PPL"). He returned to Nairobi in April 2018 and then traveled

---

[12] *Id.* at 42.

[13] *Id.* at 97.

to Jilib, where he met with "Brother." "Brother" told him to return to AAA and Mr. Abdullah did so in September 2018. Mr. Abdullah passed his final practical exam and obtained his PPL. He continued his flight training at AAA to obtain his commercial pilot license ("CPL").

[redacted]

In December 2018, Mr. Abdullah traveled back to Nairobi and rented an apartment, financed by al Shabaab. He returned to AAA at the end of December, 2018. He continued to pursue his CPL at AAA from January 2019 to May 2019.

From January 15 to 16, 2019, while Mr. Abdullah was in the Philippines, an attack occurred at the DusitD2 complex in Nairobi, Kenya.[14] Al Shabaab claimed responsibility. Ali Salim, who traveled with Mr. Abdullah to join al Shabaab, was one of five attackers and leader of the operation. He and the other attackers died. Twenty-two people were killed, including an American. Mr. Abdullah was not involved in the planning or preparation of the operation. In fact, he only heard about it after it happened, from "Stella Grace." [redacted]

Throughout this time, al Shabaab, specifically, "Stella Grace" continued to finance Mr. [redacted] Mr. Abdullah was eventually arrested by Philippines authorities in early July, 2019.

[redacted]

[redacted]

[14] Following the attack arrests were made. On June 19, 2025, a Kenyan court sentenced two architects of the attack - Hussein Mohammed Abdile and Mohamed Abdi Ali to 30 years' incarceration. Both had been convicted after trial of financing and facilitating the attack.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**The Impossibility of Cholo Abdi Abdullah Committing a September 11th Attack in the United States**

In its sentencing memorandum, the Government states, "The defendant's goals were clear – to bring terror to the United States by commandeering a plane, crashing it into a building, and murdering as many U.S. citizens as possible. Law enforcement thwarted the defendant's plot shortly before he obtained his commercial pilot's license – *inches away* from bringing his murderous plans to fruition." Gov't Sent. Memo at 1. This "plot" had no chance of success. It was not *inches*, but rather *leagues away* from ever happening. Mr. Abdullah did not have his CPL. He also did not have a visa to enter the United States. In fact, he had previously determined that it was too difficult to get such a visa and had been denied a visa to enter Canada. Even if he somehow was able to obtain a visa, it is extremely improbable that he, as a Kenyan Muslim with a CPL from a flight school in the Philippines would be able find employment as a pilot with a commercial airliner in the United States, such as Delta.[15] Accordingly, it was practically impossible, even if it was Mr. Abdullah's goal, which it was not, to pilot a "commercial airplane, crash it into a building in the United States, and recreate al Qaeda's horrific September 11, 2001 terrorist attacks." *Id.*

**Cholo Abdi Abdullah's Perseverance and Deterioration While Incarcerated Under Inhumane Conditions Pursuant to Special Administrative Measures ("SAMs") at MCC and MDC Brooklyn**

Since his extradition to the United States on December 16, 2020, Mr. Abdullah has been subjected to the harshest of prison conditions; conditions that involve severe isolation dictated by SAMs. As outlined in the attached report by forensic psychologist Dr. Adeyinka Akinsulure-Smith, *see* Exhibit "A" (Psychological Evaluation), the conditions under which Mr. Abdullah has been held meet criteria for the definition of torture - "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person." (U.N. Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art.1, para.1).

[redacted]

[15] Based on the general pilot requirements of Delta, Mr. Abdullah would not be hired. *See* https://www.delta.com/us/en/careers/pilots/hiring-faqs. He lacked legal authorization to work in the United States and sufficient travel documents; did not have a college or university degree; could not meet the FAA requirements or flight time requirements or other requirements.

[redacted]

[redacted]

[redacted]

**Cholo Abdi Abdullah's Loving and Close Relationships with his Mother, Brothers and Family**

Growing up in Isiolo, Mr. Abdullah enjoyed his family and spent a lot of time with his brothers. When his father tragically died when he was 13 years old, he helped his mother grieve her loss. They became closer and developed a bond. He lives with deep regret and pain that because of his actions and misguided ways, he is separated from her, and his brothers.

---

[16] In a call between Mr. Abdullah and his brothers, Hussein Abdullah and Rashid Abdullah on May 9, 2023, Rashid asked Mr. Abdullah how he was doing. Mr. Abdullah stated that "not very many people can be able to handle being in solitary confinement" and "were it not for the help of Allah, someone can commit suicide."

Since his incarceration at MCC and MDC Brooklyn, Mr. Abdullah has sought to maintain contact with his mother, brothers and family by way of phone calls.[17] The calls are supposed to be monthly, but have been irregular. Their communications, which are in Swahili, are recorded and summary translations are generated by the FBI. They are a lifeline for Mr. Abdullah. He hears about the current events within Isiolo and Kenya and the happenings of his brothers. He receives updates about the health and deaths of relatives and births of children. They share their reflections from the Quran and Islam, generally. Mr. Abdullah also advises his brothers and supports and comforts his mother. And he confides in her, in turn receiving strength. For instance, in call between Mr. Abdullah and his mother on May 16, 2023, Mr. Abdullah expressed his remorse for his actions. His mother told him that she "prays for him." Mr. Abdullah responded that "Allah wants them (i.e. his family) to make prayers of forgiveness." Most of all, in their calls they hear each others' voices. They share their lives. They laugh. They cry.

Mr. Abdullah and his family hope to stay in as close contact as possible while he serves his sentence. He cares about them and they care about him. He loves them and they love him. And for his mother, Mr. Abdullah deeply loves her and she loves him. Mr. Abdullah yearns for the day when he can be with her again in the present life, or in the afterlife. They shared such desires in a call on June 10, 2021 in which his mother, while crying, told Mr. Abdullah that she "prays that [Allah] helps her and Cholo meet again on this earth." In response, he said that he is "persevering" and that he "hears [her] voice and misses her." Later, in a call on May 3, 2022, Mr. Abdullah, in a call with his mother, said to her that "being close to his mother and helping her is a great deed in the eyes of Allah" and that the "only devotion there is in Islam is to worship Allah only and to honor ones parents."

**Procedural History and Sentencing Guidelines Analysis**

On December 10, 2020, the Government filed an indictment, charging Mr. Abdullah with the following: Count 1 - Conspiracy to Provide Material Support to a Foreign Terrorist Organization, 18 U.S.C. § 2339B(a)(1), (d)(1)(C), (E), and (F), and 3238; Count 2 - Providing Material Support to a Foreign Terrorist Organization 18 U.S.C. § 2339B(a)(1), (d)(1)(C), (E), and (F), and 3238, and 2; Count 3: Conspiracy to Murder U.S. Nationals 18 U.S.C. § 2332(b) and 3238; Count 4 - Conspiracy to Commit Aircraft Piracy 49 U.S.C. § 46502 and 18 U.S.C. § 3238; Count 5 - Conspiracy to Destroy Aircraft 18 U.S.C. §§ 32(a)(8) and 3238; and Count 6 - Conspiracy to Commit Acts of Terrorism Transcending National Boundaries 18 U.S.C. §§ 2332b(a)(2) and 3238. Mr. Abdullah was arrested in the Philippines and brought to the United States on December 15, 2020. He appeared in the Southern District of New York on December 16, 2020, and was detained at the Metropolitan Correctional Center ("MCC"). He was later transferred to the Metropolitan Detention Center ("MDC Brooklyn"). He has been incarcerated under SAMs since December 16, 2020.

[17] The Government acknowledges that Mr. Abdullah, based on his social call schedule at the MDC, has "family connections," but has refused to make "scheduled calls on multiple occasions, even after the trial and as recently as December 10, 2024." *See* Gov't Sent. Memo at 39. To the extent that the Government is suggesting that Mr. Abdullah lacks family support or does not care for his family, that is entirely false. Over the course of my representation, he has made every call to his family that MDC Brooklyn afforded him. And when MDC Brooklyn did not afford him his monthly family call, it destabilized him causing significant difficulty in my work with him.

On October 28, 2024, Mr. Abdullah, acting *pro se* proceeded to trial on all six counts in the indictment. After a 1-week trial, Mr. Abdullah was convicted of all six counts.

Based on information provided in trial transcripts, as well as by the Government, the United States Department of Probation ("Probation") drafted a pre-sentence report ("PSR"). Mr. Abdullah did not participate in a pre-sentence interview ("PSI") or otherwise in the pre-sentence process. As a result, Probation was unable to provide any essential information with respect to Mr. Abdullah, in the following sections of the PSR: (1) Personal and Family Data, (2) Physical Condition, (3) Mental and Emotional Health, (4) Substance Use Disorder, (5) Educational, Vocational and Special Skills, and (6) Employment Record. As the Court is aware, the absence of such information is critical, as the above categories are essential factors that the Court is mandated to consider in arriving at a sentence that is sufficient but not greater than necessary to reach the sentencing goals of Congress as set forth in 18 U.S.C. §3553(a). *See also* 18 U.S.C. §3661.

We do not object to the Guidelines analysis calculated by Probation. Because Mr. Abdullah was convicted of multiple offenses, Probation performed a multiple-count analysis, pursuant to U.S.S.G. § 3D1.1(a). Counts 1 through 6 were grouped because they involved the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. *See* U.S.S.G. § 3D1.2(b). Because the highest offense level was produced by Count 4, Conspiracy to Commit Aircraft Piracy, Probation utilized U.S.S.G. § 2A5.1. *See* U.S.S.G. § 3D1.3(a). As a result, the base offense level calculated by Probation was 38. *See* U.S.S.G. § 2A5.1. Probation included two victim-related adjustments. The first, resulting in a 12-level increase of the base offense level, was added because the offense was a felony that involved, or was intended to promote, a federal crime of terrorism. *See* U.S.S.G. § 3A1.4(a). Probation also included a 3-level victim-related adjustment, if the Court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, disability, or sexual orientation of any person. *See* U.S.S.G. § 3A1.1(a). Probation did not include a 3-level downward adjustment for acceptance of responsibility. *See* PSR at ¶ 56. The total offense level as calculated by Probation was 53. However, where the total offense level is calculated in excess of 43 – the maximum offense level set forth in the Sentencing table – the offense level will be treated as a level 43. Probation assigned Mr. Abdullah a criminal history score of zero, which placed Mr. Abdullah in Criminal History Category I. However, where the offense involved a federal crime of terrorism, the Criminal History Category is VI. *See* U.S.S.G. § 3A1.4(b). A total offense level of 43 results in a Guidelines range of Life imprisonment regardless of Mr. Abdullah's Criminal History Category.

* * *

Sentencing courts must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue."[18] Further, it must not presume the Guidelines as reasonable or be

[18] *Pepper v. United States*, 562 U.S. 476 (2011) (*quoting Koon v. United States*, 518 US 81, 113 (1996)).

restricted or bound by the Guidelines Range.[19] As such, a sentencing court must conduct an "independent review of the sentencing factors" in all cases for each defendant.[20] The aim is to fashion a sentence that is "sufficient, but not greater than necessary," based on an analysis of the § 3553(a) factors as they pertain to a particular individual offender, such as the purposes of sentencing, including, punishment, deterrence, incapacitation and treatment and rehabilitation, and consideration of the individual offender and his life history and background. This conforms with 18 U.S.C. § 3661, which provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."[21] In *Pepper*, the Supreme Court cited § 3661 as an important means of achieving just sentences: "[p]ermitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'"[22]

As this Court is well aware, *United States v. Booker*, 543 U.S. 220 (2005), and its progeny provide this Court the authority to vary from a strict application of the Guidelines. A substantial downward variance from the Guidelines is warranted in this case, based on the individualized assessment and consideration of the § 3553(a) factors as applied to Cholo Abdi Abdullah. The Guidelines Range is primarily constructed by and driven by aggravating factors, using points and numbers. Mitigating factors are not part of the Guidelines calculation. Further, the sentence of Cholo Abdi Abdullah, or any individual, should not be left to an algorithm, enhancements, points, or mathematical formula. "No chart of numbers will ever fully contemplate, quantify and cipher the endless variations of the human experience. While it might provide a normalizing force in sentencing, we cannot, with a system of points and categories, reduce justice to a universal formula."[23] Rather, the aim must be to impose a sentence that is fair and just given the particular

[19] *See Nelson v. United States*, 550 U.S. 350, 351 (2009); *see also United States v. Dorvee*, 604 F.3d 84, 93 (2d Cir. 2010) ("[i]n conducting this review [of the § 3553(a) sentencing factors], a district court needs to be mindful of the fact that it is 'emphatically clear' that the Guidelines are guidelines – that is, they are truly advisory'"), *quoting United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (requiring district courts not to presume that a Guidelines sentence is reasonable for any particular defendant).

[20] *See id.*

[21] Likewise, in 21 U.S.C. § 850, which specifically pertains to narcotics offenses and their penalties, Congress further determined that "… no limitation should be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence …" 21 U.S.C. § 850. *See also United States v. Murillo*, 902 F.2d 1169, 1172 (5th Cir. 1990).

[22] 562 U.S. at 488, *quoting Wasman v. United States*, 468 U.S. 559, 564 (1984); *see also Gall v. United States*, 552 U.S. 38, 50 (2007) (sentencing courts must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented"); *See also Cavera*, 550 F.3d at 189 (2d Cir. 2008) (en banc) (requiring district courts to conduct an "independent review of the sentencing factors" in all cases); *Gall*, 552 U.S. at 50 (sentencing courts must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented"); *United States v. Johnson*, 567 F.3d 40, 50-51 (2d Cir. 2009) (same).

[23] *United States v. Coughlin*, 2008 WL 313099 (W.D. Ark. Feb. 1, 2008).

facts of this case and the facts relative to Cholo Abdi Abdullah, and consistent with the purposes of sentencing.

With the focus on numbers, the Guidelines can become a gravitational pull on the ultimate sentence. This has been described by academic scholars as the "anchoring effect."[24] The "anchoring effect" is recognized by psychologists as a cognitive shortcut that has a strong tendency to undermine judgments in making difficult and complex decisions. Through an earlier disclosed number, the "anchor," the judgment of a decision-maker is influenced. Although *Booker* granted judges great discretion, sentences are often "anchored" by the particular Guidelines Range in a case. The Honorable Jed S. Rakoff described the phenomenon of the "anchoring effect" of the Guidelines as follows: "[T]he very first thing a judge is still required to do at sentencing is to calculate the Guideline range, and that creates a kind of psychological presumption from which most judges are hesitant to deviate too far."[25] We urge the Court to be mindful of such "psychological presumption." Additionally, while the Guidelines are the "starting point," and the Court must consider, Mr. Abdullah's sentence should not be directly derived from a mathematical analysis. Rather, it should be based on an individualized assessment of all the § 3553(a) factors.

As stated, and as this Court is also well aware, the overarching goal in any case is to fashion a sentence that is "sufficient, but not greater than necessary." And "[w]hile there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding of 'the diverse frailties of humankind,' and a 'generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain."[26] Mercy too, *must* play a role in determining a just and fair individualized sentence (emphasis added).[27] For the reasons set forth in this memorandum, a sentence well below the Guidelines - 360 months' incarceration or less is more than "sufficient, but not greater than necessary" for Cholo Abdi Abdullah.

---

[24] *See* Mark W. Bennett, *Confronting Cognitive "Anchoring Effect" and "Blind Spot" Biases in Federal Sentencing: A Modest Solution for Reforming a Fundamental Flaw,* 104 J. Crim. L. & Criminology 101, 132 (2014) (*citing United States v. Newhouse*, 919 F. Supp. 2d 955, 958 n.1 (N.D. Iowa 2013) (Bennett, J.). "Comprehensive data from the USSC establishes that the [post-*Booker/Gall*] discretion has, for the most part, had a surprisingly limited impact on federal sentencing. This is due primarily to the robust anchoring impact of first computing the advisory Guideline range before considering the other non-numerical § 3553(a) sentencing factors." *Id*. at 533-534. *See also*, *United States v. Ingram*, 721 F.3d 35, 40 (2d Cir. 2013) (Calabresi, J., concurring) (discussing how "anchoring effects" influence judgments and noting that the court "cannot be confident that judges who begin" at a higher guideline range "would end up reaching the same 'appropriate' sentence they would have reached" if they started from a lower guideline range). *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1353 n. 6, (2016) (Alito, J concurring in part) (Noting the "anchoring" effect of Guidelines).

[25] Hon. Jed S. Rakoff, *Why the Federal Sentencing Guidelines Should be Scrapped*, 26 Fed. Sent'g 6, 8 (Oct. 1, 2013).

[26] *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017).

[27] *United States v. Kloda*, 133 F. Supp. 2d 345, 349 (S.D.N.Y. 2001).

**Analysis of the Purposes of Sentencing as they Relate to Cholo Abdi Abdullah Favors a Sentence of No More than 360 Months' Incarceration**

Pursuant to § 3553(a), the Court must consider the purposes of sentencing, including "just punishment," deterrence, recidivism and incapacitation as they relate to Cholo Abdi Abdullah.

**a. "Just Punishment"**

Section 3553(a)(2)(A) requires a sentencing judge to consider "the need for the sentence imposed … to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." There is no question that Mr. Abdullah was convicted of and committed serious offenses and that he must be held accountable. Mr. Abdullah understands and accepts that he will receive a sentence of at least twenty years' incarceration in an American prison and endure the severe consequences that will follow, including years of separation from his mother, brothers and family and the reality that he may never see them again.

A sentence of life imprisonment is unjust. Mr. Abdullah's "collaboration with high-level al-Shabaab operatives," came about because of their manipulation of him, rather than a genuine intention on his part to "execute a mass-casualty terrorist attack" in the United States. *See* Govt's Sent. Memo at 29. He did not "fully intend[] to kill as many unsuspecting and innocent American men, women, and children as possible." *Id.* [redacted] And for this reason, he now states, **"my arrest was my rescue."** Further, other significant punitive consequences, including his torturous incarceration conditions under SAMs and separation from his family, mitigate against a life sentence.

**b. Deterrence, Recidivism and Incapacitation**

Section 3553(a)(2)(B) and (C) require a sentencing judge to consider "the need for the sentence imposed" to "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant." Here, in this case, for Cholo Abdi Abdullah, a sentence no more than 360 months' incarceration satisfies these sentencing purposes of deterrence, both specific and general, and incapacitation.

Mr. Abdullah is not the same person when he joined al Shabaab approximately ten years ago, when he was 25 years old. He has different beliefs and does not believe in extremism. As stated, he was motivated to join al Shabaab based on his experience of oppression and had been radicalized. He continued to be radicalized after joining al Shabaab through leadership's intentional use of propaganda with him. Leaders and high-level operatives, such as "Brother" and "Stella Grace," in seeing Mr. Abdullah's vulnerabilities, worked to take advantage of him and

manipulated him for their own cause. They gave him significance, belonging and purpose. [redacted] Mr. Abdullah's change in ideology and allegiance to Islam, differences with al Shabaab, [redacted], and regret and disappointment with himself, collectively counsel against a life sentence for the purposes of deterrence and incapacitation.[28]

As for general deterrence, the Court should also not overlook the adversities Mr. Abdullah has experienced, the circumstances that led him to joining al Shabaab and the dangers that prevented him from leaving, his brutal and inhumane conditions of solitary confinement over the last five years and the love and support from his family, solely to "send a message" to others. As the Court is aware, the impact of general deterrence is difficult, if not impossible, to quantify. After all, vast amounts of research on general deterrence show that the chance of being arrested—that is, "caught"—is a substantially more powerful deterrent than the severity of punishment. Multiple courts have relied on such data and research and concluded the same.[29] At bottom, general deterrence is served by making arrests and convicting defendants of crimes that, regardless of the length of jail sentences, cause severe and debilitating real-life consequences. In Mr. Abdullah's case, the message is clear: if you engage in terrorism offenses, you will face a substantial and life-altering sentence and be separated from your family, and be detained under inhumane conditions, such that you will suffer in every possible way. And lastly, there is no evidence that a sentence greater than our request, including a life sentence, will drive home that message any harder or louder to anyone considering joining a terrorist organization. Rather, it is through constructive educational and rehabilitation efforts that aim at curtailing extremist ideology, rather than the imposition of life sentences, which will deter "young men and women … from choosing to follow a path similar to [Mr. Abdullah's] and engaging in potentially devastating conduct in support of

---

[28] The Government argues that "anything short of a life sentence would leave the public at risk." Gov't Sent. Memo at 34. Aside from the cited reasons why a life sentence is inappropriate for the purposes of deterrence and incapacitation, the Government fails to appreciate that should the Court impose a sentence that we are seeking, Mr. Abdullah will be a much older man. Upon release, he will not return to any battlefield. Further, with technological advancements, his pilot skills, which he learned over a relatively short period of time and will not use for decades, will likely have little to no value. Finally, should he remain confined under similar conditions while serving his sentence, Mr. Abdullah will undoubtedly further deteriorate psychologically making him a liability to his family and community. No terrorist organization will be interested in exploiting him again for their purposes.

[29] *See, e.g.*, *United States v. Browning*, 2021 WL 795725, at *5 (E.D. Mich. Mar. 2, 2021) ("In terms of both specific and general deterrence, there is overwhelming evidence in the scientific literature that the *certainty* of being caught is a vastly more powerful deterrent than the severity of the punishment."); *United States v. Lawrence*, 254 F. Supp. 3d 441, 444 (E.D.N.Y. 2017) (accepting expert testimony that "[m]ost of the studies agree that there is very little deterrent effect associated with lengthy [] punishment"); *see also* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013) ("[T]here is little evidence of a [] deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased [by longer sentences].").

al-Shabaab or other terrorist groups." *See* Gov't Sent. Memo at 38.

**Sentences Imposed on Other Defendants Convicted of Similar Terrorism Offenses Support a Sentence of No More Than 360 Months' Incarceration for Cholo Abdi Abdullah**

As this Court is well aware, a sentencing court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In its sentencing memorandum, the Government contends that a life sentence for Mr. Abdullah is needed to "avoid unwarranted sentence disparities." The Government is incorrect.

The Government focuses on two cases prosecuted in this District: *United States v. Rahimi*, 16 Cr. 760 (RMB) and *United States v. Ullah*, 18 Cr. 16 (RJS). Both Rahimi and Ullah were convicted after trial where the evidence showed that they planned and committed *actual* attacks in New York City, causing injuries to others. Rahimi, motivated by propaganda from terrorist groups, placed two explosives in Chelsea and detonated them. Thirty people were injured and hundreds of thousands of dollars in property damage resulted. He also planted another explosive device in New Jersey and detonated it. In his backpack, he had six other explosive devices. Finally, at the time of his arrest, he fired multiple shots at police officers, striking and injuring multiple officers. Rahimi was sentenced to life imprisonment. Ullah, during morning rush hour, detonated a pipe bomb that had been strapped to his chest in a subway station under the Port Authority Bus Terminal in midtown Manhattan. One person was injured, two others lost their hearing and hundreds more were terrified. He did so on behalf of ISIS. He began researching how to build a bomb about a year before the attack. He built the pipe bomb in the weeks leading up to the attack at his Brooklyn apartment. After his arrest, he told law enforcement that he chose a busy weekday morning in Manhattan for the attack to "terrorize as many people as possible." And he succeeded. Finally, while at the MCC, he threatened staff and told them that "more is coming … You started this war, we will finish it. More is coming. You will see." He too was sentenced to life imprisonment. Mr. Abdullah is easily distinguishable from both and should receive a lesser sentence. He did not participate in any attacks abroad or in the United States, or actually come close to it. Additionally, unlike Rahimi and Ullah, Mr. Abdullah changed his ideology because of his differences with al Shabaab, [redacted], and lives with great regret and disappointment with himself.

The four other cases relied upon by the Government also fall short in support of a life sentence for Mr. Abdullah as they, like *Rahimi* and *Ullah*, involved more serious conduct and aggravating factors:

1. *United States v. Mohammed Mansour Jabarah*, 02 Cr. 1560 (BSJ) (SDNY): Jabarah was a member of al Qaeda who conspired to kill American citizens by bombing United States embassies in Singapore and the Philippines. He had personal relationships with Usama Bin Laden and Khalid Sheikh Mohammed ("KSM"). KSM sent Jabarah from Pakistan to Southeast Asia to meet with another terrorist organization to plan and execute the attacks on American embassies. Following his arrest, he initially cooperated and was housed in a FBI-arranged facility. However, his cooperation was short lived. Unbeknownst to the FBI agents and prosecutors, Jabarah was planning a "martyrdom mission" to murder the "infidel" agents and prosecutors he considered

responsible for his capture. During an impromptu search of his quarters, agents found weapons, directions on making explosives, pictures of Bin Laden and Mohammed Atta, and handwritten materials bearing the initials of agents and prosecutors whom Jabarah met. There were also volumes of writings drafted by Jabarah while in FBI custody in which he described his commitment to waging "jihad" against the "infidels" and killing his captors. It was Jabarah's offense conduct *and* his post-arrest "martyrdom mission" that resulted in a sentence of life imprisonment.

2. *United States v. Richard Reid*, 02 Cr. 10013 (WGY) (D. Mass.): Reid, the infamous "shoe bomber," was an al Qaeda member who had trained in Pakistan and Afghanistan. On December 22, 2001, he boarded an American Airlines flight between Paris and Miami. He wore shoes packed with explosives and attempted to detonate them, when he was subdued. He was arrested and convicted. At his sentencing, Reid lacked remorse and was combative. He stated that he was an "enemy" of the United States and a "soldier" under the command of Usama Bin Laden. He further stated that "the [American] flag will come down on the day of judgment." Based on his offense conduct, which involved premeditation and planning, and actually getting on an American commercial airliner with explosives, along with his disrespect for the court and process and confrontational nature, Reid was sentenced to life imprisonment.

3. *United States v. Abdul Hakim Murad*, 93 Cr. 180 (LAK) (SDNY): Murad participated in plot that involved a three-phase terrorist attack with Ramzi Yousef and KSM. It never materialized. They intended to assassinate Pope John Paul II, blow up 11 airliners from Asia to the United States and crash a plane into the CIA headquarters in Langley, Virginia. Murad, along with his co-conspirators tested a bomb on a flight from Manila to Tokyo. The bomb exploded and killed a passenger and badly injured several others. He was sentenced to life imprisonment.

4. *United States v. Oussama Kassir*, 04 Cr. 356 (JFK) (SDNY): Kassir conspired with others to establish a "jihad" training camp in Oregon. The "jihad" training camp was established as a site where Muslims could receive various types of training, including military-style "jihad" training, in preparation to fight "jihad" in Afghanistan or to continue with additional "jihad" training in Afghanistan. Kassir informed others that he supported Usama Bin Laden and al Qaeda, and that he had previously undertaken "jihad" training in Pakistan. Kassir also had a compact disc that contained instructions on how to make bombs and poisons. After leaving Oregon, Kassir traveled back to Seattle, Washington, and resided in the Dar Us Salaam Mosque in Seattle for approximately two months. At the mosque, Kassir provided the men at the mosque with "jihad" training lessons, including lessons on how to assemble and disassemble AK- 47's and how to alter an AK-47 to launch a grenade. Finally, he established at least six different terrorist websites, which he operated from approximately December 2001 until the time of his arrest. The websites contained instructions about how to make bombs and poisons and featured such materials as "The Mujahideen Explosives Handbook" and "The Mujahideen Poisons Handbook." He was convicted after trial and sentenced to life imprisonment.

Lastly, the Government refers to *United States v. Mumuni*, 946 F.3d 97 (2d Cir. 2019) in failed support of a life sentence for Mr. Abdullah. *See* Gov't Sent. Memo at 43. Mumuni received authorization from Junaid Hussain, a Syria-based ISIS operative, to conduct a suicide attack against law enforcement. When FBI agents came to his home to execute a search warrant, Mumuni concealed a knife behind his back, feigned compliance, then lunged at an FBI agent, stabbing him multiple times in the chest in an attempt to murder him. The agent survived only because a metal ammunition magazine in his vest deflected some of the near-fatal stabs. Undeterred, Mumuni attempted to reach for the trigger of another agent's M4 assault rifle before being subdued. Mumuni had previously planned potential attacks in Times Square or the Freedom Tower, using explosive devices. The Sentencing Guidelines called for 85 years, the statutory maximum. He was sentenced to 204 months' imprisonment (300 months following remand from the Second Circuit). *Mumuni* demonstrates that even where a defendant plans, intends and actually commits an attack against American law enforcement and is motivated to do so, a life sentence is still excessive.

The need to avoid unwarranted sentencing disparities supports a sentence of no more than 360 months' imprisonment. A review of comparable cases makes clear that life sentences should be reserved for *only* the most extreme and heinous conduct – defendants who plan and *actually* commit violent terrorist attacks. Nonetheless, even those who actually committed violent terrorist attacks have received non-life sentences. They include:

1. *United States v. Saado Mohamed Ibrahim*, 96 Cr. 660 (AJ) (SDFL): Ibrahim was convicted of aircraft piracy related to an incident on July 26, 1996. Specifically, he forced his way into the cockpit of Iberia Flight 6621 en route from Madrid to Havana on July 26, 1996, and threatened to blow it up. The aircraft carrying 231 passengers and crew landed in Miami and Ibrahim surrendered and was arrested. Ibrahim was convicted after trial on April 25, 1997. On August 25, 1997, he was sentenced to 240 months' imprisonment.

2. *United States v. Muhanad Mahmoud Al Farekh*, 15 Cr. 268 (BMC) (EDNY): Al Farekh, an American citizen, joined al Qaeda. He became a member of, and ultimately ascended to, a leadership role within al-Qaeda's external operations group, which specialized in planning and executing attacks against the U.S. and its Western allies. Over seven years, he conspired to kill Americans, including by assisting with building an explosive device that was used to attack a U.S. military installation in Afghanistan in 2009. The attack led to several serious injuries. On September 29, 2017, he was convicted after trial, of conspiracy to murder United States nationals, conspiracy to provide material support to a foreign terrorist organization and terrorists, and several weapons charges including the use of explosives, conspiracy to use a weapon of mass destruction, and conspiracy to bomb a government facility. On March 13, 2018, he was sentenced to 45 years' imprisonment.

3. *United States v. Cesar Sayoc*, 18 Cr. 820 (JSR) (SDNY): Sayoc, who had nine prior convictions, mailed 16 improvised explosive devices ("IEDs") to 13 specific victims around the country. The IEDs contained explosive powder, chlorine, and shards of glass. His mailings were a culmination of many years of threats, and months of planning. Sayoc repeatedly expressed his intent to intimidate and kill or injure his victims, mainly prominent political figures. Sayoc mailed the IEDs to private residences and government buildings, targeting George Soros, Hillary Clinton, Barack Obama, Eric Holder, Joe Biden,

Kamala Harris, Corey Booker, and others. The Sentencing Guidelines called for a sentence of life. Probation recommended a life sentence. The Government sought a life sentence. On August 7, 2019, Sayoc was sentenced to 240 months' imprisonment.

4. *United States v. Trevor Bickford*, 23 Cr. 91 (PKC) (SDNY): On December 31, 2022, Bickford traveled from Maine to New York City to "wage jihad" and "kill as many of his targets as possible." He researched his target location, Times Square, and settled on his plan of attack. He then committed a terrorist attack during New Year's Eve celebrations. He attempted to murder three New York City Police Department officers. While they survived, they suffered serious injuries. One suffered a brain injury. Another suffered a skull fracture. The officers requested that Bickford receive a life sentence. The Sentencing Guidelines called for a sentence of 1,440 months or 120 years' imprisonment. Probation recommended a sentence of 600 months' imprisonment. The Government sought a sentence of at least 600 months' imprisonment. On May 10, 2024, Bickford was sentenced to 324 months' imprisonment.

5. *United States v. Cole Bridges*, 21 Cr. 65 (LJL) (SDNY): Bridges joined the U.S. Army with the goal of infiltrating its ranks on behalf of ISIS, and provided extensive sensitive military information to people he believed to be ISIS operatives, including detailed diagrams and materials on U.S. Army tactics, techniques, and procedures, information on troop movements and locations, as well as guidance on how ISIS could use this information to successfully defeat U.S. military units. He did so with the explicit purpose of murdering fellow U.S. soldiers in an ambush. Bridges also provided information to people he believed to be ISIS operatives on methods for selecting targets in New York, and advice on how to maximize casualties using military tactics. He disseminated violent propaganda on social media, and filmed his own ISIS propaganda video praising what he believed would be an imminent attack on U.S. military personnel based on the information he had provided. In the video, he urged all Americans, as well as his fellow soldiers, to take up arms for ISIS. The Sentencing Guidelines called for a life sentence. Government advocated for a sentence of 40 years' imprisonment, the statutory maximum. On October 11, 2024, Bridges was sentenced to 168 months' imprisonment.

Accordingly, the above case comparisons provide further support for a sentence of no more than 360 months' incarceration for Cholo Abdi Abdullah.

**Conclusion**

When Mr. Abdullah was growing up in Isiolo, Kenya, he and his family experienced ongoing oppression and discrimination because of their Islamic faith. He desired change and the end of oppression and discrimination for Muslims in Kenya and Somalia. A budding investigative journalist, he sought to expose corruption within the Kenyan government. Following Kenya's military invasion into Somalia in October, 2011, terrorist attacks increased significantly in Kenya's major cities. In response, Kenya's military forces, including the ATPU, engaged in violence. They killed, kidnapped, abused, harassed anyone suspected of engaging in terrorism. At the time, Mr. Abdullah was in his early twenties. In 2012, after no longer able to pay for his university education and being unemployed, he experienced an inflection point – the assassination of Cleric Aboud

Rogo by the Kenyan government, which resulted in widespread protests. It also resulted in Mr. Abdullah, who had become destabilized, deepening his study of Islam and becoming drawn to the extremist ideology of al Shabaab. Ultimately, he decided to join al Shabaab in 2015 and did so out of idealism and to help liberate oppressed Muslims. He regrets his choice to do so.

After joining al Shabaab, Mr. Abdullah was targeted by its leadership. He was young, smart and idealistic. He also had vulnerabilities and a desire for significance, identity and purpose. Al Shabaab, in particular "Brother" and "Stella Grace," recognized that in Mr. Abdullah. [redacted] This lasted until he was arrested by Philippines authorities in 2019.

**"My arrest was my rescue."** For Mr. Abdullah, his arrest was his only way out of al Shabaab. [redacted] He accepted responsibility for his actions and expressed regret for his decisions. He has done the same with his mother, brothers and family and asked that his mother "pray" for him and that she and the family "pray for forgiveness." He has further affirmed his allegiance only to Islam and desires to be as "close" as he can to his mother and to honor and respect her. And, for the last five years, Mr. Abdullah has been subjected to conditions that involve severe isolation and restrictions dictated by SAMs. Such conditions and restrictions, which have amounted to torture, have inflicted great psychological distress and suffering upon Mr. Abdullah. Continued incarceration under these conditions will inevitably cause him permanent damage. Consequently, based on the circumstances in this case and for this person – Cholo Abdi Abdullah, along with the aforementioned case comparisons, a life sentence, which should be reserved only for the "worst of the worst," is excessive and inappropriate. Mr. Abdullah should not die in an American prison by incarceration. As such, we respectfully request that the Court impose a sentence of no more than 360 months' incarceration for Mr. Abdullah. Such a sentence is "sufficient, but not greater than necessary," based on all the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

*Anthony Cecutti*

Anthony Cecutti, Esq.

# Exhibit "A"

**ADÉYÍNKÁ M. AKINṢULURẸ-SMITH, Ph.D., ABPP**
275 West 96th Street, Suite 8D
New York, New York 10025
(917) 332-8904
NYS License # 013405

**PSYCHOLOGICAL EVALUATION**

THIS INFORMATION IS CONFIDENTIAL

**Name**: Mr. Cholo Abdi Abdullah
**Date of Birth**: October 22, 1990
**Gender**: Male
**Age**: 35 years
**Dates of Examination**: 6/23/2025, 7/15/2025, and 8/13/2025
**Date of Report**: November 24, 2025

**Referral Question**:

Mr. Cholo Abdi Abdullah is a 35-year-old, heterosexual, cis-gender, single, Black Muslim, male from Kenya. He was charged in a six-count indictment with conspiracy to provide material support to a terrorist organization, conspiracy to murder United States nationals abroad, conspiracy to commit aircraft piracy, conspiracy to destroy commercial aircraft, and conspiracy to commit acts of terrorism transcending national boundaries. He was convicted of such offenses on November 4, 2024.

Mr. Abdullah has been incarcerated at the Metropolitan Correctional Center (MCC) and the Metropolitan Detention Center (MDC) in Brooklyn, New York since his extradition from the Philippines to the United States on December 16, 2020. Since his incarceration nearly five years ago, Mr. Abdullah has been subjected to Special Administrative Measures (SAMs). In addition to extreme solitary confinement, these measures include a total restriction of his access to visitors, other inmates, and with some limited exceptions, the mail, the telephone, and the media.

Mr. Abdullah was referred for a psychological evaluation by his attorney. Specifically, this examiner was retained for the purpose of conducting a trauma-informed psychological assessment to review the impact of the ongoing application of SAMs on Mr. Abdullah's psycho-emotional functioning and to render opinions related to the impact of this chronic traumatic stressor on his present psychological functioning. This report serves to memorialize those opinions, to a reasonable degree of psychological certainty.

**Case Summary:**

Since his extradition to the United States on December 16, 2020, Mr. Abdullah has been incarcerated under extremely harsh conditions dictated by SAMs. As outlined in this report, the conditions under which Mr. Abdullah is being held meet criteria for the definition of torture, "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person." (U.N. Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art.1, para.1[1]).

For close to five years, Mr. Abullah has endured both ongoing sensory deprivation and overload; along with solitary confinement in the forms of physical, social, spiritual, and information isolation. During this time, the entirety of Mr. Abdullah's world has been reduced to the four corners of his small, windowless prison cell. Mr. Abdullah is compelled to eat, sleep, and attend to all his bodily functions in a tiny cell, all while under constant video surveillance. It is important to note that during the time Mr. Abdullah has been subjected to SAMs, he has received very few disciplinary infractions. His Presentence Investigation Report (PSR 1/31/25) reference one instance (from Bureau of Prisons' (BOP) Sentry report dated November 8, 2024) for which on July 19, 2024, Mr. Abdullah was "disciplined for possessing an unauthorized item." For this transgression, he "was sanctioned with 100 days loss of phone privileges." A review of Mr. Abdullah's BOP records indicates that on December 12, 2024 an incident report was made against him for "refusing work/program assignment" (306) and "refusing to rotate cells" (307).

[redacted].

[redacted]
Given these factors, in my professional opinion, Mr. Abdullah's psychosocial functioning and wellbeing would greatly benefit by change from the torturous conditions he is currently held under (i.e., SAMs) to being placed in the general prison population where he can at least have human contact that will allow him to rebuild his fractured sense of self and connections with human society.

---

[1] United Nations Human Rights Office of the High Commissioner (2023, April). *Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*. https://www.ohchr.org/sites/default/files/cat.pdf

**Conditions of Evaluation**:

Each meeting with Mr. Abdullah was held on the SAMs Unit at MDC Brooklyn. Mr. Anthony Cecutti, Esq, his attorney, was present for the entire duration of all of our meetings. We were separated from Mr. Abdullah by a thick glass partition. Throughout the course of our meetings, there was a constant, intermittent loud beeping sound and MDC officers would regularly slide open a partition to observe us.

At the beginning of our first meeting on June 23, 2025 and during our subsequent encounters, I identified myself to Mr. Abdullah and confirmed his name and date of birth. During each meeting, I discussed the limits of confidentiality of this Psychological Evaluation and advised him that I would share my findings with him and his attorney. I informed him that at his attorney's discretion, I would submit a written report. Although reluctant at first and with much hesitation, Mr. Abdullah agreed to meet with me. He also agreed to the condition that I would approach this evaluation with no particular result in mind and that I would exercise independent professional judgment in all aspects of this evaluation. Mr. Abdullah appeared to understand the limits of confidentiality and consented.

**Sources of Information:**

Data for this report were gathered during three clinical interview sessions with Mr. Abdullah (6/23/2025, 7/15/205, and 8/13/25) totaling over approximately 8 hours. [redacted]

Data collection was further challenged by the limitations of our setting – the thick glass partition that separated us, the video cameras that appeared to be recording us, the constant, intermittent loud beeps, and the frequent surveillance checks by the guards. [redacted] Despite these environmental challenges, the data supporting this report was derived from those clinical interviews, a mental status exam, and the psychological measures I was able to administered to Mr. Abdullah under these challenging conditions.

The information from our meetings was supplemented by a comprehensive review of Mr. Abdullah's Presentence Investigation Report (P7304273) and his BOP Health Services Records.

**Behavioral Observations and Mental Status Exam**

Mr. Abdullah was brought to each session wearing his orange institutional jumpsuit. He presented as an alert, tidily-groomed, healthy individual of average weight and height. [redacted]

[redacted]

[redacted]

Mr. Abdullah reported that he speaks fluent Borana, Swahili and English. Our meetings were conducted in English. Mr. Abdullah's verbal fluency appeared to be intact. Receptively, he appeared to comprehend all directions and instructions presented to him. Throughout, he was able to ask for further clarification when he did not understand what was asked of him. He appeared to be able to adequately see and hear all test stimuli presented. As much as he could on the other side of the thick glass partition that separated us, Mr. Abdullah was able to engage in reciprocal social interactions and conversation.

Regarding fine motor functions, Mr. Abdullah reported that he is right-hand dominant. Gross motor functions (observed when he was cuffed and led out of his side of the meeting room), while not formally assessed, appeared within normal limits. Mr. Abdullah was fully ambulatory. There was no notable disturbance of gross motor balance, coordination, or gait. With regard to attention, he generally sustained his attention and concentration on tasks. There was no noticeable disturbance of activity levels.

Overall, Mr. Abdullah's presentation during and across our meetings was consistent. His speech was normal in rhythm and rate, clear, coherent, and logical. He chose his words carefully and thoughtfully. He maintained appropriate eye contact. He was alert and aware of his surroundings and his insight was good. His memory for remote and recent events in his life appeared to be intact. No impairments in reality contact were evident at any time. [redacted]

Mr. Abdullah's responses to questions asked of him appeared to be free of any deliberate attempts to present a distorted picture. In all our meetings, he provided his personal history, past and current experiences in an unrehearsed fashion with sufficient detail, consistency, logic and attention.

**Psychological Findings**

[redacted]

[redacted]

[redacted]

[redacted] Despite this challenge, the following

[2] Dworkin, E. R., Menon, S. V., Bystrynski, J., & Allen, N. E. (2017). Sexual assault victimization and psychopathology: A review and meta-analysis. *Clinical psychology review*, *56*, 65-81.

[3] Dietrich, A. (2003). Characteristics of child maltreatment, psychological dissociation, and somatoform dissociation of Canadian inmates. *Journal of Trauma & Dissociation*, *4*(1), 81-100.

[4] Briere, J., & Rickards, S. (2007). Self-awareness, affect regulation, and relatedness: Differential sequels of childhood versus adult victimization experiences. *The Journal of nervous and mental disease*, *195*(6), 497-503.

[5] Van der Kolk, B. A., Pelcovitz, D., Roth, S., & Mandel, F. S. (1996). Dissociation, somatization, and affect dysregulation: The Complexity of adaption to trauma. *The American journal of psychiatry*.

[6] Cloitre, M., Stovall-McClough, C., Zorbas, P., & Charuvastra, A. (2008). Attachment organization, emotion regulation, and expectations of support in a clinical sample of women with childhood abuse histories. Journal of Traumatic Stress: Official Publication of The International Society for Traumatic Stress Studies, 21(3), 282-289.

[7] Pietrzak, R. H., Goldstein, M. B., Malley, J. C., Johnson, D. C., & Southwick, S. M. (2009). Subsyndromal posttraumatic stress disorder is associated with health and psychosocial difficulties in veterans of Operations Enduring Freedom and Iraqi Freedom. *Depression and anxiety*, *26*(8), 739-744.

[8] Briere, J., Scott, C., & Weathers, F. (2005). Peritraumatic and persistent dissociation in the presumed etiology of PTSD. *American Journal of Psychiatry*, *162*(12), 2295-2301.

[9] Ouimette, P. E., & Brown, P. J. (2003). *Trauma and substance abuse: Causes, consequences, and treatment of comorbid disorders*. American Psychological Association.

[10] Panagioti, M., Gooding, P. A., & Tarrier, N. (2012). A meta-analysis of the association between posttraumatic stress disorder and suicidality: the role of comorbid depression. *Comprehensive Psychiatry*, *53*(7), 915-930.

[11] Briere, J., & Gil, E. (1998). Self-mutilation in clinical and general population samples: Prevalence, correlates, and functions. *American journal of Orthopsychiatry*, *68*(4), 609-620.

standardized instruments were used to provide an independent assessment, of Mr. Abdullah's current functioning:

i) Somatic Symptom Scale-8 (SSS-8[12]). The eight item SSS is a brief, patient-reported outcome measure of somatic symptom burden. These symptoms were originally chosen to reflect common symptoms in primary care but they are relevant for a large number of diseases and mental disorders.
ii) The Physician's Health Questionniaire-9 (PHQ-9[13]), a 9-item instrument for screening, diagnosing, monitoring and measuring the severity of depression;
iii) The Hopkins Symptom Checklist-25 (HSCL-25[14]), a 25-item instrument that consists of two subscales measuring depression and anxiety;
iv) The Life Events Checklist for *DSM-5* (LEC-5[15]), an instrument which assesses exposure to 16 events known to potentially result in PTSD or distress; and
v) Torture Screening Checklist, Revised (TSCL-R[16]), this checklist is based on the United Nations Convention against Torture and the United States Torture Victims Relief Act. It is used by clinicians to assess whether an interviewee has been tortured or exposed to war trauma.

All these instruments have been used to assess mental health domains that are important across psychiatric diagnoses. In Mr. Abdullah's case, they were used to enhance clinician decision-making and, along with a comprehensive mental status assessment, to assist with clinical diagnosis and assess for malingering. These measures have been used widely in research and clinical settings to screen for and assess symptoms, and to make provisional diagnosis in a variety of populations. Although reluctant and suspicious at first, eventually Mr. Abdullah willingly responded to some of the instruments. When he did so, he responded thoughtfully to each item in a reasonable amount of time.

**Findings**

[redacted] [redacted]

[redacted]

---

[12] Gierk, B., Kohlmann, S., Kroenke, K., Spangenberg, L., Zenger, M., Brähler, E., & Löwe, B. (2014). The somatic symptom scale–8 (SSS-8): a brief measure of somatic symptom burden. *JAMA internal medicine*, *174*(3), 399-407.

[13] Kroenke, K., Spitzer, R. L., & Williams, J. B. (2001). The PHQ-9: validity of a brief depression severity measure. *Journal of general internal medicine*, *16*(9), 606-613.

[14] Derogatis, L. R., Lipman, R. S., Rickels, K., Uhlenhuth, E. H., & Covi, L. (1974). The Hopkins Symptom Checklist (HSCL): A self-report symptom inventory. *Systems Research and Behavioral Science*, *19*(1), 1-15.

[15] Weathers, F. W., Blake, D. D., Schnurr, P. P., Kaloupek, D. G., Marx, B. P., & Keane, T. M. (2013). *The life events checklist for DSM-5 (LEC-5)*. Instrument available from the National Center for PTSD at www. ptsd. va. gov.

[16] https://healtorture.org/

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

*iii. Test Response Validity*

Mr. Abdullah demonstrated a consistent pattern of responding on the tests he agreed to complete. His performance on one or more objective measures of validity fell with the normal range, underscoring his motivation to perform to the best of his abilities. There was no significant variability in his pattern of performance across the tests in the battery that would indicate questionable validity or motivation. This observation leads to the firm conclusion that there is no indication of malingering (i.e., feigning mental or physical illness for benefit) during the present evaluation.

## Diagnostic Criteria

### Torture

According to the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, torture means "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person." (U.N. Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art.1, para.1[17]). While definitions of torture vary, and often incorporate elements that remain controversial—such as the referential ambiguity regarding both the required intensity of pain or

[17] United Nations Human Rights Office of the High Commissioner (2023, April). *Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*. https://www.ohchr.org/sites/default/files/cat.pdf

suffering and the intended purpose behind the act[18, 19] — broadly speaking, torture is an ideologically driven assault that is systematically and intentionally carried out using psychological and physical techniques to affect the detainee's psyche or body, aiming to inflict severe pain and suffering, humiliation, punishment, and degradation[20, 21].

Torture is any act that deliberately inflicts severe physical or emotional pain or suffering on an individual to obtain from that person or another person - information or a confession, or to punish or intimidate or force them to do anything, or for any reason based on any type of discrimination, when such pain or suffering is inflicted by or at the instigation of or with the consent of a person acting in an official capacity. Although there is little to no credible evidence to support the belief that torture provides any reliable information, acts of torture are deliberately designed to maximize the degradation of the individual. Torture is often used systematically to break down resistance and dehumanize individuals as well as their entire communities.

Many forms of torture have been documented; from the physical techniques (e.g., beatings, electric shock, deprivation, sexual violence, etc.) to sophisticated psychological ones (e.g., accusations, threats of death or fake executions). The consequences of torture are multi-faceted and far reaching. If torture is left untreated, the physical and psychological consequences of torture can cause extensive suffering (including, head injuries, back pain, severe scarring, dental, visual, and auditory problems, anxiety, depression, nervousness, insomnia, nightmares, etc.). Torture undermines the individual's fundamental views of the world, creating an ongoing sense of unpredictability, helplessness, along with profound feelings of shame and humiliation. The experience of torture can also influence the survivor's ability to develop and maintain healthy interpersonal relationships.

Sensory Deprivation and Solitary Confinement as a form of Torture

There is broad and growing consensus that the standard conditions of prolonged sensory deprivation and/overload and solitary confinement cause serious and often indelible harm after just weeks. The United Nations Standard Minimum Rules for the Treatment of Prisoners or "Mandela Rules," named for Nelson Mandela, define "prolonged" as beyond fifteen days, after which continued isolation constitutes cruel, inhuman and degrading treatment and, under some conditions, torture. For prisoners under SAMs, isolation lasts at least a year and typically far longer.[22,]

Various scientific studies have concluded that prolonged isolation causes severe physical disease, including chronic headaches, digestive problems, dizziness, and even heart palpitations. One study of prisoners in solitary confinement found that all prisoners interviewed exhibited

---

[18] Kenny, P. D. (2010). The meaning of torture. *Polity*, *42*(2), 131-155.
[19] Rodley, N. S. (2002). The definition (s) of torture in international law. *Current Legal Problems*, *55*(1), 467-493.
[20] Kenny, P. D. (2010). The meaning of torture. *Polity*, *42*(2), 131-155.
[21] Silove, D. (1996). Torture and refugee trauma: Implications for nosology and treatment of posttraumatic syndromes. In F. L. Mak & C. C. Nadelson (Eds.), *International review of psychiatry,* Vol. 2, pp. 211–232). American Psychiatric Association.
[22] Allard K. Lowenstein International Human Rights Clinic & Center for Constitutional Rights. (2017). *The darkest corner: Special administrative measures and extreme isolation in the Federal Bureau of Prisons*. Center for Constitutional Rights. https://ccrjustice.org/sites/default/files/attach/2017/09/SAMs%20Report.Final_.pdf.

physical symptoms "that are well known in the literature to be caused by isolative confinement." Other studies demonstrate that the complete absence of stimuli experienced in solitary confinement causes structural changes to the brain.[23] Furthermore, additional studies demonstrate that solitary confinement also causes severe psychological damage, including anxiety, panic, rage, loss of control, paranoia, and hallucinations.[24, 25]

Such symptoms are widespread and have been documented among prisoners under solitary confinement. For many, the price of long-term isolation includes prisoners' basic ability to relate to other humans. Haney (2020), a leading scholar on solitary confinement has used the term "social death" to describe the phenomenon wherein prisoners under prolonged solitary confinement lose the "ability to function as social beings."[26] In summary, the effects of long-term solitary confinement mirror the effects of other forms of torture: anxiety, panic, paranoia, hallucinations, self-mutilation, and suicide. As noted by Heiss (2015), when such symptoms develop, and when the purpose of solitary confinement is to coerce, punish, or discriminate, solitary confinement *is* torture.[27]

In Mr. Abdullah's case, he has been subjected to the following forms of sensory deprivation/overstimulation and isolation (physical, social, spiritual, information, and academic/occupational/recreational).

*i) Sensory Deprivation/Over stimulation and Physical Isolation*: Since his extradition to the US, Mr. Abdullah has been held in a small cell for 22-24 hours a day, is forced to eat meals near his toilet, allowed only a few hours outside of his cell per week. Time spent alone, in a cell too small to do anything but walk a few steps in each direction. His "recreation" can be cancelled or curtailed at the discretion of the BOP officers. At times he has refused recreation because of the degrading circumstances and as a result at times gone for days without leaving his cell. He has no access to natural light or fresh air. He is subjected to lights around the clock.

ii) *Social Isolation*: In addition to his already restrictive conditions, Mr. Abdullah has very few means of communicating with other living beings. Whereas people under other forms of solitary confinement may try to maintain some minimal human contact by yelling through the walls or talking while outside their cells, under SAMs Mr. Abdullah is forbidden from communicating with other prisoners. SAMs also cut prisoners off from communication with their loved ones outside of prison. Federal prisoners in standard solitary confinement may face limits on the number of letters or calls they may make, but they generally retain the ability to correspond with approved contacts outside prison. Under SAMs, communications with people outside of prison walls are usually restricted to prisoners' attorneys and a few

---

[23] Willigan, M. (2014). What solitary confinement does to the human brain. *Solitary Watch. Np, 4*.

[24] Kurki, L., & Morris, N. (2001). The purposes, practices, and problems of supermax prisons. *Crime and Justice, 28*, 385-424.

[25] Rovner, L. L. (2024). Solitary confinement, human dignity, and the Eighth Amendment. *U Denver Legal Studies Research Paper Forthcoming, 111*

[26] Haney, C. (2020). Solitary confinement, loneliness, and psychological harm. In J. Lobel & P. S. Smith (Eds.), *Solitary confinement: Effects, practices, and pathways toward reform* (pp. 129–152). Oxford University Press., p. 140.

[27] Heiss, J. (2015). Solitary confinement isn't punishment. It's torture. *The Guardian, 2*.

immediate family members, all of whom must be cleared by the U.S. government as a condition of access (as was this evaluator). Whereas other prisoners may generally call approved contacts, SAMs prisoners are limited to authorized, immediate family members. In practice, prisoners face numerous obstacles to actually speaking with even these family members because they may call only phone numbers that have been cleared and approved by the FBI. In Mr. Abdullah's case, his family is in Kenya with very limited funds. He relies on his attorney to put in money for him to call his family once a month. He is dependent on BOP for the limited phone calls – sometimes his calls are inexplicably cancelled.

Mr. Abdullah is denied physical contact during visits. For example, all our sessions took place in a small room, with conversations happening through a thick glass barrier and thereby interfering with the necessary rapport building for this process. We were under surveillance throughout the duration of our meetings.

iii) *Spiritual Isolation and Deprivation*: For many prisoners, religious practice is one of their few methods of coping, however it is sharply restricted under SAMs. These regulations explicitly prohibit group prayer.[28] For Muslims like Mr. Abdullah, this ban is especially agonizing as Islam requires that all able-bodied men attend a congregational Friday prayer (which includes a religious sermon). Unlike other prisoners, Mr. Abdullah is not allowed to purchase religious items from the Commissary.

iv) *Information Isolation*: SAMs aggravate prisoners' social isolation by restricting their access to information about current events and the world around them. Currently, Mr. Abdullah's only sources of information about the world beyond the four corners of his small cell come from Time magazine and a broken radio from which he can only receive WABC, in whichhe is constantly bombarded with MAGA propaganda.

v) *Academic/Occupational/Recreational Deprivation*: Mr. Abdullah's PSR (1/31/25) observed, "While in BOP custody, the defendant has had no work assignments and has taken no continuing educational courses." This statement omits that fact that under the custody of SAMs, Mr. Abdullah is not allowed to engage in any academic, occupational, or recreational activities. Again, highlighting Mr. Abdullah's ongoing isolation and deprivation.

[redacted]

---

[redacted] Allard K. Lowenstein International Human Rights Clinic & Center for Constitutional Rights. (2017). *The darkest corner: Special administrative measures and extreme isolation in the Federal Bureau of Prisons*. Center for Constitutional Rights. https://ccrjustice.org/sites/default/files/attach/2017/09/SAMs%20Report.Final_.pdf.

[redacted]

[redacted]

[redacted]

Thus, as outlined above, scientific consensus that such conditions cause permanent harm led the former United Nations ("U.N.") Special Rapporteur on Torture to declare that "any imposition of solitary confinement beyond 15 days constitutes torture or cruel, inhuman or degrading treatment.[30]" [redacted]

[redacted]

[29] Allard K. Lowenstein International Human Rights Clinic & Center for Constitutional Rights. (2017). *The darkest corner: Special administrative measures and extreme isolation in the Federal Bureau of Prisons*. Center for Constitutional Rights. https://ccrjustice.org/sites/default/files/attach/2017/09/SAMs%20Report.Final_.pdf.

[30] Special Rapporteur on Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, *Interim Rep. of the Special Rapporteur of the Human Rights Council on torture and other cruel, inhuman, or degrading treatment or punishment*, 76, U.N. Doc. A/66/268 (Aug. 5, 2011) (by Juan Méndez) [hereinafter *Special Rapporteur on Torture 2011 Report*].

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

### Conclusions

Mr. Cholo Abdi Abdullah is a 35-year-old, cis gender, heterosexual, single, Black, Kenyan man who for almost five years has been incarcerated under extreme confinement (including sensory deprivation and overload, as well as physical, social, spiritual, and information isolation). [redacted]. Such conditions meet the criteria for the definition of torture, "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person." (U.N. Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art.1, para.1[31]).

[redacted]

---

[31] United Nations Human Rights Office of the High Commissioner (2023, April). *Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*. https://www.ohchr.org/sites/default/files/cat.pdf

Despite those challenges, Mr. Abdullah's presentation, particularly the ongoing decline in his mental health is consistent with the experiences of individuals who have been subjected to SAMs. As documented throughout this report, he has been subjected to the most severe form of isolation found in the United States federal prisons[32]. There is robust scientific and anecdotal evidence confirms that long-term solitary confinement causes severe physical and psychological damage. The conditions of Mr. Abdullah's incarceration under SAMs – sensory deprivation/over stimulation and physical Isolation, social isolation, spiritual isolation and deprivation, information isolation, and academic/occupational/recreational deprivation have conspired to create isolation in the form of torture even more extreme than that of standard solitary confinement. Given these factors, the substantial risks of permanent harm are heightened.

These stressors remain extreme and long-lasting. [redacted] In the face of his distressing circumstances, when he can, Mr. Abdullah does his best to occupy himself and his mind with very limited resources.

**Recommendations**

The recommendations presented here are based on the observations made of Mr. Abdullah during our clinical encounters and the review of his records. During this time, I noted an ongoing struggle in his willingness to engage in this process due to the conditions of his incarceration.

While it is possible that Mr. Abdullah could benefit from individual trauma informed Cognitive Behavioral Therapy (CBT, a form of psychotherapy that attempts to modify an individual's interpretations of experiences that determine how the individual feels and behaves), his current traumatic experiences and circumstances would make it difficult to engage in this form of treatment or support. For now, being given the opportunity to re-engage in human interactions is key to reestablishing Mr. Abdullah's emotional wellbeing and would prevent any further decline in his psychological functioning.

Throughout his incarceration, there has never been any indication of any violent tendencies on his part to justify Mr. Abdullah remaining in SAMs custody. Even as his mental health has deteriorated, Mr. Abdullah has never exhibited any aggressive of violent behaviors. In fact, the notes throughout his BOP Health Service records repeatedly state "*Threat to Self = Low*" and "*Threat to Others = Low*." Given all the factors documented here, it is my strong recommendation that Mr. Abdullah is moved out of SAMs conditions under which he is incarcerated as soon as possible and is placed in the general population. Such a move will at

---

[32] Allard K. Lowenstein International Human Rights Clinic & Center for Constitutional Rights. (2017). *The darkest corner: Special administrative measures and extreme isolation in the Federal Bureau of Prisons*. Center for Constitutional Rights. https://ccrjustice.org/sites/default/files/attach/2017/09/SAMs%20Report.Final_.pdf.

least offer him the opportunity to rebuild his sense of self, by drawing on social skills like communication and empathy, and the ability to form and maintain relationships through human contact, all of which are essential for navigating social environments and maintaining healthy human relationships.

Please feel free to contact me with any additional questions.



Adéyínká M. Akinṣulurẹ-Smith, Ph.D., ABPP
Psychologist, New York State License #013405

Colin Powell School
for Civic and Global Leadership
The City College of New York

**Adéyínká M. Akinṣulurẹ-Smith, Ph.D., ABPP**
Department of Psychology
North Academic Center, Room 7/120
160 Convent Avenue
New York, NY 10031

TEL: 917-332-8904
FAX: 212.650.5659
aakinsulure-smith@ccny.cuny.edu

Website: https://www.ccny.cuny.edu/profiles/adeyinka-akinsulure-smith **Updated**: November 2025

---

**Education**

| | |
|---|---|
| Ph.D. | Columbia University, Counseling Psychology, 1997 |
| M.Phil. | Teachers College, Columbia University, 1995 |
| Ed.M. | Teachers College, Columbia University, 1992 |
| MA | Teachers College, Columbia University, 1991 |
| BA | University of Western Ontario, Honors Psychology, 1989 |

**Licensure and Certifications**

| | |
|---|---|
| 2017 | Board Certified in Group Psychology (#8540) |
| 2017 | Certified Compassion Fatigue Professional, International Association of Trauma Professionals |
| 2015 | Certified Trauma Professional, International Association of Trauma Professionals |
| 2014 | Compassion Fatigue Educator, The Green Cross Academy of Traumatology |
| 2000 | Eye Movement Desensitization and Reprocessing, Level II |
| 1999 | Eye Movement Desensitization and Reprocessing, Level I |
| 1999 | Registered Play Therapist – Supervisor, International Association for Play Therapy, Inc. |
| 1998 | Psychologist, Licensed in the State of New York (NYS License# 013405) |

**Awards and Honors**

| | |
|---|---|
| 2024 | Inaugural Mabel Shelby Fellow at the Colin Powell School for Civic and Global Leadership, the City College of New York |
| 2022 | American Board of Professional Psychology Citizen Psychologist for Social Justice Award |
| 2021 | Inaugural Jean Lau Chin Award for Outstanding Psychologist in International Leadership Contributions, Division 52, American Psychological Association |
| 2021 | Multicultural Equity Initiative Awardee, American Family Therapy Academy |
| 2019 | Distinguished CUNY Fellow at the Advanced Research Collaborative |
| 2016 | The Dr. Patricia E. Taylor Outstanding Achievement Award, Women's International Leadership Program, International House, New York |
| 2014 | Fulbright Scholar, Africa Regional Research Program Award |
| 2010 | Community-Based Research Fellow, Colin L. Powell Center for Leadership and Service, The City College of New York |
| 2005 | Early Career Award, Teachers College, Columbia University |
| 2003 | Union Square Award for Community Organizing, Fund for the City of New York |

## Academic Appointments

Faculty, Postgraduate Group Psychotherapy Program, Gordon F. Derner School of Psychology, Adelphi University (8/20-present)

Professor of Psychology with Tenure, The City College of New York, The City University of New York, and The Graduate Center, The City University of New York (8/18-present)

Associate Professor of Psychology with Tenure, The City College of New York, The City University of New York, and The Graduate Center, The City University of New York (9/13-7/18)

Assistant Professor of Psychology, The City College of New York, The City University of New York (8/06-8/12)

Assistant Professor of Psychology, Department of Psychiatry (part-time), NYU School of Medicine, NYU Langone Medical Center (7/09-1/24)

Adjunct Assistant Professor of Counseling and Clinical Psychology, Teachers College, Columbia University (9/97-5/00)

## Clinical Appointments

Senior Supervising Psychologist, Bellevue Program for Survivors of Torture (9/99-1/24)

Psychologist, The Lucy A. Wicks HIV/AIDS Mental Health Clinic, Department of Psychiatry, New York Presbyterian Hospital Center and Columbia University College of Physicians and Surgeons, New York, New York (12/96-12/01)

Psychologist, Department of Psychological Services, Seamen's Society for Children and Families, Staten Island, New York (6/96-9/99)

Psychotherapist, Foster Boarding Home Program and Adoption Services, Central Brooklyn Coordinating Council, Brooklyn, New York (8/96-12/96)

Psychology Intern, Psychology Department, Kings County Hospital Center, Brooklyn, New York (7/95-6/96)

## Grants (direct costs only)

### External Funding

**Akinṣulurẹ-Smith, A.M**. (Consultant). Youth FORWARD: Alternate Delivery Platforms and Implementation Models for Bringing Evidence-Based Behavioral Interventions to Scale for Youth Facing Adversity in West Africa. National Institute of Mental Health (1U19MH109989-01, 2016-2021, T. Betancourt, PI).

**Akinṣulurẹ-Smith, A.M**. (Principal Investigator). The Impact and Consequences of FGC on Female West African Immigrants. National Institute of Child Health and Human Development (1SC2HD09263, 2016-2022).

**Akinṣulurẹ-Smith, A.M**. (Co-Investigator). A Social Ecological Model of Infant Sleep Environments among Non-Hispanic Black Infants. National Institute of Mental Health (1R15HD010228-01, 2016-2017, T. Chu, PI).

**Akinṣulurẹ-Smith, A.M**. (Co-Investigator). Social Networks of West African Forced Migrants, National Institute of Mental Health (1R15HD079008-01A1, 2014-2016, A. Rasmussen, PI).

**Akinṣulurẹ-Smith, A.M**. (Principal Investigator). Exploring Factors that Hinder and Help Women's Wellness in Post-Conflict Sierra Leone. Fulbright Africa Regional Research Program Award (2014-2015). Did not accomplish due to Ebola Virus disease outbreak.

**Akinṣulurẹ-Smith, A.M**. (Principal Investigator). HIV Knowledge, Risk and Protective Factors among West African Forced Migrants in New York City. National Institute of Mental Health, Research in HIV Intervention: Skills for the Community (R25MH083602, 2008-2012).

**Akinṣulurẹ-Smith, A.M**. (Co-Investigator). An Interdisciplinary Approach to Developing and Testing Evidence-based Mental Health Interventions for War Affected Youth in Sierra Leone. Harvard Catalyst Pilot Grant (2010-2011, T. Betancourt, PI).

**Internal Funding**

**Akinṣulurẹ-Smith, A.M.** (Principal Investigator). Techniques for Supporting Those Who Serve Survivors of Torture and Refugee Trauma. Professional Staff Congress – City University of New York (64661-00 52, 2021-2022).

**Akinṣulurẹ-Smith, A.M**. (Grantee). Moving from Associate to Full Professor, The City University of New York (2017). A workshop series and funding opportunity for CUNY Associate Professors addressing a broad range of practices that are important for professional success generally and promotion specifically (2017-2018).

**Akinṣulurẹ-Smith, A.M**. (Principal Investigator). The Mental Health Consequences of Refugee Resettlement Work: A Pilot Study of Prevalence and Management Strategies. Professional Staff Congress – City University of New York (69543-00 47, 2016-2017).

**Akinṣulurẹ-Smith, A.M**. (Principal Investigator). AMAUDO ITUMBAUZO – Settlement of Peace: Examining Community Based Psychosocial Services in Sub-Saharan Africa. Professional Staff Congress – City University of New York (66771-00-46, 2015-2016).

**Akinṣulurẹ-Smith, A.M**. (Principal Investigator). The Mental Health Consequences of Refugee Resettlement Work: A Pilot Study of Prevalence and Management Strategies. Health and Human Services, Office of Academic Affairs, City University of New York (2015-2016).

**Akinṣulurẹ-Smith, A.M**. (Principal Investigator). Col Aat: A Piece of Mind Series. Collaborative Research for Social Impact Seed Grant Program. Colin Powell School for Civic and Global Leadership, The City College of New York (2014-2017, $41,016).

**Akinṣulurẹ-Smith, A.M**. (Co-Investigator). Understanding Infant Sleep Environments among African American, African Immigrant and Afro-Caribbean Immigrant City-Dwellers: Towards the Development of Better Safe Sleep Interventions. CUNY Collaborative Incentive Research Grant Program (Project #2154, 2014-2015, $29,925, T. Chu, PI).

**Akinṣulurẹ-Smith, A.M**. (Principal Investigator). Female Genital Cutting and West African Immigrants: Current Attitudes, Beliefs and Practice. Professional Staff Congress – City University of New York (66771-00 44, 2013-2014).

**Akinșulurẹ-Smith, A.M**. (Principal Investigator). HIV Knowledge, Risk and Protective Factors among West African Forced Migrants in New York City. Professional Staff Congress – City University of New York (64459-0042, 2011-2012).

**Akinșulurẹ-Smith, A.M**. (Grantee). The Gender Equity Project. A university-wide workshop series and funding opportunity for women junior faculty addressing a broad range of practices that are important for professional success and promotion (2009).

**Akinșulurẹ-Smith, A.M**. (Principal Investigator). Responding to Vicarious Trauma: A Survey of Torture Treatment Programs in the United States. Professional Staff Congress – City University of New York (61253-0039, 2008-2009).

**Akinșulurẹ-Smith, A.M**. (Grantee). Fellowship Publication Program. A university-wide initiative assisting full-time untenured faculty in the design and execution of writing projects essential to progress toward tenure (2007-2008).

**Akinșulurẹ-Smith, A.M**. (Principal Investigator). Emotional Well-Being and African Immigrants in New York City. The Colin Powell Center for Policy Studies Community Based Research Grant, The City College of New York (2000-2002).

**Manuscripts (in progress)**

59. **Akinșulurẹ-Smith, A.M.**, Danladi, U., & Philip, D.L. *Stitching Stories of Recovery: The Sauki Achievers Brotherhood.*

58. **Akinșulurẹ-Smith, A.M.** & Huyal-Genco, S. *Exploring Factors that Promote or Hinder Women's Wellness in Sierra Leone.*

57. Huyal-Genco, S. & **Akinșulurẹ-Smith, A.M.** *The Relationship Between Mentalized Affectivity and Secondary Traumatic Stress Symptoms in Those Who Serve Survivors of Torture.*

56. **Akinșulurẹ-Smith, A.M.**, Andjembe Etogho, E. B., & Min., M. *FGM/C and Beyond: Exploring Sexual and Reproductive Health among West African Immigrant Women in New York City.*

**Manuscripts (under review)**

55. Bond, L., Farrar, J., Desrosiers, A., Aarons, G.A., **Akinșulurẹ-Smith, A.M.,** Borg, R., Klein, E.K., Tutlam, N., & Betancourt, T.S. *Using the Exploration, Preparation, Implementation, Sustainment (EPIS) Framework to Guide the Implementation of the Youth Readiness Intervention as Integrated into an Entrepreneurship Program in Sierra Leone: A Case Study.*

**Publications (peer-reviewed journals)**

54. **Akinșulurẹ-Smith, A. M.**, Andjembe Etogho, E. B., & Huyal-Genco, S. (2024). Exploring the Role of Traditional Women Society Membership Among West African Immigrant Women Who Have Experienced Female Genital Mutilation/Cutting. *Violence Against Women*, *30* (12-13), 3111-3452.

53. **Akinṣulurẹ-Smith, A. M.**, & Min, M. (2024). What African immigrant service providers can teach us about the needs of African immigrant survivors of FGM/C. *Health Care for Women International*, *45*(4), 463-474.

52. Freeman, J.A., Farrar, J.C., Placencio-Castro, M., Desrosiers, A., Brennan, R.T., Hansen, N. B., **Akinṣulurẹ-Smith, A. M.**, Su., S., Bangura, J. & Betancourt, T.S. (2024). Integrating Youth Readiness Intervention and Entrepreneurship in Sierra Leone: A Hybrid Type II Cluster Randomized Trial. *Journal of the American Academy of Child & Adolescent Psychiatry, 63*(7),708-719.

51. Freeman, J.A., Desrosiers, A., Schafer, C., Kamara, P., Farrar, J., **Akinṣulurẹ-Smith, A. M.**, & Betancourt, T. S. (2024). The adaptation of a youth mental health intervention to a peer-delivery model utilizing CBPR methods and the ADAPT-ITT framework in Sierra Leone. *Transcultural Psychiatry*, 61(1), 3-14.

50. Abdi, S., **Akinṣulurẹ-Smith, A. M.**, Sarkadi, A., Fazel, M., Ellis, B. H., Gillespie, S., ... & Betancourt, T. S. (2023). Promoting positive development among refugee adolescents. *Journal of Research on Adolescence*, 33(4), 1064-1084.

49. Min, M., Espinosa, A., & **Akinṣulurẹ-Smith, A.M.** (2023). My body, my culture: Understanding body image concerns among West African immigrant women. *Journal of Immigrant and Minority Health,*23*(3)*, 634-642.

48. Johnson-Agbakwu, C. E., Michlig, G. J., Koukoui, S., **Akinṣulurẹ-Smith, A. M.**, & Jacobson, D. S. (2023). Health outcomes and female genital mutilation/cutting: how much is due to the cutting itself? *International Journal of Impotence Research*, *35*(3), 218-227.

47. **Akinṣulurẹ-Smith, A.M.**, Sicalides E., & Diallo, M. (2023). Evaluating survivors of Female Genital Mutilation/Cutting for Immigration Court – Opportunities and challenges for licensed mental health professionals. *Professional Psychology: Research and Practice,* 54(*2*), 167-176.

46. Desrosiers, A., Schafer, C., Bond, L., **Akinṣulurẹ-Smith, A.M.**, Hinton, M., & Betancourt, T. S. (2023). Exploring potential mental health spillover effects among caregivers and partners of youth in Sierra Leone: A qualitative study. *Cambridge Prisms: Global Mental Health*, *10*, e40.

45. Min, M., Wong, T. & **Akinṣulurẹ-Smith, A.M.** (2022). Exploring beliefs, & attitudes towards Female Genital Mutilation/Cutting among health care providers in New York City. *Violence Against Women, 28(12-13), 3174-3193,* https://doi.org/10.1177/10778012211045710.

44. **Akinṣulurẹ-Smith, A.M.**, Wong, T., & Min, M. (2021). Addressing Female Genital Cutting among service providers in New York. *Professional Psychology: Research and Practice, 52(3),* 202-212.

43. Mumey, A., Sardana, S., & **Akinṣulurẹ-Smith, A. M.** (2021). Sharing power and building trust: recommendations for conducting research with sex trafficking survivors. *Journal of health care for the poor and underserved, 32*(2), 631-637.

42. Mumey, A., Sadana, S., Richardson-Vejlgaard, R., & **Akinṣulurẹ-Smith, A.M.** (2020). Mental Health Needs of Sex Trafficking Survivors in New York City: Reflections on Exploitation, Coping, & Recovery. *Psychological Trauma: Theory, Research, Practice, and Policy*, 13(2), 185-192.

41. Thulin, E.J., McLean, K., Sevalie, S., **Akinṣulurẹ-Smith, A.M.**, & Betancourt, T.S. (2020). Mental Health Problems among Children in Sierra Leone: Assessing Cultural Concepts of Distress. *Journal of Transcultural Psychiatry,* 1363461520916695.

40. Zuilkowski, S. S., Thulin, E. J., McLean, K., Rogers, T. M., **Akinṣulurẹ-Smith, A. M.**, & Betancourt, T. S. (2019). Parenting and discipline in post-conflict Sierra Leone. *Child abuse & neglect, 97*, 104138.

39. Espinosa, A., **Akinṣulurẹ-Smith, A.M.**, & Chu, T. (2019). Emotional intelligence and occupational stress among refugee resettlement workers: The mediating role of coping behaviors. *Psychological Trauma: Theory, Research, Practice, and Policy, 11(*1).

38. **Akinṣulurẹ-Smith, A.M.**, Chu, T., Espinosa, A., & Hallock, R. (2018). Secondary traumatic stress and burnout among refugee resettlement workers: The role of coping and emotional intelligence. *Journal of Traumatic Stress, 31*(2), 202-212.

37. **Akinṣulurẹ-Smith, A.M.**, & Conteh, J.A. (2018). The emergence of counseling in Sierra Leone. *Journal of Counseling and Development, 96*(3), 327-334.

36. Lanfranchi, M., & **Akinṣulurẹ-Smith, A.M.** (2018). The role of mental health counselors in international human rights: Reflections on counseling services with urban refugees at the Refugee Law Project in Kampala, Uganda. *International Journal for the Advancement of Counseling,40*(4), 365-386.

35. **Akinṣulurẹ-Smith, A.M.**, Chu, T., & Krivitsky, L. (2018). West African immigrant perspectives on female genital cutting: Experiences, attitudes and implications for mental health service providers. *Journal of International Migration and Integration,19*(2), 259-276.

34. **Akinṣulurẹ-Smith, A.M.**, Anosike, E., & Nwaubani, K. (2017). A model for community based psychosocial services in Nigeria. *Journal of Psychosocial Rehabilitation and Mental Health, 4*(1), 99-102. DOI: 10.1007/s40737-017-0085-x

33. **Akinṣulurẹ-Smith, A.M.**, & Chu, T. (2017). Knowledge and attitudes toward female genital cutting among West African male immigrants in New York City. *Health Care for Women International*, *38*(5), 463-477.

32. **Akinṣulurẹ-Smith, A.M.** (2017). Resilience in the face of adversity: African immigrants' mental health needs and the American transition. *Journal of Immigrant and Refugee Studies, 15*(4), 428-448.

31. **Akinṣulurẹ-Smith, A.M.**, & Chu, T. (2016). Exploring female genital cutting among survivors of torture. *Journal of Immigrant & Minority Health, 19*(3), 769-773. DOI: 10. 1007/s10903-016-0419-x.

30. **Akinṣulurẹ-Smith, A.M.**, Mirpuri, S., Chu, T., Keatley, E., & Rasmussen, A. (2016). Made in America: Perspectives on friendship in West African immigrant families. *Journal of Child and Family Studies*, *25*, 2765-2777. DOI: 10.1007/s10826-016-0431-8.

29. **Akinṣulurẹ-Smith, A.M.**, & Sicalides, E. (2016). Female genital cutting in the United States: Implications for mental health services. *Professional Psychology: Research and Practice*, *47*(5), 356-362. http://dx.doi.org/10.1037/pro0000079.

28. Betancourt, T.S., Brennan, R.T., Vinck, P., Brennan, R.T., VanderWeele, T.J., Spencer-Walters, D., Jeong, J., **Akinṣulurẹ-Smith, A.M.**, & Pham, P. (2016). Associations between mental health and Ebola related health behaviors: A regionally representative cross-sectional survey in post-conflict Sierra Leone. *PLoS Medicine, 13*(8): e1002073. DOI: 10.1371/journal.pmed.1002073.

27. Zuilkowski, S.S., Collet, K., Jambai, M., **Akinṣulurẹ-Smith, A.M.**, & Betancourt, T.S. (2016). Youth resilience in post-conflict settings: An intervention for war-affected youth in Sierra Leone. *Human Development, 59,* 64-80. DOI: 10.1159/000448227.

26. Chu, T., & **Akinṣulurẹ-Smith, A.M.** (2015). Health outcomes and attitudes towards female genital cutting in a community-based sample of West African immigrant women from high-prevalence countries in New York City. *Journal of Aggression, Maltreatment & Trauma*, *25*(1), 63-83.

25. Chu, T., Rasmussen, A., **Akinṣulurẹ-Smith, A.M.,** & Keatley, E. (2015). Exploring community engagement and cultural maintenance among forced and voluntary West African immigrants in New York City. *Journal of International Migration and Integration, 17*(3), 785-800. DOI: 10.1007/s12134-015-0443-z.

24. Newnham, E.A., McBain, R.K., Hann, K., **Akinṣulurẹ-Smith, A.M**., Weisz, J., Lilienthal, G.M., Hansen, N., & Betancourt, T.S. (2015). The Youth Readiness Intervention for war-affected youth. *Journal of Adolescent Health*, *56*(6), 606-611. DOI: 10.1016/j.jadohealth.2015.01.020.

23. **Akinṣulurẹ-Smith, A.M.** (2014). Displaced African female survivors of conflict-related sexual violence: Challenges for service providers. *Violence Against Women, 20*(6), 677-694. DOI: 10.1177/1077801214540537.

22. **Akinṣulurẹ-Smith, A.M.** (2014). Exploring female genital cutting among West African immigrants. *Journal of Immigrant and Minority Health*, *16*, 559-461. DOI 10.1007/s10903-012-9763-7.

21. **Akinṣulurẹ-Smith, A.M.** (2014). Exploring HIV knowledge, risk and protective factors among West African forced migrants in New York City. *Journal of Immigrant and Minority Health*, *16*, 481-491. DOI: 10.1007/s10903-013-9829-1.

20. **Akinṣulurẹ-Smith, A.M.,** & Keatley, E. (2014). Secondary trauma and local mental health professionals in post-conflict Sierra Leone. *International Journal for the Advancement of Counseling, 36*(2), 125-135. DOI: 10.1007/s10447-013-9197-5.

19. Betancourt, T.S., McBain, R.K., Newnham, E.A., Hann, K., **Akinṣulurẹ-Smith, A.M.**, Brennan, R.T., Weisz, J.R., & Hansen, N.B. (2014). A behavioral intervention for war-affected youth in Sierra Leone: A randomized controlled trial. *Journal of the American Academy of Child and Adolescent Psychiatry, 53*(12), 1288-1297. DOI: 10.1016/j.jaac.2014.09.011.

18. **Akinṣulurẹ-Smith, A.M.**, Chu, T., Keatley, E., & Rasmussen, A. (2013). Intimate partner violence among West African immigrants. *Journal of Aggression, Maltreatment & Trauma*, *22*, 109-126. DOI: 10.1080/10926771.2013.719592.

17. **Akinṣulurẹ-Smith, A.M.**, Jones, W. L., & Dachos, N. (2013). Nah We Yone's De Fambul Camp: Facilitating resilience in displaced African children. *Journal of Immigrant and Refugee Studies, 11*(3), 221-240. DOI: 10.1080/15562948.2013.801721.

16. Muzacz, A., & **Akinṣulurẹ-Smith, A.M.** (2013). Older adult sexuality: Implications for counseling ethnic and sexual minorities. *Journal of Mental Health Counseling, 35*, 1-14.

15. Rasmussen, A., Chu, T., **Akinṣulurẹ-Smith, A.M.**, & Keatley, E. (2013). The social ecology of resolving family conflict among West African immigrants in New York: A grounded theory approach. *American Journal of Community Psychology*, *52*(1-2), 185-196. DOI: 10.1007/s10464-013-9588-0.

14. **Akinṣulurẹ-Smith, A.M.** (2012). Responding to the trauma of sexual violence in asylum seekers: A clinical case study. *Clinical Case Studies*, *11*(4), 285-298. DOI: 10.1002/jts.21684.

13. **Akinṣulurẹ-Smith, A.M.** (2012). Using group work to rebuild family and community ties among displaced African men. *Journal for Specialists in Group Work, 37*(2), 95-112. DOI: 10.1080/01933922.2011.646086

12. **Akinṣulurẹ-Smith, A.M.**, Keatley, E., & Rasmussen, A. (2012). Responding to secondary traumatic stress: A pilot study of torture treatment programs in the United States. *Journal of Traumatic Stress*, *25*, 232-235. DOI: 10.1002/jts.21684.

11. **Akinṣulurẹ-Smith, A.M.,** & O'Hara, M. (2012). Working with forced migrants: Therapeutic issues and considerations for mental health counselors. *Journal of Mental Health Counseling*, *34*, 38-55.

10. **Akinṣulurẹ-Smith, A.M.,** & Smith, H. (2012). Evolution of family policies in post-conflict Sierra Leone. *Journal of Child and Family Studies*, *21*, 4-13. DOI: 10.1007/s10826-011-9495-7.

9. Rasmussen, A., **Akinṣulurẹ-Smith, A.M.**, Chu, T., & Keatley, E. (2012). "911" among West African immigrants in New York City: A qualitative study of parents' disciplinary practices and their perceptions of child welfare authorities. *Social Science & Medicine*, *75*(3), 516-525. DOI: 10.1016/j.socscimed.2012.03.042.

8. **Akinṣulurẹ-Smith, A.M.**, & Jones, W. L. (2011). Nah We Yone – A grassroots community based organization in New York City: Successes, challenges, and lessons learned. *International Journal of Migration, Health, and Social Care, 7*, 44-57. DOI: 10.1108/17479891111176296

7. O'Hara, M., & **Akinṣulurẹ-Smith, A.M.** (2011). Working with interpreters: Tools for clinicians conducting psychotherapy with forced immigrants. *International Journal of Migration, Health, and Social Care*, *7*, 33-43. DOI: 10.1108/17479891111176287

6. Smith, H.E., & **Akinṣulurẹ-Smith, A.M.** (2011). Needed – not just needy: Empowerment as a therapeutic tool in the treatment of survivors of torture and refugee trauma. *African Journal of Traumatic Stress, 2,* 17-31.

5. **Akinṣulurẹ-Smith, A.M.** (2009). Brief psychoeducational group treatment with re-traumatized refugees and asylum seekers. *Journal for Specialists in Group Work*, *34*(2), 137-150. DOI: 10.1080/01933920902798007.

4. **Akinṣulurẹ-Smith, A.M.,** Ghiglione, J., & Wollmershauser, C. (2009). Healing in the midst of chaos: Nah We Yone's African women's wellness group. *Women & Therapy*, *32*, 105-120. DOI: 10.1080/02703140802384602.

3. Amowitz, L.L., Reis, C., Lyons, K.H., Vann, B., Mansaray, B., **Akinṣulurẹ-Smith, A.M.**, Taylor, L., & Iacopino, V. (2002). Prevalence of war-related sexual violence and other human rights abuses among internally displaced persons in Sierra Leone. *Journal of the American Medical Association*, *287*, 513-521.

2. Carter, R.T., **Akinṣulurẹ-Smith, A.M.**, Smailes, E.M., & Clauss, C.S. (1998). The status of racial/ethnic research in counseling psychology: Committed or complacent? *Journal of Black Psychology*, *24*, 322-334.

1. Carter, R.T., & **Akinṣulurẹ-Smith, A.M.** (1996). White racial identity and expectations about counseling. *Journal of Multicultural Counseling and Development*, *24*, 218-228.

**Publications (books)**

1. Barber-Rioja, V., **Akinṣulurẹ-Smith, A.M**., & Vendzules, S. (2022). Mental Health Evaluations in Immigration Court: A Guide for Mental Health and Legal Professionals. New York: NYU Press.

**Publications (book chapters)**

15. Barber-Rioja, V., **Akinṣulurẹ-Smith, A.M.**, & Sarah Vendules. (in progress). Immigration Proceedings. In Zapf, P.A.*APA Handbook of Forensic Psychology*. *Second Edi*tion*: Vol. 1. Individual and Situational Influences in Criminal and Civil Contexts.* American Psychological Association.

14. **Akinṣulurẹ-Smith, A.M.** & Smith, H.E. (2023). *"You in Americuh, Now"*: African Forced Migrants in the 21st Century US. (pp. 275-287). In Rich., G.J, Kaplin, D., Kuransky, J, & Gielen, U. (Eds.). *Coming to America: Psychosocial Experiences and Adjustment of Migrants.* Elsevier Publishers.

13. **Akinṣulurẹ-Smith, A.M.**, & Smith, H.E. (2019). Recreating family and community networks: Group interventions with forced migrants. In S.M. Berthold & K. Libal (Eds.), *Refugees and asylum-seekers in the United States: Interdisciplinary perspectives* (pp.182-201). ABC-CLIO Press (Imprint: Praeger).

12. **Akinṣulurẹ-Smith, A.M.**, Anosike, E., & Nwaubani, K. (2017). Examining community based psychosocial service in sub-Saharan Africa: Amaudo Itumbauzo – Settlement of peace. In C.E. Stout & G. Wang (Eds.), *Why global health matters: How to (actually) make the world a better place* (pp. 326-344). Seattle, WA: CreateSpace

11. Rasmussen, A., **Akinṣulurẹ-Smith, A.M.**, & Chu, T. (2016). Grounded theory in community psychology. In L. A. Jason & D. S. Glenwick (Eds.), *Handbook of methodological approaches to community-based research: Qualitative, quantitative, and mixed methods* (pp. 23-32). New York: Oxford University Press.

10. **Akinṣulurẹ-Smith, A.M.,** & Smith, H. (2014). Emerging family policies in Sierra Leone. In M. Robila (Ed.), *Family policies across the globe* (pp. 15-29). New York: Springer.

9. Berthold, S.M., & **Akinṣulurẹ-Smith, A.M.** (2014). Survivors and victims of terrorism. In A. Glitterman (Ed.), *Handbook of social work with vulnerable and resilient populations* (3rd ed.) (pp. 484-508). New York: Columbia University Press.

8. Betancourt, T.S., Newnham, E.A., Hann, K., McBain, R.K., **Akinṣulurẹ-Smith, A.M.**, Weisz, J.R., Lilienthal, G.M., & Hansen, N.B. (2014). Addressing the consequences of violence and adversity: The development of a group mental health intervention for war-affected youth in Sierra Leone. In J. Raynaud, M. Hodes, & S.S. Gau (Eds.), *From research to practice in child and adolescent mental health* (pp. 157-178). New York: Rowman & Littlefield.

7. Clauss-Ehlers, C.S., & **Akinṣulurẹ-Smith, A.M.** (2013). Working with forced migrant children and their families: Mental health, developmental, legal, and linguistic considerations in the context of school-based mental health services. In C. Clauss-Ehlers, Z. Serpell, & M. Weist (Eds.), *Handbook of culturally responsive school mental health: Advancing research, training, practice, and policy* (pp. 135-146). New York: Springer.

6. Robila, M., & **Akinṣulurẹ-Smith, A.M.** (2012). Psychological ethics and immigration. In M.M. Leach, M.J. Stevens, A. Ferrero, Y. Korkut, & G. Lindsay (Eds.), The *Oxford handbook of international psychological ethics* (pp. 191-200). New York: Oxford University Press.

5. **Akinṣulurẹ-Smith, A.M.** (2010). Torture. In C.S. Clauss-Ehlers (Ed.), *Encyclopedia of cross-cultural school psychology* (Vol. 2, pp. 27-29). New York: Springer.

4. **Akinṣulurẹ-Smith, A.M.** (2007). Use of interpreters with survivors of torture, war, and refugee trauma. In H.E. Smith, A.S. Keller, & D.W. Lhewa (Eds.), *"...Like a refugee camp on First Avenue." Insights and experiences from the Bellevue/NYU Program for Survivors of Torture* (pp. 82-105). New York: The Bellevue/NYU Program for Survivors of Torture.

3. Porterfield, K., & **Akinṣulurẹ-Smith, A.M.** (2007). Therapeutic work with children and families. In H.E. Smith, A.S. Keller, & D.W. Lhewa (Eds.), *"...Like a refugee camp on First Avenue." Insights and experiences from the Bellevue/NYU Program for Survivors of Torture* (pp. 299-336). New York: The Bellevue/NYU Program for Survivors of Torture.

2. Smith, H.E., & **Akinṣulurẹ-Smith, A.M.** (2004). A global perspective on youth outreach. In C.S. Clauss-Ehlers & M.D. Weist (Eds.), *Community planning to foster resiliency in children* (pp. 127-140). New York: Kluwer Academic/Plenum Publishers.

1. **Akinṣulurẹ-Smith, A.M.** (2003). The black-eye peas group game. In H.G. Kaduson & C.E. Schaefer (Eds.), *101 favorite play therapy techniques* (Vol. 3, pp. 370-372). Northvale, NJ: Jason Aronson Inc.

**ADDITIONAL PUBLICATIONS**

American Psychological Association (2010). Resilience and recovery after war: Refugee children and families in the United States. *Report of the APA Task Force on the Psychosocial Effects of War on Children and Families who are Refugees from Armed Conflict Residing in the United States.* Washington, DC: American Psychological Association. Retrieved from: http://www.apa.org/pi/families/refugees.aspx (Member of the APA Task Force).

**Akinṣulurẹ-Smith, A.M.** (2004). Giving voice to the voiceless: Providing interpretation for survivors of torture, war, and refugee trauma. *The Gotham Translator, May/June,* 6-7.

**Akinṣulurẹ-Smith, A.M.** (January 1, 2002). African women don't get the blues. *Mu Yepe, 1,* 4-5.

**Akinṣulurẹ-Smith, A.M.,** & Smith, H. (2002). Mission to Freetown. *Mano Vision, 26/27*, 12-13.

**Akinṣulurẹ-Smith, A.M.** (May 10, 2000). Perspective on Sierra Leone; rape and trauma arise from a deal made in hell; peacekeeping won't do. International peacemaking must show its viability in Africa. *Los Angeles Times,* Part B; p. 9.

**Teaching**

Department of Psychology, The City College of New York (8/06 - present)

Graduate Courses

V6532: Theories and Techniques of Counseling
V6540 Trauma and Resilience
V6560: Multicultural Issues in Counseling
V6589: Practicum in Counseling I
V6597: Foundations of Mental Health Counseling & Consultations
U ED 71100: Immigration and the Intersection of Education, Law and Psychology

Undergraduate Courses

PSY 24600: Infancy & Childhood
PSY 31906: Trauma and Resilience
PSY 35500: Women & Violence
PSY 35600: Adolescent & Youth
PSY 41000: Contemporary Issues in Human Rights and Social Justice

**Trainings and Workshops**

27. **Akinșulurẹ-Smith, A.M.**, Gutman, A., & McQuaid, J. (June 2025). *Validated Measures to Support Mental Health Evaluations*. A workshop on the use of psychological instruments in Forensic Evaluations. Midwest Human Rights Consortium & Society of Asylum Medicine.

26. **Akinșulurẹ-Smith, A.M.** (June 2025). *Small Acts of Living: Fostering Resilience during Supervision in Times of Transition.* Webinar: https://healtorture.org/training/sustaining-purpose-leadership-and-resilience-in-human-centered-work/

25. Cohen, R., **Akinșulurẹ-Smith, A.M.,** & Garlock, L.R. (April, 2025). *The Fabric of Healing: Meaningful Trauma Recovery for Communities Exposed to Sexual Violence, War, and Displacement.* 2025 Trauma Research Foundation Annual Boston International Trauma Conference.

24. **Akinșulurẹ-Smith, A.M.,** Diallo, M., Gyimah-Boadi, A., & Cohen, R. (March, 2024). *Common Threads Training Workshop*, Abuja, Nigeria

23. **Akinșulurẹ-Smith, A.M**., & Smith, H.E. (2024, February). *Fractures and Integration: Therapeutic Work with Forced Migrants and Survivors of Torture.* AGPA 2024 Connect, National Harbor, MD

22. **Akinșulurẹ-Smith, A.M**., & Smith, H.E. (2022, December). *The Role of Health Professionals in Documenting Human Rights Abuses and Advocating for Asylum Seekers.* Eastern Virginia Medical School, Norfolk, VA.

21. **Akinṣulurẹ-Smith, A.M**., & Guskovict, K. (2020, November). "I was already burned out, and now this…" *Strategies for Staff and Supervisors to Mitigate Burnout, Vicarious Trauma, and Other Occupational Hazards.* Webinar, *https://switchboardta.org/resource/i-was-already-burned-out-and-now-this-strategies-for-staff-and-supervisors-to-mitigate-burnout-vicarious-trauma-and-other-occupational-hazards/*

20. **Akinṣulurẹ-Smith, A.M.** (2020, March & April). *Addressing the Cost of Caring: Developing Self-Compassion and Resilience in Challenging Times*. Workshop series conducted for Obama Foundation Scholars Program, Columbia University, New York, NY.

19. Dross, P., Spelman, L., Parkikh, M., Gorlitsky, K., Oldfield, T., & **Akinṣulurẹ-Smith, A.M.** (2018, September). *Organizational Sustainability: A View from 3 Perspectives Online Consultation*. Webinar, https://www.healtorture.org/webinars

18. Dross, P., Stein, P., & **Akinṣulurẹ-Smith, A.M.** (2018, September). *Organizational Sustainability: A View from 3 Perspectives*. Webinar, https://www.healtorture.org/webinars

17. **Akinṣulurẹ-Smith, A.M.**, Smith, H.E., Porterfield, K., & Figley, C. (2016, December). *Assessment and treatment of torture survivors: Resilience-centered healing*. Webinar, APA Division 56 (Trauma). https://tulanetraumatologyinstitute.com/news-1/2017/7/24/join-us-for-free-webinar-assessment-and-treatment-of-torture-survivors-resilience-centered-healing

16. **Akinṣulurẹ-Smith, A.M**. (2015, September). *Forced migrants and sexual violence: Prevalence, types, and therapeutic considerations.* Workshop conducted for the Intercultural Counseling Center, Baltimore, MD.

15. **Akinṣulurẹ-Smith, A.M**. (2015, July). *Addressing the cost of caring in survivors of torture programs.* Workshop conducted for the National Capacity Building Project, the Center for Victims of Torture, St. Paul, MN.

14. **Akinṣulurẹ-Smith, A.M.** (2015, February). *Gendered perspectives in times of war*. Workshop conducted for Building a Culture of Peace, Adelphi University, New York, NY.

13. **Akinṣulurẹ-Smith, A.M.,** & Smith, H.E. (2014, June). *Overcoming Challenges in Service Provision: Culture, Compassion, and Self-Care.* Workshop conducted for Hebrew Immigrant Aid Society, Vienna Austria.

12. **Akinṣulurẹ-Smith, A.M.** (2011, March). *Sexual violence as a tool of torture and weapon during conflict.* Webinar, Gulf Coast Jewish Family and Community Services, Clearwater, FL. https://gulfcoastjewishfamilyandcommunityservices.org/refugee-services/national-partnership-for-community-training/webinars/#1524598803120-b6b4fdbb-5d27

11. **Akinṣulurẹ-Smith, A.M.** (2007, December). *Responding to refugee children and their families*. Workshop conducted at Episcopal Migration Ministries/Program for Survivors of Torture Refugee Mental Health Training, Atlanta, GA.

10. **Akinṣulurẹ-Smith, A.M.** (2007, June). *Therapeutic responses to displaced African female survivors of sexual violence.* Workshop conducted at War, Torture and Terror: The Role of Psychology. Ferkauf Graduate School of Psychology, Yeshiva University, New York, NY.

9. **Akinṣulurẹ-Smith, A.M.,** & Smith, H.E. (2005, March). *Overview of torture and its consequences, secondary trauma, and working with interpreters.* Workshops conducted at the 2005 New Staff Institute, Center for Victims of Torture, Minneapolis, MI.

8. **Akinṣulurẹ-Smith, A.M.,** & Smith, H.E. (2004, December). *Therapeutic work with African survivors of war and trauma.* Brown bag workshop conducted at The Institute of African Studies, School of International and Public Affairs, Columbia University, New York, NY.

7. **Akinṣulurẹ-Smith, A.M.,** & Smith, H.E. (2004, October). *Human rights advocacy: Stress and renewal*. Workshop conducted for The Human Rights Advocate Program, School of International and Public Affairs, Columbia University, New York, NY.

6. **Akinṣulurẹ-Smith, A.M.** (2003, September). *Assessing the credibility of Sierra Leonean trauma survivors.* Workshop conducted for the New York Asylum Office, the Bureau of Citizenship and Immigration Services of the Department of Homeland Security, Rosedale, NY.

5. **Akinṣulurẹ-Smith, A.M.** (2001, May). *What is psychotherapy?* Workshop conducted for African refugee women at the International Institute of New Jersey, Cross-Cultural Counseling Center, Jersey City, NJ.

4. **Akinṣulurẹ-Smith, A.M.** (2001, April). *Interviewing survivors of war-related sexual violence.* Workshop conducted for WITNESS, Lawyers Committee for Human Rights, New York, NY.

3. **Akinṣulurẹ-Smith, A.M.,** & Eyega, Z. (2000, June). *Reproductive health and rights for African immigrants and refugee women: Strategies for community empowerment.* Workshop conducted at Focus on Women's Health Around the World in Support of the Beijing Platform for Action, Hunter College, New York, NY.

2. **Akinṣulurẹ-Smith, A.M.,** & Impalli, E. (2000, March). *Considerations for working with interpreters.* Workshop conducted at Conference on Refugee Resettlement: Therapeutic Factors and Interventions, New York University Medical School, Bellevue Hospital, New York, NY.

1. **Akinṣulurẹ-Smith, A.M.,** & Smith, H.E. (1996, March). *Each child has a gift.* Workshop presented at the Champions Academics & Sports Club, New York Junior Tennis League Parent Workshops, Brooklyn Public Schools, Brooklyn, NY.

***Consultations***

2000-Present Expert Witness
*Forensic Evaluations, Human Rights Consultations, and Mitigation Services on capital cases for private legal firms and public entities.

7/21-7/22 FREEDOM HOUSE, INC.
*Conduct psychosocial trainings to religious freedom defenders and partners of Freedom House under the Netherlands Ministry of Foreign Affairs
*Target audiences include International Christian Concern (Pakistan & US) and Yazda and Hammurabi (Iraq)

2021 Alsace, T. O., **Akinṣulurẹ-Smith, A. M.**, & Colón, G. Professional development module: Approaches to Educating Refugees and Immigrants. *CUNY - Initiative on Immigration and Education.* CUNY-IIE. https://www.cuny-iie.org/comprehensive-educator-modules

3/10-3/16 Expert Witness
*Retained by Trial Chamber III of the International Criminal Court, The Hague, to serve as a joint expert on gender crime and Post Traumatic Stress Disorder ("PTSD") for all parties and participants in the case of the *Prosecutor v. Jean-Pierre Bemba Gombo* (case number ICC-01/05-01/08).

8/08-12/10 American Psychological Association Task Force on The Psychological Effect of War on Children and Families Who Are Refugees from Armed Conflicts Residing in The United States (PEWCF)
*Appointed to a task force created to assist psychologists in the U.S. to meet the challenges of working with children and families residing in the US who are refugees from armed conflicts.

2/01 Physicians for Human Rights & United Nations Mission in Sierra Leone, Human Rights Division
*****Co-led a quantitative study of women's health and human rights post-civil war conflict in Sierra Leone.
*****Co-authored a report documenting women's experience of sexual violence during civil war in Sierra Leone.

3/00 Physicians for Human Rights & United Nations Mission in Sierra Leone, Human Rights Division
*****Participated in an investigation of women's health and human rights post-civil war conflict in Sierra Leone.

9/99-9/00 African Services Committee, New York
*African Community Prevention Campaign - Provided HIV/STD/TB education, prevention and care workshops within the African immigrant and refugee communities in New York City.

**Pod Cast**

2021-Present **Akinṣulurẹ-Smith, A.M**. (with co-hosts R. E. Landrum, S. A. Nolan, & A. Seawell). *PsychSessions: Beyond teaching* [Podcast]. https://psychsessionspodcast.libsyn.com/

**Professional Activities**

March 2021 Member, Switchboard National Advisory Panel, International Rescue Committee

2019- Present, Member, African Child Migration Research Network https://acymn.com/

2018-2020 Board Member, American Group Psychology Association

July 2016 Women in Leadership: Empowering Women and Girls in Africa: Discussions from a Global Perspective
*Co-Chaired/Directed a day-long symposium in collaboration with the Annie Walsh Old Girls Association and the Department of Psychology/Colin Powell School for Civic and Global Leadership, City College of the City University of New York.

10-11/2014 Ebola in Sierra Leone - Mental Health Radio Program
*Co-created and launched a radio program series in Sierra Leone providing critical information throughout the country about mental health care and Ebola Virus Disease.

1997-2010 Nah We Yone, Inc., New York
*Co-founded and co-directed a non-profit community-based organization that supported displaced and traumatized Africans within the New York City metropolitan area with their adjustment to living in a new country and culture.

**Membership in Professional Associations**

2020-Present African Child and Youth Migration Research Network
2017-Present American Group Psychotherapy Association
2016-Present Sierra Leone Mental Health Initiative
2015-Present International Association of Trauma Professionals
2015-Present The Green Cross Academy of Traumatology
1998-Present American Counseling Association
1998-Present New York State Psychological Association

**Invited Presentations**

64. **Akinṣulurẹ-Smith, A.M.** (2024, May). Mental Health Evaluations in Immigration Court. A panel discussion for The Psychological Impact of Forced Displacement: Intervention, Research, and Policy Implications. Invited Panelist, Long Island University, New York, New York.

63. **Akinṣulurẹ-Smith, A.M.** (2024, April). *The Elusive Concept of Home: Internal and External Reflections.* Invited Speaker, 2024 Psychology Colloquium Series. Department of Psychology, Western University, London, Ontario, Canada

62. **Akinṣulurẹ-Smith, A.M.** (2024, February). Considerations for Providing Therapeutic Service to Forced Migrants. Invited Speaker, Refugee Mental Health, Center for Human Development, University of Alaska Anchorage

61. **Akinșulurẹ-Smith, A.M.** (2023, November). NYC's "Migrant Crisis": What Mental Health Professionals Need to Know. Invited Speaker, PhD Program in Clinical Psychology, Long Island University, New York

60. **Akinșulurẹ-Smith, A.M.,** Elshazly, M. & Niconchuk,M. (2021, May). *Mental Health Realities and Treatments in the Field*. Panel discussion conducted for Human Security, Violence and Trauma. University of California, Berkeley; https://hsvt.berkeley.edu/schedule/

59. **Akinșulurẹ-Smith, A.M.** (2021, April). *Psychosocial Support for Youth in Post Conflict Settings: The Youth Readiness Intervention.* Invited Speaker, Sofia University, Bulgaria

58. **Akinșulurẹ-Smith, A.M.,** Mfuranzima, J.S.P, & Kurup, N. (2021, March). *Journey & Healing: Trauma in Immigrant Communities*, Panel discussion conducted for Northeast Iowa Peace & Justice Center; https://neipjc.org/event/journey-healing-trauma-in-immigrant-communities/

57. Waskow, A., Chavez, E., **Akinșulurẹ-Smith, A.M.**, & Agdem, R. (2021, February). *Awaken Strength through Social Action: Immigration Reform Panel.* Panel discussion conducted for Romemu, New York, NY. https://fb.watch/3OPYWle7oR/

56. **Akinșulurẹ-Smith, A.M.** (2019, May). *Addressing the Mental Health Consequences of Fleeting Persecution and Seeking Refuge.* Invited Speaker, Bennington College, Bennington, VT.

55. Pûras, D., Arbukle, M., Brown, C., & **Akinșulurẹ-Smith, A.M.** (2017, October). *Mental Health and Human Rights: Debating the Future of the Biomedical Model.* Panel discussion conducted at Mailman School of Public Health, Columbia University, New York, NY.

54. **Akinșulurẹ-Smith, A.M.** (2017, October). *The mental health consequences of refugee resettlement work: A pilot study of prevalence and management strategies.* Invited speaker, International Rescue Committee, New York, NY.

53. **Akinșulurẹ-Smith, A.M.** (2017, October). *The mental health consequences of refugee resettlement work: A pilot study of prevalence and management strategies.* Webinar, Refugee Council USA.

52. **Akinșulurẹ-Smith, A.M.** (2017, June). *Psychosocial support for youth in post conflict settings: The Youth Readiness Intervention.* Keynote speaker, Global Mental Health and Psychosocial Support Conference: Partnerships and Mutual Learning. King's Health Partners, London, United Kingdom.

51. **Akinșulurẹ-Smith, A.M.** (2017, April). *Mental health IS women's health!* Invited speaker, Leadership, Immigration, and Empowerment Conference, Maplewood, NJ.

50. **Akinșulurẹ-Smith, A.M.** (2017, March). *Resilience and the African immigrant experience.* Invited lecture to the Psychology Department, Lehman College, Bronx, NY.

49. **Akinṣulurẹ-Smith, A.M**. (2016, November). *Capacity building for mental health work in alternate delivery platforms: Experience of the Youth Readiness Intervention.* Youth FORWARD: Alternate Delivery Platforms and Implementation Models for Bringing Evidence-Based Behavioral Interventions to Scale for Youth Facing Adversity in West Africa, Freetown, Sierra Leone.

48. **Akinṣulurẹ-Smith, A.M**. (2016, October). *Trauma, resilience and survival: Addressing the needs of forced migrants.* Ozanam Scholars Program, St John's University, Queens, New York.

47. **Akinṣulurẹ-Smith, A.M**. (2016, March). *Trauma, resilience and survival: Clinical service provision with forced migrants.* Keynote speaker, IPS: Mental Health Over the Life Span, Scientific Conference and Annual General Meeting, Alberta Psychiatric Association, Banff, Alberta, Canada.

46. **Akinṣulurẹ-Smith, A.M**. (2015, September). *Caring for forced migrants: Toward an integrated response.* Keynote speaker, IPS: The Mental Health Services Conference, American Psychiatric Association, New York, NY.

45. Rabago, M., Kooijmans, J., Barrios, V., & **Akinṣulurẹ-Smith, A.M**. (2015, March). *The road to healing: Exploited girls and women standing strong.* Panel discussion conducted at the Commission on the Status of Women. United Nations, New York, NY.

44. **Akinṣulurẹ-Smith, A.M.** (2014, December). *AMAUDO ITUMBAUZO – Respice, adspice, prospice. Mental illness in Nigeria!* The Impact of Amaudo Mental Health Services in South East Nigeria since 1989, Symposium celebrating Amaudo Itumbauzo 25 Years, Umuahia, Abia State, Nigeria.

43. Pike, K., Clark, W.W., **Akinṣulurẹ-Smith, A.M.**, & Rataemane, S. (2014, May). *What will it take to prevent brain disorders?* Panel presentation conducted for Preventing Brain Disorders: Improving Global Mental Health, Columbia University Epidemiology Scientific Symposium, New York, NY.

42. **Akinṣulurẹ-Smith, A.M.** (2014, March). *International human rights, International House, and me.* The Women's International Leadership Program and The Davis Peace and Diplomacy Initiative at International House, New York, NY.

41. Betancourt, T., & **Akinṣulurẹ-Smith, A.M.** (2013, July). *Mental health issues among former child soldiers in Sierra Leone: A longitudinal perspective.* Paper presented at the 6th Pan Africa PCAF Psychotrauma Conference, Kampala, Uganda.

40. O'Hara, G., **Akinṣulurẹ-Smith, A.M.,** & Porterfield, K. (2012, April). *Refugees and psychosocial wellbeing.* Panel discussion conducted for 5th Annual Psychology Day at the United Nations. *Human Rights for Vulnerable People: Psychological Contributions and the United Nations Perspective,* New York, NY.

39. **Akinṣulurẹ-Smith, A.M.** (2012, March). *Building on community strengths: Using group work to facilitate healing in refugee communities.* First Annual "It Takes a Community: Optimizing Refugee Resettlement" Conference, Franklin & Marshall College, Lancaster, PA.

38. **Akinṣulurẹ-Smith, A.M.**, Abdi, S., & Miller, C. (2011, July). *Refugee health in FY2011 and 2012: Challenges and innovative strategies.* Panel presentation conducted for Church World Service/The Immigration and Refugee Program National Conference, New York, NY.

37. **Akinṣulurẹ-Smith, A.M.**, Constantino, G., Javier, R., Suzuki, L., Wilkinson, L., & Clauss-Ehlers, C.S. (2010, April). *Promoting social justice and positive mental health in educational settings.* Panel presentation sponsored by New York State Psychological Association, Division of Culture, Race, and Ethnicity, New York, NY.

36. Soysa, C., Saunders, A., & **Akinṣulurẹ-Smith, A.M.** (2010, March). *Women's health and mental health in times of crisis: War, natural disasters, epidemics.* Panel discussion conducted for The Session of the Commission on the Status of Women Parallel Event, Sponsored by the American Psychological Association (APA); the NGO Committee on HIV/AIDS; and the NGO Committee on the Family, New York, NY.

35. **Akinṣulurẹ-Smith, A.M.** (2009, April). *The war on women: Gender based violence in armed conflict.* 2009 Women's Resource Center and Women's Studies Guest Lecture, College of Staten Island, the City University of New York, NY.

34. **Akinṣulurẹ-Smith, A.M.** (2008, April). *Caught in the crossfire – Violence against women during armed conflict*. 2008 Women and Gender Guest Lecture, University of Maine at Farmington, Farmington, ME.

33. **Akinṣulurẹ-Smith, A.M.** (2008, April). *Responding to the tragedy of war: The Nah We Yone story*. Invited guest lecture, 2008 Culture and Diversity Program, University of Maine at Farmington, Farmington, ME.

32. **Akinṣulurẹ-Smith, A.M.** (2008, March). *Women and genocide: The use of sexual violence against women as a tool of genocide during armed conflict*. Invited guest lecture, 2008 Women and Genocide Lecture, Center for Holocaust/Genocide Study & Women's Studies Program, Drew University, Madison, N.J.

31. Mattis, J.S., **Akinṣulurẹ-Smith, A.M.,** Mahoney, A.M., & Fullilove, R. (2008, February). *Demographic profiles.* Panel discussion conducted for The 3rd Annual Conference on the Health of the African Diaspora: Mental Health, New York University School of Medicine and Bellevue Hospital Center, New York, NY.

30. Kodindo, G., **Akinṣulurẹ-Smith, A.M.**, Hein, K., & Askew, G. (2007, December). *Promoting health and human rights of women and children.* Panel discussion conducted for Profiles in Courage: Health and Human Rights in Action. Center for Health and Human Rights: New York University School of Medicine, New York, NY.

29. Myerfeld, J., Green, J., & **Akinṣulurẹ-Smith, A.M.** (2007, April). *Torture and the body.* Panel discussion conducted for Rutgers University's Human Rights Panel Series, New Brunswick, NJ.

28. Otto, J., Rone, J., & **Akinṣulurẹ-Smith, A.M.** (2006, March). *Between two fires: Torture and displacement in northern Uganda.* Panel discussion conducted for WITNESS, United Nations Plaza, New York, NY.

27. **Akinṣulurẹ-Smith, A.M.**, Kante, A., Traore, T., & Gogo, M. (2005, August). *A discussion on social relationships and (x)ual politics for the African woman.* A day of A.W.E. (African Women's Empowerment). Panel discussion conducted for Sanctuary for Families, New York, NY.

26. Waruzi, B.T., Brown, C.J., **Akinṣulurẹ-Smith, A.M.**, Dicker, R., & Agborsangaya. P. (2005, April). *Female child soldiers in the DR of Congo.* Panel discussion conducted for Citizens for Global Solutions, Woodrow Wilson Center, Washington, DC.

25. **Akinṣulurẹ-Smith, A.M.** (2004, June). *Speaking the unspeakable: Interpreting for survivors of torture, war, and refugee trauma.* Global Security: Implications for Translation and Interpretation. Presentation at the 2nd International Translation Conference sponsored by NYU School of Continuing and Professional Studies' Center for Foreign Languages and Translation, New York, NY.

24. **Akinṣulurẹ-Smith, A.M.,** & Smith, H.E. (2003, November). *Working with survivors of torture and refugee trauma.* International Center, New York, NY.

23. **Akinṣulurẹ-Smith, A.M.** (2003, May). *Women and trauma: A global perspective.* Treating Women: Facilitating Cultural Connection. Keynote speech at the spring conference 2003, Princeton House Women's Program, Mt. Laurel, NJ.

22. **Akinṣulurẹ-Smith, A.M.** (2003, April). *Working in the climate of war: Being compassionate in the face of hostility.* All Sides of Working in the Time of HIV and AIDS, annual conference of the Terry K. Watanabe Volunteer Center & GMHC Action, New York, NY.

21. **Akinṣulurẹ-Smith, A.M.,** & Porterfield, K. (2003, April). *Responding to disasters: Mental health assessment and self-care.* Grand rounds conducted for the Department of Social Work and Home Care Services, Beth Israel Hospital Center, New York, NY.

20. **Akinṣulurẹ-Smith, A.M.,** & Rogers, J. (2002, October). *Operation Fine Girl: The abuse of women in war-torn Sierra Leone.* Discussion conducted for the Barnard Forum on Migration, Barnard College, Columbia University, New York, NY.

19. **Akinṣulurẹ-Smith, A.M.** (2001, May). *Sierra Leonean women: The scars of war.* Healing the Pain: Multicultural Responses to Violence Against Women, annual conference of the International Society of Traumatic Studies, Inc., New York Chapter, Fordham University, New York, NY.

18. **Akinṣulurẹ-Smith, A.M**., Rogers, J., & Smith, H.E. (2001, April). *Impact of wars in Africa: Case of Sierra Leone.* School of Social Work, International Social Welfare Caucus, Columbia University, New York, NY.

17. **Akinṣulurẹ-Smith, A.M.** (2000, October). *Adjustment issues in refugee children.* The Changing Face of Resettlement, Church World Service/Episcopal Migration Ministry Joint National Conference, Austin, TX.

16. **Akinṣulurẹ-Smith, A.M.** (2000, October). *Issues of reproductive health for refugee women*. The Changing Face of Resettlement, Church World Service/Episcopal Migration Ministry Joint National Conference, Austin, TX.

15. **Akinṣulurẹ-Smith, A.M.,** & Smith, H. (2000, October). *Challenges of being a caseworker.* The Changing Face of Resettlement, Church World Service/Episcopal Migration Ministry Joint National Conference, Austin, TX.

14. Shinn, B., Evans-Tranumn, S., McAshan, J., Fatima, C., **Akinṣulurẹ-Smith, A.M.**, & Beckman, D. (2000, October). *Poverty unveiled: A panel discussion*. Invited panelist at Women's Missionary Society, African Methodist Episcopal Church: Mobilizing Against Poverty – A Clarion Call – Connect, Act, Respond, Experience – Care. 12th Annual NGO Conference, United Nations Headquarters, New York, NY.

13. **Akinṣulurẹ-Smith, A.M.** (2000, September). *Considerations for psychotherapy with war and torture survivors.* Invited lecture given at the Pre-Doctoral Psychology Internship Program, New York Psychiatric Institute, New York, NY.

12. **Akinṣulurẹ-Smith, A.M.,** & de Jong, K. (2000, September). *Refugee trauma: From Sierra Leone to New York.* Doctors Without Borders/Médecins Sans Frontières (MSF) Special Event – A Refugee Camp in the Heart of the City, New York, NY.

11. **Akinṣulurẹ-Smith, A.M.** (2000, August). *Physical and mental health consequences of the Sierra Leone civil war on women: Where do we go from here?* Perspectives of Sierra Leoneans in the New Millennium, first annual Conference of the National Organization of Sierra Leoneans in North America, Atlanta, GA.

10. **Akinṣulurẹ-Smith, A.M.** (2000, August). *The Sierra Leonean civil war*. Invited presentation given at the International Institute of New Jersey, Cross-Cultural Counseling Center, Jersey City, NJ.

9. **Akinṣulurẹ-Smith, A.M.**, Engo-Tjega, R.B., Taylor, B., & Zemele, P. (2000, August). *Solidarity with Africa: A call for more action.* African Women and HIV/AIDS, workshop conducted at 53rd Annual DPI/NGO Conference, Global Solidarity: The Way to Peace and International Cooperation, United Nations Headquarters, New York, NY.

8. **Akinṣulurẹ-Smith, A.M.,** & Burke, P. (2000, February). *What women bring back from their sojourns in academia in the U.S.: Experiences of international professional women.* Invited presentation given at NAFSA: Association of International Educators, Women's Right to Education: Building Global Leadership for the 21st Century, United Nations, New York, NY.

7. **Akinṣulurẹ-Smith, A.M.,** & Smith, H.E. (1999, November). *Sierra Leone: What are the health/human rights concerns in Sierra Leone? Why did the situation in Sierra Leone receive such little attention?* Invited lecture given for course STC 398: Health and Human Rights in the World Community, Princeton University, Princeton, NJ.

6. **Akinṣulurẹ-Smith, A.M.**, Rogers, J., & Smith, H.E. (1999, June). *Refugee children traumatized by war.* Children in Limbo. Symposium conducted at the Fifteenth Annual Manhattan Child and Adolescent Services Committee Conference, Fordham University, New York, NY.

5. **Akinṣulurẹ-Smith, A.M.** (1998, May). *Overview of the Wechsler Adult Intelligent Scale III.* Invited lecture given at the Pre-Doctoral Psychology Internship Program, Kings County Hospital Center, Brooklyn, New York.

4. **Akinṣulurẹ-Smith, A.M.,** & Smith, H.E. (1998, April). *Recognizing, assessing and responding to suicidal risk factors in adolescents.* Invited lecture given at ASPIRA of New York, Inc., New York, NY.

3. **Akinṣulurẹ-Smith, A.M.,** Smith, H.E., & Van Harte, E. (1997, April). *Psychotherapy with Africans in America.* Symposium conducted at the Perspectives on Black Psychology: Past, Present, and Future, Pace University, New York, NY.

2. **Akinṣulurẹ-Smith, A.M.** (1996, October). *Clinical issues for consideration in working with African populations.* Invited lecture given at the Pre-Doctoral Psychology Internship Program, Kings County Hospital Center, Brooklyn, NY.

1. **Akinṣulurẹ-Smith, A.M.** (1996, January). *Working with African populations.* Invited lecture given at the Pre-Doctoral Psychology Internship Program, Kings County Hospital Center, Brooklyn, NY.

**<u>Papers and Poster Sessions</u>**

37. Rasmussen, A., Coquillon, E., **Akinṣulurẹ-Smith, A.M.**, & Rojas Nuñez, J., (Sep 2024). Forensic Mental Health Assessments in Immigration Court: What Attorneys Find Useful. Paper presented in Steel, Z. (Chair), *Uncertain Futures: Exploring the Social, Psychological, and Forensic Dimensions of Asylum Seeking in High-Income Nations.* Symposium at the 40th Annual Meeting of the International Society of Traumatic Stress Studies, Boston, MA.

36. **Akinṣulurẹ-Smith, A.M.** (2019, March). S*econdary Traumatic Stress and Burnout among Refugee Resettlement Workers: The role of coping and emotional intelligence.* Paper presented at the Annual Meeting National Consortium of Torture Treatment Programs, George Washington University, Washington, DC.

35. Eig, A., **Akinṣulurẹ-Smith, A.M.**, Smith, H.E., & Phillips, S. (2018, March). *Trauma, Torture and Displacement: Finding Connection and Self in Group.* Paper presented at the Annual Meeting of the American Group Psychotherapy Association, Houston, TX.

34. **Akinṣulurẹ-Smith, A.M.**, Espinosa, A., Chu, T., & Hallock, R. (2017, June). *The mental health consequences of refugee resettlement work: A pilot study of prevalence and management strategies.* Paper presented at the Psychological Study of Social Issues Conference, Albuquerque, NM.

33. **Akinṣulurẹ-Smith, A.M.** (2016, September). *Resilience in the face of adversity: African immigrants' mental health needs and the American transition.* Paper presented at the United States Conference on African Immigrant Health, New York, NY.

32. Chu, T., **Akinṣulurẹ-Smith, A.M.,** & Mohamed, N. (2016, September). *Support for female genital cutting among West African immigrants in New York City.* Paper presented at the United States Conference on African Immigrant Health, New York, NY.

31. S.M. Berthold, & **Akinṣulurẹ-Smith, A.M.** (2016, July). *When asylum fails to protect from hate: Working with torture survivors who remain at risk of persecution in exile*. Paper presented at The Society for the Psychological Study of Social Issues/European Association of Social Psychology Joint Conference – Understanding Hate Crime: Multi-Disciplinary Analyses, Storrs, CT.

30. **Akinṣulurẹ-Smith, A.M.** (2015, April). *Resilience in the face of adversity: African immigrants and the American shock!* Paper presented at the Annual Meeting of the New York African Studies Association, Albany, NY.

29 **Akinṣulurẹ-Smith, A.M.** (2014, September) *Exploring HIV knowledge, risk and protective factors among West African forced migrants in New York City.* Panel presentation at the United States Conference on African Immigrant Health, Pittsburgh, PA.

28. **Akinṣulurẹ-Smith, A.M.** (2014, September) *Mental health research and African immigrants: Considerations for effective recruitment and retention.* Panel presentation at the United States Conference on African Immigrant Health, Pittsburgh, PA.

27. **Akinṣulurẹ-Smith, A.M.**, Chu, T., Rasmussen, A., & Roubeni, S. (2013, June). *Population movement, cultural identity, and public health: The case of West African immigrants in New York City*. Paper presented at the Global Health and Well-Being the Social Work Response Conference, New York, NY.

26. Jeswani, S., Rasmussen, A., **Akinṣulurẹ-Smith, A.M.**, & Chu, T. (2013, June). *Stressors and coping strategies among West African immigrant youth*. Paper presented at the Annual Ethnographic and Qualitative Research Conference, Cedarville, OH.

25. Betancourt, T., & **Akinṣulurẹ-Smith, A.M.** (2013, March). *Child development and mental health: Using longitudinal data to develop a youth readiness intervention.* Paper presented at the Annual Mental Health Conference, Freetown, Sierra Leone.

24. **Akinṣulurẹ-Smith, A.M**., Chu, T., Keatley, E., & Rasmussen, A. (2012, November). *Family conflict and community support among West African refugee families in New York.* Paper presented at the Annual Meeting of the International Society for Traumatic Stress Studies, Los Angeles, CA.

23. Betancourt, T.S., Hann, K, Newnham, E.A., **Akinṣulurẹ-Smith, A.M.**, & Hansen, N. (2012, November). *Design and evaluation of a group mental health intervention for multi-symptomatic war-affected youth in Sierra Leone*. Paper presented at the Annual Meeting of the International Society for Traumatic Stress Studies, Los Angeles, CA.

22. Newnham, E.A., **Akinṣulurẹ-Smith, A.M.**, Hansen, N., & Betancourt, T.S. (2012, November). *A collaborative model for building capacity in mental healthcare: Training and supervision for the Youth Readiness Intervention in Sierra Leone.* Paper presented at the Annual Meeting of the International Society for Traumatic Stress Studies, Los Angeles, CA.

21. Newnham, E.A., **Akinṣulurẹ-Smith, A.M.**, Hansen, N., & Betancourt, T.S. (2012, July). *A collaborative model for building capacity in mental healthcare: Training and supervision for the Youth Readiness Intervention in Sierra Leone.* Poster presented at the McGill University Advanced Study Institute in Cultural Psychiatry**,** Montreal, Canada.

20. Rasmussen, A., **Akinṣulurẹ-Smith, A.M.**, Chu, T., & Keatley, E. (2012, June). *The place of public health institutions within problem-solving strategies of West African families in New York City.* Paper presented at the Annual Meeting of the Society for the Study of Psychiatry and Culture, New York, NY.

19. Rasmussen, A., Chu, T., Keatley, E., & **Akinṣulurẹ-Smith, A.M.** (2011, June). *Community resilience and conflict among West African migrants to New York City*. Paper presented at the Biennial Conference of the Society for Community Research and Action, Chicago, IL.

18. Rasmussen, A., Chu, T., **Akinṣulurẹ-Smith, A.M.**, & Keatley, E. (2010, October). *The social ecology of solving family conflict in West African communities in New York*. Paper presented at the International Conference on Urban Health, New York, NY.

17. **Akinṣulurẹ-Smith, A.M.** (2010, July). *Female genital cutting.* Workshop conducted at MAN UP, Young Leaders Summit, Johannesburg, South Africa.

16. **Akinṣulurẹ-Smith, A.M.,** & Smith, H.E. (2010, July). *Violence against women around the world.* Seminar conducted at MAN UP, Young Leaders Summit 2010, Johannesburg, South Africa.

15. **Akinṣulurẹ-Smith, A.M.,** & Smith, H.E. (2010, April). *Nah We Yone – Rebuilding and empowering shattered African communities.* Panel presentation at the United States Conference on African Immigrant Health, Atlanta, GA.

14. **Akinṣulurẹ-Smith, A.M.,** & Smith, H.E. (2010, April). *Rebuilding community & family ties: The use of group treatment for African survivors of torture & trauma.* Panel presentation at the United States Conference on African Immigrant Health, Atlanta, GA.

13. Pfister, J., Aubry, T., **Akinṣulurẹ-Smith, A.M.,** Bost, S.M., McGee, M., & Travis, T. (2009, November). *Re-thinking "therapeutic culture*." Roundtable conducted at American Studies Association Annual Convention, Washington, DC.

12. Muzacz, A., & **Akinṣulurẹ-Smith, A.M.** (2009, April). *Sexuality and aging: Practice and research with ethnic minority and LGB adults.* Paper presented at the Southeastern Regional Counseling Psychology Conference, Athens, GA.

11. Muzacz, A., & **Akinṣulurẹ-Smith, A.M.** (2008, October). *Counseling healthy sexuality with ethnic minority and LGBT older adults.* Workshop presented at the State Society on Aging of New York's Annual Meeting, Saratoga Springs, NY.

10. Muzacz, A., & **Akinṣulurẹ-Smith, A.M.** (2008, May). *Counseling older adults: Implications for sexual health*. Poster session presented at Pace University's Annual Psychology Conference, New York, NY.

9. **Akinṣulurẹ-Smith, A.M.,** & Smith, H.E. (2006, October). *Making therapy culturally relevant: Group therapy with African survivors of torture and refugee trauma.* Workshop conducted at the Institute for the Study and Promotion of Race and Culture, Boston College, Chestnut Hill, MA.

8. **Akinṣulurẹ-Smith, A.M.,** & Smith, H.E. (2006, October). *Nah We Yone – It belongs to us.* Structured discussion conducted at the Institute for the Study and Promotion of Race and Culture, Boston College, Chestnut Hill, MA.

7. **Akinṣulurẹ-Smith, A.M.,** & Porterfield, K. (2004, November). *Two short-term group treatment models for war trauma survivors.* Workshop conducted at the Annual Meeting of the International Society for Traumatic Stress Studies, New Orleans, LA.

6. **Akinṣulurẹ-Smith, A.M.**, Rogers, J., & Smith, H.E. (2004, November). *Nah We Yone, Inc.: Creating hope, support and safety out of chaos.* Workshop conducted at the Annual Meeting of the International Society for Traumatic Stress Studies, New Orleans, LA.

5. **Akinṣulurẹ-Smith, A.M.**, Smith, H.E., & Nguyen, L. (2003, October). *Identity and meaning: Psychotherapy with survivors of torture.* Workshop conducted at the Annual Meeting of the International Society for Traumatic Stress Studies, Chicago, Il.

4. **Akinṣulurẹ-Smith, A.M.,** Smith, H.E., Sesay, S., & Moore, M. (2003, May). *Working with African survivors of torture and refugee trauma.* Workshop conducted at the Ethiopian Community Development Council, Inc. National Conference, Washington, DC.

3. Carter, R.T., Sicalides, E.I., Lee, D.Y., Ota Wang, V., **Akinṣulurẹ-Smith, A.M.,** & Smith, H.E. (1996, February). *A process model for cultural competence.* Workshop conducted at the Annual Teachers College Winter Roundtable on Cross-Cultural Psychology and Education, New York, NY.

2. Carter, R.T., Clauss, C.S., **Akinṣulurẹ, A.M.,** & Smailes, E.M. (1995, August). *The status of cross-cultural research in psychology: Committed or complacent?* Poster session presented at the Annual American Psychological Association Annual Convention, New York, NY.

1. Carter, R.T., **Akinṣulurẹ, A.M.**, Lee, D.Y., Ota Wang, V., Sicalides, E.I., & Smith, H.E. (1995, February). *A model for training racial-cultural competencies.* Workshop conducted at the Annual Winter Roundtable on Cross-Cultural Psychology and Education, Teachers College, Columbia University, New York, NY.

**<u>Symposia</u>**

10. **Akinṣulurẹ-Smith, A.M.**, Willhoite, A., Kaplan, J., Nolan, A., & Husssein, G. (2024, May). *The Problem of the Relief to Development Gap*. Panel discussion for Bridging the Humanitarian, Peacebuilding, and Humanitarian Nexus: Building Systems for Mental Health & Psychosocial Support (MHPSS) for Populations Affected by War, Forced Displacement, and Resettlement through an Implementation Science Lens. Boston College and Trinity College Symposium, Dublin, Ireland

9 Betancourt, T., Rabin, N., Fazel, M., & **Akinṣulurẹ-Smith, A.M.**, (2019, April). Top 10 lessons from working with forced migrants. *Approaching Migrant Communities from Trauma-Informed Yet Strengths-Based Approaches.* Symposium conducted at the Conference on Global Migration, Boston College, Boston, MA.

8. Lewis, G., **Akinṣulurẹ-Smith, A.M.**, de las Fuentes, C., Streets, B.F., Salton, W., & Carll, E. (2016, August). Top 10 lessons from working with forced migrants. In C.F. Auerbach (Chair), *World refugee trauma – Women, children, families, and social justice.* Symposium conducted at the American Psychological Association Annual Convention, Denver, CO.

7. Smith, H.E., **Akinṣulurẹ-Smith, A.M.**, & Porterfield, K., & Kilpatrick, D. (2016, August). Assessment and treatment of torture survivors: Integrative approaches to service provision. In D. Kilpatrick (Chair), *Assessment and treatment of torture survivors – One response to the Hoffman Report.* Symposium conducted at the American Psychological Association Annual Convention, Denver, CO.

6. Rasmussen, A., **Akinşulurẹ-Smith, A.M.,** Chu, T., & Keatley, E. (2010, May). Assessing family conflict in West African immigrant families. In D. Hinton (Chair), *Culturally sensitive assessment of psychologically distressed ethnic and non-English speaking populations*. Symposium conducted at the annual meeting of the American Psychiatric Association, New Orleans, LA.

5. **Akinşulurẹ-Smith, A.M.**, Betancourt, T.S., & Kia-Keating, M. (2009, August). Therapeutic interventions: Challenges and new directions. In K. Porterfield (Chair), *War-affected refugee youth in America – Challenges and new directions.* Symposium conducted at the American Psychological Association Annual Convention, Toronto, Ontario, Canada.

4. Annan, J, Betancourt, T, Rasmussen, A., & Borisova, I. (2007, November). In **A.M. Akinşulurẹ-Smith** (Chair), *War-affected women and girls in three African conflicts – Wives, mothers, soldiers.* Symposium conducted at the Annual Meeting of the International Society for Traumatic Stress Studies, Baltimore, MD.

3. **Akinşulurẹ-Smith, A.M.**, Rogers, J., & Smith, H. E. (2000, February). *A challenge to cross-cultural psychology: Considerations for psychotherapy with war traumatized African refugees – Is there a place at the table?* Symposium conducted at the Annual Teachers College Winter Roundtable on Cross-Cultural Psychology and Education, Teachers College, Columbia University, New York, NY.

2. **Akinşulurẹ-Smith, A.M.,** & Smith, H. E. (1997, February). Africans in America: Cultural and environmental considerations for psychotherapy. In E. van Harte (Chair), *Families and environmental influences in cross-cultural psychology and education*. Symposium conducted at the Annual Teachers College Winter Roundtable on Cross-Cultural Psychology and Education, Teachers College, Columbia University, New York, NY.

1. **Akinşulurẹ, A.M.**, Lee, D.Y., Ota Wang, V., Sicalides, E.I., & Smith, H.E. (1995, August). In R.T. Carter (Chair), *The evolution of a training model for racial-cultural competencies.* Symposium conducted at the American Psychological Association Annual Convention, New York, NY.

## Appendix A

**Qualifications of Evaluating Clinician**:

My qualifications to render an expert opinion in this case can be found in the attached curriculum vitae. To summarize, I earned a Bachelor of Arts (BA) with Honors in Psychology from the University of Western Ontario. From the Columbia University Teachers College, I earned a Master of Arts (MA), Master of Education (Ed.M.), and Master of Philosophy (M.Phil.), followed by a Doctor of Philosophy (Ph.D.) from Columbia University in Counseling Psychology. I am a Counseling Psychologist, licensed to practice in the State of New York (NYS License# 013405) and Board Certified in Group Psychology by the American Board of Professional Psychology (Diploma# 8540). My clinical, research, teaching, and advocacy experiences have focused on the areas of Trauma, Gender-Based Violence, and Forced Migrant/Refugee/Immigrant mental health.

From 1999-2024 I provided clinical treatment as a Senior Supervising Psychologist at the Bellevue Program for Survivors of Torture (PSOT) in New York City. The Bellevue Program for Survivors of Torture continues as the leading torture survivor and refugee trauma treatment and resource center in New York City. It is the first and only comprehensive treatment program for survivors of torture and refugee trauma in the New York metropolitan area. This unique program provides interdisciplinary care to victims of torture and other human rights abuses, traumatized forced migrants, and to their families.

As a tri-lingual Psychologist (English, Krio, and French) at PSOT, my responsibilities included providing trauma informed treatment to forced migrants (refugees, asylees, asylum seekers, and undocumented persons) who have experienced trauma, particularly torture, armed conflict, sexual violence, and other human rights abuses. My work included conducting forensic evaluations regarding asylum proceedings, providing consultation and training to healthcare, legal, and human rights agencies in the matters of interviewing and managing various posttraumatic psychological dysfunctions in trauma survivors from around the world. I was also an Assistant Clinical Professor in the Department of Psychiatry at the New York University School of Medicine. In addition to my clinical duties, I supervised and trained psychology interns and externs and psychiatry residents in the diagnosis and treatment of survivors of forced migration, gender-based violence, human rights abuses, armed conflict, torture, and trauma.

I am a Full Professor with Tenure in the Department of Psychology at City College of the City University of New York and at the Graduate Center of the City University of New York. I have been teaching for over 30 years and currently teach both graduate and undergraduate studies, including courses in Trauma and Resilience, Theories and Techniques of Counseling, Women and Violence, and Multicultural Issues in Counseling. In 2012, I completed a 4-year NIMH Fellowship during which I explored and documented HIV risk and protective factors, as well as issues pertaining to Female Genital Mutilation/Cutting among West African immigrants. I am a founding member of the West African Families Project, a multi-site community research collaboration committed to developing psychosocial supports for West African immigrants in

New York City. My research highlights the role of disciplinary practices among West African families, intimate partner conflict, and the significance of community within this immigrant population. Internationally, my research has developed and examined mental health interventions in Sierra Leone and Nigeria.

In addition to my teaching, clinical work, and research, I am the recipient of several grants, including a 2014-2015 Fulbright Africa Regional Research Program award and a research study funded by the National Institutes of Health to examine FGM/C among female African immigrants and service providers in the United States. Drawing on my considerable experiences providing therapeutic services to diverse populations and my ongoing research projects, I have provided local, national and international trainings and written extensively on topics such as the impact on compassion fatigue among service providers, service provision to and mental health challenges facing forced migrants.

From 2008-2010, I served on the American Psychological Association's Task Force on the Psychological Effect of War on Children and Families who are refugees from armed conflicts residing in the United States (PEWCF). In addition to my community service, research, teaching and scholarly publications, I participated in human rights investigations in Sierra Leone with Physicians for Human Rights and the United Nations Mission in Sierra Leone, Human Rights Division.

I have served as a joint expert on gender crimes and Post Traumatic Stress Disorder in a case before the International Criminal Court in The Hague. Currently I conduct forensic evaluations, human rights consultations, and mitigation services to private firms and public entities with attorneys on cases involving human rights, torture, trauma, and maltreatment.

My qualifications and publications in the past ten years are further set forth in my *curriculum vitae*, attached and incorporated by reference. My research has appeared in high impact, peer-reviewed scholarly publications such as *Journal of Immigrant and Refugee Studies, Professional Psychology: Research and Practice, Journal of Child and Family Studies, Human Development, PLOS, Journal of Immigrant & Minority Health, American Journal of Community Psychology, Journal of Aggression, Maltreatment & Trauma, and Journal of Traumatic Stress.*